**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: HONORABLE STEPHEN ALEXANDER VADEN, JUDGE**

| | |
|---|---|
| _____ ) | |
| **UNITED STATES OF AMERICA** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Court No. 20-03628** |
| ) | |
| **AEGIS SECURITY INSURANCE CO.,** ) | |
| ) | |
| **Defendant.** ) | |
| _____) | |

**[PROPOSED] MEMORANDUM OF *AMICI* CURIAE**

Paul C. Rosenthal
Michael J. Coursey
Cameron R. Argetsinger
KELLEY DRYE & WARREN, LLP
3050 K Street, N.W., Suite 400
Washington, D.C. 20007
(202) 342-8400

*Counsel to Amici Curiae*

Louis S. Mastriani
ADDUCI, MASTRIANI & SCHAUMBERG, L.L.P.
1133 Connecticut Ave., N.W.
Washington, DC 20036
(202) 467-6300

*Co-Counsel to Amici Curiae Bayou Land Seafood, LLC and Catahoula Crawfish, Inc.*

# TABLE OF CONTENTS

**Page**

I.   THE SURETY INDUSTRY'S ROLE IN ABETTING THE NEW SHIPPER BOND DISASTER UNDERMINES SURETY AMICI'S PUBLIC POLICY ARGUMENTS FOR SETTING ENTRY LIQUIDATION AS THE LIMITATIONS-PERIOD'S START DATE ...........................7

    A.   CUSTOMS BONDS PLAY A CRUCIAL ROLE IN THE ENFORCEMENT OF AD ORDERS ....................................................7

        1.   A Customs Bond's Major Purpose Is to Transfer the Risk that an Importer Will Not Pay the Amount It Owes on the Secured Entry From Customs to the Issuing Surety ...........................................................7

        2.   SEBs Like New Shipper Bonds Are Required by Law on Entries Where the Risk of the Importer's Breach of Its Payment Obligations Is High ...........................................................................................................8

    B.   THE ILL-FATED "NEW SHIPPER" BONDS ..........................................8

        1.   Basic Procedures For Assessing and Collecting AD Duties.......................8

        2.   "China-Wide" Duty Deposit Rates .............................................................9

        3.   "New Shipper" Administrative Reviews and the New Shipper Bonding Option Were Added to the AD Law in 1995 .............................10

        4.   The Sureties' Failure to Follow Established Underwriting Rules Allowed "Shell" Importers to Use New Shipper Bonds to Fraudulently Circumvent the Four Orders ...................................................................10

        5.   The Sureties and Congress Failed to Heed The Domestic Producers' Early Warnings of Damage and Risks Posed by the New Shipper Bonds ......................................................................................................12

        6.   In 2003, Several Sureties Told Congress They Faced Substantial Liability for New Shipper Bonds..............................................................................13

        7.   Congress Finally Suspended the New Shipper Bonding Option in August 2006 ............................................................................................14

    C.   THE SURETY INDUSTRY'S RESPONSE TO CUSTOMS' COLLECTION EFFORTS ................................................................15

        1.   Hartford Fire Insurance Co. ....................................................................15

        2.   Government Collection Actions Against Multiple Sureties ......................16

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*United States v. Am. Home Assurance Co.*,
    151 F. Supp. 3d 1328 (Ct. Int'l Trade 2016), *appeal filed* (Fed. Cir. May 14,
    2018) .................................................................................................................... 2

*United States v. Great Am. Ins. Co. of New York*,
    791 F. Supp. 2d 1337 (Ct. Int'l Trade 2011), *rev'd in part*, 738 F.3d 1320
    (Fed. Cir. 2013) ................................................................................................... 2

*United States v. Int'l Fidelity Ins. Co.*,
    273 F. Supp. 3d 1170 (Ct. Int'l Trade 2017) ....................................................... 2

**Statutes**

19 U.S.C. § 1504(d) ...................................................................................................... 2

19 U.S.C. § 1505(a) ...................................................................................................... 9

19 U.S.C. §§ 1673e(a)(3), 1673g(a) .............................................................................. 9

19 U.S.C. §§ 1673e(a)(3), 1675(a)(1) .......................................................................... 10

19 U.S.C. §§ 1675(a)(1)(B), (2)(A), (2)(C) ..................................................................... 9

19 U.S.C. §§ 1675(a)(1)(B), (a)(2)(A) ........................................................................... 9

19 U.S.C. § 1675(a)(2)(B) ........................................................................................... 10

19 U.S.C. § 1675(a)(2)(B)(iii) ...................................................................................... 10

19 U.S.C. § 1675c(a) ..................................................................................................... 6

28 U.S.C. § 1215(a) ...................................................................................................... 2

*28 U.S.C. §§ 1581(a) and (i)* ...................................................................................... 16

28 U.S.C. § 1582 .......................................................................................................... 8

28 U.S.C. § 2415(a) ................................................................................................... 2, 3

31 U.S.C. §§ 9301-09 .................................................................................................... 7

Pub. L. No. 109-280, § 1632(a) ................................................................................... 14

