UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: THE HON. STEPHEN ALEXANDER VADEN, JUDGE

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) |
| v. | ) Court No. 20-03628 |
| AEGIS SECURITY INSURANCE COMPANY, | ) |
| Defendant. | ) |

## <u>ORDER</u>

Upon consideration of the Motion of Defendant, Aegis Security Insurance Company, for Summary Judgment, and all other papers and proceedings had herein, and after due deliberation, it is hereby

**ORDERED** that the Motion for Summary Judgment is **GRANTED**; and it is further

**ORDERED** that Court No. 20-03268 is dismissed.

_____
Stephen Alexander Vaden, Judge

Dated: _____, 2021
         New York, New York

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: THE HON. STEPHEN ALEXANDER VADEN, JUDGE

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> AEGIS SECURITY INSURANCE COMPANY, <br><br> Defendant. | ) <br> ) <br> ) <br> ) <br> )    Court No. 20-03628 <br> ) <br> )    **PUBLIC VERSION** <br> ) <br> ) <br> ) |

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant, Aegis Security Insurance Company, pursuant to Rule 56 of the Rules of the United States Court of International Trade, moves this Court for summary judgment against plaintiff, the United States.  Summary judgment in favor of defendant is appropriate because there are no genuine issues of material fact, and defendant is entitled to judgment in its favor as a matter of law, as explained in the accompanying memorandum of law.

WHEREFORE, defendant respectfully moves this Court to enter an order granting its motion for summary judgment in this action.

Respectfully submitted,

*/s/ T. Randolph Ferguson*
T. Randolph Ferguson
Sandler, Travis & Rosenberg P.A.
601 Montgomery Street
Suite 1208
San Francisco, CA 94111
Tel.: 415-378-3374
E-Mail: rferguson@strtrade.com

*/s/ Jeffery M. Telep*
Jeffery M. Telep
King & Spalding LLP
1700 Pennsylvania Avenue NW
Suite 200
Washington, D.C. 20006
Tel.: 202-626-2390
E-Mail: jtelep@kslaw.com

*Attorneys for Defendant Aegis Security Insurance Company*

September 14, 2021

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: THE HON. STEPHEN ALEXANDER VADEN, JUDGE

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| | ) Court No. 20-03628 |
| v. | ) |
| | ) **PUBLIC VERSION** |
| AEGIS SECURITY INSURANCE COMPANY, | ) |
| | ) |
| Defendant. | ) |
| | ) |

**DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS
MOTION FOR SUMMARY JUDGMENT ON ITS AFFIRMATIVE DEFENSES
OF LACHES AND IMPAIRMENT OF SURETYSHIP**

T. Randolph Ferguson                Jeffery M. Telep
Sandler, Travis & Rosenberg P.A.     King & Spalding LLP
601 Montgomery Street                1700 Pennsylvania Avenue NW
Suite 1208                           Suite 200
San Francisco, CA 94111              Washington, D.C. 20006
Tel.: 415-378-3374                   Tel.: 202-626-2390
E-Mail: rferguson@strtrade.com       E-Mail: jtelep@kslaw.com

*Attorneys for Defendant Aegis Security Insurance Company*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................... ii

I.     THE PARTIES' ARGUMENTS ................................................................. 2

II.    THE ISSUES .............................................................................................. 3

III.   FACTUAL BACKGROUND ..................................................................... 3

IV.    ARGUMENT .............................................................................................. 7

       A.    Standard Of Review .................................................................... 7

       B.    Customs Was Obligated To Make Its Demand On Defendant At
             Liquidation Or Within A Reasonable Time Following Liquidation ................... 8

       C.    Customs' Claim Is Barred By The Doctrine Of Laches .................................... 11

       D.    Customs' Claim Is Barred By The Doctrine Of Impairment Of
             Suretyship ................................................................................... 19

       E.    Customs' Interpretation of The Statute Would Lead To Absurd
             Results ........................................................................................ 21

V.     CONCLUSION.......................................................................................... 23

## TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ................................................................................ 7

*Benedict v. City of New York*,
   250 U.S. 321 (1919) ............................................................................... 12

*Bennett v. Leatherby*,
   3 Cal. App. 4th 449 (1992) .................................................................. 20

*Citizens Utils. Co. v. Am. Tel. & Tel. Co.*,
   595 F.2d 1171 (9th Cir.), *cert. denied*, 444 U.S. 931 (1979) ................. 14

*Encino Motor Cars, LLC v. Navarro*,
   136 S. Ct. 2117 (2016) ............................................................................ 9

*Franklin Sav. & Loan Co. v. Branan*,
   188 S.E. 67 (Ga. Ct. App. 1936) .......................................................... 20

*Holmberg v. Ambrecht*,
   327 U.S. 392 (1946) ............................................................................... 12

*Holy Trinity Church v. United States*,
   143 U.S. 457 (1892) ............................................................................... 23

*Int'l Cargo & Sur. Ins. Co. v. United States*,
   779 F. Supp. 174 (Ct. Int'l Trade 1991) ........................................ 3, 9, 10

*JANA, Inc. v. United States*,
   936 F.2d 1265 (Fed. Cir. 1991) ............................................................ 17

*Koyo Corp. v. United States*,
   403 F. Supp. 2d 1305 (Ct. Int'l Trade 2005) .................................. 21, 22

*Koyo Corp. v. United States*,
   497 F.3d 1231 (Fed.Cir. 2007) .......................................................... 3, 21

*Lyell Theatre Corp. v. Lowes Corp.*,
   682 F.2d 36 (2d Cir. 1982) .............................................................. 13, 14

*McKnight v. Taylor*,
   42 U.S. (1 How.) 161 (1843) ................................................................ 12

*Nyhus v. Travel Mgmt. Corp.*,
   466 F.2d 440 (D.C. Cir. 1972) ..................................................... 8, 11, 14

*Old Republic Ins. Co. v. United States*,
   645 F. Supp. 943 (Ct. Int'l Trade 1986) ................................................................. 19

*Phone-Mate, Inc. v. United States*,
   690 F. Supp. 1048 (Ct. Int'l Trade 1988),
   *aff'd* 867 F.2d 1404 (Fed. Cir. 1989) ......................................................................... 7

*St. Paul Fire & Marine Ins. Co. v. United States*,
   6 F.3d 763 (Fed. Cir. 1993) ........................................................................................ 9

*United States v. Admin. Enters., Inc.*,
   46 F.3d 670 (7th Cir. 1995) ............................................................................... 17, 18

*United States v. Am. Home Assurance Co.*,
   151 F. Supp. 3d 1328 (Ct. Int'l Trade 2016), *as amended* (Mar. 14, 2016) ............ 11

*United States v. Ataka Am. Inc.*,
   826 F. Supp. 495 (Ct. Int'l Trade 1993) ................................................. 8, 11, 14, 17

*United States v. Cocoa Berkau, Inc.*,
   990 F.2d 610 (Fed. Cir. 1993) .................................................................................. 12

*United States v. Commodities Exp. Co.*,
   972 F.2d 1266 (Fed. Cir. 1992) ................................................................................ 13

*United States v. Great Am. Ins. Co. of NY*,
   791 F. Supp. 2d 1337 (Ct. Int'l Trade 2011) ..................................................... 11, 19

*United States v. Great Am. Ins. Co.*,
   738 F.3d 1320 (Fed. Cir. 2013) ................................................................................ 19

*United States v. Ins. Co. of N. Am.*,
   83 F.3d 1507 (D.C. Cir. 1996), *as amended* (June 19, 1996) ................................. 11

*United States v. Int'l Fid. Ins. Co.*,
   273 F. Supp. 3d 1170 (Ct. Int'l Trade 2017) ........................................................... 11

*United States v. Summerlin*,
   310 U.S. 414 (1940) ................................................................................................. 17

*Wash Int'l Ins. Co. v. United States*,
   138 F. Supp. 2d 1314 (Ct. Int'l Trade 2001) ........................................................... 19

*West Virginia v. United States*,
   479 U.S. 305 (1987) ............................................................................................ 18, 19

**Statutes**

19 U.S.C. § 1504 ............................................................................................... *passim*

19 U.S.C. § 1505 .................................................................................................... *passim*

28 U.S.C. § 2415 .................................................................................................... *passim*

**Regulations**

19 C.F.R. § 113.62 ............................................................................................. 2, 12, 13

19 C.F.R. § 159.9 ........................................................................................................ 23

19 C.F.R. § 159.11 ...................................................................................................... 23

**Other Authorities**

72 Corpus Juris Secundum, Principal and Surety ...................................................... 20

Restatement (Third) of Suretyship and Guarantee (1996) .................................... 19, 20

S. Rep. No. 95-778 (1978),
    *as reprinted in* 1978 U.S.C.C.A.N. 2211 ........................................................ 3, 10

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: THE HON. STEPHEN ALEXANDER VADEN, JUDGE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>AEGIS SECURITY INSURANCE COMPANY,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Court No. 20-03628<br><br>**PUBLIC VERSION** |

**DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS
MOTION FOR SUMMARY JUDGMENT ON ITS AFFIRMATIVE DEFENSES
OF LACHES AND IMPAIRMENT OF SURETYSHIP**

On Friday, July 16, 2021, this honorable Court held oral argument on the Motion for

Judgment on the Pleadings filed by the Defendant, Aegis Security Insurance Company ("Aegis"

or the "Defendant"), and the Motion for Summary Judgment filed by Plaintiff, the United States.

