UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HONORABLE STEPHEN ALEXANDER VADEN, *JUDGE*

———————————————————————
|                                          | : |
| UNITED STATES OF AMERICA,                | : |
|                                          | : |
|                           Plaintiff,     | : |   Court No.: 20-03628
|             v.                           | : |   **Public Version**
|                                          | : |
| AEGIS SECURITY INSURANCE CO.,            | : |
|                                          | : |
|                        Defendant.        | : |
———————————————————————

**PLAINTIFF'S MEMORANDUM OF LAW IN
RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

BRIAN M. BOYNTON
Acting Assistant Attorney General

PATRICIA M. McCARTHY
Director

JUSTIN R. MILLER
Attorney-In-Charge
International Trade Field Office

PETER A. MANCUSO
Trial Attorney
Department of Justice, Civil Division
Commercial Litigation Branch
26 Federal Plaza – Suite 346
New York, New York 10278
Tel. (212) 264–0484 or 9230
Attorneys for Plaintiff

Of Counsel:
SUZANNA HARTZELL-BALLARD
Office of the Assistant Chief Counsel
U.S. Customs and Border Protection

Dated: October 21, 2022

# TABLE OF CONTENTS

BACKGROUND ..................................................................................................... 1

   A.  Facts Supporting Plaintiff's Complaint ............................................... 2

   B.  Aegis's Customs Bond Program ............................................................ 7

      i.   History And Organization Of Aegis's Customs Bond Program ................................. 7

      ii.  Administrations Of Aegis's Customs Bond Program .................................... 8

      iii. Aegis's Handling Of The Continuous Bond At Issue ............................... 10

ARGUMENT ...................................................................................................... 11

  I.   BECAUSE A BOND IS A CONTRACT, A CAUSE OF ACTION TO ENFORCE IT DOES NOT ACCRUE UNTIL ITS TERMS ARE BREACHED ............................. 11

   A.  The Government's Cause Of Action Accrued When Aegis Breached The Terms Of The Bond .................................................. 12

   B.  Aegis's Measurement Of The Accrual Date From The Date Of Deemed Liquidation Is Misplaced ................................................ 14

   C.  The Question Presented By This Case Has Not Been Previously Adjudicated ............. 20

  II.  THE TERMS OF THE CONTINUOUS BOND ARE CONSISTENT WITH THE STATUTORY SCHEME .............................................................. 22

   A.  Collection Of Duties Under Section 1505(b) Applies To Entries Deemed Liquidated Under 19 U.S.C. § 1504(b) ............................................ 22

   B.  The Demand Requirement In The Continuous Bond Is Consistent With Sections 1505 and 1514 ....................................................... 24

  III. *ENCINO MOTORCARS, LLC V. NAVARRO* IS INAPPOSITE ..................................... 30

  IV.  THIS ACTION IS NOT BARRED BY AFFIRMATIVE DEFENSES OF LACHES .... 34

   A.  The Affirmative Defense of Laches Is Unavailable Under The Circumstances Presented By This Case ............................................ 34

   B.  Aegis Has Not Demonstrated That It Is Entitled To Dismissal Of This Action On The Basis Of Laches ................................................ 37

i

i.   Aegis Has Failed To Demonstrate That It Suffered Defense Prejudice ................... 38

ii.  The Economic Prejudice Claimed By Aegis Is Insufficient To Dismiss
     This Action ..................................................................................................... 39

iii. General Prejudice To Aegis's Business Is Insufficient To Support
     The Defense Of Laches.......................................................................... 41

iv.  Aegis's Own Lack Of Diligence Led To Any Alleged Harm ................................. 42

V.   CBP DID NOT RELIQUIDATE THE ENTRIES AT ISSUE ....................................... 44

VI.  A DENIED PROTEST IS NOT REQUIRED TO VEST THE COURT WITH
     JURISDICTION TO HEAR AN ACTION BROUGHT UNDER 28 U.S.C. § 1582 ..... 45

CONCLUSION .................................................................................................... 48

## TABLE OF AUTHORITIES

**Cases**

*Advanced Cardiovascular Systems, Inc. v. SciMed Life Systems, Inc.,*
988 F.2d 1157 (Fed. Cir. 1993)................................................................................ 37

*Air-Sea Brokers, Inc. v. United States,*
66 C.C.P.A. 64 (1979) ............................................................................................ 36

*American Drew v. United States,*
577 F. Supp. 3d 1369 (Ct. Int'l Trade 2022) ............................................................ 29

*Bay Area Laundry and Dry Cleaning Pension Trust Fund v. Ferbar Corp. of Ca., Inc.,*
522 U.S. 192 (1997)................................................................................................ 12

*Bethlehem Steel Corp. v. United States,*
551 F. Supp. 1148 (Ct. Int'l Trade 1982) ................................................................. 36

*Chemsol, LLC v. United States,*
755 F.3d 1345 (Fed. Cir. 2014)............................................................................... 14

*Chevron U.S.A. v. United States,*
923 F.2d 830 (Fed. Cir. 1991) ................................................................. 15

*Cornetta v. United States,*
851 F.2d 1372 (Fed. Cir. 1988) ............................................................... 37

*Encino Motorcars, LLC v. Navarro,*
136 S. Ct. 2117 (2016) ...................................................................... 30, 31

*JANA, Inc. v. United States,*
936 F.2d 1265 (Fed. Cir. 1991) ............................................................... 37

*Nyhus v. Travel Management Corp.,*
466 F.2d 440 (D.C. Cir. 1972) ................................................................ 15

*Pepper v. United States,*
794 F.2d 1571 (Fed. Cir. 1986) ............................................................... 37

*Rumsfeld v. United Technologies Corp.,*
315 F.3d 1361 (Fed. Cir. 2003) ............................................................... 31

*S.E.R., Jobs for Progress, Inc. v. United States,*
759 F.2d 1 (Fed. Cir. 1985) ............................................................... 34, 35

*SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods., LLC,*
580 U.S. 328, 137 S. Ct. 954 (2017) ................................................... 34, 35

*Stone v. INS,*
514 U.S. 386 (1995) ............................................................................. 25

*Union Steel Manufacturing Co., LTD. v. United States,*
968 F. Supp. 2d 1297 (Ct. Int'l Trade 2014) ............................................. 21

*United States v. Admin. Enter., Inc.,*
46 F.3d 670 (7th Cir. 1995) ....................................................... 35, 36, 41

*United States v. Am. Home Assurance Co.,*
100 F. Supp. 3d 1364 (Ct. Int'l Trade 2015) ....................................... 24, 41

*United States v. Am. Home Assurance Co.,*
151 F. Supp. 3d 1328 (Ct. Int'l Trade 2015) ....................................... *passim*

*United States v. Am. Home Assurance Co.,*
857 F.3d 1329 (Fed. Cir. 2017) .................................................. 15, 24, 29

*United States v. Am. Home Assurance Co.,*
Fed. Cir. Appeal No. 18-1960 ....................................................... 3, 4, 21, 22

*United States v. Angell,*
292 F.3d 333 (2d Cir. 2002) ............................................................... 36

*United States v. Arrow Transp. Co.,*
658 F.2d 392 (5th Cir. 1981) .............................................................. 36

*United States v. Ataka Am., Inc.,*
826 F. Supp. 495 (Ct. Int'l Trade 1993) ...................................... *passim*

*United States v. Cherry Hill Textiles, Inc.,*
112 F.3d 1550 (Fed. Cir. 1997) .......................................................... 27

*United States v. Cocoa Berkau, Inc.,*
789 F. Supp. 1160 (Ct. Int'l Trade 1992) ........................................... 16

*United States v. Cocoa Berkau, Inc.,*
990 F.2d 610 (Fed. Cir. 1993) ..................................................... *passim*

*United States v. Commodities Export Co.,*
972 F.2d 1266 (Fed. Cir. 1992) ................................................... *passim*

*United States v. Fed. Ins. Co.,*
805 F.2d 1012 (Fed. Cir. 1986) .......................................................... 36

*United States v. Great. Am. Ins. Co.,*
738 F.3d 1320 (Fed. Cir. 2013) .......................................................... 41

*United States v. Great Am. Ins. Co. of NY,*
791 F. Supp. 2d 1337 (Ct. Int'l Trade 2011) ................................. 20, 21

*United States v. Heraeus-Amerisil, Inc.,*
671 F.2d 1356 (CCPA 1982) .............................................................. 46

*United States v. Ins. Co. of N. Am.,*
83 F.3d 1507 (D.C. Cir. 1996) ...................................................... 15, 18

*United States v. Int'l Fid. Ins. Co.,*
273 F. Supp. 3d 1170 (Ct. Int'l Trade 2017) ................................. 20, 21

*United States v. Reul,*
959 F.2d 1572 (Fed. Cir. 1992) .................................................... 15, 23

*United States v. Summerlin,*
310 U.S. 414 (1940) ........................................................................... 35

*Zacharin v. United States,*
213 F.3d 1366 (Fed. Cir. 2000) .................................................... 31, 32

iv

**Statutes**

19 U.S.C. § 580.................................................................................................*passim*

19 U.S.C. § 1500(c)................................................................................................. 14

19 U.S.C. § 1500(d)................................................................................................. 14

19 U.S.C. § 1501..................................................................................................... 28

19 U.S.C. § 1504..................................................................................................... 27

19 U.S.C. § 1504(a)................................................................................................. 22

19 U.S.C. § 1504(d).........................................................................................*passim*

19 U.S.C. § 1505..............................................................................................*passim*

19 U.S.C. § 1505(a).................................................................................... 23, 24, 29

19 U.S.C. § 1505(b).........................................................................................*passim*

19 U.S.C. § 1505(c) (1988)............................................................................... 25, 46

19 U.S.C. § 1505(d).........................................................................................*passim*

19 U.S.C. § 1514..................................................................................................... 27

19 U.S.C. § 1514(a)......................................................................................... 27, 46

19 U.S.C. § 1515..................................................................................................... 46

19 U.S.C. § 1515(a)................................................................................................. 45

19 U.S.C. § 1677g....................................................................................... 4, 5, 29

28 U.S.C. § 1582(2)........................................................................................*passim*

28 U.S.C. § 1961................................................................................................ 1, 48

28 U.S.C. § 2415(a)........................................................................................*passim*

**Rules**

Fed. Cir. R. 36....................................................................................................... 21

USCIT Rule 8(d)(1)................................................................................................ 37

USCIT Rule 30(b)(6) ................................................................................................ 7, 8

**Regulations**

19 C.F.R. § 24.3(e).................................................................................................. 13, 26

19 C.F.R. § 24.3a(a) ................................................................................................. 13

19 C.F.R. § 24.3a(c)(4) ............................................................................................. 41

19 C.F.R. § 24.3(e).................................................................................................. 13, 26

19 C.F.R. § 113.62 .................................................................................................... 13

19 C.F.R. § 113.62(a)(1)(ii) ................................................................................. 12, 13, 20

19 C.F.R. § 159.1 ................................................................................................... 14, 26

19 C.F.R. § 174.30(a) ............................................................................................... 45

**Other Authorities**

*Antidumping Duty Order:Fresh Garlic From the People's Republic of China*
59 Fed. Reg. 59,209 (Dep't of Commerce Nov. 16, 1994) ......................................... 2

*Fresh Garlic From the People's Republic of China*
68 Fed. Reg. 40,242 (Dep't of Commerce July 7, 2003) ....................................... 3, 23

*Initiation of Antidumping nd Countervailing Duty Administrative Reviews
and Request for Revocaation in Part*
69 Fed. Reg. 77,181 (Dep't of Commerce Dec. 27, 2004)....................................... 3

*Fresh Garlic from the People's Republic of China: Final Results and Partial Rescission of
Antidumping Duty Administrative Review and Final Results of New Shipper Reviews*
71 Fed. Reg. 26,329 (Dep.'t of Commerce May 4, 2006)........................................... 3

*Fresh Garlic from the People's Republic of China: Preliminary Results and
Partial Rescission of Antidumping Duty Administrative Review and
Preliminary Results of New Shipper Reviews*
70 Fed. Reg. 69,942 (Dep't of Commerce Nov. 18, 2005) ...................................... 3

North American Free Trade Act Agreement Implementation Act,
Pub. L. No. 103-182, § 642, 107 Stat. 2205 (1993).................................................. 25

Miscellaneous Trade and Technical Corrections Act of 2004,
P.L. 108-429, §§ 2107-08 .......................................................................................... 28

THIS PAGE CONTAINS CONFIDENTIAL INFORMATION

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HONORABLE STEPHEN ALEXANDER VADEN, *JUDGE*

_____

|  |  |  |
|---|---|---|
| | : | |
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Plaintiff, | : | Court No.: 20-03628 |
| v. | : | **Public Version** |
| | : | |
| AEGIS SECURITY INSURANCE CO., | : | |
| | : | |
| Defendant. | : | |
| | : | |

_____

### PLAINTIFF'S MEMORANDUM OF LAW IN
### RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff, the United States of America (the Government), respectfully submits this memorandum of law in response to the motion for summary judgment filed by defendant, Aegis Security Insurance Company (Aegis).  This action was commenced by the Government pursuant to 28 U.S.C. § 1582(2) against Aegis to recover unpaid antidumping duties under a continuous customs bond and interest pursuant to 19 U.S.C. § 1505 in the total amount of $50,000.00 — the contractual limit of the bond — and interest pursuant to 19 U.S.C. § 580 and post-judgment interest pursuant to 28 U.S.C. § 1961, which are not subject to the bond limits.  We respectfully request that this Court deny Aegis's motion.