Pub. Law 103-465 ....................................................................................................... 10

198 Stat. 4857, 4930 Part 4, § 283(c) ........................................................10

Trade Facilitation and Trade Enforcement Act of 2015, Pub. L. 114-125 (Feb. 24, 2016) ........................................................................................................15

**Other Authorities**

19 C.F.R. § 113.37 .......................................................................................7

19 C.F.R. §§ 351.211(a), (b)(2) ..................................................................9

19 C.F.R. §§ 351.213(a), (b)(2) ..................................................................9

31 C.F.R. Part 223 ........................................................................................3

31 C.F.R. § 223.11 .......................................................................................7

*Antidumping Duty Order: Fresh Garlic From the People's Republic of China*, 59 Fed. Reg. 59,209 (Dep't Commerce Nov. 16, 1994) (Garlic Order) .........................1

*Notice of Amendment of Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order: Certain Preserved Mushrooms From the People's Republic of China*, 64 Fed. Reg. 8308 (Dep't Commerce Feb. 19, 1999) (Mushroom Order) ................................................................................1

*Notice of Amendment to Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order: Freshwater Crawfish Tail Meat From the People's Republic of China*, 62 Fed. Reg. 48,218 (Dep't Commerce Sept. 15, 1997) (Crawfish Order) .....................................................................................1

*Notice of Amended Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order; Honey From the People's Republic of China*, 66 Fed. Reg. 63,670 (Dep't Commerce Dec. 10, 2001) (Honey Order) .......................1

*U.S. Customs and Border Protection CDSOA Annual Report for Fiscal Year (FY) 2003*, Section III: FY 2003 ......................................................................14

## **INTRODUCTION**

Each of the entities listed in Exhibit 1 hereto is a domestic producer protected by one of the antidumping (AD) orders listed below on four agricultural imports from the People's Republic of China (China) (Four Orders).[1]  These producers respectfully submit this brief as *amici curiae* (Domestic Producer *Amici*) in support of the motion for summary judgment filed by Plaintiff United States (Government) (MSJ Memo) (ECF No. 14) (Jan. 29, 2021).

The Government in this action seeks performance from defendant Aegis Security Insurance Co. ("Aegis") on a continuous entry bond (CEB) it issued to secure the payment of antidumping AD duties on five entries of fresh garlic imported from China.  While the parties generally agree on the material facts at issue, they disagree on whether the Government filed its October 2, 2020 complaint within six years of date on which its claims against the surety "accrued" under 28 U.S.C. § 2415(a) (Sec. 2415(a)).[2]

Aegis asserts that the Government's claim accrued under its bond when the entries it secured became liquidated as a matter of law (deemed liquidated) under 19 U.S.C. § 1504(d), which was approximately 14 years before the complaint was filed.  But neither Sec. 2415(a) nor

---

[1] *See Antidumping Duty Order: Fresh Garlic From the People's Republic of China*, 59 Fed. Reg. 59,209 (Dep't Commerce Nov. 16, 1994) (Garlic Order); *Notice of Amendment to Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order: Freshwater Crawfish Tail Meat From the People's Republic of China*, 62 Fed. Reg. 48,218 (Dep't Commerce Sept. 15, 1997) (Crawfish Order); *Notice of Amendment of Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order: Certain Preserved Mushrooms From the People's Republic of China*, 64 Fed. Reg. 8308 (Dep't Commerce Feb. 19, 1999) (Mushroom Order); *Notice of Amended Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order; Honey From the People's Republic of China*, 66 Fed. Reg. 63,670 (Dep't Commerce Dec. 10, 2001) (Honey Order).

[2] "[E]very action for money damages brought by the United States . . . which is founded upon a contract" – including a customs bond – "shall  be barred unless the complaint  is filed within six years after the right of action *accrues* . . . ." 28 U.S.C. § 1215(a) (emphasis added).

any other statute or regulation suggests that the date of a bond-secured entry's deemed or actual liquidation triggers the start of the six-year limitations period for the Government's claim under the bond.  Further, the three decisions of this Court cited by Aegis that adopted this view did so without any legal analysis of this issue.[3]

The Government argues that its claims against Aegis accrued 30 days after Customs' initial demand, following the bond's importer/principal's failure to pay the amounts billed on the entries, for Aegis's payment under the bond without the surety's compliance, which for each of the entries was on or after October 3, 2014, less than six years before the complaint's October 2, 2020 filing date (ECF No. 3).[4]

Domestic Producer *Amici* agree with the Government on this issue, and so will not repeat its argument here. Nevertheless, Domestic Producer *Amici* have asked to participate in this lawsuit to provide the Court with much-needed perspective for the public policy arguments in support of Aegis's position recently submitted by five surety trade associations (Surety *Amici*).[5] *See* Motion for Leave to File Out Of Time a Brief as *Amici Curiae* (ECF No. 28) (May 14, 2021)

---

[3] *See United States v. Great Am. Ins. Co. of New York*, 791 F. Supp. 2d 1337, 1344 (Ct. Int'l Trade 2011), *rev'd in part*, 738 F.3d 1320 (Fed. Cir. 2013); *United States v. Am. Home Assurance Co*., 151 F. Supp. 3d 1328, 1342–43 (Ct. Int'l Trade 2016), *appeal filed* (Fed. Cir. May 14, 2018); *United States v. Int'l Fidelity Ins. Co*., 273 F. Supp. 3d 1170, 1177 (Ct. Int'l Trade 2017).