Defendant is the surety on certain entries made by Linyi Sanshan Import & Export Co. ("Linyi"),

the importer of record and principal on the bond at issued in this case.  The United States

commenced this action to collect duties owed by the importer of record and secured by

Defendant.

At the outset of its argument, Defendant moved the Court for leave to amend its Answer

to add two new affirmative defenses: laches and impairment of suretyship.  The Court granted

leave to allow the Defendant 15 days to file its First Amended Answer and 60 days to file its

supplemental summary judgment brief in support of its new defenses.  The Court also

determined that Defendant's original Motion for Judgment on the Pleadings would be treated as

a Motion for Summary Judgment in order to allow the Defendant the opportunity to support its

moving papers with declarations to evidence the prejudice suffered by the Defendant necessary

to sustain its claims under the theories of laches and impairment of suretyship. The Court determined that it would entertain no argument on the defenses of laches or impairment of suretyship during oral argument on that date, but would defer all evidence and argument on those two issues to the post-hearing briefs to be filed by the parties.

## I.      THE PARTIES' ARGUMENTS

The United States argues that the six-year statute of limitations under 28 U.S.C. § 2415(a) for collection of duties under a bond does not commence until 30 days after demand has been made against the surety. Plaintiff bases its entire case on contract law, specifically the bond provision to "[p]ay as demanded by CBP, all additional duties … found due, legally fixed, and imposed on any entry secured by this bond."[1] July 16, 2021 Hearing Transcript ("Tr.") at 63:1-4. Plaintiff argues that, absent laches, no statute or regulation places a limit on the amount of time that Plaintiff may take in making its demand on a surety for payment of liquidated duties. Tr. at 96:17-99:5.

On the other hand, the Defendant argues that it never agreed, much less even contemplated, that Plaintiff might have an unlimited time — even beyond the statute of limitations period — to demand payment under the terms of its bond. To the contrary, Defendant argues that it relied upon the six-year statute of limitations that started running at liquidation — or a reasonable period of time after liquidation — as the outside limit in the management of its risk. The standard Customs surety industry practice was to manage risk by reliance on the applicable Customs statutes, in this case the appraisement statute (19 U.S.C. § 1504)[2] and the collection statute (19 U.S.C. § 1505) in conjunction with the six-year statute of

---

[1]      This bond provision is prescribed by Customs' regulation. 19 C.F.R. § 113.62(a)(1)(ii).

[2]      Congress twice amended section 504 of the Tariff Act to "increase certainty in the customs process for importers, surety companies, and other third parties with a potential liability

limitations (28 U.S.C. § 2415(a)).  Defendant further argues below that any collection action by the United States is barred by the doctrines of laches and impairment of suretyship.

## II.     THE ISSUES

1.     Whether the doctrine of laches bars the United States' collection action against Defendant when U.S. Customs and Border Protection ("Customs" or "CBP") inexcusably delayed more than eight years after the deemed liquidation of the subject entries to demand payment form Defendant, when Defendant did not agree to a contract term that would allow Customs an indefinite amount of time to collect duties on a liquidated entry, and when Defendant was substantially prejudiced by the delay?

2.     Whether the doctrine of impairment of suretyship bars the United States' collection action against Defendant when Customs' first demand for payment was more than eight years after liquidation of the subject entries and when Customs' delay jeopardized Defendant's rights under its contractual relationships with the bond principal and importer of record, Linyi, and with Defendant's reinsurer; impeded Defendant's ability to establish cash reserves and set premiums, and impaired Defendant's reporting and recordkeeping obligations with state and Federal agencies.

## III.     FACTUAL BACKGROUND

Defendant incorporates by reference Plaintiff's Statement of Material Facts set forth in its February 21, 2020 Summary Judgment Motion.  In addition, Defendant sets forth the following facts.

---

relating to a customs transaction."  S. Rep. No. 95-778, at 32 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 2211, 2243.  *Int'l Cargo & Sur. Ins. Co. v. United States*, 779 F. Supp. 174, 176-77 (Ct. Int'l Trade 1991).  In 1993, section 504 was further amended to remove the government's unilateral ability to extend indefinitely the time for liquidating entries.  *Koyo Corp. v. United States*, 497 F.3d 1231, 1242 (Fed. Cir. 2007).

According to James Zuhlke, a partner in Avalon Risk Management Insurance Agency, LLC ("Avalon"), during the last 40 years, sureties have relied on a Customs administrative process that may be defined with liability beginning with the filing of an entry, finality coming with the liquidation of the entry, and collection following within a reasonable time after liquidation with the statute of limitations for collection of the debt expiring six years following liquidation. Zuhlke Dec. ¶ 10. The several customs statutes read in conjunction with one another support this process. *Id*. The court cases on point have supported this process holding that liquidation initiates the running of the statute. *Id*. Sureties' business procedures and risk analysis rely upon that Customs process. *Id*. Notwithstanding the industry's reliance on the process, CBP gave the surety industry no notice whatsoever of its policy shift from starting the statute of limitations running from the date of liquidation to starting it from the date of its billing. *Id*.

Sureties operate under Certificates of Authority from the United States Treasury and the states in which they operate. Zuhlke Dec. ¶ 11. Financial reports are filed at least annually, and operations are examined under state law usually triennially. *Id*. Actuaries are engaged to review loss developments and assist the surety companies in ratemaking and reserve setting. Sophisticated algorithms are used to establish pricing and reinsurance programs. *Id*. All of the foregoing tasks have relied upon the Customs administrative process set out above. *Id*. Customs current departure from that longstanding procedure, if upheld by the Court, will have a definite negative effect on sureties' past and future reporting and rating obligations. *Id*.

Failure to receive timely notice of liability (a bill) skews a surety's on-going performance analysis results favorably which has the negative effect on rate setting, causing the underpricing of premiums. Zuhlke Dec. ¶ 12. Conversely late notice skews the loss experience data

4

adversely. *Id*. Such after-the-fact adjustments are reported as "prior period development." *Id*. Significant amounts of prior period development will have a large impact on reported results, a reduction in authorized T-limit, reduced investor confidence, and will potentially result in a downgrade or loss of rating with insurance company rating services like AM Best. *Id*. A loss or down grade of a Best's rating can often cause a self-fulfilling prophecy and a spiral into insolvency as business is lost. *Id*.

According to William Wollyung, President of Aegis Security Insurance Company, Aegis is an insurer with its business organized according to long-standing Statutory Accounting Principles ("SSAPs") promulgated by the National Association of Insurance Commissioners ("NAIC"). Wollyung Dec. ¶ 2. Aegis, along with every other type of insurance carrier doing business currently relies on the NAIC model law, which issues SSAP's to which all regulated insurance carriers must adhere. *Id*. This applies to all statutory loss and loss adjustment expense reserves as well as unearned premium reserves. *Id*. The Internal Revenue Service relies on these rules when calculating federal income taxes. *Id*. The impact of various components of business operations feeds into and guides Defendant's financial reporting system as to solvency and credit worthiness. *Id*.

In accordance with the SSAP's described above, Aegis files financial reports, calculated amounts within actuarial guidelines for various reserves and income/loss recognition for its underwriting operations. Wollyung Dec. ¶ 4. These financial reports are relied upon to assess the carrier's financial strength and credit worthiness. *Id*. Financial Strength ratings can be issued by various firms; Aegis contracts with AM Best Co. to issue its financial strength and credit ratings annually. *Id*. In deciding a carrier's rating, the industry relies on the SSAPs not only for its financial reporting but to also determine if its actuarial determinations of premium

and claim reserves are accurate. *Id.* This information is then used to develop rates/pricing of what a policyholder is charged for a particular coverage. *Id.* The effects of properly and timely reserving affects the entire food chain in the insurance industry from the state regulators and AM Best right down to the ultimate consumer which is the average citizen purchasing a binding insurance policy. *Id.*

Aegis issued Importer Duty Bonds/U.S. Custom Bonds covering the importer's entries from 1998 through 2008 through a general agency, Avalon Risk Management Inc. Wollyung Dec. ¶ 3. In addition, Aegis reinsured this U.S. Custom Bond program through a reinsurer. *Id.*

On January 7, 2015, U.S. Customs and Border Protection ("CBP" or "Customs") made its first demand for payment from Aegis for the debt owed under the $50,000 continuous importation bond via the Formal Demand on Surety for Payment of Delinquent Amounts Due (the "612 Report"). Complaint ¶ 22; Answer ¶ 22; Pl. Ex. 3 ¶ 18; Pl. Ex. 5. The 612 Report reflected incorrect bill amounts, which exceeded the amount actually owed by the Defendant pursuant to the deemed liquidation of the entries. Pl. Ex. 3 ¶ 21; Pl. Ex. 5. Since January 7, 2015, Customs never issued Defendant a corrected bill. Tr. at 93:7-95:17.