## I.      BACKGROUND

This action seeks to recover upon a $50,000.00 continuous customs bond issued by defendant, Aegis, that secured the importation of ten entries of fresh garlic imported by Linyi Sanshan Import & Export Co. (Linyi) from the People's Republic of China (China).  The entries were subject to an antidumping duty order covering certain fresh garlic from China issued by the U.S. Department of Commerce (Commerce).  Linyi, as principal, secured the importation of the fresh garlic with single transaction bonds (STBs) issued by ███████████████

THIS PAGE CONTAINS CONFIDENTIAL INFORMATION

████ , in addition to the continuous bond issued by Aegis.  After being billed by U.S. Customs and Border Protection (CBP), Linyi failed to pay the outstanding duties and interest, and consequently, pursuant to the terms and conditions of the continuous bond, CBP demanded payment from Aegis.  Aegis has refused to pay.

A. **Facts Supporting Plaintiff's Complaint**

On October 24, 2002, Aegis, as surety, entered into a continuous customs bond (the continuous bond) with Linyi, as principal.  *See* Amended Compl. ¶7 (AC); Second Amended Answer ¶7 (AA); Pl. Ex. 1.  The limit of liability of the continuous bond was $50,000.00 (*See* Pl. Ex. 1) and was effective from October 26, 2002, until terminated on October 25, 2004.  *See* AC ¶10; AA ¶10.  Under the terms of the continuous bond, Aegis agreed to be jointly and severally liable to pay, as demanded by CBP, any duties, taxes, and charges subsequently found due, legally fixed, and imposed on any entry secured by the continuous bond up to the "limit of liability" reflected on the bond.  *See* AC ¶8; AA ¶8; Pl. Ex. 1.

Between January 16 and February 11, 2004, Linyi made ten entries of fresh garlic from China through the ports in Miami, Florida and Houston, Texas.  *See* Pl. Ex. 2.  The entries were subject to the antidumping duty order on certain fresh garlic from China issued by Commerce (A-570-831).  *See Antidumping Duty Order: Fresh Garlic From the People's Republic of China*, 59 Fed. Reg. 59,209 (Dep't of Commerce Nov. 16, 1994).

At the time of entry, Linyi asserted in its entry papers that the entries were subject to antidumping duties at a rate of ████ percent *ad valorem* (*see* Pl. Ex. 2) and the amount of antidumping duties asserted for the ten entries at issue totaled $699,562.84. *See* AC ¶13; AA ¶13; Pl. Ex. 3 ¶7.

THIS PAGE CONTAINS CONFIDENTIAL INFORMATION

     In addition to the continuous bond securing the entries, Linyi obtained a STB from

███████ for each of the entries and provided the STBs to CBP in lieu of making cash deposits of

estimated antidumping duties for each of the entries.[1]  *See* Pl. Ex. 3 ¶¶ 8, 9; *Fresh Garlic From*

*the People's Republic of China*, 68 Fed. Reg. 40,242 (Dep't of Commerce July 7, 2003).  The

amount of the STBs that Linyi obtained for the ten entries totaled $███████.  *See* Pl. Ex. 3

¶10.

     On November 4, 2006, the entries liquidated by operation of law (deemed liquidation) at

the rate of duty, value, quantity, and amount of duty asserted by the importer at the time of

entry.[2]  *See* 19 U.S.C. § 1504(d); *United States v. Am. Home Assurance Co.*, 151 F. Supp. 3d

---

[1] During May and June 2003, █████ submitted a request to Commerce for a new shipper review, in which it certified that it did not export any of the subject merchandise to the United States during the period of investigation for the antidumping duty order at issue, that it had never been affiliated with any exporter or producer who did, and that its export activities were not controlled by the Chinese government.  68 Fed. Reg. 40,242 (Dep't of Commerce July 7, 2003).  Based on these certifications by █████, on July 7, 2003, Commerce published notice in the Federal Register that it would conduct a new shipper review and would instruct Customs "to allow, at the option of the importer, the posting of a bond or security in lieu of a cash deposit for each entry of the subject merchandise both grown and exported by █████ until the completion of the new shipper review[]."  *Id.*

[2] The facts that resulted in the deemed liquidation are as follows.  Each year during the anniversary month of the publication of an antidumping duty order, interested parties may request that Commerce conduct an administrative review of the order.  In November 2004, a group of petitioners requested an administrative review of the garlic antidumping duty order for 21 companies, including █████.  70 Fed. Reg. 69,942 (Dep't of Commerce Nov. 18, 2005).  The initiation of this administrative review resulted in the suspension of liquidation for entries covered by the administrative review, which included the entries at issue in this matter.  *See* 69 Fed. Reg. 77,181 (Dep't of Commerce Dec. 27, 2004).  On February 9, 2005, Commerce received a timely filed submission from the petitioners withdrawing their request for review of █████.  70 Fed. Reg. 69,942 (Dep't of Commerce Nov. 18, 2005).  On May 4, 2006, Commerce published notice that it was rescinding the administrative review with respect to █████ 71 Fed. Reg. 26,329 (Dep't of Commerce May 4, 2006).  In a decision involving a different surety and importers, the Court held that Commerce's publication of the notice of partial rescission constitutes notice to CBP that the suspensions of liquidation had been lifted.  *See United States v. Am. Home Assurance Co.*, 151 F. Supp. 3d 1328, 1342–43 (Ct. Int'l Trade 2015), *amended*, (Ct. Int'l Trade March 15, 2016), *aff'd*, Fed Cir. Appeal No. 18-1960 at Doc. 66 (judgment affirmed Sept. 6, 2019, pursuant to Federal Circuit Rule 36).  Applying this principle here,

THIS PAGE CONTAINS CONFIDENTIAL INFORMATION

1328, 1342–43 (Ct. Int'l Trade 2015), *amended*, (Ct. Int'l Trade March 15, 2016) (*AHAC 2016*),

*aff'd*, Fed Cir. Appeal No. 18-1960 at Doc. 66 (judgment affirmed Sept. 6, 2019, pursuant to

Federal Circuit Rule 36).  The rate asserted by Linyi for the antidumping duties covering the

merchandise of this case was ███ percent *ad valorem*.  *See* Pl. Ex. 2.  Linyi became liable for

$699,562.84 in antidumping duties as a result of the deemed liquidation of the entries.  *See* AC

¶18; AA ¶18.  CBP was not aware of the deemed liquidations at the time the entries liquidated by

operation of law and bills were not issued at that time.  *See* Message No. 4195304 from

Commerce (July 14, 2014) attached hereto as Pl. Ex. 7.

In July 2014, message number 4195304 from Commerce notified CBP that the

suspension of liquidation for the entries at issue had lifted in May 2006 when Commerce had

published the notice of the partial rescission of the order in the Federal Register.  *Id*.  Shortly

after CBP received message number 4105304, on October 3, 2014 and October 31, 2014, CBP

issued bills to Linyi for the first time for the outstanding antidumping duties due on each of the

entries.  *See* Pl. Ex. 3 ¶¶13–14; Pl. Ex. 4.  However, due to CBP error, the bills issued to Linyi

reflected an incorrect amount, which exceeded the amount that was owed pursuant to the deemed

liquidation of the entries.  Pl. Ex. 3. ¶15.  Specifically, for eight of the entries at issue, the bills

that CBP issued to Linyi reflected double the amount of antidumping duties asserted at entry and

included charges for 19 U.S.C. § 1677g interest.  *Id*.  This doubling of the amount of

antidumping duties asserted at entry was for Linyi's failure to provide a non-reimbursement

---

because CBP did not liquidate the entries within six months from the publication of the notice
of partial rescission, the entries liquidated by operation of law on November 4, 2006.  *See id*.;
19 U.S.C. § 1504(d).  When an entry liquidates by operation of law, the duties are calculated
using "the rate of duty, value, quantity, and amount of duty asserted by the importer of record"
at the time of entry.  19 U.S.C. § 1504(d).

THIS PAGE CONTAINS CONFIDENTIAL INFORMATION

certificate. *Id.*; Pl. Ex. 2; Pl. Ex. 4.  For the other two entries (H0202152684 and H0202152544), the bills that CBP issued to Linyi reflected the amount of antidumping duties asserted at the time of entry (*i.e.*, duties were not doubled), but these bills incorrectly included charges for 19 U.S.C. § 1677g interest.  *Id.*  Linyi did not pay any of the outstanding debt — neither the incorrect amount reflected in the bills nor the correct amount that was owed as a result of the deemed liquidations.  *See* Pl. Ex. 3 ¶16; Pl. Ex. 4.

Due to Linyi's failure to pay its debts, CBP began seeking payment from the sureties on the bonds that secured the entries.  On January 7, 2015, CBP made its first demand for payment from Aegis for the debt owed under the $50,000.00 continuous bond via the Formal Demand on Surety for Payment of Delinquent Amounts Due (known as the "612 Report").  *See* AC ¶22; AA ¶22; Pl. Ex. 3 ¶18; Pl. Ex. 5.  Similar to the bills issued to Linyi, the 612 Report reflected incorrect bill amounts, which exceeded the amount owed pursuant to the deemed liquidation of the entries.  Pl. Ex. 3 ¶21; Pl. Ex. 5.  Regardless of the billing error, the correct amount of the outstanding debt, calculated in accordance with the deemed liquidation of the entries, exceeded the limit of liability of the bond issued by Aegis ($50,000.00).  Pl. Ex. 1; Pl. Ex. 2; Pl. Ex. 3 ¶¶23–30.  Aegis made no attempt to pay on the continuous bond at that time.  *See* AC ¶35; AA ¶35; Pl. Ex. 3 ¶19.

Subsequently, CBP sought payment from ██████ on the STBs, mailing its first demand on ██████ in April 2015 for payment of the debt owed.  *See* Pl. Ex. 3 ¶20.  The demand was made to ██████ via its own individual 612 Report.  *Id.*  Unlike Aegis, on November 17, 2017, ██████ paid the value of the STBs for each entry.  *See Id.* ¶22.  However, due to the accumulation of delinquency interest on the portion of the bill that was the correct amount owed by Linyi, ██████ payment of the STBs did not completely satisfy the outstanding debt for the

THIS PAGE CONTAINS CONFIDENTIAL INFORMATION

entries.  *See Id.* ¶¶23–30.  The remaining debt exceeded the face value of the $50,000.00

continuous entry bond issued by Aegis.  *Id.*  Thus, CBP continued to demand payment from

Aegis for the debt owed under the continuous bond via the 612 Report, after ▮▮▮▮▮ payment

of the STBs.  *See* AC ¶29; AA ¶29.

To date, Aegis has not made any payment involving the outstanding debt for the entries.

*See* AC ¶35; AA ¶35; Pl. Ex. 3 ¶32.  The outstanding debt and refusal to pay by Linyi and Aegis

prompted the filing of this affirmative collection action.