[4] As the Government explains in its memorandum in support of its summary judgment motion, the limitations period of § 2415(a) does not begin to run at the time of liquidation, deemed or otherwise. *See* MSJ Memo at 13-26.  Instead, it begins at the time the customs bond is breached, which cannot occur until Customs makes a demand for payment under the bond.  *Id.*  Because the Government's lawsuit was filed less than six years after Customs made its initial demands on Aegis and the importer, its claims are timely.

[5] The Surety *Amici* are: the Customs Surety Coalition ("CSC"); the International Trade Surety Association ("ITSA"); the National Association of Surety Bond Producers, Inc. ("NASBP"); the Surety & Fidelity Association of America ("SFAA"); and the Customs Surety Association ("CSA").

(Surety *Amici* Mot.).  The four members of the lead association, the Customs Surety Coalition (CSC), are themselves each a trade association consisting of companies engaged in the surety bond industry.  CSC states that its four members' members collectively "represent the U.S. Treasury certified[6] surety companies (and their agents) responsible for the vast majority of surety bonds on file with CBP."  *Id.* at 5.  In explaining why the Surety *Amici* are qualified to advise the Court on the limitations-period start-date issue,  CSC states that the sureties it represents

> have decades of experience in working under and developing the laws, regulations and policies which govern the custom[s] surety process, *balancing their obligations of financial responsibility with the needs of the government to collect revenue and enforce laws at our borders*, while providing all importers with the ability to facilitate trade while the government's obligations are secured.

*Id.* at 3 (emphasis added).  CSC further states that it  "has at least three meetings annually with CBP and many conference calls" that cover a wide range of listed topics, the first of which concerns "[*s*]*afeguarding revenue* and *improving compliance*" with "Customs surety bond programs."  *Id.* at 6 (emphasis added).

The Surety *Amici* support Aegis's *legal* argument that Customs' claim for performance under a surety bond accrues at the time the bonded entry becomes deemed or actually liquidated. *See Amicus* Curiae Brief (ECF No. 38) (May 20, 2021) (Surety *Amici* Br.) at 2-6; *see also* Aegis's Reply in Support of its Motion for Judgment on the Pleadings and Response to Plaintiff's Motion for Summary Judgment (ECF No. 23) (April 2, 2021) (Aegis Reply) at 4-9. They also claim that Aegis's position is supported by *public policy* considerations.  Surety *Amici* Br. at 5-8, 12-13.  They object to the Government's view of the limitations-period's start date,

---

[6] *See* 31 C.F.R. Part 223 (Surety Companies Doing Business with the United States); U.S. Department of Treasury, Dept. Circular 570 (list of companies holding certificates of authority as acceptable sureties on federal bonds and as acceptable reinsuring companies), *available at* https://www.fiscal.treasury.gov/surety-bonds/list-certified-companies.html.

claiming that it "introduce[s] uncontrollable and unpredictable exposure for the sureties which would fundamentally impair the functioning of the customs surety process relied upon by both the trade and the federal government."  Surety *Amici* Mot. at 5; *see also id.* at 12-13.  They also claim that tying a bond's statute of limitations start date to Customs' issuance of a bill on the secured entry is "contrary to the entire bonding scheme which demands responsible action by the Government and permits the Government to control the date the statute of limitations begins to run."  *Id.* at 8.  They nevertheless fail to square their concerns with the plain statutory language at issue.

Further, the Surety *Amici*'s public policy arguments ring hollow considering that the surety industry's irresponsible conduct caused a colossal disruption in Customs' enforcement of the AD orders on the agricultural imports from China covered by the Four Orders, by allowing huge volumes of those goods to flood the U.S. market from 1998 through 2006. That conduct imposed grave and ongoing injury on the competing domestic producers, including the Domestic Producer *Amici*.

In sum, over this period, eight major bond sureties issued about 8,000 single-entry bonds (SEBs) (referred to as "new shipper" bonds) on 8,000 entries of imports covered by the Four Orders, with a total face value of $627 million (and an average face value of $78,000), to secure the ultimate payment of the same amount AD duties assessed on those entries.[7]  The sureties issued those bonds on behalf of "shell" companies that posed as legitimate U.S. importers, *without performing* the standard underwriting required to confirm that those companies were credit-worthy, or obtaining full collateral against each bond's value as was then, and still is generally required for SEBs, which have long been considered high-risk credit instruments.

---

[7] *See* Ex. 2 (*Major Surety Issuers of New Shipper Bonds, 1998-2006*).

Those sureties essentially made these bonds available over the eight-year period to any importer that was willing to pay the standard 1 to 1.5 percent bond premium.