If this Court were to uphold the United States' claim, which was not billed at liquidation or soon after liquidation, Aegis's reporting obligations will be inaccurate, and 11 years of reporting will have to be corrected. Wollyung Dec. ¶ 5.a. Aegis's actuarial data upon which it based its rates, establish statutory reserves, etc. will be made inaccurate as they are not, and have not been, accounted for since the expiration of the limitations period from date of liquidation. *Id.*

In addition, Aegis's reinsurer is now insolvent. If this Court were to determine that Aegis must pay this claim, Aegis's right to reimbursement will be frustrated. Wollyung Dec. ¶ 5.c. Furthermore, the importer of record and principal on the bond is now out of business.

6

Accordingly, Aegis's right to reimbursement and subrogation have been impaired due to untimely notice to Aegis.  Wollyung Dec. ¶ 5.d.

Aegis relies on the Customs' statutes and timely claim filing to bring finality to insurance business transactions. Wollyung Dec. ¶ 5.e.  These are the same statutes New York relies upon to set a six-year requirement for the retention of insurance records.  *Id*.  Customs' untimely claim filing jeopardized Aegis for relying on the records retention statutes.  *Id*.

As described above, the NAIC requires financial reporting. When Aegis does not receive notice of a claim, it cannot establish case reserves.  Wollyung Dec. ¶ 5.f.  Not having reserves results not only in under-reserving, but also in overstating capital.  *Id*.  The ramifications run from IRS corrections to State mandatory financial reporting corrections.  *Id*.

Plaintiff's more than eight-year delay in billing duties due on entries that were deemed liquidated in 2006 directly caused the unnecessary accrual of interest under 19 U.S.C. § 1505(d) to the detriment of Defendant's interests. The unjustified delay directly causing the substantial accrual of interest unilaterally increased surety's risk of loss and unnecessarily caused surety's exposure to an actual loss not contemplated by any party to the subject bond.

## IV.   ARGUMENT

### A.  Standard Of Review

On a motion for summary judgment, the Court determines whether any material facts are in dispute.  *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986).  "The court may not resolve or try factual issues on a motion for summary judgment."  *Phone-Mate, Inc. v. United States*, 690 F. Supp. 1048, 1050 (Ct. Int'l Trade 1988), *aff'd* 867 F.2d 1404 (Fed. Cir. 1989).  As shown below, no material facts are in dispute that would foreclose summary judgment in Defendant's favor.

**B.  Customs Was Obligated To Make Its Demand On Defendant At Liquidation Or Within A Reasonable Time Following Liquidation**

Creditors must make demand under a bond within a reasonable time.  *See, e.g., Nyhus v. Travel Mgmt. Corp*., 466 F.2d 440, 452 (D.C. Cir. 1972) ("[A] party is not at liberty to stave off operation of the statute [of limitations] inordinately by failing to make demand; when statutorily unstipulated, the time for demand ordinarily is a reasonable time." (footnote omitted)); *United States v. Ataka Am. Inc.,* 826 F. Supp. 495, 503 (Ct. Int'l Trade 1993) ("the right to collect immediately on liquidation carries with it the responsibility to act within six years of liquidation to collect on the contract obligation of the surety.").

Customs' eight-year delay in billing Defendant is unreasonable by any measure.  As noted in the declaration of James Zuhlke, "time is the greatest enemy of the surety."  Zuhlke Dec. ¶ 5.  As also noted in the Zuhlke Declaration, a surety would not knowingly undertake a bond without a discernable basis for determining risk.  *Id*.  The length of time relied upon by the surety to manage its exposure is governed by both a meaningful statute of limitations and a reasonable period for Customs to demand payment.  Zhulke Dec. ¶ 10.  For at least 40 years, sureties have relied upon a set of statutes and regulations and case law that have set the initiation of the statute of limitations at the date of liquidation or shortly thereafter and the termination of liability immediately after the passage of six years.  *Id*., Wollyung Dec. ¶ 5.e.  These statutes include the assessment statute (19 U.S.C. § 1504) and the collection statute (19 U.S.C. § 1505) being read in *pari matria* with the six-year statute of limitations (28 U.S.C. § 2415(a)) to set the outside limit on the amount of time allowed for Plaintiff to demand and collect liquidated duties assessed on an entry under a customs surety bond.

During the July 16th proceeding, the Court recognized the importance of the surety industry's settled expectations based on Customs' heretofore consistent application of the

statutes, regulations, and court decisions on which both parties relied to support their respective, but opposite positions.  The Court cited the Supreme Court's decision in *Encino Motor Cars, LLC v. Navarro,* 136 S. Ct. 2117 (2016), which dealt with the question of whether a regulated party had the right to rely on a long-standing agency interpretation of a regulation and the statute that underlay it.  Tr. at 34:10-36:6.  In *Encino Motor Cars*, the U.S. Supreme Court held that it was arbitrary and capricious of the agency to make a 180-degree change in its interpretation and enforcement of a regulation, even after engaging in notice and comment rulemaking, if it did not take into account those reliance interests.  *Encino*, 136 S. Ct. at 2125-26.  As this Court noted during oral argument, "[t]hose reliance interests mean something because people organized their business enterprises according to that longstanding understanding of [the] regulation."  Tr. at 34-35:13-16.  This is particularly true when, as here, the Defendant did not even have the benefit of Customs' change in position by means of notice-and-comment rulemaking. Rather, Customs announced its new collection position in the form of a demand notice and a complaint.

The surety industry has relied on the statute governing the collection of duties being read *in pari materia* with the statute governing the liquidation of duties and the statute of limitations on the collection of duties.  The liquidation statute, 19 U.S.C. § 1504, was specifically amended in 1978 to eliminate the authority of Customs to delay liquidation for as long as it pleased[3], with or without giving notice.  The 1978 amendment set strict limitations on when and how Customs was to liquidate entries in the future in order to increase certainty in the customs process for

---

[3]      *St. Paul Fire & Marine Ins. Co. v. United States,* 6 F.3d 763, 767 (Fed. Cir. 1993) ("… section 1504 must be seen in its proper perspective.  Before the enactment of section 1504, no provision limited the amount of time that Customs could expend before liquidating an entry. Thus, before 1978, 'Customs could delay liquidation as long as it pleased, with or without giving notice.'" (quoting *Int'l Cargo & Sur. Ins.*, 779 at 177)).

importers, surety companies, and other third parties to manage their risk.[4]  The collection statute, 19 U.S.C. § 1505, was never amended for the purpose of expanding Customs' authority to delay the collection of duties assessed on liquidation of the entries under the liquidation statute, 19 U.S.C. § 1504.

The 1993 amendment to the collection statute, 19 U.S.C. § 1505(b), was enacted for no purpose other than to set the moment in time when duties became delinquent for the purpose of calculating the amount of remedial interest due under section 1505(c).  Nothing in the 1993 amendment authorizes Customs to delay in the collection of liquidated duties.  If duties are paid before expiration of the 30-day period by any party, 19 U.S.C. § 1505(b) does not come into play at all.  If Customs delays in its obligation to demand payment, however, the amount interest calculated under 19 U.S.C. § 1505(c) is based on the date of liquidation, not demand.  Therefore, the longer CBP delays in billing, the greater the accumulation of section 1505 interest that can be assessed to the detriment of the importer and surety.  In such a case, CBP's section 1505 interest assessment can no longer be considered remedial to the benefit of the government; it becomes penal against the surety, having increased based solely on CBP's own failure to bill.  Zuhlke Dec. ¶ 13.

During oral argument, Plaintiff admitted to the Court that its case is based solely on the terms of its bond.  Tr. at 62:4-6.  It is respectfully submitted that a single payment provision in a standard form government bond read in conjunction with a single sentence in a collection statute that allows for the collection of interest on a "delinquent debt" should not be permitted turn the

---

[4]    *Int'l Cargo & Sur. Ins.,* 779 F. Supp. at 177.  Section 1504 consequently serves to "increase certainty in the customs process for importers, surety companies, and other third parties with a potential liability relating to a customs transaction."  S. Rep. No. 95-778, at 32, 1978 U.S.C.C.A.N. at 2243.

entire statutory scheme of appraisement and collection on its head.  Nor should it require that all statutes be interpreted with a demand requirement where the statutes, precedent, and case law do not support such interpretation.