In this civil action, the Government only seeks to collect from Aegis the outstanding

antidumping duties calculated at the appropriate rate as asserted by the importer at the time of

entry (▮▮▮ percent *ad valorem*), plus interest, remaining after the application of the STB

payments by ▮▮▮▮, up to the limit of Aegis's bond and associated section 580 and post-

judgment interest based upon Aegis's failure to pay.  Likewise, the delinquency interest the

Government seeks to collect, is calculated on the appropriate outstanding antidumping duties

running in 30-day periods from the date the bills were first issued to Linyi until the date of the

STB payments by ▮▮▮▮, and continuing to run on the appropriate remaining balance forward,

up to the limit of Aegis's bond.  *See* Pl. Ex. 8 (Pl. Resp. to Rogs. Nos. 9–11) (Pl. Resp. to RFP

No. 3).  No delinquency interest was charged for the period from the deemed liquidation of the

entries through the date of the first bills to Linyi.  *Id.* (Pl. Resp. to Rogs. No. 9).

THIS PAGE CONTAINS CONFIDENTIAL INFORMATION

### B. Aegis's Customs Bond Program

#### i. History And Organization Of Aegis's Customs Bond Program



█████████. Def. Ex. 3 (Zuhlke Deposition I[3]) at 31:20–32:18; Def. Ex. 8 (Zuhlke Deposition II) at 45:19–55:23. ████████████████

████████████[4]██████████████████████ Def. Ex. 8 at 50:10–51:11. ██████████████████████████

█████████████████████ Def. Ex. 3 at 31:20–32:18. ██████████████

███████████████████████████████ Def. Ex. 3 at 19:22–20:19, 32:19–35:24; Def. Ex. 2 (Wollyung Deposition[5]) at 36:11–38:23. ███████████████

██████████████████████ Def. Ex. 8 at 19:22–20:19. ██████████

███████ Def. Ex. 2 at 36:11–38:23. ████████████████

██████████████████ Def. Ex. 12. ██████████████

---

[3] Mr. James Zuhlke is currently executive chairman of Avalon Risk Management, LLC. Def. Ex. 3 at 17:1–4. Aegis designated Mr. Zuhlke to testify on its behalf pursuant to USCIT Rule 30(b)(6).

[4] . Def. Ex. 3 at 23:17–29:21. ████████

*Id.* Both entities will be referred to hereinafter as "Avalon."

[5] Mr. William Wollyung is currently CEO and president of Aegis. Def. Ex. 2 at 17:4–16. Aegis designated Mr. Wollyung to testify on its behalf pursuant to USCIT Rule 30(b)(6).

THIS PAGE CONTAINS CONFIDENTIAL INFORMATION



████████████████████████████████████████████. *Id.*; Def. Ex. 2 at

36:11–38:23.

████████████████████████████████████████████████

████████████████████████████████████████ Def. Ex. 8 at

60:21–61:9, 73:1–76:8; Def. Ex 10.  In 2016, LGIC went into liquidation.  Def. Ex. 11. ███

██████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████ Def. Ex. 2 at 97:24–101:14; Def. Ex. 12.

Aegis and Kingsway settled this lawsuit wherein Kingsway agreed to indemnify Aegis for 60

percent of its future losses associated with bonds issued under the customs bond program,

including attorney fees.   Def. Ex. 2 at 97:24–101:14; Def. Ex. 14. ████████████████

████████████████████████████████████████████████

███████    Def. Ex. 2 at 101:11–14; Pl. Ex. 9 (Def. Resp. to 2d Rogs. No. 1(b)).

 **ii.** **Administration Of Aegis's Customs Bond Program**

████████████████████████████████████████████. Def. Ex. 2 at 14:6–

17. ██████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████ Def. Ex. 3 at 19:22–20:19, 24:6–27:23;

Def. Ex. 18 (Dierschow Deposition[6]) at 17:20–18:7.

  According to Aegis, properly underwriting a customs bond requires the surety to assess

the risk of the commercial transaction.  Def. Ex. 3 at 51:13–21.  Assessing the risk of a potential

---

[6] Ms. Gale Dierschow is currently employed as a surety claims analyst by Avalon and is
responsible for handling customs bonds claims.  Def. Ex. 18 at 14:6–15:18.  Aegis designated
Mr. Dierschow to testify on its behalf pursuant to USCIT Rule 30(b)(6).

bond requires a surety to obtain information about a potential principal regarding its

creditworthiness, importing history, prior customs violations, and finances, among other things.

*Id.* at 55:5–56:17.  Specifically, antidumping duties pose a high risk due to the amount of time

that can elapse between entry and liquidation and the amount of duties involved — before

issuing a bond, a surety needs to know if the entry is subject to these duties.  *Id.* at 38:9–39:8,

43:23–44:3, 52:14–21; Def. Ex. 18 at 38:8–19, 103:18–104:7.  Entries made by a foreign

importer also increase the risk associated with a customs bond due to communication,

coordination, and collection problems associated with a foreign entity.  Def. Ex. 8 at 39:5–25.



Based upon these considerations, ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆.  Def. Ex. 3 at 59:14–61:2, 80:1–24. ▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆ *Id.*; Def. Ex. 8 at 39:5–41:16. ▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆[7]

▆▆▆▆▆▆.  Def. Ex. 3 at 59:14–63:6, 67:2–14; Def. Ex. 8 at 22:2–25:16).

However, because a continuous entry bond secures entries made over a specific period of

time by an importer, rather than being associated with an individual entry (*i.e.*, a STB), ▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆.  Def. Ex. 3 at 67:15–69:24; Def. Ex. 18 at 123:24–124:24. ▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆.  Def. Ex. 3 at 67:15–69:24. ▆▆▆▆▆▆

[7] ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
Def. Ex. 3 at 81:9–83:22; Def. Ex. 8 at 8:9–15:20.

THIS PAGE CONTAINS CONFIDENTIAL INFORMATION

██████████████████████████████████████████████████████████

████████████████████████████████ *Id.*

### iii.   **Aegis's Handling Of The Continuous Bond At Issue**

The continuous entry bond under review in this case was issued by a customs house

broker to Linyi ████████████████████████████████████████████████.

Def. Ex. 8 at 22:2–25:16; Def. Ex. 18 at 35:1–36:24, 103:9–105:5. ████████████

████████████████████████████████████████████████████ however, for the

continuous bond of this case, a foreign importer was listed on the face of the bond.  Def. Ex. 18

at 100:5–105:5; Def. Ex. 8 at 40:14–41:16.

The entries at issue were made by Linyi in January and February 2004 using the

continuous entry bond along with the █████ STBs to avoid depositing cash to cover the

antidumping duties.  Pl. Ex. 2; Def. Ex. 3 at 38:9–22.  ████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████ Def. Ex. 18 at 105:11–114:8.  ████████████████

██████████████████████████████████████████████████████████

████████████████████████████ *Id.* ██████████████████████████

████████████████████████████ *Id.* ██████████████████████████

██████████████████████████████████████████████ *Id.* at

113:1–115:21.  ██████████████████████████████████ *Id.*

Between the time when Aegis discovered that the continuous entry bond secured

antidumping duties (July 13, 2004) and when CBP issued its first bill for the collection

antidumping duties (October 3, 2014 and October 31, 2014) from Linyi, ████████████

██████████████████████████████████████████████████████████,

THIS PAGE CONTAINS CONFIDENTIAL INFORMATION



. *Id.* at 82:2–87:22.

*Id.* at 82:2–87:22, 113:1–114:8.  In 2014, after being notified by CBP that a bill was issued to Linyi for the outstanding antidumping duties secured by the continuous entry bond,

*Id.* at 66:2–67:20, 74:23–75:21.

## **ARGUMENT**

### I.   **BECAUSE A BOND IS A CONTRACT, A CAUSE OF ACTION TO ENFORCE IT DOES NOT ACCRUE UNTIL ITS TERMS ARE BREACHED**

Aegis contends that the Government's complaint should be dismissed because the statute of limitations has expired under 28 U.S.C. § 2415(a).  Pl. Br. at 12.  In support, Aegis argues that the Government's cause of action to collect upon the continuous bond accrued on the date of deemed liquidation.  *Id.*

However, Aegis's liability is based on the bond that it issued and its subsequent breach of its contractual obligations thereunder.  The date on which the entries were liquidated by operation of law is not the date on which Aegis breached the terms of the bond.  Rather, Aegis breached the terms of the bond when CBP made a demand for payment against Aegis and Aegis failed to pay the duties within the time required by law.  It is at this point that the Government's cause of action accrued.

11

### A. The Government's Cause Of Action Accrued When Aegis Breached The Terms Of The Bond

Pursuant to 28 U.S.C. § 2415(a), "every action for money damages brought by the United States . . . which is founded upon any contract express or implied in law or fact, shall be barred unless the complaint is filed within six years after the right of action accrues . . . ." This limitations period applies to affirmative actions against sureties for the collection of debts owed under a bond. *See United States v. Cocoa Berkau, Inc.*, 990 F.2d 610, 612–13 (Fed. Cir. 1993).

The United States Supreme Court has long observed the standard rule that a "limitations period begins when the plaintiff has a 'complete and present cause of action.'" *Bay Area Laundry and Dry Cleaning Pension Trust Fund v. Ferbar Corp. of Ca., Inc.*, 522 U.S. 192, 201 (1997) (internal citations omitted). "'Under federal law governing statutes of limitations, a cause of action accrues when all events necessary to state a claim have occurred.'" *United States v. Commodities Export Co.*, 972 F.2d 1266, 1270 (Fed. Cir. 1992) (internal citations omitted).

In the context of an action to collect upon a customs bond, "the date of accrual occurs at the time of the breach of the bond," just as in any other action sounding in breach of contract. *Cocoa Berkau*, 990 F.2d at 613 (citations omitted). To determine when a bond has been breached, the Federal Circuit looks to the "language of the bond stipulating the relevant obligations of the bond principal and surety." *Cocoa Berkau*, 990 F.2d at 613–14.

Here, a condition of the bond issued by Aegis is that the principal and surety agree to pay "as demanded by CBP." Pl. Ex. 1 (incorporating 19 C.F.R. § 113.62(a)(1)(ii)). Indeed, Section II of the bond provides that "[t]his bond includes the following agreements" and the parties selected "Activity Code 1," which includes "Customs Regulations in which conditions codified." Pl. Ex. 1. The regulations for Activity Code 1 are set forth in 19 C.F.R. § 113.62, which provides in part as follows:

> (1) If merchandise is imported and released from CBP custody . . . the *obligors (principal and surety, jointly and severally) agree to*:
> (ii) *Pay, as demanded by CBP, all additional duties, taxes, and charges subsequently found due*, legally fixed, and imposed on any entry secured by this bond.

19 C.F.R. § 113.62(a)(1)(ii) (emphasis added).

The bond, therefore, incorporates 19 C.F.R. § 113.62 as part of its contractual terms.  *See* Pl. Ex. 1 ("Principal and surety agree that they are bound to the same extent as if they executed a separate bond *covering each set of conditions incorporated by reference to the Customs Regulations into this bond*.") (emphasis added).  Thus, the terms of the bond at issue were not breached by Aegis until CBP made a demand for payment against Aegis and Aegis failed to pay the duties within the time required by law.

By statute, "[d]uties, fees, and interest determined to be due upon liquidation or reliquidation are due 30 days after issuance of the bill for such payment."  19 U.S.C. § 1505(b).  CBP's regulations involving demands for payment mirror this 30-day time frame.  *See* 19 C.F.R. § 24.3a(a) (incorporating the 30-day time frame of 19 C.F.R. § 24.3(e)).

Under this framework, when a duty debt arises, CBP bills the principal and provides 30 days for payment.  If the principal fails to fully pay the bill within the 30-day period, the unpaid balance is considered delinquent.  CBP will then make a formal demand on the surety and again provide 30 days for the payment.  If the surety fails to pay the demand with the 30 days, the surety falls in breach of the bond and in violation of the related law — 19 U.S.C. § 1505(b) and 19 C.F.R. § 24.3a(a) (incorporating 19 C.F.R. § 24.3(e)).

This legal framework demonstrates the timeliness of this action.  CBP first billed the principal, Linyi, on October 3, 2014.  Pl. Ex. 4.  When Linyi failed to pay, CBP then made its first demand for payment against Aegis on January 7, 2015.  Pl. Ex. 5.  When the bill against

Aegis became delinquent on February 7, 2015 (*i.e.*, 30 days after the demand), Aegis had breached the terms of the bond.  *See* Pl. Ex. 1.  We commenced this action on October 2, 2020, which was within six years of February 7, 2015.  Therefore, this action is timely because it was commenced within six years of Aegis's breach.