Under the cover of the NS bonds, the bogus importers imported huge volumes of the four agricultural products covered by the Four Orders, and sold them in the United States at steeply dumped (*i.e.*, below-cost) prices.  The U.S. Commerce Department (Commerce) eventually instructed Customs on an ongoing basis to liquidate the entries secured by the NS bonds near, at or above the bonds' face values. When Customs billed the importers for the duties, they had disappeared and never responded.  When Customs then demanded payment from the sureties under their bonds, they collectively engaged in major evasive action to prevent Customs from recovering any of the unpaid AD duties secured by the bonds.  Of the eight major sureties that facilitated this fraudulent evasion of AD duties under the Four Orders, five remain in business, are members of one or more of the *Amici* surety trade associations, and remain on the Treasury Department's list of surety companies approved to provide financial instruments including customs bonds.  *See* Ex. 2. The other three sureties have been dissolved, or are subject to dissolution, under state insurance proceedings.  *Id.*

Domestic Producer *Amici* provide further detail on this matter below.

### DOMESTIC PRODUCER *AMICI*'S INTEREST IN THE PROCEEDING

As explained in Domestic Producer *Amici*'s motion for leave to file this brief, their interest in this case arises from the fact that the Aegis bond at issue secures AD duties that are subject to an AD order on merchandise from China, *i.e.*, the Garlic Order.  Each of the Domestic Producer *Amici* – with the exception of American Honey Producers Association (AHPA), which is a trade association consisting of domestic producers under the Honey Order – is a domestic producer under one of the Four Orders, and each has an interest in seeing the effective

enforcement of all AD orders, including the Garlic Order.

In addition, as explained in Domestic Producer *Amici*'s motion for leave, the funds the Government seeks to recover in this action are subject to distribution by Customs under the Continued Dumping and Subsidy Offset Act of 2000 ("CDSOA").   19 U.S.C. § 1675c(a) (repealed, subject to savings provision).  Each of the Domestic Producer *Amici* qualifies as an "affected domestic producer" (ADP) under the CDSOA, including the AHPA, which, with Sioux Honey Association (SHA) (a cooperative under Iowa law whose 200 member/owners are domestic producers under the Honey Order), petitioned the Government in 2000 on behalf of their members for the imposition of that Honey Order.  Domestic Producer *Amici* Christopher Ranch LLC and The Garlic Company are ADPs under the Garlic Order and therefore would be entitled to a *pro rata* share of any funds that the Government recovers from Aegis in this action. Therefore, Domestic Producer *Amici* have a substantial interest in seeing that the statute of limitations not be misapplied in this case or in any case involving the Government's collection of AD duties distributable under the CDSOA.

Domestic Producer *Amici* sought leave to participate in this case to assist the Court in understanding how the Surety *Amici*'s public policy arguments do not square with the surety industry's conduct in undermining Customs' collection of AD/CV duties and enforcement of the AD/CV laws through its unrestrained issuance of new shipper bonds to high-risk importers and refusal to honor its payment obligations on those bonds.

## ARGUMENT

I. **THE SURETY INDUSTRY'S ROLE IN ABETTING THE NEW SHIPPER BOND DISASTER UNDERMINES SURETY *AMICI*'S PUBLIC POLICY ARGUMENTS FOR SETTING ENTRY LIQUIDATION AS THE LIMITATIONS-PERIOD'S START DATE**

### A. **Customs Bonds Play a Crucial Role in the Enforcement of AD Orders**

#### 1. **A Customs Bond's Major Purpose Is to Transfer the Risk that an Importer Will Not Pay the Amount It Owes on the Secured Entry *From* Customs *to* the Issuing Surety**

A customs bond is a three-party contract that is issued by an established U.S. insurance company, referred to in this context as the bond's "surety," that has been approved by the U.S. Treasury Department ("Treasury") to issue surety bonds, including customs bonds, for use in transactions involving the U.S. Government.[8]  The bond is issued on behalf of an importer, referred to as the bond "principal," which pays the surety a premium for issuing the bond. Customs is the bond's identified "beneficiary,"  and the surety, as the bond's issuer, is the "guarantor" of the importer/principal.

Through the bond, the surety promises that if the importer fails to keep its specified obligations on specified entries, the surety will pay Customs a sum of money up to the bond's face value.  If and when the surety pays Customs under the bond, it is subrogated, up to the amount paid under the bond, to Customs' former right to seek payment of that amount from the importer, and is authorized to file a collections lawsuit against the importer in this Court under 28 U.S.C. § 1582.

Thus, a customs bond is intended to transfer the risk that an importer will not fulfill its obligations to Customs on a specific entry *from* Customs *to* the surety.

---

[8] *See* 31 U.S.C. §§ 9301-09; 31 C.F.R. § 223.11; 19 C.F.R. § 113.37.