### C.  Customs' Claim Is Barred By The Doctrine Of Laches

In its Motion for Judgment on the Pleadings, Defendant contended that the United States' cause of action accrued on November 4, 2006, the date on which the importer's entries were deemed liquidated by operation of law, which was six months after the U.S. Department of Commerce ("Commerce") published its notice of rescission of administrative review in the Federal Register.  Def. Apr. 2, 2021 Reply Br. at 4 (citing *United States v. Am. Home Assurance Co.,* 151 F. Supp. 3d 1328, 1342 (Ct. Int'l Trade 2016), *as amended* (Mar. 14, 2016), *United States v. Int'l Fid. Ins. Co*., 273 F. Supp. 3d 1170, 1177 (Ct. Int'l Trade 2017); *United States v. Great Am. Ins. Co. of NY*, 791 F. Supp. 2d 1337, 1367-68 (Ct. Int'l Trade 2011).  Alternatively, Customs' cause of action accrued within a reasonable period of time following the deemed liquidation of the importer's entries.  *Ataka Am. Inc.,* 826 F. Supp. at 503 ("the right to collect immediately on liquidation carries with it the responsibility to act within six years of liquidation to collect on the contract obligation of the surety.")).

Defendant also established that Customs' cause of action did not accrue upon its failure to pay following Customs' demand for payment on the bond when the bond merely obligated Defendant to "[p]ay, as demanded by CBP."  Def. Apr. 2, 2021 Reply Br. at 10.  Rather, "[w]here a demand is necessary to perfect a cause of action, the statute of limitations does not commence to run until the demand is made …. Where, on the other hand, a call for performance is not an essential element of the cause of action, the running of the statute does not await a demand."  *United States v. Ins. Co. of N. Am.*, 83 F.3d 1507, 1510 (D.C. Cir. 1996), *as amended* (June 19, 1996) (quoting *Nyhus*, 466 F.2d at 452-53).  Indeed, the Federal Circuit held that bond

language requiring payment of liquidated damages "as may be demanded" was insufficiently mandatory to make Customs' "demand" the trigger for payment and, following default, the commencement of the statute of limitations. *United States v. Cocoa Berkau, Inc.*, 990 F.2d 610, 613-14 (Fed. Cir. 1993) (internal quotation marks omitted). During the July 16th Oral Argument, the Court further noted that the "[p]ay as demanded" language set forth in Customs' regulations, 19 C.F.R. § 113.62, and the standard-form Customs bond has been used for between 20-30 years and has been cited in 60 court decisions, yet none of those decisions has interpreted the language as a demand requirement. Tr. at 33:17-34:3. Accordingly, Defendant's failure to pay Customs' January 7, 2015 demand on Aegis did not commence the statute of limitation period. Rather, the United States' cause of action accrued on November 4, 2006, the date the importer's entries were deemed liquidated, or a reasonable period thereafter.

Nevertheless, in the event the Court were to conclude that the United States' cause of action did not accrue upon the deemed liquidation of the importer's entries, or a reasonable time thereafter, but instead accrued upon Defendant's failure to pay 30 days after Customs' demand for payment, the United States' claim still is barred by the doctrine of laches. In its discussion of laches, the U.S. Supreme Court in *Holmberg v. Ambrecht* stated as follows: "'[t]here must be conscious, good faith, and reasonable diligence to call into action the powers of the court[.]' … [The] court may dismiss a suit where the plaintiff's 'lack of diligence is wholly unexcused; and both the nature of the claim and the situation of the parties was such as to call for diligence.'" 327 U.S. 392, 396 (1946) (quoting *McKnight v. Taylor*, 42 U.S. (1 How.) 161, 168 (1843) and *Benedict v. City of New York*, 250 U.S. 321, 328 (1919)). The Second Circuit's decision in *Lyell Theatre Corp. v. Lowes Corp.* also involved the dismissal of a civil action for the failure of the

12

plaintiff to diligently prosecute its case against the defendant and held that prejudice resulting from unreasonable delay may be presumed as a matter of law.  682 F.2d 36, 43 (2d Cir. 1982).

This case falls squarely within the *Holmberg v. Ambrecht* ambit.  It is beyond cavil that Customs' failed to diligently issue a demand on the Defendant or commence its collection action in this Court.  Customs was authorized by statute to demand payment from Defendant upon liquidation of the subject entries.  19 C.F.R. § 113.62(a).  It also was authorized to "call into action the powers of the court" immediately upon liquidation of the importer's entries.  *See, e.g.,* *United States v. Commodities Exp. Co.*, 972 F.2d 1266, 1271 (Fed. Cir. 1992) ("[t]he bond does not require Customs to wait 60 days for a response to the demand before suing …, [and] [n]o statute requires Customs to give notice of demand of liquidated damages before suing.").  Customs, however, waited more than eight years after liquidation of the subject entries to issue its first bill to the Defendant for the liquidated duties, and another six years to commence its action after making demand.

It also is beyond dispute that Plaintiff's lack of diligence is "wholly unexcused."  Indeed, the United States' reasons for its delay are entirely its own fault.  As recounted in the United States' brief, Customs failed to send the importer or Defendant any bills for eight years because the U.S. Department of Commerce did not send Customs notice of the November 4, 2006 deemed liquidation until July 14, 2014, and Customs otherwise did not apprehend the significance of the U.S. Department of Commerce's Federal Register notice announcing the rescission of the administrative review with respect to the importer's entries or the fact that they had been deemed liquidated.  Pl. Feb. 11, 2021 Br. at 5 n.4, Pl. Ex. 7.  Regardless, CBP had it within its domain to ascertain at the time of the entry, or indeed at the time of the liquidation, all surety bonds posted on behalf of the importer.  Zuhlke Dec. ¶ 14.

Moreover, both "the nature of [Customs'] claim and the situation of the parties [were] such as to call for diligence."  As recounted above, the courts have limited creditors — including Customs — to a reasonable time to make demand under a bond.  *See Nyhus*, 466 F.2d at 452-53 ("[A] party is not at liberty to stave off operation of the statute [of limitations] inordinately by failing to make demand; when statutorily unstipulated, the time for demand ordinarily is a reasonable time." (footnote omitted)); *Ataka Am. Inc.*, 826 F. Supp. at 503 ("the right to collect immediately on liquidation carries with it the responsibility to act within six years of liquidation to collect on the contract obligation of the surety.").

Finally, Defendant has been prejudiced by Customs' unreasonable delay.  First, prejudice can be presumed from Customs' eight-year delay from liquidation of the entries to demanding payment, and another six years to file a complaint.  *See, e.g., Lyell Theatre Corp.*, 682 F.2d at 43 ("[p]rejudice to defendants resulting from unreasonable delay may be presumed") (citing *Citizens Utils. Co. v. Am. Tel. & Tel. Co.,* 595 F.2d 1171, 1174 (9th Cir.), *cert. denied,* 444 U.S. 931 (1979)).

Second, Defendant has suffered actual harm and undue prejudice arising from the United States' delay in bringing its claims.  According to Mr. Zuhlke, sureties manage their risk by relying upon the interplay among the Customs' statutes, specifically between 19 U.S.C. § 1504, 19 U.S.C. § 1505, and 28 U.S.C. 2415(a).  Zuhlke Dec. ¶ 10.  Customs' current approach to its collection authority, permitting it to unreasonably delay the running of the statute of limitations until the agency first bills the debt, eviscerates the statute of limitations and creates a level of uncertainty that is damaging to importers and sureties alike.  Zuhlke Dec. ¶ 9.  It is unconscionable to suggest that CBP can create a new statute of limitation period out of thin air by the simple expedient of ignoring their own negligence and the sending of a new bill.  *Id*.  This

approach wreaks havoc on the policies and procedures that the industry has had in place for more than four decades.  *Id*.

In accordance with the SSAP's described above, Aegis filed financial reports, calculated amounts within actuarial guidelines for various reserves and income/loss recognition for its underwriting operations.  Wollyung Dec. ¶ 4.  If this Court were to uphold the United States' claim, which was not billed on or soon after liquidation, Aegis's reporting obligations will be inaccurate, and 11 years of reporting will have to be corrected.  Wollyung Dec. ¶ 5.a.  Aegis's actuarial data upon which it based its rates, established statutory reserves, and set premiums, will be made inaccurate as they are not, and have not been, accounted for since the expiration of the limitations period from date of liquidation.  *Id*.

According to Mr. Zuhlke, sureties operate under Certificates of Authority from the United States Treasury and the states in which they operate.  Zuhlke Dec. ¶ 11.  Financial reports are filed at least annually, and operations are examined under state law usually triennially.  *Id*.  Actuaries are engaged to review loss developments and assist the companies in ratemaking and reserve setting.  Sophisticated algorithms are used to establish pricing and reinsurance programs.  *Id*.  All of the foregoing tasks have relied upon the Customs administrative process set out above.  *Id*.  Customs' current departure from that longstanding procedure, if upheld by the Court, will have a definite negative effect on sureties' past and future reporting obligations and industry ratings.

Moreover, Aegis's right to reimbursement has been impaired due to untimely notice to Aegis.  Aegis paid a premium for reinsurance for this bond program.  Wollyung Dec. at ¶ 5.c.  Aegis' reinsurer is now insolvent, and its right to reimbursement under its reinsurance policy has been frustrated.  *Id*.  Aegis has been prejudiced by having to bear the entire loss when

reinsurance would have applied if the United States' claim had been timely filed or if Customs had provided timely notice of its demand.