**B.  Aegis's Measurement Of The Accrual Date From The Date Of Deemed Liquidation Is Misplaced**

Aegis measures the date of accrual for the Government's claims from the date that the entries deemed liquidated.  This position, however, is misplaced.

As part of its administrative functions when merchandise enters the United States, CBP is obligated to "fix the final amount of duty to be paid on such merchandise and determine any increased or additional duties, taxes, and fees due or any excess of duties, taxes, and fees deposited."  19 U.S.C. § 1500(c).  CBP is also obligated to "liquidate the entry."  *Id*. § 1500(d).  "Liquidation means the final computation or ascertainment of the duties . . . ."  19 C.F.R. § 159.1.

A deemed liquidation occurs when CBP fails to act within the timeframe required by law.  Unless an extension has occurred, CBP must liquidate an entry, "within 6 months after receiving notice of the removal [of a suspension] from the Department of Commerce, other agency, or a court with jurisdiction over the entry."  19 U.S.C. § 1504(d).  If CBP fails to act within this time period, the entry "shall be treated as having been liquidated at the rate of duty, value, quantity, and amount of duty asserted by the importer of record."  *Id*.; *see also Chemsol, LLC v. United States*, 755 F.3d 1345, 1349 (Fed. Cir. 2014) (explaining liquidation and deemed liquidation).

Aegis misinterprets the significance of a liquidation or a deemed liquidation for purposes of determining the date of accrual.  "'Under federal law governing statutes of limitations, a cause of action accrues when all events necessary to state a claim have occurred.'"  *Commodities*

14

*Export Co.*, 972 F.2d at 1270 (quoting *Chevron U.S.A.*, 923 F.2d at 834).  As we demonstrated above, all events necessary for a claim against a surety on a continuous entry bond will not have occurred at the time of a liquidation or a deemed liquidation.  Although liquidation or a deemed liquidation signifies the final computation of the duties, Aegis agreed to "[p]ay, as demanded by CBP, all additional duties, taxes, and charges subsequently found due, legally fixed, and imposed on any entry secured by this bond."  Pl. Ex. 1.

As reflected by caselaw within the Federal Circuit, sureties are generally "obligated to pay the United States" only after receiving a demand for payment because "only from then can the United States lay claim to a loan to the surety."  *United States v. Reul*, 959 F.2d 1572, 1581 (Fed. Cir. 1992); *see also United States v. Am. Home Assurance Co.*, 857 F.3d 1329, 1335–1336 (Fed. Cir. 2017) ("[T]he time when the bonds became due can be no earlier than the government's first formal demand for payment.").  And other courts of appeals have held that similar language in surety bonds make "demand . . . a prerequisite to liability and therefore to the running of the statute of limitations."  *See*, *e.g.*, *United States v. Ins. Co. of N. Am.*, 83 F.3d 1507, 1510 (D.C. Cir. 1996).  As held by the Court of Appeals for the District of Columbia Circuit, "[w]hether a demand was required to trigger the statute of limitations depends on the terms of the bond.  If it 'envisions an actual demand, the statute of limitations is set in motion only by such demand.'"  *Id*.  (quoting *Nyhus*, 466 F.2d at 453).

As we demonstrated above, the date on which the bond is breached marks the date of accrual for claims arising from a bond.  *See Cocoa Berkau*, 990 F.2d at 613–14; *see also Commodities Export Co.*, 972 F.2d at 1270–72.  In *Cocoa Berkau*, the principal and surety entered into an "Immediate Delivery and Consumption Entry Bond" to secure the importation of

15

chocolate. *United States v. Cocoa Berkau*, Inc., 789 F. Supp. 1160, 1161 (Ct. Int'l Trade 1992).

The terms of the bond stated:

> principal shall redeliver or cause to be redelivered to [Customs], *on
> demand* . . . any and all merchandise found not to comply with law
> and regulations governing its admission into the commerce of the
> United States . . . or in default of redelivery after a proper demand .
> . . the principal [or surety] shall pay to [Customs] such amounts as
> liquidated damages *as may be demanded* by [Customs.].

*Cocoa Berkau*, 990 F.2d at 611 (alterations in original) (emphasis added).

On February 11, 1985, CBP issued a notice to the principal demanding redelivery within

30 days. *Id.* The principal failed to redeliver and on June 26, 1985, CBP demanded payment for

liquidated damages from the principal within 60 days. *Id.* at 611–12. The principal did not pay.

*Id.* at 612. On November 20, 1990, CBP then sought payment of the liquidated damages from

the surety and, upon default of the surety, commenced suit on August 22, 1991. *Id.*

The surety moved to dismiss the action as untimely under 28 U.S.C. § 2415(a), arguing

that the Government's right of action accrued no later than March 13, 1985, when the principal

breached the bond (*i.e.*, 30 days after the redelivery demand). *Id.* Alternatively, the Government

countered that its right of action accrued on December 30, 1990, when the surety defaulted on its

obligations to pay liquidated damages. *Id.*

In its decision, the Federal Circuit held that a claim accrues when all events fixing

liability have occurred and for "a claim arising under a bond . . . the date of accrual occurs at the

time of the breach of the bond." *Id.* at 613. Because the bond in *Cocoa Berkau* "placed an

obligation on the bond principal to redeliver the imported merchandise upon a proper demand"

for redelivery by Customs, the Court found that, "[t]he bond was breached, and . . . the

government's right of action accrued, when the principal failed to redeliver upon proper

demand." *Id.*

16

In this case, Aegis breached the terms of the continuous entry bond when it refused to pay the demand for the outstanding debt within 30 days of the issuance of the demand. This action is timely as it was commenced within six years of this breach.

There are two unique aspects of *Cocoa Berkau* worth mentioning for completeness and greater clarity. First, the terms of the immediate delivery bond under review in *Cocoa Berkau* differ from the terms of the continuous entry bond issued by Aegis. In *Cocoa Berkau*, the "default of redelivery" by the principal was a condition precedent prior to seeking liquidated damages from either the principal or surety for the immediate delivery bond. *Id*. at 613. Thus, the Court held that the breach of the bond occurred "when the principal failed to redeliver upon proper demand," and "not when the surety failed to pay." *Id*. No such condition precedent exists for the continuous entry bond issued by Aegis. *See* Pl. Ex. 1.

Second, the Court further observed that, "[a]bsent an agreement between the parties, the surety incurs derivative liability when the principal breaches the bond." *Cocoa Berkau*, 990 F.2d at 614. This latter portion of the Court's decision (measuring the date of the accrual for claims against the surety from the breach of the principal) is not applicable to the circumstances of this case because of the differences in the terms of the respective bonds. In *Cocoa Berkau*, the "default of redelivery" by the principal was a condition precedent prior to seeking liquidated damages from either the principal or surety for the immediate delivery bond. Thus, the Court's determination that the breach of the bond occurred "when the principal failed to redeliver upon proper demand," and "not when the surety failed to pay" was consistent with the plain meaning

of the terms of the bond.  No such condition precedent exists for the continuous entry bond issued by Aegis.[8]  *See* Pl. Ex. 1.

The Court in *Cocoa Berkau* also struggled with whether the "as demanded" language in the immediate delivery bond was a condition of the surety's liability or "merely a procedural step" for obtaining the outstanding debt.  *Cocoa Berkau*, 990 F.2d at 613–14; *c.f. Commodities Export Co.*, 972 F.2d at 1270–72 (analyzing whether a demand for payment, imposed by regulation, triggered the accrual of the Government's claims).  The statutory and regulatory framework discussed above shows that, for purposes of the Aegis bond, the demand against Aegis was not merely a procedural step.  *See* 19 U.S.C. § 1505(b) ("[d]uties, fees, and interest determined to be due upon liquidation or reliquidation" is not due until "30 days after issuance of the *bill* for such payment") (emphasis added).  Therefore, the demand for payment is a necessary prerequisite for the accrual of the surety's liability.

Nevertheless, to avoid the legal implications of the demand language in the bond, Aegis argues that the "Subject Bond did not make Customs' demand for payment 'an essential element of [the Government's] cause of action' because it did not use the required mandatory language." Def. Br. at 16 (alteration in original) *citing Ins. Co. of N. Am.*, 83 F.3d at 1510.

Aegis contends that the language in the bond is insufficiently mandatory to constitute a demand requirement and instead uses "non-mandatory bond language" which, from Aegis's reading of *Cocoa Berkau*, "was insufficient to establish Customs' demand for payment as the trigger for the surety's breach and the United States' cause of action."  Def. Br. at 16. Defendant's argument, however, is based upon a misreading of *Cocoa Berkau*.

---

[8] Should the Court apply this portion of the holding of *Cocoa Berkau*, this action is still timely because we commenced this case within six years of the breach of the bond by the principal, Linyi.

At issue in *Cocoa Berkau* was "which event, the default of redelivery by the bond principal or the default of payment of liquidated damages by the bond surety, constituted the breach of the bond which fixed liability for purposes of triggering the statute of limitations." *Cocoa Berkau*, 990 F.2d at 613.  Ultimately, the Federal Circuit found that "[t]he bond was breached, and thus the government's right of action accrued, when the principal failed to redeliver *upon proper demand*" by CBP.  *Id.* (emphasis added).

Thus, the event that the Federal Circuit held constituted a breach of the bond, and triggered the accrual of the Government's cause of action,[9] was a default by the principal after a redelivery *demand* by CBP, which was required by the bond language "on demand."  *Id.* at 613–14.  Therefore, the decision shows that the bond language "on demand" was sufficiently mandatory to measure when a bond has been breached and when a cause of action accrues.  *Id.*

Aegis also argues that CBP cannot rely upon its own internal procedures for issuing a demand to toll the statute of limitations because it would allow one party to unilaterally postpone the accrual of a cause of action.  Def. Br. at 17–18. Aegis, however, fails to acknowledge that the demand at issue is not an "internal procedure" but rather a term of the bond that was agreed to — voluntarily — by Aegis as part of the bond contract.

Indeed, the Federal Circuit has indicated that if the demand requirement is found within the terms of the bond, the Court will give it effect.  *Commodities Export*, 972 F.2d at 1271.  For instance, in *Commodities Export*, the Federal Circuit disregarded the demand procedures used by CBP to collect liquidated damages because it was only found in CBP's regulations, and not the terms of the bond.  *Id.*  The Court found that, had the parties "agreed in advance to a condition

---

[9] Significantly, the Federal Circuit did not find that the date of liquidation triggered the accrual of the cause of action.  If it did, the Court would have found the Government's cause of action in *Cocoa Berkau* to be timely.  *Cocoa Berkau*, 990 F.2d at 612–13.

on the filing of a suit, the [Court would give] effect to that agreement by delaying accrual of the right of action." *Id.*

Here, unlike *Commodities Export* wherein the demand for liquidated damages was tied to a regulation and not the bond, in this case, the demand for payment was a term of the bond that was agreed to by Linyi and Aegis. *See* Pl. Ex. 1; 19 C.F.R. § 113.62(a)(1)(ii). Thus, the requirement of a demand prior to payment was a condition agreed to by the parties to the bond. Failure to pay, after demand by CBP, constituted a breach of the bond's terms in this case, which gave rise to Aegis's liability for statute of limitations purposes.

Therefore, *Cocoa Berkau* and *Commodities Export* demonstrate that our cause of action did not accrue until Aegis breached the terms of the continuous bond by failing to pay the outstanding antidumping duties after a demand by CBP. In its brief, Aegis disregards the rule that "the date of accrual occurs at the time of the breach of the bond" and the case law that supports it.

### C. The Question Presented By This Case Has Not Been Previously Adjudicated

Aegis cites *AHAC 2016*, 151 F. Supp. 3d 1328, *United States v. Int'l Fid. Ins. Co.*, 273 F. Supp. 3d 1170 (Ct. Int'l Trade 2017) (*International Fidelity*), *United States v. Great Am. Ins. Co.*, 791 F. Supp. 2d 1337 (Ct. Int'l Trade 2011) (*Great American*), and *United States v. Ataka Am., Inc.*, 826 F. Supp. 495 (Ct. Int'l Trade 1993) in support of its measurement of the date of accrual. Def. Br. at 13–14. But Aegis's reliance on these cases is misplaced.