    2.    **SEBs Like New Shipper Bonds Are Required by Law on Entries Where the Risk of the Importer's Breach of Its Payment Obligations Is High**

There are two types of customs bonds.  A *continuous bond* is a relatively low-value bond that typically covers all of the entries made by the importer that is the bond's principal for a one year period.  Customs generally requires every commercial importer to maintain a continuous bond with a face value equal to the higher of $50,000 or 10 percent of the total amount of taxes, fees and duties the importer paid Customs during the most recent year.  Should the an importer become insolvent during the bond's pendency, Customs can demand payment from the bond's surety, and apply its proceeds to any amount owed Customs by the importer, up to the bond's value.  While Customs can apply proceeds from a continuous bond to recover assessed but uncollected AD duties, in such cases the amount of unpaid duties owed by the defaulting importer far exceeds the face value of its continuous bond.

The second type of customs bond is the *single-entry bond* (SEB).  For entries where the risk that an importer will default on paying the amount Customs eventually bills it on an entry is high, the importer often will be required by law to post, in addition to its standard continuous bond, an SEB with a face value that is high enough to cover the heightened risk.  For example, for some food-related imports that present a high risk of spoilage or contamination, Customs, in conjunction with the U.S. Food and Drug Administration, requires an importer to post an SEB of up to three times the entry's value.

    B.    **The Ill-Fated "New Shipper" Bonds**

    1.    **Basic Procedures For Assessing and Collecting AD Duties**

Final AD duties are not billed and collected at the time imports subject to an AD order are entered.  Rather, over the two or more years following entry, Commerce will determine the rate at which the imports were dumped, which is referred to as the "assessment" rate, and

typically is expressed *ad valorem*, i.e., as a percentage of the imported goods' declared value.[9] Commerce will then instruct Customs to (1) determine, in the course of liquidating the entry, the amount of final AD duties owed on it by multiplying the entry's value by the assessment rate; and (2) bill the importer for the amount of those duties not covered by the entry's "cash deposit, discussed nest.[10]

Upon the arrival of an entry of imports that are subject to an AD order, the entry's importer must post with Customs a specific amount of collateral – typically in cash – against the importer's potential failure to pay the final AD duties billed by Customs upon the entry's liquidation.[11]  The amount of this "cash deposit" is determined by multiplying the declared value of the merchandise times the relevant exporter's "deposit rate," which is the rate (also expressed *ad valorem*, as a percent) at which Commerce has most recently determined the exporter dumped earlier imports into this country.[12]

## 2.    "China-Wide" Duty Deposit Rates

New entries from an exporter in a non-market economy country like China that has not been reviewed by Commerce, and thus has not yet been assigned its own deposit rate, will be subject to the so-called "country-" or "China-wide" deposit rate, which typically is substantially higher than the deposit rates assigned to exporters that have successfully been reviewed by Commerce.  Entries from exporters that have not previously shipped to the U.S. market – so-called "new shippers" – are subject to the China-wide deposit rate.

---

[9] 19 U.S.C. §§ 1675(a)(1)(B), (a)(2)(A); 19 C.F.R. §§ 351.213(a), (b)(2).

[10] 19 U.S.C. §§ 1675(a)(1)(B), (2)(A), (2)(C).

[11] *See* 19 U.S.C. §§ 1673e(a)(3), 1673g(a)(collateral required on entry); 19 U.S.C. § 1505(a); 19 C.F.R. §§ 351.211(a), (b)(2)(collateral typically must be in cash form).

[12] 19 U.S.C. §§ 1673e(a)(3), 1675(a)(1).

### 3. "New Shipper" Administrative Reviews and the New Shipper Bonding Option Were Added to the AD Law in 1995

In 1995 the AD law was amended to allow new shipper exporters to obtain their own deposit rates by participating in a "new shipper" administrative review of the relevant AD order, based on Commerce's analysis of the exporter's U.S. shipments made over the most recent six-to twelve-month period.[13]  During the year or more it takes Commerce to complete a new shipper review, new entries from the participating exporters continue to be subject to the China-wide deposit rate.  The amended law, however, allowed an importer to satisfy the duty deposit requirement on such entries by posting a SEB with a face value equal to the amount of the cash deposit that otherwise would be required.[14]  Such bonds are known as "new shipper" bonds, and the importers' ability to use such bonds was known as the "new shipper bonding option."

For an entry covered by a new shipper bond, if the importer on whose behalf the bond was issued failed to pay the amount of final AD duties assessed and billed by Customs, the surety that issued the bond is required to pay the duties up to the bond's face value.  Once it does so, the surety becomes subrogated to Customs' right to sue the importer for repayment.

### 4. The Sureties' Failure to Follow Established Underwriting Rules Allowed "Shell" Importers to Use New Shipper Bonds to Fraudulently Circumvent the Four Orders

The new shipper review procedure and the new shipper bonding option became available

---

[13] *See* Pub. Law 103-465 of Dec. 8, 1994, Title II, Subtitle A, § 220(a), Subtitle B, Part 4, § 283(c), 198 Stat. 4857, 4930 (codified as amended at 19 U.S.C. § 1675(a)(2)(B)).