In addition, Aegis's right to subrogation has been impaired due to untimely notice to Aegis. Wollyung Dec. ¶ 5.d. Customs' notice of liquidation was supposed to be in the form of a bill, but Aegis did not receive a bill for eight years following liquidation of the importer's entries. Wollyung Dec. ¶ 5.b. By that time, however, the importer, Linyi, had gone out of business. Because of the eight-year delay between the deemed liquidation of the importer's entries and Customs' demand on the importer (and later demand on Aegis), Linjyi was no longer available to repay Aegis under its subrogation right. Wollyung Dec. ¶ 5.d.; Pl. SUMF ¶¶ 12-19. Accordingly, Aegis' right to recover against the importer was denied, and its commercial interests have been prejudiced.

Next, Aegis relies on the Customs statutes and timely claim filing to bring finality to its insurance business transactions. Wollyung Dec. ¶ 5.e. These are the same statutes the State of New York relies upon to set a six-year requirement for the retention of insurance records. *Id*. Untimely claim filing jeopardized Aegis for relying on the records retention statutes. *Id*.

Further, as described above, the NAIC requires financial reporting. When Aegis does not receive notice of a claim, it cannot establish case reserves. Wollyung Dec. ¶ 5.f. Not having reserves results not only in under-reserving, but also in overstating capital. *Id*. The ramifications run from IRS corrections to State mandatory financial reporting corrections. *Id*. According to Mr. Zuhlke, failure to receive timely notice of liability (a bill) skews a surety's on-going performance analysis results favorably which has the negative effect on rate setting, causing the underpricing of premiums. Zuhlke Dec. ¶ 12. Conversely late notice skews the loss experience data adversely. *Id*. Such after the fact adjustments are reported as "prior period development."

*Id*.  Significant amounts of prior period development will have a large impact on reported results, a reduction in authorized T-limit, reduced investor confidence, and will potentially result in a downgrade or loss of Best's rating.  *Id*.  A loss or down grade of a Best's rating can often cause a self-fulfilling prophecy and a spiral into insolvency as business is lost.  *Id*.

Lastly, Plaintiff's more than eight-year delay in billing duties due on entries that were deemed liquidated in 2006 directly caused the unnecessary accrual of interest under 19 U.S.C. § 1505(d) to the detriment of Defendant's interests.  Wollyung Dec. ¶ 5.g.  The unjustified delay directly causing the substantial accrual of interest unilaterally increased surety's risk of loss and unnecessarily caused surety's exposure to an actual loss not contemplated by any party to the subject bond.  *Id*.

Defendant is mindful that the United States traditionally has not been subject to the defense of laches.  *United States v. Summerlin,* 310 U.S. 414, 416 (1940).  Nevertheless, "'the availability of laches in at least some government suits is supported by Supreme Court decisions … that refuse to shut the door completely to the invocation of laches or estoppel (similar doctrines) in government suits."  *United States v. Admin. Enters., Inc*., 46 F.3d 670, 672-73 (7th Cir. 1995) (citing cases).  Indeed, the question of whether laches applies against the United States is an open question in the Federal Circuit.  *JANA, Inc. v. United States*, 936 F.2d 1265, 1270 (Fed. Cir. 1991).  And in *Ataka*, this Court did not rule out laches as a viable defense against the United States, *Ataka*, 826 F. Supp. at 497 n.3.[5]  At a minimum, laches applies against

---

[5]    In A*taka*, the United States misinterpreted the statute of limitations set forth in 28 U.S.C. § 2415(a) and its six-year window for collection to be tolled during the pendency of a protest, which would have allowed the Government an extra year to collect the duties in controversy after making a decision on the protest.  The *Ataka* court held that the filing of a protest did not toll the statute of limitations and that the Government was bound to the six-year period.  The case at bar is quite similar to *Ataka*.  In both cases, the six-year period of limitations expired before the government brought suit to collect the duties.  In *Ataka*, the Court had no problem

the United States in egregious situations, where no statute of limitations otherwise applies, or where the United States' claim is for interest, among others. *See Admin. Enters.*, *Inc.* 46 F.3d at 673; *West Virginia v. United States*, 479 U.S. 305, 311 (1987).

Here, the United States' delay is egregious. Customs inexcusably waited eight years to demand payment, and the United States waited another six years to file suit. As described above, the United States' delay in commencing this action is entirely its own fault. And the United States' delay has substantially prejudiced Defendant.

Moreover, if the Court were to reject Defendant's argument that the United States' claim does not accrue at the time of liquidation — or a reasonable period thereafter — then the six-year statute of limitations in 28 U.S.C. § 2415(a) does not apply to the interval between liquidation and demand. Laches is then the only defense to Customs' inordinate delay in demanding payment. Indeed, counsel for the United States admitted that Customs' ability to demand payment from the surety is unlimited absent prejudice to the surety. Tr. at 99:1-5.

Finally, as recounted in the United States' brief, the principal amount of the importer's antidumping liability already has been paid by the surety who issued single transaction bonds for the ten entries at issue in this case. Pl. Feb. 11, 2021 Br. at 3-4. But for Customs' rules regarding delinquency interest, which must be paid before principal debt is retired, Customs' current action against Defendant would be for only the interest that accrued on the importer's unpaid antidumping duties between the time of Customs' demand on the importer and the other surety's payment, as well as interest on that interest, during the six-year period Customs waited

---

with applying the principles of laches to bar the Governments late collection attempt. It similarly should have no problem applying the laches doctrine here.

to file its action against Aegis.  Accordingly, laches is an appropriate defense to a claim by the

United States for interest.  *West Virginia*, 479 U.S. at 311.

### D.  Customs' Claim Is Barred By The Doctrine Of Impairment Of Suretyship

Defendant is the secondary obligor on the import transactions at issue in this case.  As

such, it is discharged from its obligation under the continuous importation bond because the

obligee, the United States, impaired Defendant's recourse against the principal obligor, Linyi, the

importer, Defendant's reinsurer, and other third parties.  Plaintiff unreasonably delayed issuing

demands on Linyi, the importer and on the co-surety, Hartford, the single transaction bond

surety, and the Defendant.  Plaintiff's delay created liability that was entirely unnecessary, and

impaired Defendant's rights against third parties.  By the time Plaintiff billed the importer, more

the eight years had passed from the dates of liquidation, the importer was nowhere to be found,

and Aegis's reinsurer was in liquidation.

This Court and the Federal Circuit look to the Restatement of Suretyship to examine the

rights of the surety, the government's obligations, and the surety's liability under a given

Customs bond.  *United States v. Great Am. Ins. Co.*, 738 F.3d 1320, 1332 (Fed. Cir. 2013).  *See

also Wash Int'l Ins. Co. v. United States*, 138 F. Supp. 2d 1314, 1330 (Ct. Int'l Trade 2001).  In

each case, the critical question is whether an act of the obligee, in this case, the United States,

"fundamentally alter[ed] the risks imposed on the secondary obligor."  Restatement (Third) of

Suretyship and Guarantee § 37(2) (1996) (the "Restatement").  For there to be an impairment of

suretyship such that the surety is discharged of its obligation, the increase in the surety's risk

must be material.  *Great Am. Ins. Co.,* 791 F. Supp. 2d at 1360 (citing *Old Republic Ins. Co. v.

United States,* 645 F. Supp. 943, 955 (Ct. Int'l Trade 1986); *Wash. Int'l Ins. Co.,* 138 F. Supp. 2d

at 1330-31 ("The federal common law is clear that when a surety's contractual obligation is

materially altered without its knowledge or consent in a manner that increases its risk, the surety

19

is to be discharged to the extent that it is prejudiced or damaged.")).  "A surety is discharged by any act of the creditor that induces the surety to forego taking steps for self-protection … or … does any act that violates or impairs the surety's rights against the principal."  72 Corpus Juris Secundum, Principal and Surety, § 139.  *See also Franklin Sav. & Loan Co. v. Branan*, 188 S.E. 67 (Ga. Ct. App. 1936); *Bennett v. Leatherby,* 3 Cal. App. 4th 449 (1992).

As noted in the Restatement, Suretyship Defenses, Introductory Note to section 37, "[a]s a result of the duties flowing from the principal obligor to the secondary obligor, the secondary obligor's decision as to whether to enter into the secondary obligation typically depends on a risk assessment.  The secondary obligor must assess the risk that the principal obligor will not perform the underlying obligation and that, if so, the secondary obligor will not be able successfully to pass the cost of its performance to the principal obligor despite the existence of the principal obligor's duties."  Section 37 of the Restatement provides that an act that increases the secondary obligor's risk of loss by increasing its potential cost of performance or decreasing its potential ability to cause the principal obligor to bear the cost of performance is an "impairment of suretyship status."