First, in several of the cases cited by Aegis, the Court did not analyze or discuss the relevant case law or bond terms before concluding that the statute of limitations had accrued at liquidation. For example, in *Great American*, *International Fidelity*, and *AHAC 2016*, the Court summarily held that the deemed liquidation of the subject entries triggered the date of accrual for

the Government's claims against the surety, without explaining how a deemed liquidation

satisfies the appropriate legal standard. *See Great American*, 791 F. Supp. 2d at 1367–68; *Int'l*

*Fid. Ins. Co.*, 273 F. Supp. 3d at 1176–77; *AHAC 2016*, 151 F. Supp. 3d at 1342–43.

These cases do not discuss the standard for determining when a limitations period begins

to run. *See Cocoa Berkau*, 990 F.2d at 613 ("With respect to a claim arising from a bond . . . the

date of accrual occurs at the time of the breach of the bond." (citation omitted)).  Nor is there any

discussion of the terms of the bonds at issue, the date upon which the bonds were breached, or

the effect of 19 U.S.C. § 1505(b) on the accrual of the Government's cause of action.

Aegis relies on the Federal Circuit's affirmance in *AHAC 2016* to support its contention

that this issue has been settled by the Court.  Def. Br. at 13.  However, in the appeal of *AHAC*

*2016*, the parties did not present any arguments regarding the statute of limitations to the court of

appeals, and the court of appeals summarily affirmed the trial court's decision pursuant to

Federal Circuit Rule 36.  *See United States v. Am. Home Assurance Co.*, Fed Cir. Appeal No. 18-

1960 at Doc. 66 (judgment affirmed Sept. 6, 2019, pursuant to Federal Circuit Rule 36).  Federal

Circuit Rule 36 provides that, "[t]he court may enter a judgment of affirmance without opinion,

citing this rule, when it determines that [certain] conditions exist and an opinion would have no

precedential value."  Fed. Cir. R. 36; s*ee also Union Steel Manufacturing Co., LTD. v. United*

*States*, 968 F. Supp. 2d 1297, 1316 (Ct. Int'l Trade 2014) (holding that an affirmance pursuant to

Federal Circuit Rule 36 is not precedential).

In accordance with the rule, the order issued by the Federal Circuit bears the notation,

"NOTE: This disposition is nonprecedential."  *Am. Home Assurance Co.*, Fed Cir. Appeal No.

18-1960 at Doc. 66.  Therefore, the question involving the date of accrual remains

unadjudicated.[10]

## II.   THE TERMS OF THE CONTINUOUS BOND ARE CONSISTENT WITH THE STATUTORY SCHEME

As outlined above, the terms of the continuous bond at issue require that CBP first make

a demand for payment on the surety before the duties become due.  Pl. Ex. 1.  It is only after this

demand remains unpaid for 30 days that the Government's cause of action accrues to collect

upon the bond pursuant to 28 U.S.C. § 1582(2).  This is consistent with 19 U.S.C. § 1505(b),

which directs CBP to collect "any increased or additional duties . . . determined to be due upon

liquidation or reliquidation . . . after issuance of the bill for such payment."

Nevertheless, Aegis contends that our measurement of the date of accrual is contrary to

the statutory scheme.  Def. Br. at 18–25.  Aegis is wrong.

### A.  Collection Of Duties Under Section 1505(b) Applies To Entries Deemed Liquidated Under 19 U.S.C. § 1504(d)

Aegis argues that the billing mechanism of section 1505(b) does not apply to entries

deemed liquidated under section 1504(d).  Def. Br. at 18–20.  According to Aegis, "entries that

have been deemed liquidated do not involve 'increased or additional duties' that are 'determined

on a liquidation or reliquidation,'" but rather are liquidated at the rate and amount of duty

asserted by the importer at the time of entry.  *Id.* at 19.  For Aegis, because the amount of duties

owed is unchanged, a bill is unnecessary to collect.[11]  *Id.* at 19–20.  This argument, however,

---

[10] Aegis also cites this Court's decision in *Ataka*.  Def. Br. at 14.  However, as will be demonstrated below (Pl. Br. at 29–30), an in-depth review of the opinion reveal's that the holding of the case supports our analysis of the limitations period.

[11] Aegis bolsters its argument with section 1504(a), which dispenses with the requirement that CBP give notice of a liquidation for entries deemed liquidated.  Def. Br. at 19.  However, this provision of the law (*i.e.*, that a deemed liquidation does not require notice) further shows that

THIS PAGE CONTAINS CONFIDENTIAL INFORMATION

fails to account for the entirety of the statutory scheme and the commercial reality of collecting outstanding duties.

As described above, Commerce instructed CBP with regard to antidumping duties, "to allow, at the option of the importer, the posting of a bond or security in lieu of a cash deposit for each entry of the subject merchandise both grown and exported by [Linyi] until the completion of the new shipper review[]." 68 Fed. Reg. 40,242 (Dep't of Commerce July 7, 2003). Securing duties with a bond is an exception permitted by section 1505(a), which otherwise requires an importer to deposit, at the time of entry, "the amount of duties and fees estimated to be payable on such merchandise." 19 U.S.C. § 1505(a). Consequently, if a bond is used in lieu of a cash deposit, *additional duties* must be collected after the amount due is ascertained at liquidation. Section 1505(b) directs CBP to collect these additional duties. 19 U.S.C. § 1505(b). But for the billing requirement in section 1505(b), CBP would have no other statutory mechanism to collect these additional duties that were secured by bond at the time of entry.

Furthermore, dispensing with the billing requirement of section 1505(b) ignores the commercial reality that debts are not paid until the creditor seeks payment. Aegis's business practices confirm this reality. ██████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ .

Def. Ex. 18 (Dierschow Tr. at 87:9–22) (Q: ██████████████████████████ ████████████████████████████████████████ ? A: Correct. Q: Okay. ███████ ██████████████████████████████████████████

---

the date of deemed liquidation is not the relevant date concerning when the surety is obligated to issue payment because a surety cannot be required to pay a debt to which it is unaware. *Reul*, 959 F.2d at 1581.

THIS PAGE CONTAINS CONFIDENTIAL INFORMATION

███████████. A: Correct.  Q: Okay. ███████████████████████? A: Yes. . . .

███████████████████████████████████████.).  What is more, counsel for

Aegis represented that a surety is entitled to notice of outstanding duties pursuant to a deemed

liquidation before payment will be made to CBP.  Oral Arg. Tr. at 73:10–74:17.

Thus, the billing requirement of section 1505(b) is necessary for CBP to collect duties,

regardless of the manner of liquidation, and without it, CBP would have no mechanism to collect

additional duties that were not deposited at the time of entry, *i.e.*, those secured with a bond

pursuant to section 1505(a).

## B. The Demand Requirement In The Continuous Bond Is Consistent With Sections 1505 and 1514

Aegis argues that interpreting the bond language to require a demand by CBP before

Aegis incurs liability for the outstanding duties would violate the principle that a statutory

scheme should be read *in pari materia*.  Def. Br. at 23–24.  However, case law interpreting the

assessment, liquidation, and collection statutes demonstrate that Aegis is incorrect.

The terms of the bond at issue in this case mirror the framework of 19 U.S.C. § 1505(b),

which "governs the payment of duties and fees on entries of imported merchandise." *United*

*States v. Am. Home Assurance Co.*, 100 F. Supp. 3d 1364, 1368 (Ct. Int'l Trade 2015) ("Once

Customs liquidates or reliquidates an entry, any duties and fees . . . due and owing are payable 30

days after Customs issues a bill."), *aff'd*, 857 F.3d 1329, 1335 (Fed. Cir. 2017) (holding that

section 1505 "is directed to the duties and fees due on the merchandise under bond").

The terms of the continuous bond provide, in part, that the surety agrees to "[p]ay, as

demanded by CBP, . . . duties . . . found due."  Pl. Ex. 1.  Similarly, section 1505(b) provides in

part, that "[t]he Customs Service shall collect any increased or additional duties and fees *due . . .*

24

.  Duties, fees, and interest determined to be due upon liquidation or reliquidation are *due* 30 days after issuance of a bill for such payment."  (emphasis added).

In *United States v. Ataka America, Inc.*, this Court discussed the significance of the term "due" as set forth in the bond at issue in that case.  *Ataka Am.*, 826 F. Supp. 495.  In *Ataka*, the terms of the bond securing the antidumping duties stated that the principal and surety were obligated to "pay any and all such duties and taxes found to be due on the shipment."  *Id.* at 500. Based upon these terms, a breach of the bond occurred at the "time the customs duties became due."  *Id.*  The Court looked to section 1505 for guidance as to when duties are "due."  *Id.*  At that time, the statute provided that "[d]uties determined to be due upon liquidation or reliquidation shall be due 15 days after the date of that liquidation or reliquidation."  *Id.* (quoting 19 U.S.C. § 1505(c) (1988)) (alteration in original).

Relying on the text of section 1505 at the time, the Court held that, "[a]s to the surety, the government must sue within six years (following the fifteenth day after liquidation)" to commence a timely action for breach of the bond.  *Id.* at 503.  According to *Ataka*, when the terms of the bond require payment of duties at the time they are "found to be due," a breach of the bond occurs when the surety fails to make payment as per section 1505 (which at the time was 15 days following liquidation) — not at the time of liquidation.  *Id.* at 500.

In 1993, and still in effect today, Congress amended the language of section 1505 to specify that duties are due "30 days after issuance of the bill for such payment."  19 U.S.C. § 1505(b); North American Free Trade Agreement Implementation Act, Pub. L. No. 103-182, § 642, 107 Stat. 2205 (1993).  This statutory amendment reflects a change by Congress regarding when the Government's ability to pursue a claim for nonpayment would begin — changing the accrual date from fifteen days post-liquidation to thirty days post-bill.  *Stone v. INS*, 514 U.S.

25

386, 397 (1995) ("When Congress acts to amend a statute, we presume it intends its amendment to have real and substantial effect.").

Here, the terms of the continuous bond indicate that Aegis must "[p]ay, as demanded by CBP, all additional duties, taxes, and charges subsequently *found due*."  Pl. Ex. 1 (emphasis added).  CBP's regulations provide that "bills for duties, taxes, fees, interest, or other charges are due and payable within 30 days of the date of issuance of the bill."  19 C.F.R. § 24.3(e).  Likewise, section 1505, as amended in 1993 to its current form, provides that duties "are due 30 days after issuance of the bill for such payment."  19 U.S.C. § 1505(b) (2004).  Applying the logic of *Ataka* to the facts of this case, the duties were not due from the surety until 30 days after CBP issued the bill to Aegis as per section 1505, and the breach of the bond by Aegis occurred when the bill became delinquent.  This interpretation is consistent with the bond terms and CBP regulations which require a demand and payment within 30 days before the bond is breached and our cause of action accrues.  The date of deemed liquidation does not figure into this calculus.

Aegis further contends that the Government's position is inconsistent with the purpose and history of 19 U.S.C. § 1504.  Def. Br. at 24.  However, Aegis confuses the time when the *amount* of duties is mathematically computed with the time when Aegis is liable to pay the outstanding duties.

As relevant here, section 1504(d) states that "when a suspension . . . order is removed, [CBP] shall liquidate the entry . . . within 6 months after receiving notice of the removal from [Commerce] . . . .  Any entry . . . not liquidated by [CBP] within 6 months after receiving such notice shall be treated as having been liquidated at the rate of duty, value, quantity, and amount of duty asserted by the importer . . . ."  19 U.S.C. § 1504(d).  "Liquidation means the final computation or ascertainment of the duties . . . ."  19 C.F.R. § 159.1.  Unless protested within the

time prescribed by law, section 1514 renders the deemed liquidation and the duties owed final and conclusive.  19 U.S.C. § 1514(a).

Indeed, sections 1504 and 1514 can foreclose an increase in the amount of duty owed once the entries liquidate and become final, but do not speak to the time when those duties are due or when a claim accrues against a surety on a bond.  As demonstrated above, for the surety, that is left to the terms of the continuous bond at issue.  Notably, because no statute of limitations exists with regard to the collection of duties from an importer, it does not "strain[] credulity to believe that" sections 1504 and 1514 are unconcerned with the amount of time an importer or surety can be held liable for duties owed, as argued by Aegis.  Def. Br. at 24–25; *Ataka Am.*, 826 F. Supp. at 497–98 ("It is a longstanding principle that customs duties are a personal debt upon the importer that derives from a statutory rather than a contractual obligation.  Thus, suit by the United States against [an importer] for recovery of duties is not barred by the contractual statute of limitations found in 28 U.S.C. § 2415(a).") (citations omitted).