[14] 19 U.S.C. § 1675(a)(2)(B)(iii).  Under a 1985 memorandum of understanding between Customs and Commerce, Customs is required to obtain an SEB on any entry subject to an AD Order, and for which a bond can be used in lieu of cash to meet the duty deposit requirement, if the applicable AD duty deposit rate is five percent *ad valorem* or higher.  <u>See</u> T.D. 85-145, published at 19 Cust. B. & Dec. 331 (the "Commerce/Customs MOU"), *available at* http://www.cbp.gov/linkhandler/cgov/trade/priority_trade/revenue/bonds/accept_cash.ctt/accept_cash.doc.

on January 1, 1995.  While many new shipper reviews were conducted under various AD orders over the next three years, few if any of the exporters and importers involved made use of the new shipper bonding option.  The reason was that, then as now, sureties generally considered the SEB required for this option to be a high-risk instrument, and under the still-prevailing bond underwriting standards only issued such bonds on behalf of importers the surety determined were highly creditworthy and/or which deposited with the surety collateral equal to the bond's face value.  As a result, relatively few entries were made from exporters that were undergoing a new shipper review through 1997.

Then, some dishonest Chinese exporters and U.S. importers discovered that a number of sureties were willing to issue new shipper bonds on behalf of importers entering merchandise from exporters that were undergoing new shipper reviews under the Four Orders without first determining that the importers were creditworthy and/or requiring them to deposit collateral with the sureties equal to the high face value of the bonds, which was about two to four times the value of the secured imports.[15]  The sureties only required that the importers pay the relatively small premium for issuing the bonds (1 to 1.5 percent of the bond's value).  These importers used these new shipper bonds to enter huge volumes of the agricultural imports covered by the Four Orders into the United States, and to sell them here at steeply dumped prices, as if the Four Orders -- and the substantial protection the orders otherwise would have provided the domestic producers -- did not exist.

Commerce initiated its first two new shipper reviews under the Four Orders on May 8, 1998, under the Crawfish Order.  *See* Exhibit 3 (*107 "New Shipper" Administrative Reviews*

---

[15] During this period, the China-wide deposit rates under the Four Orders ranged from 183.80 percent (for the China honey AD order) to 376.67 percent (for the China fresh garlic AD order).

*under the Four Orders*, first two entries under the Crawfish Order).  Between that date and August 2006, when Congress finally suspended the new shipper bonding option, Commerce initiated and conducted 107 new shipper reviews under the Four Orders.  *Id.*  Huge amounts of the covered exports were entered from the participating exporters during these new shipper reviews, and were sold at steeply dumped prices in the U.S. market.

Based on Customs' August 8, 2013 letter to Congress, Customs over this eight-year period accepted 8,000 new shipper bonds on 8,000 entries of imports from Chinese exporters that were undergoing NSRs under the Four Orders, with a combined face value of $627,739,667.00, for an average of about $78,000 per bond.[16]  These imports had an ongoing devastating impact on the domestic producers that were supposed to be protected from such imports by the Four Orders.  Had the importers been required to post cash deposits instead of bonds, none of these imports would have been entered, and all of the injury caused by the imports would not have occurred.  That is because the importers would have been required to post cash deposits equal to the value of the new shipper bonds, which the importers, being shell companies with no significant assets, could not have done.

> 5.   **The Sureties and Congress Failed to Heed The Domestic Producers' Early Warnings of Damage and Risks Posed by the New Shipper Bonds**

The four domestic industries that were being devastated by the crush of imports from exporters undergoing new shipper reviews at first took little action, thinking the sureties would soon discover they were courting an enormous risk in continuing to issue the new shipper bonds. Then on September 26, 2002, the domestic producers sent a nine-page memorandum to one of

---

[16] *See* <u>Exhibit 4</u> (Aug. 8, 2013 letter from Michael Yeager, Assistant Commissioner, Customs to Hon. Charles Boustany Jr.).

the two national surety trade associations – the Surety Association of America – that detailed the high risk the new shipper bonds posed to the sureties, and the immense damage they were inflicting on the domestic producers.[17]  The association and its members ignored that warning.

In the spring of 2003, the domestic producers initiated what turned out to be a three-year campaign to convince Congress to stop the huge damage being wrought by the new shipper bonding option by quickly repealing it, but the campaign was stymied by the reasonable disbelief of key Members and their staffs that the sureties could actually be issuing such risky bonds on behalf of brand new importers with neither assets nor established credit history, contrary to what had to be established under longstanding underwriting guidelines and simple common sense.

### 6.    In 2003, Several Sureties Told Congress They Faced Substantial Liability for New Shipper Bonds

By the fall of 2003, several sureties had become aware that Customs was assessing huge amounts of AD duties on imports secured by new shipper bonds they had issued, as is evidenced by testimony given on behalf of a second national surety trade association, the American Surety Association (ASA), at an October 30, 2003 hearing held by the House Ways & Means Committee.[18]  The ASA therein reported that several major sureties had issued many new shipper bonds to "shell" importers, and faced substantial current liability for unpaid AD duties that Customs had already billed on entries secured by their bonds, and substantial future liability for the duties that would be billed on as yet unliquidated entries.  That potential future liability was confirmed by Customs' report in early 2004 that, as of Oct. 1, 2003, it was holding *$236*

---

[17] *See* Exhibit 5 (Sept. 26, 2002 letter from Michael Coursey to Seth Mones, Vice President, Public Affairs and Government Relations, the Surety Association of America).