As applied to this case, Customs inexcusable delay in billing Aegis for eight years after the deemed liquidation of the importer's entries — and after the running of the statute of limitations based on such deemed liquidation — impaired its suretyship.  As recounted above, and in the Zuhlke and Wollyung Declarations, the United States' delay in commencing this action

    i.     impaired Defendant's financial and regulatory reporting obligations, Wollyung Dec. ¶ 5.a.;

    ii.    impeded Defendant's right to reimbursement from its reinsurer, *id.* ¶ 5.c.;

iii.     impeded Defendant's right to subrogation against the importer and principal obligor on

the bond, *id.* ¶ 5.d;

iv.     jeopardized Defendants' compliance with state law record retention requirements, *id.*

¶ 5.e;

v.     impaired Defendant's ability to establish correct cash reserves and set premiums, *id.*

¶ 5.f.; and

vi.     caused an accumulated claim for interest that increased Defendant's risk of loss and its

cost of performance.  *id.* ¶ 5.g.

For these reasons, Defendant is relieved from its obligations under the bond, and Customs' claim

is barred by the doctrine of impairment of suretyship.

### E.  Customs' Interpretation of The Statute Would Lead To Absurd Results

Finally, the Court should reject Plaintiff's argument that the 1993 amendment to 19

U.S.C. § 1505(b) allows it to ignore — no, actually throw out - the statute of limitations set forth

in 28 U.S.C. § 2415 and collect duties whenever Customs decides to bill them.  The last time

Customs attempted to manipulate a statute of limitations for its own benefit, this Court took the

agency to task.  *See Koyo Corp. v. United States,* 403 F. Supp. 2d 1305 (Ct. Int'l Trade 2005),

*vacated in part and remanded on other grounds*, 497 F.3d 1231 (Fed.Cir. 2007)*.*  In that case, the

importer deposited antidumping duties at a rate higher than the final assessment rate determined

by the Department of Commerce following its annual administrative review of the antidumping

duty order.  Customs failed to timely liquidate the entry at the lower, final assessment rate.  As a

result, the entry liquidated by operation of law at the higher cash deposit rate but, as here,

Customs gave the importer no notice of the deemed liquidation.  Without notice of the

liquidation, the importer failed to protest the deemed liquidation at the higher cash deposit rate.

Customs argued that it was entitled to keep the higher sum on deposit.  This Court rebuked Customs' interpretation of the deemed liquidation statute:

> The government's interpretation of the statute is that the words are clear.  In essence, it states that it is immaterial if the government benefits from its own neglect or other wrongdoing.  The words of the statute control, and because it inadvertently failed to liquidate on time, it may retain any money collected.  The government argues further that the goal of the statute was to achieve finality, and that goal is met as soon as the six-month period elapses.  This is absurd.  The goal of the statute was to achieve finality so that importers would not be hit with unexpected duties years later, not so that Customs would profit by intentional wrongdoing or even mere inattention to duty.

*Koyo Corp.,* 403 F. Supp. 2d at 1308.

The *Koyo* lower court's response and discussion are instructive here.  In this case, neither Commerce nor Customs took any step toward the collection of duties from either the importer or Defendant for more than eight years after the deemed liquidation of the importer's entries.  The deemed liquidation statute was put in place to achieve finality so that importers and their sureties would not be hit with unexpected duties years later.  The 1993 amendment to 19 U.S.C. § 1505(b) was not enacted to permit Customs to thwart the statute of limitations and ignore the rights of the surety and importer to be protected from unexpected duty demands years later.

Indeed, as in *Koyo*, Customs' interpretation of the statute in this case would be absurd.  Congress plainly intended to limit Customs' ability to collect unpaid duties from sureties when it enacted the six-year statute of limitations in 28 U.S.C. § 2415(a).  If the Court were to adopt Customs' position that it can get around both statutory provisions by delaying making a demand in perpetuity, effectively vitiating any and all limits on its ability to demand payment from sureties — indeed to treat the surety just like the importer of record for which no statute of limitations applies — would upend the statutory scheme, Congress's intent as expressed in such scheme, and lead to profoundly absurd results.  The Court should avoid interpreting the statute

when it leads to an absurd result. *Holy Trinity Church v. United States,* 143 U.S. 457, 460 (1892).

Finally, during oral argument, the Court asked whether a surety would benefit by waiting to be sued and hoping to pocket its premium if it is not. Tr. at 104:3-4. The answer is no. As established during the oral argument, notices of deemed liquidation are not sent to the surety. 19 U.S.C. § 1504(a)(1)(E); 19 C.F.R. §§ 159.9, 159.11. Accordingly, the "windfall" argument that the surety need only wait out the six years and pocket the premium is unsupportable because the surety, without notice of the liability, cannot be said to be waiting out anything. As for "surprise" the surety can certainly be, and in this case was, surprised by the United States' claim to satisfy a debt eight years after liquidation and two years after the statute of limitations had already run. The liquidation statute was originally amended in 1978 to avoid just this type of "surprise."

## V.   CONCLUSION

For the foregoing reasons, Defendant respectfully requests that the Court enter summary judgment in its favor and dismiss the Government's complaint.

September 14, 2021

Respectfully submitted,

| | |
|---|---|
| */s/ T. Randolph Ferguson* | */s/ Jeffery M. Telep* |
| T. Randolph Ferguson | Jeffery M. Telep |
| Sandler, Travis & Rosenberg P.A. | King & Spalding LLP |
| 601 Montgomery Street | 1700 Pennsylvania Avenue NW |
| Suite 1208 | Suite 200 |
| San Francisco, CA 94111 | Washington, D.C. 20006 |
| Tel.: 415-378-3374 | Tel.: 202-626-2390 |
| E-Mail: rferguson@strtrade.com | E-Mail: jtelep@kslaw.com |

*Attorneys for Defendant Aegis Security Insurance Company*

## CERTIFICATE OF COMPLIANCE

I, T. Randolph Ferguson, an attorney at the law office of Sandler, Travis & Rosenberg P.A., who is responsible for the Defendant's memorandum in support of Defendant's motion for summary judgment, dated September 14, 2021, relying upon the word count feature of the word processing program used to prepare the memorandum, certify that this memorandum complies with the word count limitation under the Court's chambers procedures, and contains 7,334 words.

*/s/ T. Randolph Ferguson*

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: THE HON. STEPHEN ALEXANDER VADEN, JUDGE

| | |
|---|---|
| UNITED STATES OF AMERICA,        ) | |
|         ) | |
|         ) | |
| Plaintiff,        ) | Court No. 20-03628 |
|         ) | |
| v.        ) | **PUBLIC VERSION** |
|         ) | |
| AEGIS SECURITY INSURANCE COMPANY,        ) | |
|         ) | |
| Defendant.        ) | |

**STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO DISPUTE**

Pursuant to Rule 56.3 of the Rules of this Court, Defendant asserts that the following material facts are undisputed:

1. Defendant incorporates by reference Plaintiff's Statement of Material Facts set forth in its February 21, 2020 Summary Judgment Motion. In addition, Defendant sets forth the following facts.

2. During the last 40 years, sureties have relied on a Customs administrative process that may be defined with liability beginning with the filing of an entry, finality coming with the liquidation of the entry, and collection following within a reasonable time after liquidation with the statute of limitations for collection of the debt expiring six years following liquidation. Zuhlke Dec. ¶ 10. The several customs statutes read in conjunction with one another support this process. *Id*. The court cases on point have supported this process holding that liquidation initiates the running of the statute. *Id*. Sureties' business procedures and risk analysis rely upon that Customs process. *Id*. Notwithstanding the industry's reliance on the process, CBP gave the surety industry no

notice whatsoever of its policy shift from starting the statute of limitations running from the date of liquidation to starting it from the date of its billing. *Id*.

3. Sureties operate under Certificates of Authority from the United States Treasury and the states in which they operate. Zuhlke Dec. ¶ 11. Financial reports are filed at least annually, and operations are examined under state law usually triennially. *Id*. Actuaries are engaged to review loss developments and assist the surety companies in ratemaking and reserve setting. Sophisticated algorithms are used to establish pricing and reinsurance programs. *Id*. All of the foregoing tasks have relied upon the Customs administrative process set out above. *Id*. Customs current departure from that longstanding procedure, if upheld by the Court, will have a definite negative effect on sureties' past and future reporting and rating obligations. *Id*.

4. Failure to receive timely notice of liability (a bill) skews a surety's on-going performance analysis results favorably which has the negative effect on rate setting, causing the underpricing of premiums. Zuhlke Dec. ¶ 12. Conversely late notice skews the loss experience data adversely. *Id*. Such after-the-fact adjustments are reported as "prior period development." *Id*. Significant amounts of prior period development will have a large impact on reported results, a reduction in authorized T-limit, reduced investor confidence, and will potentially result in a downgrade or loss of rating with insurance company rating services like AM Best. *Id*. A loss or down grade of a Best's rating can often cause a self-fulfilling prophecy and a spiral into insolvency as business is lost. *Id*.