Moreover, Aegis's reliance on *United States v. Cherry Hill Textiles, Inc.* is misplaced. Def. Br. at 24.  In *Cherry Hill*, the importer entered the imported merchandise duty free.  *United States v. Cherry Hill Textiles, Inc.*, 112 F.3d 1550, 1551 (Fed. Cir. 1997).  Because CBP did not liquidate the entry within one year from the date of entry, it deemed liquidated pursuant to 19 U.S.C. § 1504.  *Id.* at 1558.  However, one month after the date of deemed liquidation, CBP liquidated the entry for a second time (reliquidated) and assessed duties — thus increasing the amount owed by the importer.  *Id.* at 1559.

The Federal Circuit found this second liquidation invalid because "[t]he effect of a 'deemed liquidation' is therefore to fix the liability of the importer or surety."  *Id.* at 1559.  "The 'deemed liquidation' must therefore be regarded as final.  In cases in which a liquidation has

27

become final, the government cannot seek to recover additional duties simply by making a new liquidation of the original entry."[12]  *Id.* at 1560.

Here, the Government is not seeking to replace the deemed liquidations with subsequent reliquidations.  This is evident from the instructions on the entry summaries and the explanation of the procedures taken by CBP in the Ingalls affidavit.  Pl. Ex. 2; Pl. Ex. 3 at ¶¶12–14. Furthermore, the Government's complaint and other filings make clear that the Government only seeks to collect amounts owed pursuant to the deemed liquidation of the entries.  Accordingly, the Government is not seeking to replace the deemed liquidations from 2003 and 2004 with new ones, or collect increased antidumping duties mistakenly billed on these entries.  We merely seek to recover upon the continuous bond for the remaining antidumping duties that are lawfully owed by Linyi after the STBs satisfied only a portion of the outstanding debt.  That debt was determined at the time of deemed liquidation but was not due to be paid by Aegis until a demand was issued by CBP as per the terms of the bond and 19 U.S.C. § 1505(b).

Finally, the interest provision of section 1505(d) does not detract from this analysis. Aegis argues that since delinquency interest pursuant to 19 U.S.C. § 1505(d) may run from the date of liquidation, any cause of action to collect on the principal debt should also accrue from that date.  Def. Br. at 23.  However, section 1505(d) is irrelevant to determining when a bond is breached and, therefore, when the cause of action accrues.

Reading section 1505 as a whole demonstrates that 1505(d) interest is not a consequence for failing to pay monies due under a bond but rather compensates the Government for the time

---

[12] Due to a statutory amendment to 19 U.S.C. § 1501, which became effective for entries made on or after December 18, 2004, CBP now has authority to reliquidate entries that liquidated by operation of law within 90 days.  Miscellaneous Trade and Technical Corrections Act of 2004, P.L. 108-429, §§ 2107-08.  At the time of the *Cherry Hill* decision, this was not the case.

value of money for under-deposits at the time of entry.  *See* 19 U.S.C. § 1505(a), (c).  Because

the United States employs a retrospective duty system, the ultimate applicable AD/CVD rate is

unknown at the time of entry.  Through the provision of pre-liquidation and delinquency interest,

the statutory scheme aims to put the Government in the position that it would have been in if the

appropriate deposit rate and amount had been known at the outset by compensating for the time

value of the under-deposited money.  Because it is calculated from the date of liquidation,

section 1505(d) interest picks up where pre-liquidation interest under 19 U.S.C. § 1505(c) and/or

19 U.S.C. § 1677g leaves off.  *See American Drew v. United States*, 577 F. Supp. 3d 1367,

1369–70 (Ct. Int'l Trade 2022).  In essence, the three provisions read together show that

Congress sought to provide interest to the Government on the underpayment of duties from the

date of entry until the time when the duties are paid.  Thus, measuring interest from the date of

liquidation simply places the Government in the position that it would have been in if the final

duty rate and amount had been known and collected at the time of entry — this is unrelated to

the question of when the cause of action accrues.

Similarly, although section 1505(d) interest may be calculated from the date of

liquidation, it is not until a bill remains unpaid for 30 days that it begins to accrue.  19 U.S.C. §

1505(d); *Am. Home. Assurance Co.*, 857 F.3d at 1335 ("In other words, the government is

entitled to post-liquidation § 1505(d) interest, which may accrue up to the face of the bond,

starting thirty days after Customs issues the first post-liquidation bill and ending when the full

balance is paid (up to the bond amount).").

In short, although interest pursuant to section 1505(d) may be calculated from liquidation

to compensate the Government for the lost time value of money, it is the failure to pay a bill

within 30 days that triggers both the post-liquidation interest provisions of sections 1505(d) and

580 — again showing that a delinquent bill is a necessary element of the Government's claim.

III.     *ENCINO MOTORCARS, LLC V. NAVARRO* **IS INAPPOSITE**

Aegis argues that the Government's effort to collect upon the bond at issue is an arbitrary

and capricious interpretation and enforcement of a regulation and damaging to the reliance

interests of Aegis and similarly-situated sureties.  Def. Br. at 25–26.  Aegis relies upon the

Supreme Court's decision in *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117 (2016) and the

testimony of James Zuhlke to support its contention.  *Id.*  However, unlike this case, *Encino*

*Motorcars* is not rooted in contract law, and its administrative law holding is inapplicable to the

facts presented in this case, as well as the Court's *de novo* standard of review applicable here.

Additionally, Aegis's business practices belie the assertions of Mr. Zuhlke.

At issue in *Encino Motorcars* was the interpretation of a provision of the Fair Labor

Standards Act (FLSA).  *Encino Motorcars*, 136 S. Ct. at 2121–22.  Congress had authorized the

Department of Labor to create rules to implement this provision and through a number of

administrative actions over 30 years, the Department had consistently interpreted the statute to

exempt certain automobile dealership employees from its reach.  *Id.* at 2122–23.  In 2011,

however, the Department issued a regulation through the notice-and-comment rule marking

procedure that no longer interpreted the statute to exclude these employees.  *Id.* at 2123.

Because the Department was engaged in rule making with the force and effect of law under the

Administrative Procedure Act (APA), the Supreme Court engaged in a *Chevron* analysis to

determine whether the Department's interpretation was entitled to any level of deference.  *Id.* at

2124.

In so doing, the Court found that the Department had issued this regulation "without the reasoned explanation that was required in light of the Department's change in position and the significant reliance interest involved" and was therefore arbitrary and capricious. *Id.* at 2126. Thus, the Department's rule could not carry the force of law and the statute would be interpreted without deference to the agency's interpretation. *Id.* at 2127.

*Encino Motorcars* is inapposite to the facts presented by this case. This case is solely about Aegis's breach of its bond. CBP has not engaged in any rulemaking to fill gaps in a statute nor are we asking the Court to afford deference to any agency regulation. Instead, we are simply asking the Court to enforce the terms of a contract (*i.e.*, the continuous bond) against a party who voluntarily and willingly entered into a commercial transaction and knowingly and freely agreed to the terms of its bond (Aegis). Accordingly, the issues of administrative law discussed in *Encino Motorcars* are simply not present here, and their application does not resolve this matter.

Moreover, although Aegis argues that it and the surety industry relied upon a purported "previous consistent interpretation of the accrual date for duty claims based upon the deemed liquidation of entries" (Def. Br. at 26), in the context of a contractual duty owed to the Government, it is well-settled that the Government's prior treatment of a contract term cannot form the basis of an equitable estoppel claim absent the claimant's showing of "affirmative misconduct" by the Government. *Rumsfeld v. United Technologies Corp.*, 315 F.3d 1361, 1377 (Fed. Cir. 2003); *Zacharin v. United States¸* 213 F.3d 1366, 1371 (Fed. Cir. 2000). The Federal Circuit has made clear "that the Government may not be estopped on the same terms as any other litigant." *United Technologies Corp.*, 315 F.3d at 1377. Indeed, "if equitable estoppel is available at all against the government some form of affirmative misconduct must be shown in addition to the traditional requirements of estoppel." *Zacharin¸* 213 F.3d at 1371. Here, Aegis

31

THIS PAGE CONTAINS CONFIDENTIAL INFORMATION

fails to allege — let alone prove by a preponderance of the evidence — that the Government has

engaged in any affirmative misconduct that could conceivably give rise to an estoppel defense.

*See Zacharin¸* 213 F.3d at 1371–72.

Finally, even assuming, for argument's sake, that the administrative law principles of

*Encino Motorcars* could apply here, Aegis still has not demonstrated a reliance interest that

would be damaged if this Court enforces the bond at issue.  Although Mr. Zuhlke testified that

Aegis's "surety business procedures and risk analysis rely upon" the "statute of limitation for

collection of the debt expiring six years following liquidation," this claim is conclusory and

contradicted by the undisputed facts revealed through discovery.  Def. Br. at 26.

First, Aegis fails to explain or present evidence to demonstrate how enforcing this bond

will "wreak[] havoc on the policies and procedures" of Aegis and the surety industry, or how

such alleged havoc could provide a cognizable legal defense.  Def. Br. at 27.  Further, the

undisputed facts show that Aegis did not rely upon a notion that its liability under the bonds

would expire six years after liquidation when formulating its policies and procedures used to

administer its customs bond program.

For example, from 2002 through 2014, ███████████████████████████████████

███████████████████████████████████████.  Def. Ex. 18 at 82:2–

87:22.  With respect to the bond at issue, ████████████████████████████████

██████████████████████████.  Def. Ex. 5 (Def. Resp. to Pl. 1st Rogs. No. 1);

Def. Ex. 18 at 85:21–87:22.  Indeed, ██████████████████████████████████

████████████████████.  Def. Ex. 18 at 85:21–87:22.  Because Aegis was not

aware of the liquidation dates of entries covered by a bond, Aegis could not have relied on a

THIS PAGE CONTAINS CONFIDENTIAL INFORMATION

legal position that its liability under the bonds would expire six years after liquidation when

creating policies, procedures, or making business decisions.

     Furthermore, ███████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████

███████████████████████████████. Def. Ex. 5 (Def. Resp. to Pl. 1st Rogs. No.

4); Def. Ex. 3 at 81:9–83:22; Def. Ex. 8 at 8:9–15:20.   Thus, Aegis did not return collateral as a

matter of course, when a period of six years elapsed after a liquidation, in reliance upon the

assumption that the statute of limitations had expired.   Finally, ████████████████████

██████████████████████████████████████████████████████████████████████████

███████. Def. Ex. 5 (Def. Resp. to Pl. 1st Rogs. No. 21).   Therefore, financial reserves were not

released in reliance upon on an expectation that its liability under the bonds would expire six

years after liquidation.

     In sum, the undisputed facts show that Aegis did not rely to its detriment when

organizing its business on the assumption that its liability under the bonds would expire six years

after liquidation.   Rather, the undisputed facts show that Aegis created policies and procedures

acknowledging that it did not consider itself liable for duties until CBP issued a bill (*i.e.*¸

██████████████████████████████████████████████████████████████████████████

███████████).

## IV.    <u>THIS ACTION IS NOT BARRED BY AFFIRMATIVE DEFENSES OF LACHES</u>

### A.  **The Affirmative Defense Of Laches Is Unavailable Under The Circumstances Presented By This Case**

The affirmative defense of laches is unavailable for two reasons.[13]  First, the Supreme Court has held that when Congress has enacted a statute of limitations, the affirmative defense of "laches cannot defeat a damages claim brought within the period prescribed" by law.  *SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods., LLC*, 580 U.S. 328, 137 S. Ct. 954, 960 (2017) (*SCA Hygiene*) (internal citations omitted).  In *SCA Hygiene*, the Supreme Court rejected the defendant's assertion of a laches defense against an action timely commenced within the statute of limitations permitted by the Patent Act.  *Id.* at 960–61.

The Court explained that separation of powers concerns are implicated if laches is applied when a statute of limitations period has been specified by Congress:

> The enactment of a statute of limitations necessarily reflects a congressional decision that the timeliness of covered claims is better judged on the basis of a generally hard and fast rule rather than the sort of case-specific judicial determination that occurs when a laches defense is asserted. Therefore, applying laches within a limitations period specified by Congress would give judges a "legislation-overriding" role that is beyond the Judiciary's power. . . . courts are not at liberty to jettison Congress' judgment on the timeliness of suit.