[18] *See* Ways and Means, *United States-China Relations and China's Role in the Global Economy*, 108th Cong. (2003) (Statement of the Customs Bond Committee of the American Surety Association) ("ASA Statement"), *available at* https://www.gpo.gov/fdsys/pkg/CHRG-108hhrg92208/pdf/CHRG-108hhrg92208.pdf.

*million* in new shipper bonds on *unliquidated* entries under the Four Orders.[19]

### 7.   Congress Finally Suspended the New Shipper Bonding Option in August 2006

As rumors circulated in early 2006 that Congress would repeal or suspend the new shipper bonding option by Labor Day, the amount of imports arriving from the 27 exporters that were then undergoing new shipper reviews under the Four Orders peaked.  By legislation enacted on August 17, 2006, Congress (1) suspended the new shipper bonding option retroactively from April 1, 2006 through June 30, 2009; and (2) instructed Customs to return to the U.S. importers all new shipper bonds it accepted on imports that arrived on or after April 1, and to obtain from those exporters the equivalent cash deposits in place of the bonds.[20]

Almost overnight, Congress' suspension of the new shipper bonding option restored the Four Orders' ability to protect the domestic producers from ongoing injurious dumping. According to the GAO, importers had posted $96 million in new shipper bonds on new entries from April 1, 2006 to the bonding option's suspension in August – an amount that would equal $256 million on an annualized basis.[21]  In response to Customs' demand that these importers replace these bonds with cash deposits, the agency received less than $100,000 – or 0.10 percent of the $96 million in bonds.[22]

Although the suspension of the new shipper bonding option was lifted on June 30, 2009,

---

[19] *See U.S. Customs and Border Protection CDSOA Annual Report for Fiscal Year (FY) 2003*, Section III: FY 2003 Clearing Account Balances as of October 1, 2003, *available at* https://www.cbp.gov/trade/priority-issues/adcvd/continued-dumping-and-subsidy-offset-act-cdsoa-2000.

[20] *See* Pub. L. No. 109-280, § 1632(a).

[21] *See Antidumping and Countervailing Duties: Congress and the Agencies Should Take Additional Steps to Reduce Substantial Shortfalls in Duty Collection*, GAO Rept. No. 08-391 (Mar. 2008) at 25, n.52, *available at* https://www.gao.gov/assets/gao-08-391.pdf.

[22] *Id.*

no surety was known on or after that date to issue a new shipper bond, as all sureties were again issuing SEBs only on behalf of importers they determined were creditworthy and that posted equivalent collateral with the surety for the bond. Congress finally repealed the defunct new shipper bonding option from the AD law in March 2016. *See* Trade Facilitation and Trade Enforcement Act of 2015, Pub. L. 114-125 (Feb. 24, 2016).

### C.   The Surety Industry's Response to Customs' Collection Efforts

The surety industry issued more than $627 million in NS bonds under the Four Orders alone between 1998, when the first NS review was initiated under the Crawfish Order, and 2006, when Congress suspended the practice. *See* Ex. 4. When the predictable wave of importer defaults followed, the sureties that issued new shipper bonds could not contest their obligation to pay Customs based on the misfeasance of the importers. Indeed, importer misfeasance was the very risk that the sureties assumed when they sold the bonds. Nonetheless, most of the sureties resisted Customs' demands for payment under the new shipper bonds that they had issued. Each of the sureties discussed below is – or was before becoming insolvent – a member of The Surety & Fidelity Association of America, one of the five Surety *Amici* in this case. *See* Exhibit 6 (*Surety & Fidelity Association of America Membership List*).

### 1.   Hartford Fire Insurance Co.

Hartford Fire Insurance Co. ("Hartford") chose to challenge its liability to Customs on a bond-by-bond basis, filing 387 lawsuits (including 303 involving entries under the Four Orders) at the CIT between 2006 and 2017 in which Hartford contested its liability under dozens of different legal theories. *See* Exhibit 7 (*Hartford Lawsuits Filed at the CIT under 28 U.S.C. §§ 1581(a) and (i) to Avoid Liability for AD Duties under Customs Bonds*). During that span, Hartford was this Court's most prolific litigant by a wide margin, filing more than twice the number of lawsuits as the United States, the second-most prolific litigant during that period, filed

15

on all matters.[23]

Virtually all of Hartford's lawsuits bear the hallmarks of the Chinese new shipper scheme described by the American Surety Association in 2003. *First*, almost all involve bonds that Hartford issued prior to the Congress' suspension of the new shipper bonding option in August 2006, which discontinued the use of single-entry bonds to secure AD duties. *See* Ex. 7. *Second*, the vast majority of Hartford's cases (*i.e.*, 76%) involve bonds securing entries under one of the Four Orders, *i.e.*, the products that account for most of the abuses of the Chinese new shipper scheme. *Id.* *Third*, in every single one of Hartford's cases, the importer failed to pay the duties at issue and Hartford became liable on the importer's default.