5. Aegis is an insurer with its business organized according to long-standing Statutory Accounting Principles ("SSAPs") promulgated by the National Association of Insurance Commissioners ("NAIC"). Wollyung Dec. ¶ 2. Aegis, along with every other type of

insurance carrier doing business currently relies on the NAIC model law, which issues

SSAP's to which all regulated insurance carriers must adhere. *Id*. This applies to all

statutory loss and loss adjustment expense reserves as well as unearned premium

reserves. *Id*. The Internal Revenue Service relies on these rules when calculating federal

income taxes. *Id*. The impact of various components of business operations feeds into

and guides our financial reporting system as to solvency and credit worthiness. *Id*.

6.   In accordance with the SSAP's described above, Aegis files financial reports, calculated

amounts within actuarial guidelines for various reserves and income/loss recognition for

its underwriting operations. Wollyung Dec. ¶ 4. These financial reports are relied upon

to assess the carrier's financial strength and credit worthiness. *Id*. Financial Strength

ratings can be issued by various firms; Aegis contracts with AM Best Co. to issue its

financial strength and credit ratings annually. *Id*. In deciding a carrier's rating, the

industry relies on the SSAPs not only for its financial reporting but to also determine if its

actuarial determinations of premium and claim reserves are accurate. *Id*. This

information is then used to develop rates/pricing of what a policyholder is charged for a

particular coverage. *Id*. The effects of properly and timely reserving affects the entire

food chain in the insurance industry from the state regulators and AM Best right down to

the ultimate consumer which is the average citizen purchasing a binding insurance policy.

*Id*.

7.   Aegis issued Importer Duty Bonds/U.S. Custom Bonds covering the importer's entries

from 1998 through 2008 through a general agency, Avalon Risk Management Inc.

Wollyung Dec. ¶ 3. In addition, Aegis reinsured this U.S. Custom Bond program through

a reinsurer. *Id*.

8. On January 7, 2015, U.S. Customs and Border Protection ("CBP" or "Customs") made its first demand for payment from Aegis for the debt owed under the $50,000 continuous importation bond via the Formal Demand on Surety for Payment of Delinquent Amounts Due (the "612 Report").  Complaint ¶ 22; Answer ¶ 22; Pl. Ex. 3 ¶ 18; Pl. Ex. 5.  The 612 Report reflected incorrect bill amounts, which exceeded the amount actually owed by the Defendant pursuant to the deemed liquidation of the entries.  Pl. Ex. 3 ¶ 21; Pl. Ex. 5. Since January 7, 2015, Customs never issued Defendant a corrected bill.  Tr. at 93:7-95:17.

9. If this Court were to uphold the United States' claim, which was not billed at liquidation or soon after liquidation, Aegis's reporting obligations will be inaccurate, and 11 years of reporting will have to be corrected.  Wollyung Dec. ¶ 5.a.  Aegis's actuarial data upon which it based its rates, establish statutory reserves, etc. will be made inaccurate as they are not, and have not been, accounted for since the expiration of the limitations period from date of liquidation.  *Id*.

10. In addition, Aegis's reinsurer is now insolvent.  If this Court were to determine that Aegis must pay this claim, Aegis's right to reimbursement will be frustrated. Wollyung Dec. ¶ 5.c.  Furthermore, the importer of record and principal on the bond is now out of business.  Accordingly, Aegis's right to reimbursement and subrogation have been impaired due to untimely notice to Aegis.  Wollyung Dec. ¶ 5.d.

11. Aegis relies on the Customs' statutes and timely claim filing to bring finality to insurance business transactions. Wollyung Dec. ¶ 5.e.  These are the same statutes New York relies upon to set a six-year requirement for the retention of insurance records.  *Id*.  Customs' untimely claim filing jeopardized Aegis for relying on the records retention statutes.  *Id*.

4

12. As described above, the NAIC requires financial reporting.  When Aegis does not receive notice of a claim, it cannot establish case reserves.  Wollyung Dec. ¶ 5.f.  Not having reserves results not only in under-reserving, but also in overstating capital.  *Id.*  The ramifications run from IRS corrections to State mandatory financial reporting corrections. *Id.*

13. Plaintiff's more than eight-year delay in billing duties due on entries that were deemed liquidated in 2006 directly caused the unnecessary accrual of interest under 19 U.S.C. § 1505(d) to the detriment of Defendant's interests. The unjustified delay directly causing the substantial accrual of interest unilaterally increased surety's risk of loss and unnecessarily caused surety's exposure to an actual loss not contemplated by any party to the subject bond.

Respectfully submitted,

/s/ *T. Randolph Ferguson*          /s/ *Jeffery M. Telep*
T. Randolph Ferguson                Jeffery M. Telep
Sandler, Travis & Rosenberg P.A.    King & Spalding LLP
601 Montgomery Street               1700 Pennsylvania Avenue NW
Suite 1208                          Suite 200
San Francisco, CA 94111             Washington, D.C. 20006
Tel.: 415-378-3374                  Tel.: 202-626-2390
E-Mail: rferguson@strtrade.com      E-Mail: jtelep@kslaw.com

*Attorneys for Defendant Aegis Security Insurance Company*

September 14, 2021

# Exhibit 1

Public Version

# PERSONAL AND BUSINESS PROPRIETARY INFORMATION REDACTED

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: THE HON. STEPHEN ALEXANDER VADEN, JUDGE

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | ) |
|  | ) |
| Plaintiff, | ) |
|  | ) Court No. 20-03628 |
| v. | ) |
|  | ) |
| AEGIS SECURITY INSURANCE COMPANY, | ) |
|  | ) |
| Defendant. | ) |
|  | ) |

**DECLARATION OF JAMES R. ZUHLKE**

I, James Zuhlke, do depose and say that I have personal knowledge of the following facts and if I were called upon to testify in this civil action, I would testify under oath as follows:

1. That I am of full age of majority and not a party to the above captioned civil action.

2. I am employed by ARM Insurance Group LLC the parent company of Avalon Risk Management Insurance Agency, LLC, (Avalon). My business address is ██████████████████████████
██████████████. My telephone number is ██████████.

3. I am a partner in Avalon and the Executive Chairman of the company and its operating subsidiaries.

4. I have been an executive in the customs surety bond business since January of 1976 when I organized and served as President of Washington International Insurance Company until 1980. During that time I secured US Treasury Certificates of Authority for four additional risk bearing entities specializing in customs surety business and was instrumental in securing a Treasury listing for Old Republic Insurance Company. Thereafter until 1997 I was a principal in the formation and T-listing of Intercargo Insurance Company (fka International Cargo and Surety Insurance Company (IC&S)) which became publicly traded

in 1988 and specialized in the customs surety business. Throughout that period I had plenary responsibility for all aspects of the business including pricing, loss administration and reinsurance as well as public reporting and disclosures. I subsequently served on the boards of several insurance companies and a mortgage company, assisting three of them with initial public offerings and numerous public financings. I also frequently served as chairman of the audit and reinsurance committees. In October 2009 I became Executive Chairman of Avalon a retail producer and program manager for customs surety and related insurance coverages for importers, exporters, customs house brokers and third-party logistics providers where we produced approximately one third of the importer activity C-1 bonds of record with CBP each year.

5. Over the course of my forty-five years as an executive in this business, I have come to the conclusion that time is the greatest enemy of the surety. One of the principal difficulties has been obtaining certainly over the administrative process imposed upon the industry by Customs and Border Protection (CBP). Another has been getting timely notifications. For example, it still often takes months to receive notice from CBP that an importer has issued an NSF check. But the bane of the industry has been and remains the Anti-Dumping and Countervailing Duty (AD/CVD) bonding process. The protracted and often politically charged investigation and determination process can lead to a significant accumulation of exposure over time. To facilitate trade, sureties may undertake to provide the necessary bonds for importers by securing collateral to ensure the importer's performance. The return of that collateral is explicitly tied to the extinguishment of liability under the bond including the running of the statute of limitations.

We take and, if due, return ▮▮▮▮ of dollars of collateral each month all in reliance on the established practices concerning liquidation and the running of the statute. The governments position in the instant case upends that longstanding practice and replaces it with absolute uncertainty as to when if ever the liability is extinguished. Since their proposed standard would apply to all entries, whether liquidated, deemed liquidated or unliquidated, the surety industry could be left in situations where collateral has been returned and then suddenly find themselves with a new bill potentially for millions of dollars. This is a risk that has not been bargained for and which could have a profound affect on sureties, importers and trade in general.

6. CBP like all businesses has evolved and modernized its capabilities and procedures, albeit usually several steps behind the industry. For example, in 1977, I was the first to seek and obtain Treasury department approval to use facsimile signatures and seals, followed shortly thereafter by application for and receipt of approval for the use of carbonless forms with blue ink. Such things seem minor now, but they illustrate the level of detail at which the industry was regulated and remains regulated to this day.

7. For many years the surety industry battled regularly with CBP over the agency's arbitrary and capricious application of rules and standards which were inconsistent from port to port and case by case or in contravention of long-established practices and statutory language  For example, we challenged the inadequacy of suspension notices which were being issued contrary to law. More relevant to this case; over the years the sureties litigated and won civil actions involving the statute of limitations when CBP attempted to utilize whichever initiation date it chose to best suit the preferences and advantage of the agency.