*Id.* at 960 (internal citations and quotations omitted); *see also S.E.R., Jobs for Progress, Inc. v. United States*, 759 F.2d 1, 9 (Fed. Cir. 1985) (concluding that "laches cannot ordinarily be invoked as a defense to legal claims where a statute of limitations is normally available to

---

[13] At oral argument, the Government stated that prejudice to a surety due to the passage of time may limit CBP's ability to collect upon a bond.  Oral Arg. Tr. at 97:16–99:5.  However, at the time the parties had yet to research and brief the issue of laches.  *Id.* at 18:19–21:17, 26:13–24, 96:5–20.  Upon further review of this issue, the clarification discussed in this section is necessary.

preclude the recovery on stale claims, unless the offended party has been unmistakably prejudiced by the delay in the assertion of the claim").

In essence, "[l]aches is a gap-filling doctrine, and where there is a statute of limitations, there is no gap to fill." *SCA Hygiene*, 137 S. Ct. at 961.

Here, the parties agree that the six-year statute of limitations prescribed by 28 U.S.C. § 2415(a) for "action[s] for money damages brought by the United States . . . founded upon any contract" applies to an action for collection upon a customs bond pursuant to 28 U.S.C. § 1582(2). Pl. Br. at 15; Def. Br. at 12. The Government has demonstrated above that this action was timely commenced within the period allowed by section 2415(a). Def. Br. at 15–26. Therefore, because a statute of limitations already governs this action, the doctrine of laches is unavailable as a defense in this matter.

Second, separate from the fact that the Government's cause of action is already governed by a statute of limitations, the Supreme Court has held that the United States is generally not "subject to the defense of laches in enforcing its rights." *United States v. Summerlin*, 310 U.S. 414, 416 (1940). However, we observe that in more recent years, certain jurisdictions have "refuse[d] to shut the door completely to the invocation of laches or estoppel (similar doctrines) in government suits." *United States v. Admin. Enter., Inc.*, 46 F.3d 670, 673 (7th Cir. 1995). In our jurisdiction, the Federal Circuit has stated that it does "not think that the thrust of the decisions is that laches is always inapplicable *per se* in any contract or other claim where a legal rather than an equitable remedy is sought." *S.E.R., Jobs for Progress, Inc.*, 759 F.2d at 8–9.

Even in jurisdictions that recognize the defense, there is a consensus among several circuit courts that "laches is not available against the federal government when it undertakes to

enforce a public right or protect the public interest." *United States v. Angell*, 292 F.3d 333, 338 (2d Cir. 2002); *see also Admin. Enter., Inc.*, 46 F.3d at 673 (noting the distinction "between government suits in which the government is seeking to enforce either on its own behalf or that of private parties what are in the nature of private rights, and government suits to enforce sovereign rights, and to allow laches as a defense in the former class of cases but not the latter") (internal citations omitted); *United States v. Arrow Transp. Co.*, 658 F.2d 392, 394 (5th Cir. 1981).

Collection of duties on imports is a fundamental act of sovereignty designed to benefit the public interest. *Air-Sea Brokers, Inc. v. United States*, 66 C.C.P.A. 64, 68 (1979) ("When acting in its sovereign capacity, the Government is acting for the benefit of the general public a role clearly embracing the collection or refund of duties on imports."); *see also Bethlehem Steel Corp. v. United States*, 551 F. Supp. 1148, 1150 (Ct. Int'l Trade 1982) ("the Government through its Customs Service is acting in its sovereign capacity in the collection of duties on imports"); *United States v. Fed. Ins. Co.*, 805 F.2d 1012, 1014 (Fed. Cir. 1986) ( "no equitable estoppel can arise against the government in connection with an obligation to pay taxes. . . . Thus, the Court of International Trade erred, as a matter of law, in holding that the government was equitably estopped from collecting from the importer and its surety the duties owed to the public fisc.").

Here, the Government brought this action pursuant to 28 U.S.C. § 1582(2) to recover upon a continuous entry bond issued by Aegis that secured customs duties owed by an importer. *See* AC ¶¶ 2, 6. Because this suit seeks to collect customs duties, it is enforcing a public right and therefore the affirmative defense of laches is unavailable to Aegis. However, even if the Court were to consider the merits of this defense, which it should not, Aegis has failed to demonstrate that this action should be dismissed on this equitable basis.

**B. Aegis Has Not Demonstrated That It Is Entitled To Dismissal Of This Action On The Basis Of Laches**

Laches is an affirmative defense, which defendant has the burden to plead and prove. USCIT Rule 8(d)(1); *Cornetta v. United States*, 851 F.2d 1372, 1380 (Fed. Cir. 1988). Laches "requires that there be (1) unreasonable and unexcused delay in bringing the claim, and (2) material prejudice to the defendant as a result of the delay." *Advanced Cardiovascular Systems, Inc. v. SciMed Life Systems, Inc.*, 988 F.2d 1157, 1161 (Fed. Cir. 1993) (*ACS*); *see also JANA, Inc. v. United States*, 936 F.2d 1265, 1269 (Fed. Cir. 1991).

In this jurisdiction, "[t]he mere passage of time does not constitute laches." *ACS*, 988 F.2d at 1161. "Even lengthy delay does not eliminate the prejudice prong of the laches test." *Cornetta*, 851 F.2d at 1378. Thus, in this circuit, for Aegis to prevail on its affirmative defense of laches it must prove unreasonable and unexcused delay on behalf of the Government *as well as* material prejudice resulting therefrom. *ACS*, 988 F.2d at 1161; *JANA, Inc.*, 936 F.2d at 1269; *Cornetta*, 851 F.2d at 1378–80; *Pepper v. United States*, 794 F.2d 1571, 1573 (Fed. Cir. 1986).

The Federal Circuit recognizes two types of prejudice resulting from delay: (1) defense prejudice and (2) economic prejudice. *JANA, Inc.*, 936 F.2d at 1269–70; *Cornetta*, 851 F.2d at 1378. Defense prejudice constitutes the "impairment of the ability to mount a defense due to circumstances such as loss of records, destruction of evidence, or witness unavailability." *JANA, Inc.*, 936 F.2d at 1269–70; *see also Cornetta*, 851 F.2d at 1378. Economic prejudice requires the proponent to demonstrate that it suffered monetary consequences due to a change in position that was caused by the delay in filing suit. *Cornetta*, 851 F.2d at 1378. For example, courts have required the proponent of the claim of economic prejudice to "demonstrate with competent evidence that it suffered a change in position adverse to its interests. That is, the [proponent] must show a substantial likelihood that it could have defeated the underlying claim . . . , settled

37

the case for a smaller sum than that for which it was ultimately settled, suffered tangible economic injury, or irretrievably lost a substantial right" attributable to the plaintiff's delay in bringing an action. *AHAC 2016*, 151 F. Supp. 3d at 1351 (citations omitted).

Here, the undisputed facts demonstrate that Aegis did not suffer from prejudice sufficient to dismiss this action.

### i.   **Aegis Has Failed To Demonstrate That It Suffered Defense Prejudice**

The only defense prejudice Aegis claims is its inability to obtain the customs broker's files associated with the entries at issue. Def. Br. at 33. Aegis cites no other evidence necessary to its defense in this matter that is no longer available due to the passage of time. Def. Br. at 31–36. However, the failure to obtain these documents did not result in prejudice to Aegis's defense.

In 2014, after receiving a bill from CBP, Aegis sought the customs broker's files to review the relevant entry paperwork and obtain the contact information for Linyi. Def. Ex. 18 at 45:14–47:1, 51:1–7. Aegis required this information to issue demand letters to Linyi and to determine the antidumping case number involved. *Id.* at 51:1–56:18. Although these records were no longer available through the customs broker, shortly after Aegis made this request, CBP provided copies of the entry paperwork and a copy of the continuous entry bond to Aegis. *Id.* These documents provided Aegis with information regarding the entries at issue as well as the business address used by Linyi. *Id.* In addition, Aegis was able to determine the antidumping case number through independent internet research. *Id.* at 54:19–56:18.

Thus, because all information sought from the customs broker was obtained through other sources, Aegis did not suffer any defense prejudice.

THIS PAGE CONTAINS CONFIDENTIAL INFORMATION

**ii.    The Economic Prejudice Claimed By Aegis Is Insufficient To Dismiss This Action**

Aegis claims that its subrogation and reinsurance rights were frustrated due to the Government's purported delay in commencing this action.  Def. Br. at 28, 32–33.  However, Aegis fails to meet its burden of proof that the Government's purported delay caused the identified economic prejudice.

First, Aegis has not established that its inability to obtain subrogation from Linyi was due to the fault of the Government.  In 2004, Aegis became aware that Linyi improperly entered merchandise subject to antidumping duties under the continuous bond.  Def. Ex. 18 at 105:11–114:8.  In response, ██████████████████████████████████████████ ████████████████ *Id.* ██████████████████████ . *Id.* ██████████████████ ██████████████████████ . *Id.*  Similarly, after receiving a bill from CBP in 2014 for the antidumping duties owed by Linyi, ██████████████████████ ██████████████ . *Id.* at 66:2–67:20, 74:23–75:21.  ████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████ . *Id.* at 76:17–77:23.  Based upon this history, ██████████████ ████████████████████ , Aegis cannot establish that, had this action been commenced within six years of the date of deemed liquidation, it would have been successful in obtaining subrogation from Linyi.

Second, Aegis's claim of economic prejudice is undermined by the fact that it is entitled to ██████████████████████████████████████████████ ██████████████████████████ . Def. Ex. 12.  The Indemnity and Hold Harmless Agreement between Aegis and Kingsway provides that:



Def. Ex. 12 at 10008.

This agreement includes ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *Id.* Due to LGIC's insolvency, Kingsway agreed to pay 60 percent of Aegis's future losses (with some limitations not relevant here), that would have been previously covered by the LGIC reinsurance. Def. Br. at 32; Def. Ex. 2 at 97:24–101:14; Def. Ex 14; Pl. Ex. 9 (Def. Resp. to 2d Rogs. No. 1(b)). Aegis has failed to demonstrate — or even alleges — that it is unable to obtain indemnification from Kingsway due to the passage of time or that any purported delay on behalf of the Government has resulted in prejudice with regard to Aegis's ability to enforce these agreements. Thus, Aegis has failed to meet its burden of proof to demonstrate that its ability to recover from LGIC and/or Kingsway was caused by the Government purported delay.[14]

Finally, Aegis's argument that the Government's delay in commencing this action led to an "unnecessary accrual of interest under 19 U.S.C. § 1505(b) and (d)" is incorrect. Def. Br. at 31–32. The entries made by Linyi were secured by both the continuous bond at issue and ten STBs that were issued by ▮▮▮▮▮. Pl. Ex. 3 ¶8. The first bills from CBP to recover the outstanding antidumping duties were issued to Linyi in October 2014. *Id.* at ¶14. When Linyi failed to pay, CBP first sought payment from Aegis in January 2015 for the debt, which would be limited to the face value of the $50,000 continuous bond. *Id.* at ¶¶16–18. Only once Aegis

---

[14] Aegis cites the same prejudice to support its impairment of suretyship defense — frustration of subrogation and reinsurance rights. Def. Br. at 35–36. But, as demonstrated above, Aegis has not met its burden of proof to dismiss this action on that basis.

THIS PAGE CONTAINS CONFIDENTIAL INFORMATION

refused to pay this debt, did CBP seek payment from ▉▉▉▉▉ under the STBs in April 2015.  *Id.* at ¶20.  ▉▉▉▉ did not pay on the STBs until November 2017 and in the interim, over $80,000 in section 1505(d) interest accumulated on the outstanding balance of the duties as asserted by the importer at entry, running from date that the first bill was issued to Linyi (*i.e.*, October 2014). *Id.* at ¶¶22–24; *See* Pl. Ex. 8 (Pl. Resp. to Rogs. No. 9–11) (Pl. Resp. to RFP No. 3).  No delinquency interest was charged for the period from the deemed liquidation of the entries through the date of the first bills to Linyi.  *Id.* (Pl. Resp. to Rogs. No. 9).  Per 19 C.F.R. § 24.3a(c)(4), late payments of outstanding duty bills must first be applied to interest charges prior to principal amount and therefore the STB payments from ▉▉▉▉ resulted in a remainder of $79,171.70 in principal.  Pl. Ex. 3 ¶28; *Am. Home Assurance Co.*, 100 F. Supp. 3d at 1373.