Thus, Hartford had reason to know of the extreme risk of underwriting new shipper bonds on Chinese imports, which had been public knowledge since at least 2003. *See* the American Surety Association's October 2003 Statement cited at footnote 18, *supra*. In spite of this risk, Hartford continued to sell new shipper bonds, in vast quantities, right up until the new shipper bonding option was suspended on August 17, 2006. Indeed, in at least 371 of Hartford's 387 lawsuits, Hartford would have sold the new shipper bonds at issue *after* the ASA's October 2003 testimony describing the Chinese new shipper scheme. *Id.*[24]

### 2.   Government Collection Actions Against Multiple Sureties

In contrast to Hartford, which sued the Government to contest its bond obligations, each other surety known to have issued a new shipper bond simply waited for the Government to sue them before the running of the six-year limitations period. This was the case even for the few

---

[23] According to the Court's Electronic Case Filing ("ECF") system, the United States filed 146 lawsuits during that time period. The third most-prolific litigant, DSM Nutritional Products, Inc., filed 65 lawsuits.

[24] *See* footnote 18, *supra*.

occasions where these sureties filed a protest against Customs demand for payment. Between 2009 and 2013, the Government filed 31 lawsuits against six sureties[25] seeking to enforce 798 new shipper bonds that secured nearly $83 million in AD duties owed under the Four Orders. *See* Exhibit 8 (*DOJ Collection Actions Against Customs Bond Sureties to Recover Under Single-Entry Bonds, 2009-13*). Like Hartford, these sureties raised numerous different defenses to liability under the new shipper bonds that they had issued. With few exceptions, the courts rejected every one of these asserted defenses, and the Government ultimately prevailed or received a settlement payment in all but three of the collection actions that have concluded to date.[26]

*    *    *

As explained above, the applicable law is clear that Customs' cause of action against a surety on a customs bond does not accrue – and the six-year limitations period does not begin to run – until Customs makes a demand for payment. Further, the Surety *Amici*'s appeal to public policy as a basis for keying accrual to the date of liquidation is undermined by the surety industry's role in the new shipper bond disaster, which contributed significantly to Customs' difficulties in stopping the flow of unfairly dumped Chinese merchandise and collecting AD duties.

For all of the above reasons, the Court should grant the Government's motion for

---

[25] American Home Assurance Co., American Casualty Company of Reading, PA, Great American Insurance Company of New York, Hartford, Lincoln General Insurance Company, and Mapfre Insurance Company.

[26] The Government did not prevail in *U.S. v. Am. Home Assur. Co.*, CIT Case No. 10-0002, *U.S. v. Am. Home Assur. Co.*, CIT Case No. 10-0003, or *U.S. v. Lincoln Gen. Ins. Co.*, CIT Case No. 11-00504. In addition, twelve of the lawsuits against Lincoln General Insurance Company have been stayed since that surety entered insolvency proceedings in 2015. *See U.S. v. Lincoln Gen. Ins. Co.*, CIT Case Nos. 11-00296 , 11-00352 , 11-00367 , 13-00084, 13-00085, 13-00086, 13-00087, 13-00088, 13-00089, 13-00090, 13-00091, 13-00092.

summary judgment.

Respectfully submitted,

Dated:  July 2, 2021                      /s/ Michael J. Coursey
                                         PAUL C. ROSENTHAL
                                         MICHAEL J. COURSEY
                                         CAMERON R. ARGETSINGER
                                         KELLEY DRYE & WARREN LLP
                                         3050 K Street, N.W., Suite 400
                                         Washington, D.C.  20007
                                         (202) 342-8400
                                         prosenthal@kelleydrye.com
                                         mcoursey@kelleydrye.com
                                         cargetsinger@kelleydrye.com

                                         *Counsel to Amici Curiae*

                                         LOUIS S. MASTRIANI
                                         ADDUCI, MASTRIANI & SCHAUMBERG,
                                         L.L.P.
                                         1133 Connecticut Ave., N.W.
                                         Washington, DC 20036
                                         (202) 467-6300

                                         *Co-Counsel to Amici Curiae Bayou Land Seafood,*
                                         *LLC and Catahoula Crawfish, Inc.*

**CERTIFICATE OF COMPLIANCE
WITH COURT OF INTERNATIONAL TRADE
STANDARD CHAMBERS PROCEDURES**


Pursuant to the Court of International Trade Standard Chambers procedures, undersigned counsel certifies that this brief contains 5,575 words, including footnotes.  The word-count certification is made in reliance on the word-count feature contained in Microsoft Word Office 2013.


Respectfully submitted,


/s/  Michael J. Coursey
PAUL C. ROSENTHAL
MICHAEL J. COURSEY
JOHN M. HERRMANN II
JENNIFER E. MCCADNEY
CAMERON R. ARGETSINGER
KELLEY DRYE & WARREN, LLP
3050 K Street, N.W., Suite 400
Washington, D.C.  20007
(202) 342-8400