8. The industry was heartened by and has relied upon the 1997 United States Court of Appeals decision in *United States v. Cherry Hill Textiles* 112 F. 3rd 1550 which upheld Congress's intent "to bring finality to the duty assessment process…and eliminate unanticipated requests for additional duties coming years after the original entry." Although not exactly on point because *Cherry Hill* concerned the finality of a deemed liquidation, the logic of that case obtains equally in the present case in which the defendant argues that importers and their sureties are entitled to finality and repose.

9. Customs' current approach to its collection authority, permitting it to unreasonably delay the running of the statute of limitations until the agency first bills the debt, eviscerates the statute of limitations and creates a level of uncertainty that is damaging to importers and sureties alike. It is unconscionable to suggest that CBP can create a new statute of limitation period out of thin air by the simple expedient of ignoring their own negligence and the sending of a new bill. This approach wreaks havoc on the policies and procedures that the industry has had in place for more than four decades.

10. During the last 40 years, we and all our competitors have operated our surety businesses on a Customs administrative process that may be defined with liability beginning with the filing of an entry, finality coming with the liquidation of the entry, and collection following within a reasonable time after liquidation with the statute of limitations for collection of the debt expiring six years following liquidation. The several customs statutes read in conjunction with one another support this process.

The court cases on point have supported this process holding that liquidation initiates the running of the statute. As will be set out immediately below, our surety business procedures and risk analysis rely upon that Customs process. Notwithstanding the industry's reliance on the process, CBP gave the surety industry no notice whatsoever of its policy shift to base the running of the statute of limitation from the date of liquidation to the date of its billing.

11. Sureties operate under Certificates of Authority from the United States Treasury and the states in which they operate. Financial reports are filed at least annually, and operations are examined under state law usually triennially. Actuaries are engaged to review loss developments and assist the companies in ratemaking and reserve setting. Sophisticated algorithms are used to establish pricing and reinsurance programs. All of the foregoing tasks have relied upon the Customs administrative process set out above. As will be demonstrated, Customs current departure from that longstanding procedure, if upheld by the Court, will have a definite negative effect on surety's past and future reporting and rating obligations.

12. Failure to receive timely notice of liability (a bill) skews a surety's on-going performance analysis results favorably which has the negative effect on rate setting, causing the underpricing of premiums. Conversely late notice skews the loss experience data adversely. Such after the fact adjustments are reported as "prior period development." Significant amounts of prior period development will have a large impact on reported results, a reduction in authorized T-limit, reduced investor confidence, and will potentially result in a downgrade or loss of Best's rating. A loss or down grade of a Best's rating can often cause a self-fulfilling prophecy and a spiral into insolvency as business is lost.

13. In the instant case CBP is suing the surety to recover section 505 interest that accumulated to a point that overwhelmed the penal value of the bond by the time CBP issued its first bill to Aegis. It is my understanding that by the time the first bill was issued to the co-surety single transaction bond underwriter in 2014, the section 505 interest had exceeded the penal value of the single transaction bonds. Due to the further delay in billing defendant Aegis, the interest component exceeded the penal value of Aegis's continuous bond as well. The liquidation date was 14 years prior to bringing the lawsuit. It is my understanding that although Aegis was first made aware of the change of policy in 2015 with receipt of its first bill, the service of this civil action was the first public notice to the surety industry of CBP's change in it collection policy.

14. As an active participant in the surety industry's partnership with Customs, I know that CBP had it within its domain to ascertain at the time of the entry, or indeed at the time of the liquidation, all surety bonds posted on behalf of the importer. Avalon administers over 33,000 claims per year and like most similar specialists in the field receives daily electronic updates from CBP. On that basis, I am of the opinion that there is no justifiable rationale that warrants notification being delayed for such an unreasonable time as in the instant case. The novel arguments proposed by Plaintiff should not be allowed to overturn accepted practice upon which importers and their sureties have relied.

I declare under penalty of perjury under the laws of the State of Illinois that the foregoing statements are true and correct to the best of my knowledge and belief.

Executed on this 13thday of September, 2021, in the County of Cook, at Elk Grove Village, Illinois.

James R. Zuhlke

**Exhibit 2**

Public Version


PERSONAL AND BUSINESS

PROPRIETARY INFORMATION

REDACTED

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: THE HON. STEPHEN ALEXANDER VADEN, JUDGE

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Court No. 20-03628 |
| v. ) | |
| ) | |
| AEGIS SECURITY INSURANCE COMPANY, ) | |
| ) | |
| Defendant. ) | |
| ) | |

## DECLARATION OF WILLIAM WOLLYUNG

I, William J Wollyung III, do hereby depose and say that I have personal knowledge of the following and if called upon to testify in this civil action, I would testify under oath as follows:

1.  My name is William J. Wollyung, III, a CPA of full age of majority. I am employed by Aegis Security Insurance Company ("Aegis") as CEO/President of Aegis. I have been with Aegis for 29 years, the first 24 years as CFO and the remaining five years as CEO/President. My business address is Aegis Security Insurance Company, ████████████████████. My office direct office line is ████████ and my cell telephone number is ████████.

2.  Aegis is a Pennsylvania domiciled property and casualty insurance carrier with certificates of authority to do business in every state and Washington D.C. Aegis is an insurer with its business organized according to long-standing Statutory Accounting Principles promulgated by the National Association of Insurance Commissioners (NAIC). Aegis, along with every

1

other type of insurance carrier doing business currently relies on the NAIC model law which issues SSAP's that all regulated insurance carriers must adhere to. This applies to all statutory loss and loss adjustment expense reserves as well as unearned premium reserves. The Internal Revenue Service relies on these rules when calculating federal income taxes. The impact of various components of business operations feeds into and guides our financial reporting system as to solvency and credit worthiness.

3. Aegis issued Importer Duty Bonds/US Custom Bonds from 1998 through 2008 through a general agency, Avalon Risk Management Inc. In addition, Aegis had reinsured this US Custom Bond program through a reinsurer, Lincoln General Insurance Company.

4. Aegis, in accordance with the SSAP's described above, filed financial reports, calculated amounts within actuarial guidelines for various reserves and income/loss recognition for its underwriting operations. These financial reports are relied upon to assess the carrier's financial strength and credit worthiness. Financial Strength ratings can be issued by various firms; however, Aegis contracts with AM Best Co. to issue its financial strength and credit ratings annually. In deciding a carrier's rating, the industry relies on the statutory accounting principles not only for its financial reporting but to also determine if its actuarial determinations of premium and claim reserves are accurate. This information is then used to develop rates/pricing of what a policyholder is charged for a particular coverage. The effects of properly and timely reserving affects the entire food chain in the insurance industry from the state regulators and AM Best right down to the ultimate consumer which is the average citizen purchasing a binding insurance policy.

5. Aegis suffers harm and undue prejudice when claims are not brought timely in accordance with the Statutory scheme. Some examples of this harm are:
   a. If this honorable Court should uphold CBP's claim in this civil action which was not billed on or soon after liquidation, Aegis's reporting obligations listed in 3 above are inaccurate and 11 years of reporting will have to be corrected. Aegis' Actuarial data upon which we base rates, establish statutory reserves, etc. will be made

inaccurate as they are not, and have not been, accounted for since the expiration of the limitations period from date of liquidation.

b. Aegis' notice of liquidation was supposed to be a bill. Aegis never received a notice of liquidation nor a bill.

c. I understand and believe that Aegis paid a premium for Reinsurance for the program. However, the Reinsurer is now insolvent and Aegis' right to reimbursement, if this Court determines that Aegis must pay this claim, will be frustrated.

d. I understand and believe that the importer is now out of business. Accordingly, Aegis's right to subrogation and reimbursement have been impaired due to untimely notice to Aegis.

e. Aegis relies on statutes and timely claim filing to bring finality to insurance business transactions. These are the same statutes New York relies upon to set a 6-year requirement for the retention of insurance records. Untimely claim filing jeopardizes Aegis for relying on the records retention statutes.

f. The National Association of Insurance Commissioners (NAIC) requires financial reporting. Where Aegis has no notice, we cannot establish case reserves. Not having reserves results not only in under-reserving, but also in overstating capital. The ramifications are rippling from IRS corrections to State mandatory financial reporting corrections.

g. Plaintiff's more than eight-year delay in billing duties due on entries that were deemed liquidated in 2006 directly caused the unnecessary accrual of interest under 19 U.S.C. § 1505(d) to the detriment of Defendant's interests. The unjustified delay directly causing the substantial accrual of interest unilaterally increased surety's risk of loss and unnecessarily caused surety's exposure to an actual loss not contemplated by any party to the subject bond.

3

I declare under penalty of perjury that the foregoing is true and correct.
Executed on this 13th day of September, 2021, in the County of Dauphin, at the
Town of Harrisburg, Commonwealth/State of Pennsylvania.


W. J. Wollyung, III CPA
CEO/President
Aegis Security Insurance Company

4