Therefore, the principal outstanding on Linyi's debt exceeded the face value of the continuous bond at the time when CBP first billed Aegis, as well as at the time this action was commenced — any delay in issuing a bill or bringing this lawsuit did not cause interest to unnecessarily accrue to Aegis's detriment.

### iii.   General Prejudice To Aegis's Business Is Insufficient To Support The Defense Of Laches

Aegis claims that "[i]f this Court were to endorse Customs' interpretation of the assessment, liquidation, and collection statutes, Customs' delay would prejudice Aegis at a programmatic level."  Def. Br. at 33.  However, it is Aegis's burden to establish that the delay caused specific and actual prejudice.  "The claimed prejudice must relate to particular bonds, not to a surety's business in general."  *AHAC 2016*, 151 F. Supp. 3d at 1351 (citing *United States v. Great. Am. Ins. Co.*, 738 F.3d 1320, 1330 (Fed. Cir. 2013).  Speculating as to potential future prejudice that defendant "may" experience if the suit is allowed to proceed is insufficient  — "[a] more concrete harm must be shown."  *Admin. Enter., Inc.*, 46 F.3d at 673.

By Aegis's own admission, these claims of prejudice are not related to the continuous bond at issue but rather affect Aegis at the "programmatic level" (Pl. Br. at 33) and are all general business impacts.  Def. Ex. 8 at 87:20–102:23.

iv.     **Aegis's Own Lack of Diligence Led To Any Alleged Harm**

The undisputed facts show that in administering its customs bond program, Aegis acted with willful blindness towards its liabilities and chose to ignore the entries it secured until a bill was issued by CBP.  This lack of diligence contributed to the prejudice that Aegis now seeks to blame on the Government's delay in commencing this action.



Under Aegis's customs bond program, ███████████████████████

██████████████████████████████████████████████████████████████

███████████.  Def. Ex. 18 at 34:19–37:10; Def. Ex. 3 at 59:14–63:6, 67:2–14, 80:1–24; Def. Ex. 8 at 22:21–25:16.  ████████████████████████████████████████

██████████████████████████████████████████████████████████

█████████████████.  Def. Ex. 18 at 100:5–105:5, 123:24–124:24; Def. Ex. 3 at 59:14–61:2, 67:15–69:24.  What is more, █████████████████████████████

███████████████.  Def. Ex. 8 at 39:5–41:16.  However, it was evident from the face of the bond that Linyi was a foreign importer, and yet, █████████████████████

█████████████████████████████████████.  *Id.*

Aegis continued to exhibit a lack of diligence after entries were made under its bonds. For instance, █████████████████████████████████████████████

█████████████████████████████████.  Def. Ex. 18 at 82:2–87:22, 113:1–114:8.  Indeed, ██████████████████████████████████████

████████████████████████████████████████████████.  *Id.*  ████████

42

THIS PAGE CONTAINS CONFIDENTIAL INFORMATION

███████████████████████████████████████████████████. *Id.*  Thus, Aegis

created a system where it remained willfully ignorant to its liability until alerted by CBP.  Thus,

it was unable to settle its debts with CBP and seek subrogation and/or reinsurance coverage at an

earlier point.

Even when Aegis was aware that an importer associated with one of its bonds was

unlikely to pay its duties, Aegis still ignored its liabilities until CBP issued a bill.  For example,

at the renewal date of the continuous bond in 2004, ████████████████████████

██████████████████████████████████████. *Id.* at 105:11–115:21.  In

response, ███████████████████████████████████████

█████████ *Id.* ███████████████████████████████████

████████████████████████████████████████████████████

███████████. at 113:1–115:21.  However, other than terminating the continuous bond,

████████████████████. *Id.*  At this point, Aegis had information regarding Linyi that should

have raised alarm bells. ██████████████████████████████████

██████████████████████████████████████████████i. *Id.* at

64:6–68:24.

The forgoing undisputed facts show that Aegis's lack of diligence led to any purported

harm. ███████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████  A diligent surety would have monitored the entries to determine

whether duties were in fact paid. █████████████████████████████

██████████████████████████████████████ and now claims that its ability

to seek redress from the importer or reinsurer may be diminished. Aegis has not shown that it is in a materially worse position that can be attributed to any purported delay by the Government.

## V.   **CBP DID NOT RELIQUIDATE THE ENTRIES AT ISSUE**

Aegis claims that the bills issued by CBP "could only have been the result of a purported manual liquidation attempted in 2014 more than six years after the entries were deemed liquidated." Def. Br. at 36. Aegis's claim is incorrect. CBP seeks to collect the antidumping duties asserted at entry and owed pursuant to the deemed liquidations of the entries — which were amounts lawfully billed by CBP, even though the bills erroneously contained additional charges.

The following facts show that CBP's bills were not an attempt by CBP to unlawfully reliquidate the entries. In July 2014, Commerce notified CBP in message 4195304 that the suspension of liquidation applicable to these entries lifted years prior, in May 2006. Pl. Ex. 7. Thereafter, CBP took actions to effectuate the deemed liquidations and issue bills for the antidumping duties asserted at entry. Pl. Ex. 3 ¶¶12–14. Indeed, CBP made notations on the entry summaries that the entries deemed liquidated in a manner identified by the Commerce message. *Id.*; Pl. Ex. 2.

Consistent with the deemed liquidations and in order to systematically generate bills for the outstanding antidumping duties, CBP manually entered liquidations for these entries into its electronic system. Pl. Ex. 3 ¶¶12–14. As a result, the first bill to Linyi for each of the entries was issued on October 3 or 31, 2014. *Id.*; Pl. Ex. 4. Thus, these records show that CBP did not attempt to perform an unlawful liquidation/reliquidation of the entries, as alleged by Aegis.

**VI.    A DENIED PROTEST IS NOT REQUIRED TO VEST THE COURT WITH
JURIDICTION TO HEAR AN ACTION BROUGHT UNDER 28 U.S.C. § 1582**

Finally, Aegis claims that the Government's "cause of action against the Miami entries

should be dismissed for lack of final agency action, ripeness, and jurisdiction."  Def. Br. at 37.

For Aegis, because CBP "failed to sign, date, or mail its denial of the Miami protests to Aegis or

its counsel" pursuant to 19 U.S.C. § 1515(a) and 19 C.F.R. § 174.30(a), the decision on the

protest is not final, our collection action is not ripe, and this Court lacks jurisdiction to hear this

matter.  *Id.* at 38.

Aegis's analysis of the law is misguided.

The Government commenced this action pursuant to 28 U.S.C. § 1582(2) to collect

unpaid duties and interest covered, in part, by the continuous bond issued by Aegis.  AC ¶ 2.

Section 1582(2) bestows subject matter jurisdiction on the Court of International Trade for

actions commenced by the United States to "recover upon a bond relating to the importation of

merchandise."  28 U.S.C. § 1582(2).

In this case, when the duties and interest became due, CBP requested payment from Linyi

and Linyi failed to pay.  *See* Pl. Ex. 3 ¶¶13–14, 16; Pl. Ex. 4.  CBP then requested payment from

Aegis.  *See* Pl. Ex. 3 ¶18; Pl. Ex. 5.  Aegis refused to pay, which prompted the commencement

of this court action.  *See* Pl. Ex. 3 ¶19, 32.  Section 1582(2) covers this cause of action, and aside

from the Government seeking to collect outstanding debt "upon a bond relating to the

importation of merchandise," there is no other requirement within section 1582(2) for the

commencement of a suit.

The mailing requirements of 19 U.S.C. § 1515(a) and 19 C.F.R. § 174.30(a) do not

detract from this conclusion.  The statutes — 28 U.S.C. §1582(2) and 19 U.S.C. § 1515(a) — are

separate and independent legal provisions, and the purported failure to mail a notice of denial of

45

a protest does not affect the operation of 28 U.S.C. § 1582(2), or whether jurisdiction exists for this affirmative suit.  There is no requirement within 28 U.S.C. § 1582(2) that CBP mail a hard copy of the notice of the denial of a protest prior to commencing suit.  Indeed, there is no perquisite within the statutory framework that an interested party exhaust the administrative protest remedies of 19 U.S.C. §§ 1514(a), 1515 before the Government is permitted to commence suit under 28 U.S.C. § 1582(2) to collect on a bond.

This concept was addressed in *United States v. Ataka*.  In that proceeding, the Court of International Trade found that the Government need not wait until a defendant's administrative protest was resolved to file suit to collect duties.  *Ataka.*, 826 F. Supp. at 502–04.  In reaching this conclusion, the Court discussed *United States v. Heraeus-Amerisil, Inc.*, 671 F.2d 1356 (CCPA 1982), where the appellate court held that, based on the statute in force at the time, "payment of customs duties did not become due until after any protests were denied and either the importer filed suit in the Court of International Trade or the time to file suit had expired."[15] *Ataka*, 826 F. Supp. at 500.  In response to the *Heraeus-Amerisil* decision, Congress passed legislation, codified as 19 U.S.C. § 1505(c) (1988), "to allow Customs to take immediate steps to collect monies determined to be due and payable to the United States."  *Id.* (quotations and citations omitted).

19 U.S.C. § 1505(c) (1988) — which was applied in the *Ataka* decision — specified that duties determined to be due on liquidation or reliquidation were due 15 days after such liquidation or reliquidation.  *Ataka*, 826 F. Supp. at 500.  This provision was subsequently amended to its current form to change the date from 15 days post liquidation or reliquidation, to

---

[15] The statute applied in the *Heraeus-Amerisil* decision stated that customs "shall collect any increased . . . duties due . . . as determined on a liquidation."  19 U.S.C. § 1505(b) (1981).

46

"30 days after issuance of the bill for such payment."  19 U.S.C. § 1505(b).  Consequently, the interplay of 28 U.S.C. § 1582(2) and 19 U.S.C. § 1505(b) shows that the Government may commence suit to recover upon a bond without the necessity of a denied protest — the only requirement is that the Government issue a bill that remains unpaid for 30 days.  *See*, *e.g.*, *Ataka*, 826 F. Supp. at 503 (a surety "breaches its bond if it does not pay in accordance with its obligation, whether or not protest proceedings are pending").

Here, prior to the commencement of this action CBP made several demands for payment from the importer and surety that remain unpaid.  *See* AC ¶¶19, 22, 35; AA ¶¶19, 22, 35; Pl. Ex. 3 ¶¶13–14, 18–19, 32; Pl. Ex. 4; Pl. Ex. 5.

In short, section 1582(2) confers this Court with jurisdiction to hear this suit, which is an affirmative action "to recover [duties and interest] upon a bond relating to the importation of merchandise."  28 U.S.C. § 1582(2).

## <u>CONCLUSION</u>

For the foregoing reasons, this Court should grant the Government's motion for summary judgment and enter judgment in its favor against defendant, Aegis, for duties and interest pursuant to 19 U.S.C § 1505 in the total amount of $50,000.00 — the contractual limit of the bond — and interest pursuant to 19 U.S.C. § 580 and post-judgment interest pursuant to 28 U.S.C. § 1961, which are not subject to the bond limit.

<div style="margin-left: 40%;">

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

<u>/s/ Justin R. Miller</u>
By:   JUSTIN R. MILLER
Attorney-In-Charge
International Trade Field Office

<u>/s/ Peter A. Mancuso</u>
PETER A. MANCUSO
Trial Attorney
Department of Justice, Civil Division
Commercial Litigation Branch
26 Federal Plaza – Suite 346
New York, New York 10278
Tel. (212) 264–0484 or 9230
Attorneys for Plaintiff

</div>

Of Counsel:
SUZANNA HARTZELL-BALLARD
Office of the Assistant Chief Counsel
U.S. Customs and Border Protection

Dated: October 21, 2022

## <u>CERTIFICATE OF COMPLIANCE</u>

I, Peter A. Mancuso, an attorney in the Office of the Assistant Attorney General, Civil Division, Commercial Litigation Branch, International Trade Field Office, who is responsible for the Government's memorandum of law in response to defendant's motion for summary judgment, dated October 21, 2022, relying upon the word count feature of the word processing program used to prepare the memorandum, certify that this memorandum complies with the word count limitation ordered by this Court of 16,000 words (*Dkt.* No. 80), and contains 15,825 words.

<u>/s/ Peter A. Mancuso</u>