1    UNITED STATES COURT OF INTERNATIONAL TRADE

2

3    Case No. 20-cv-03628

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6    UNITED STATES,

7                      Plaintiff,

8            vs.

9    AEGIS SECURITY INSURANCE COMPANY,

10                     Defendant.

11   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

12

13                   U.S. Court of International Trade

14                   One Federal Plaza

15                   New York, NY 10278

16

17                   April 24, 2023

18                   2:34 PM

19

20

21

22

23   B E F O R E :

24   HON STEPHEN ALEXANDER VADEN

25   U.S. INTERNATIONAL TRADE JUDGE

```
 1  A P P E A R A N C E S :

 2

 3  U.S. DEPARTMENT OF JUSTICE

 4        Attorney for Plaintiff

 5        International Trade Field Office

 6        26 Federal Plaza

 7        New York, NY 10278

 8

 9  BY:  BEVERLY A. FARRELL, ESQ.

10

11  U.S. CUSTOMS AND BORDERS

12        Attorney for Plaintiff

13        26 Federal Plaza

14        Room 258

15        New York, NY 11557

16

17  BY:  TAYLOR R. BATES, ESQ.

18

19  SANDLER, TRAVIS & ROSENBERG, PA

20        Attorneys for Defendant

21        414 Jackson Street

22        Suite 200

23        San Francisco, CA 94111

24

25  BY:  THOMAS R. FERGUSON, ESQ.
```

```
 1   SANDLER, TRAVIS & ROSENBERG, PA

 2        Attorney for Defendant

 3        5835 Blue Lagoon Drive

 4        Suite 200

 5        Miami, FL 33126

 6

 7   BY:  GILBERT L. SANDLER, ESQ.

 8

 9   KING & SPALDING, LLP

10        Attorney for Defendant

11        1700 Pennsylvania Avenue, N.W.

12        Suite 200

13        Washington, DC 20006

14

15   BY:  JEFFREY M. TELEP, ESQ.

16

17

18

19

20

21

22

23

24

25
```

```
 1                  P R O C E E D I N G S

 2            THE COURT:  Please be seated.

 3            THE BAILIFF:  United States Court of International

 4   Trade is now in session.  The Honorable Stephen Alexander

 5   Vaden presiding before court number 20-03628, United States

 6   v. Aegis Security Insurance Company.  Will the attorneys

 7   please state their names and firms for the record, starting

 8   with Plaintiff's counsel?

 9            MS. FARRELL:  Your Honor, the United States,

10   Beverly Farrell.  And with me --

11            MS. BATES:  Taylor Bates on behalf of U.S. Customs

12   and Border Protection.

13            MR. TELEP:  Jeff Telep, King & Spalding for

14   Defendant, Aegis Security Insurance Company.  And with me --

15            MR. SANDLER:  Gilbert Lee Sandler, Sandler, Travis

16   & Rosenberg for Aegis as well.

17            MR. FERGUSON:  T. Randolph Ferguson, Sandler,

18   Travis & Rosenberg for Aegis.

19            THE COURT:  Jason (ph.), we're going to need IT.

20   All right.  We're ready.  Okay.  All right.  Okay.  Thank you

21   all so very much for being here today.  I know this is second

22   time that this case has appeared before me for oral argument

23   after some time taken at your request for discovery.  Let me

24   just begin by reminding you that if anyone would like to have

25   a transcript, it will be seven days from today's date, seven
```

1   calendar days that we will request you to provide that

2   request to us so we can get it to you promptly.

3          Also want to say that I think this case has

4   benefited at least in regard to sharpening and clarifying the

5   issues that are set for this court's adjudication by the time

6   it was taken by the parties.  I don't know if we're

7   completely there yet.  We have to see where things stand at

8   the end of today.  But this set of briefings that was done

9   was much better on all sides than the first set that came

10  through.

11         I want to begin off this afternoon with some

12  factual questions so that I can ensure that I adequately

13  understand the record as it currently stands following

14  discovery before me.  As usual, these questions are not

15  designed to trick.  They're merely designed to inform me and

16  ensure that I understand what the status of things are.

17         My first question is to the Government.  And if the

18  insurance company has any comment on it, they can provide

19  comment after the Government answers.  It's a basic question,

20  but one that is skipped through in the briefing.  And I am

21  reminded of the Federal Circuit's recent opinion affirming me

22  in Acquisition 362 where they took a noted issue in

23  consternation with the Government's failure to explain how

24  the process works as a general matter before diving in to the

25  legal matter that's before the Court.

1            I think that a large amount of the frustration the

2    Court has had with this case is there being no explanation

3    provided really from either party regarding how the normal

4    process of liquidation and demand or billing works, whether

5    it be a case where the custom service does its job and

6    liquidates manually, I'll call it, or whereas here, the

7    custom service fails to do its job and the entry is being

8    liquidated by operation of law.

9            So I'd like to begin with allowing the attorneys

10   for the custom service -- and it can be either of you or both

11   of you.  Doesn't matter to me.  If you could walk me through

12   from your perspective the procedures of statutory and

13   regulatory that customs undertakes to collect the money owed

14   to government.

15           MS. FARRELL:  Your Honor, would you like me to

16   approach the podium?

17           THE COURT:  That would be fine.

18           MS. FARRELL:  Okay.  Your Honor, my understanding

19   of how this process works in the ordinary course -- because,

20   as Your Honor recognizes, with respect to the facts in this

21   case, it's not the ordinary course.  In the ordinary course,

22   an importer has a broker who sends to customs an entry

23   that -- an entry summary that is telling customs on the water

24   are goods that are coming into the United States.  And we

25   think that they're classifiable here.  We think their value's

1   this and that.

2          Once it's at the port, the broker has -- I think

3   it's 10 or 14 days to then actually submit an entry summary,

4   which is the final where they -- they're telling you,

5   customs, this is what came in.  This what we believe is the

6   proper classification.  And the entry summary, the entry

7   paperwork that goes to customs that is the final document

8   upon which customs relies, that document has to contain

9   whether or not -- whether it's bonded.

10          So you'll say that a bond, and you'll say who the

11   bond number, the bond number for the surety, who the surety

12   is.  It will also say whether or not there are anti-dumping

13   duties, whether there are countervailing duties, or whether

14   there are any other kind of strange -- whether there's a

15   drawback possibility, whether there's a country or origin,

16   special free trade.  Those types of data are all baked into

17   the documents.  Customs then receives that.

18          The goods are generally -- unless there's something

19   weird going on, like customs could detain goods if they felt

20   there was a problem -- forced labor, or improper marking, or

21   some other reasons why.  But generally, the goods come in,

22   and they're -- they leave.  They leave the port, and then the

23   paperwork is to be processed.

24          The paperwork goes to an entry team at customs.

25   And so long as customs and many of the entries that come in

1   at customs are typically bypass entries.  So based on the

2   Modernization Act, importers are expected to comply and work

3   with customs.

4           In fact, Judge Kelly recently issued a decision in

5   the Otter Prods case with a nice description of how the trade

6   community in customs have to work together and that customs

7   is relying on the trade community to comply with their Mod

8   Act requirements, which is to put reasonable -- you know, use

9   reasonable efforts to give accurate information into the

10  entry paperwork.

11          So customs will then take that entry paperwork.

12  Likely, it's a bypass.  Now, in the case of an anti-dumping

13  case, which is what we have here, customs is not going to

14  proceed to liquidation if it's been told by commerce, oh,

15  FYI, that particular anti-dumping order -- if it's an

16  initiation of an anti-dumping order, everything stops.  But

17  if it's one that's been around for a while -- and in this

18  case garlic's been around for a while -- that anti-dumping

19  order may be under a review.

20          So every year people who participate can ask

21  customs -- and it's the domestics -- can ask if there's,

22  like, a new shipper or if they think something has changed.

23  And if the rate should change, they can go to commerce and

24  say would you please have -- you know, continue this review

25  for this particular period of time, the one-year period for

```
 1   the entries that come in.  Now, that will obviously --

 2   commerce is going to look at that after the entries have come

 3   in.  So it is a prospective event that will ultimately be

 4   retroactive on the entries for that time period of the

 5   review.

 6              If there's no review at all, then customs can just

 7   proceed to operate normally, which would be -- you know, I

 8   have no reason not to believe that the entry paperwork is

 9   accurate.  The bypass is okay.  No one's tipped us that

10   there's something weird here, and we're just going to go and

11   follow whatever's in the entry paperwork.  And they have one

12   year to get that done to liquidate that entry.

13              Once there is a request to review an anti-dumping

14   order, all bets are off.  Customs can't move forward on that.

15   Unfortunately, there are times when it happens, but they're

16   not supposed to.  They're supposed to stop everything and

17   suspend liquidation.  Commerce now has to undertake its

18   event.

19              And one of the problems is, like, in this instance,

20   if you have a new shipper -- so I'm going to stop a little

21   bit.  If you don't mind, Your Honor, I know you want kind of

22   a generic, but I may pepper a little just so the Court

23   understands that during the time period, in the early 2000s,

24   new shippers of goods that were subject to anti-dumping, you

25   could get Commerce to agree that you could use a bond in lieu
```

1    of making a cash deposit.  And that's the situation that we

2    have here, that the Linyi folks in July of 2003 went to

3    commerce and said, hey, FYI, we're going to be bringing in

4    things that are subject -- in this case garlic -- that's

5    subject to an anti-dumping order.  But we would like to be

6    able because it's a new shipper -- we would like to be able

7    to use a bond in lieu of --

8             THE COURT:  Cash deposit?

9             MS. FARRELL:  -- a cash deposit, exactly.  And that

10   was a strange period.  In 2011, commerce discontinued that

11   because there had been --

12            THE COURT:  A lot of fraud.

13            MS. FARRELL:  Massive abuse, massive abuse by new

14   shippers who had never intended -- I mean, they took

15   advantage of the sureties.  They took advantage of the

16   government.  That, you know, was unfortunate, but that's what

17   happened.  And so in 2011, commerce stopped that, and now I

18   think in 2019, commerce began to consider whether they would

19   allow bonds in lieu of cash deposits again.  I confess to not

20   knowing the full outcome of that.  I apologize Your Honor,

21   but --

22            THE COURT:  But anyhow, this came -- this

23   particular transaction was part of a series of transactions

24   that were part of a failed experiment one might say?

25            MS. FARRELL:  They were part of that time period

1   when, you know, high jinks and you know, shenanigans were

2   occurring by shippers who were taking advantage of the system

3   because they had never intended to -- you know, it was easier

4   just to pay a small premium and get a bond than it is to pay

5   the full amount of the anti-dumping --

6           THE COURT:  Yeah.

7           MS. FARRELL:  -- duties.

8           THE COURT:  Yeah.

9           MS. FARRELL:  So yeah.

10          THE COURT:  So take me now to the point where -- of

11  course, in this case, the company was told, okay, we don't

12  need to review you after all.  So suspension is lifted.  And

13  that was published in the federal registry?

14          MS. FARRELL:  That's right, Your Honor.  And I can

15  again let the Court know that at that time a partial

16  recission -- I'm not sure with the garlic, but there -- in

17  many instances you would have a -- for a new shipper, they

18  should be getting the countrywide rate.  And if the

19  countrywide rate was also under review, it was customs

20  understanding that that new shipper wouldn't -- even though

21  the -- there was a recission specifically to that shipper,

22  the fact that that shipper would then be subject to a

23  countrywide rate, customs thought, well, okay, there -- we're

24  going to have to wait until we get the countrywide rate

25  number from commerce.

1    If there was no countrywide rate number that would

2    generated, then it would make sense, and I -- I'd have to go

3    back and look more closely at the Federal Register notices,

4    because a lot of times they foot in the footnotes that, you

5    know, the countrywide rate is still under review.

6    This court in the American Home case found that

7    partial recission, even if there was a countrywide rate still

8    to be determined, from this court's perspective, that was a

9    lifting of the suspension, and there should have been a

10   liquidation of those at the rate as entered.  But at that

11   time, commerce -- this is back in 2003, 2004 -- that case was

12   in front of Judge Eaton, and I think the final decision in

13   that was 2016 when upstairs came back as a Rule 36 per

14   curiam.

15   So for all intents and purposes, you know, everyone

16   is now of the mind that if there's a partial recission --

17   notwithstanding the fact that there may be a countrywide

18   determination to come that would affect possibly that new

19   shipper, if it's rescinded, as to them it's up.  Go ahead and

20   liquidate.  Liquidate based on the entered amount.  And I

21   supposed, you know, if it were -- I guess under, like, Koyo

22   and some other cases.

23   If, in fact, they ended up dumped into a

24   countrywide rate which was lower, I would imagine an importer

25   might come back and say, hey, you know, you -- we did what we

1   felt was right, and they didn't review us.  But now there's a

2   countrywide rate, and we really should hit that rate.  But

3   that's for another day.  That didn't happen here.

4        So customs did not -- again, because partial

5   recissions weren't something that was triggering, so when

6   they get that final register notice it wasn't triggering

7   customs to go ahead and proceed with a liquidation.  Instead,

8   to protect everyone who's out there when there is, in fact, a

9   suspension listed, there's an automatic liquidation.  It

10  operates by law, and that's what we all know as a deemed

11  liquidation.  You know, colloquially, we're all calling it a

12  deemed liquidation.  So that's what happens here.

13       And once there's a deemed liquidation, there wasn't

14  a requirement for customs to give notice, and that would make

15  sense because in a deemed liquidation, in a world where you

16  don't have bonds in lieu of cash deposits, it would make

17  sense that you wouldn't need a notice because you'd already

18  been paid.  And since it liquidated as entered, you'd already

19  been paid as exactly as was stated upon entry.

20       THE COURT:  What would also make notice because in

21  a deemed liquidation customs cannot change the amount due.

22  Whatever they wrote down on the piece of paper governs

23  whether it's right or wrong.

24       MS. FARRELL:  Correct.  Unless --

25       THE COURT:  And presumably, they know what they

1   wrote down on their own piece of paper.

2          MS. FARRELL:  That's correct, Your Honor.  They

3   know that under the Mod Act what they wrote on their paper

4   should be accurate and you know, correct.  So they wouldn't

5   need to know because they would just say we already paid,

6   we're good.

7          What we have is this slice of time where -- you

8   know, we call them unicorns, or quirky cases, or however you

9   want to say it.  But there's a slice of time where strange

10  things happen like what we see in this case where you have

11  that deemed liquidation, but in fact, you need to actually

12  give notice and tell people, hey, you owe me money.

13         THE COURT:  Well, the notice part is -- do you

14  distinguish between notice and the bill?

15         MS. FARRELL:  No.  Notice and the bill for all

16  intents and purposes are the same thing, because if there's a

17  deemed liquidation and you're not getting notice -- but if

18  there's a regular old liquidation, a regular old liquidation

19  at liquidation --

20         THE COURT:  So you think that notice and the bill

21  are the same thing?

22         MS. FARRELL:  I think they are, Your Honor.

23         THE COURT:  Okay.  Go on.  Tell me more.

24         MS. FARRELL:  So when the bill goes out with a

25  liquidation, then an importer knows that it has to pay X

1    amount of money, and it knows it has 30 days free float to do

2    it.  If it doesn't pay, then customs might send another

3    demand and say, hey, did you --

4            THE COURT:  Where do we get the -- you get 30 days

5    to pay?

6            MS. FARRELL:  The 30 days to pay is built into both

7    the statute and the reg.

8            THE COURT:  Okay.  Where in the statute do I find

9    it?

10           MS. FARRELL:  I think it's 1505(b).  If Your Honor

11   will let me just take a quick peek so I don't misstate.

12   Right, 1505(b), duties, fees, and interests determined to be

13   due upon liquidation or reliquidation are due 30 days after

14   issuance of the bill for such payment.  So --

15           THE COURT:  Okay.  I thought you just told me that

16   notice and the bill were the same thing and notice isn't

17   required in a deemed liquidation.

18           MS. FARRELL:  Well, in a deemed liquidation, no

19   notice is required because that was -- this is a kind of

20   unique scenario.  In the ordinary course there weren't bonds

21   in lieu of cash deposits, so a deemed --

22           THE COURT:  Well, but did they amend the statute to

23   reflect that?

24           MS. FARRELL:  I don't think that they amended the

25   statute to reflect the bonds, but I do think that customs is

1   now required to give notice on deemed liquidations.

2          THE COURT:  Well, the statute version that I have

3   says in 1504(a)(1), it says notwithstanding 1500(e) of this

4   title, which generally requires notice, notice of liquidation

5   need not be given of an entry deemed liquidated.

6          MS. FARRELL:  Right.

7          THE COURT:  So if you're telling me that notice and

8   the bill are one in the same, how do you wrap your argument

9   then around a bill being the triggering event for accrual of

10  the cause of action?

11         MS. FARRELL:  Because --

12         THE COURT:  If there were two separate sheets of

13  paper -- if the notice were one thing and then

14  congratulations, your item has liquidated, and then the bill

15  were separate, maybe that makes sense.  But if you're telling

16  me that notice and the bill are the same thing and the

17  statute clearly says notice is not required when there's a

18  deemed liquidation, then why isn't the surety company correct

19  that if -- that has to mean that it accrues on liquidation?

20         MS. FARRELL:  Well, it wouldn't accrue upon

21  liquidation because even if -- there has to be a bill that

22  goes out to -- even at the time of liquidation, there has to

23  be a bill that goes out if money is due and owing.  In that

24  strange scenario of a deemed liquidation, if we don't have a

25  bond in lieu, there wouldn't necessary be a bill that would

1  go out.  And there's no need to give anyone notice that

2  you're -- when the bill goes out on a 612 report, an importer

3  knows when they get that bill on the 612 report, oh, that

4  means this entry -- because it lists the entry --  that means

5  this entry has liquidated.  So now they know it's liquidated.

6  So it's like a dual purpose event.

7          THE COURT:  Well, is there -- I mean, you're

8  explaining to me how you think this may work as a practical

9  matter.  I'm looking at the statutes and the regulations.

10 The reason why I asked you to describe for me the process as

11 you understand it working is because I want to understand

12 that I'm reading the statutes and regulations correctly.  But

13 is there any regulation that was applicable at the time of

14 these transactions having occurred that lays it out as you

15 have?  I mean, I -- I'm a little surprised that you came in

16 and said that notice and the bill are the same thing because

17 if notice and the bill are the same thing, doesn't that blow

18 your case out of the water?

19          MS. FARRELL:  Well, well, no, Your Honor.

20          THE COURT:  Because the statute is very explicit in

21 saying, no, this is not required in a deemed liquidation.

22          MS. FARRELL:  Correct, Your Honor.  A separate

23 notice that a liquidation has occurred is not required.  And

24 the reason it's not required, you don't need to know that an

25 entry has liquidated because if the deposit is there, it's

1  already paid.  Upon liquidation everything is done.  There's

2  no more.

3          THE COURT:  Well, that's true, but the statute

4  doesn't say notice is not required unless you posted a bond.

5  It just says notice is not required for a deemed liquidation,

6  meaning any deemed liquidation.

7          MS. FARRELL:  Right, right, Your Honor.  So yes,

8  that's true that notice is not required.

9          THE COURT:  Unless you've got a regulation

10  somewhere that you didn't point to --

11          MS. FARRELL:  No.

12          THE COURT:  -- in the -- that says, you know, oh,

13  it's a different if there's a bond, and here's why.  Read our

14  regulation.

15          MS. FARRELL:  No, Your Honor.  There isn't any

16  separate -- there is no separate regulation.  It's just that

17  in this unique scenario because it -- typically, a deemed

18  liquidation would not require anything else to be done.

19  There is no notice that goes out.

20          THE COURT:  So let me try to go down the train here

21  because you've taken me off a track that I thought I was

22  going to be on with your colloquy with me here in answering

23  these questions.  Is your argument that accrual in the

24  instance of a deemed liquidation such as we have here only

25  happens on issuance of a bill limited to cases where someone

1    has posted a bond in lieu of actual deposit?  Are you saying

2    that the accrual of a deemed liquidation, the accrual of any

3    causes of action related to a deemed liquidation differ based

4    on whether or not a bond is posted?

5            MS. FARRELL:  Well, what I would say, Your Honor,

6    is that in situation where a bond has been posted in lieu of

7    cash deposits, it changes the dynamic.

8            THE COURT:  Well, I don't disagree there, but I

9    don't see that in the statute.  So if the statute said except

10   where there's a bond or it mentioned a bond in some form or

11   fashion other than the statutory permission that you can ask

12   for a bond instead of a cash deposit, you know, to me I

13   thought you were going to come in here and say something

14   like, you know, it's the same regardless of how it's

15   liquidated and how they pay.  We have to send a bill.

16           Instead, you come in here and said a notice and a

17   bill are the same thing.  Notice is not required for deemed

18   liquidation except in this instance where we had this little

19   experiment that failed where we allowed new shippers to post

20   bonds instead of cash deposits.  That's almost in a lawless

21   space out there floating somewhere.  I mean, maybe that's

22   what the statute should say, but that's not what it has said

23   in any point at any -- and I've looked at a whole lot of

24   different versions of this statute going back to the 1970s

25   and your regulations, and I don't see anybody drawing the

1    distinction that you're drawing here today.

2           MS. FARRELL:  Well, I think, Your Honor, the

3    distinction that I'm drawing is that the reason a notice

4    wouldn't be necessary in a deemed liquidation is that you

5    wouldn't be sending -- you typically wouldn't be sending a

6    bill out on a deemed liquidation because the money would've

7    already been deposited as the face of the entry required.

8    There had been no change to the as entered amount, and the

9    money would've already been paid to customs.

10          THE COURT:  Well, it seems as though when we were

11   first here -- and I know you weren't here.  Mr. Mancuso was

12   where you are today.  When we were here nearly a year ago, we

13   argued this for the first time.  I posited playing devil's

14   advocate from the Government's perspective at least at that

15   time that maybe one way to read the statute is this bill is

16   necessary where the customs does its job and liquidates

17   itself, and in particular, if they determine, whoops, we

18   disagree with you on how much you owe.  We think you actually

19   owe X instead of Y.  The bill makes perfect sense, and I --

20   because how else would you know what Commerce wanted from --

21   customs wanted from you and if it was more or less and what

22   have you?

23          MS. FARRELL:  Your Honor, if I may answer that.

24          THE COURT:  But I'm not finished --

25          MS. FARRELL:  Oh, sorry.

1          THE COURT:  -- with my remark. And then maybe it
2  didn't apply in the event of a deemed liquidation.  And at
3  that point, Mr. Mancuso disagreed with me, and he said a bill
4  is a bill, and it's required for everything regardless of how
5  it's done.  And then today you walk in here, and you're
6  saying exactly the opposite.
7          MS. FARRELL:  Your Honor, if I may, I don't think
8  I'm saying exactly the opposite of that.  If money is due and
9  owing to the government, a bill is required.  A demand must
10  be made because, you know, they're not mind melding with the
11  government.  They're not going to know.  When Your Honor was
12  discussing, you know, how would they know if we disagreed
13  with a deemed --
14          THE COURT:  Well, a deemed liquidation you can't
15  disagree.  It's happened.  Your right to disagree is
16  terminated with a deemed liquidation.
17          MS. FARRELL:  Well, with a deemed liquidation, it
18  doesn't necessarily become final.  You have 90 days to
19  reliquidate.  So if you thought that there was an error in
20  the deemed liquidated, within --
21          THE COURT:  Well, that hasn't happened here.
22          MS. FARRELL:  Correct, Your Honor.
23          THE COURT:  There's been no reliquidation.
24          MS. FARRELL:  But just to clear out the entire
25  picture, that's something that customs does which is called a

1    rate advance.  If they felt there was an error in what the

2    importer put in their entry papers, customs can during the

3    pendency or within 90 days thereafter let the importer know,

4    you know, there's a mistake here.  We disagree.  We're going

5    to rate advance.  We're going to change the amount.  You now

6    actually owe us money, and we'll send you a bill.  And that

7    is -- and at that point upon the rate advance, they now know

8    once the reliquidation occurs and the rate advances work

9    through the reliquidation --

10            THE COURT:  So are you now conceding your statutory

11   argument that your cause of action accruing requiring a bill

12   is not founded on a statute, but is instead founded solely on

13   your contractual claim that it has to be a demand?

14            MS. FARRELL:  No, Your Honor.  If money is due and

15   owing, there has to be a bill, statutorily.

16            THE COURT:  But you just told me notice and the

17   bill were the same thing.  I didn't say that.  You did.

18            MS. FARRELL:  Well, with respect to a deemed

19   liquidation where they don't know that there's anything due,

20   there's no notice of liquidation going out.  So when the bill

21   goes out, you get notice as an importer on your 612 report.

22   That's your notice simultaneously with the bill to the extent

23   you owe more money because something happened that there was

24   error in your paperwork.

25            THE COURT:  So are you now saying that the notice

1   and the bill are different things?  Are notice and bill

2   anywhere defined in a customs regulation?

3          MS. FARRELL:  I believe the bill is -- the bill may

4   be defined, or at least the mechanics of the bill are defined

5   in 24(a).

6          THE COURT:  I mean, I thought I had a decent grasp

7   of at least where the questions were, but after listening to

8   your opening remarks just asking you how does this generally

9   work, I feel like you've thrown confusion into not only where

10  we are, but what your own brief said.  Now, I realize Mr.

11  Mancuso, at least he's listed on the briefs as having

12  argued -- have drafted the briefs.  I don't know if you were

13  involved or not.  But you seem to be singing a different song

14  than what I read in the briefing.

15         MS. FARRELL:  Well, Your Honor, without a doubt, if

16  money is due and owing to the Government as a result of a

17  liquidation or a reliquidation, bills have to go out.  Bill

18  has to go out to the importer, and then if the importer

19  doesn't pay within 30 days --

20         THE COURT:  And where do you get that?

21         MS. FARRELL:  That comes from the statute and comes

22  from the regs that upon liquidation, duties, fees, and

23  interests determined to be due -- this is 1505(b) -- duties,

24  fees, and interests determined to be due upon liquidation are

25  due 30 days after issuance of the bill for such payment.

1          THE COURT:  Okay.  Let me stop you there.  I

2     promise I'm going to give the surety company an opportunity

3     to respond to these interesting developments.  But I want to

4     ask you another factual question that goes directly to you.

5     Let's just start on an agreed point or a semi-agreed point

6     for purposes of this argument.  You're looking at 1505(b)

7     that says duties, fees, and interests determined to be due on

8     liquidation or reliquidation are due 30 days after issuance

9     of the bill for such payment.  Notably absent from that

10    statutory language is any statutory duty on the Customs

11    service to issue the bill within a certain period of time.

12          MS. FARRELL:  That's correct, Your Honor.

13          THE COURT:  Is it the Government's contention that

14    there are no constraints whatsoever on how long it can wait

15    to issue the bill?

16          MS. FARRELL:  Your Honor, there's nothing --

17          THE COURT:  Equitable, legal, or otherwise?

18          MS. FARRELL:  Equitable, legal, otherwise, I'm not

19    sure, but equitable and legal no.

20          THE COURT:  So the Government doesn't believe that

21    imparity of suretyship is a defense that can be used against

22    it?

23          MS. FARRELL:  I suppose it's a possibility if one

24    wants to raise an affirmative defense.

25          THE COURT:  Which they did.

1           MS. FARRELL:  But you have to actually meet your

2     burden to raise that defense.  So you know, with respect to

3     the time it takes to do it -- like, for example, Your Honor,

4     with respect to laches, no, but with respect to possibility

5     of impairment of suretyship, if that can be shown --

6           THE COURT:  It's a theoretical possibility, the

7     impairment of suretyship.

8           MS. FARRELL:  Theoretical possibility.

9           THE COURT:  But other than that, you can't -- so in

10    other words, if they have waited 50 years at the Customs

11    service and then somebody opened a drawer as they were moving

12    a desk and discovered, oh, here's the bill for the garlic,

13    they could send that out?

14          MS. FARRELL:  Yes, Your Honor.  In 50 years I don't

15    know how much luck they'll have finding someone and getting a

16    good address, but yes, because ultimately, customs is charged

17    with collecting monies due and owing because that money goes

18    to the public trust.  And so they -- Congress has not seen

19    fit to build into 1505(b) or anywhere else.

20          THE COURT:  Well, I guess that's a question,

21    because, of course, if we go back to the earlier versions of

22    sections 1505, it used to be pretty specific.  So in '83,

23    '84, the Congress was disturbed by the predecessor to the

24    Federal Circuit, the Court of Customs and Patent Appeals and

25    its decision in the -- what is that?  The Hersel (sic)

1   whatever case.  And they decided that, no, they really didn't

2   want it to be indeterminate of when customs might be able to

3   get its money, particularly in an era of very high inflation.

4   How ironic that we're considering another one of these things

5   in an era of high inflation.

6          But anyhow, and so they put in a requirement that

7   duties determined to be due on liquidation or reliquidation

8   are due 15 days after the day of that liquidation or

9   reliquidation.  But then for reasons that seem somewhat

10  obscure, in 1993, Congress again amended the statute and

11  amended it to its present form where they took out that 15

12  days after the date of liquidation or reliquidation and

13  instead put 30 days after a bill is issued.

14         Although strangely, for a statutory change that has

15  been in effect for three decades at this point, this direct

16  question appears not to have been litigated despite there

17  having been multiple opportunities to do so.

18         MS. FARRELL:  Your Honor, I don't think that the

19  issue arose in the past, at least not in -- in the times that

20  we were working on collection actions -- when I started at

21  DOJ in 2009, we started getting a bunch of collection

22  actions.  And there was never this delay.

23         This delay seems to be a product of that partial

24  recission.  At least I know in the AHAC case that happened.

25  And we believe that we were -- we timely had commenced that

1   action because the partial recission didn't start via the

2   time -- the clock to liquidate, but in fact, you had to wait

3   until the final notice came out, and we were within a time

4   period.  There was no discussion.  There was no possibility

5   that the bill and when we lost the suit could possibly not

6   been within the six years.

7           So that didn't come up.  But when that decision was

8   made, we did seek to supplement our briefing to make a

9   different legal argument, and the trial court didn't want to

10  hear the separate argument.  We didn't make it because we

11  believed that the recission argument, in fact, covered any

12  possibility that there was a statute of limitations issue.

13  So that, it didn't come up, but it seems to me, Your Honor,

14  just based on the various collection actions we've seen that

15  it's like a strange amalgam of factual events that occur.

16          THE COURT:  It's definitely strange.  I agree with

17  you on that.

18          MS. FARRELL:  And it causes -- a lot of times it's,

19  you know, who's the surety?  There was a time when single

20  transaction bond sureties were not getting any information

21  about liquidation because the computer system was

22  incapable --

23          THE COURT:  Only gave it to the continuance bond.

24          MS. FARRELL:  Only gave it to the continuous bond

25  because it --

1          THE COURT:  Yeah.

2          MS. FARRELL:  -- held the first spot, and the

3     computer system didn't have a second spot.

4          THE COURT:  So let's talk about another piece of

5     language that appears to have been longstanding but not

6     really litigated much before, and that's 19 CFR Section

7     113.62, which contains the magical pay of demanded language

8     that's much discussed.

9          MS. FARRELL:  Your Honor, may I grab that?

10          THE COURT:  Yeah, absolutely, although my question,

11     at least in the instance, won't necessarily require you to

12     have the language in front of you.  From our research, it

13     appears that language has been there quite some time in terms

14     of it being a mandatory contractual provision.  Perhaps,

15     going as far back as 1984.

16          Seems a little strange that something that is

17     nearly as old as I am -- which is not that old -- but nearly

18     as old as I am can't really find anything.  Well, I assume if

19     you had a case that had interpreted this as a demand

20     requirements or not a demand requirement, someone would have

21     cited it to me.  That's some pretty old language never to

22     have been brought up in a court before as absolutely being

23     mandatory, pay on demand, what have you.

24          MS. FARRELL:  Well, Your Honor, I don't -- I'm not

25     aware of any cases that the Government's brought against a

1    surety where they didn't make a demand, so I -- you know,

2    that was always our understanding that a demand was

3    necessary.  In fact --

4              THE COURT:  Why did the Government think the

5    statute of limitations runs from when it makes demands on the

6    surety as opposed to when the breach happens by the

7    principle?

8              MS. FARRELL:  Because when the breach --

9              THE COURT:  Isn't the surety on the hook the moment

10   the principle breaches?

11             MS. FARRELL:  When the principle breaches, the

12   surety may be on the hook because it is possible that the

13   importer comes in late and pays interest and --

14             THE COURT:  Well, that's true, but I mean, a breach

15   is a breach.

16             MS. FARRELL:  But upon a breach of the 30 days

17   after -- the 31st day you know that the importer has not

18   paid, so therefore, they've breached their obligation to

19   customs.

20             THE COURT:  Which means the surety's on the hook to

21   pay?

22             MS. FARRELL:  Which means that customs will then

23   turn to the surety.  Generally, from what I've seen on 612

24   reports, sureties usually somewhere between 60 and 90 days

25   get a 612 report letting them know that their bond is now due

1   and owing because the importer didn't pay.

2        THE COURT:  Uh-huh.

3        MS. FARRELL:  And the reason for that is the

4   vagaries of when bills go out, and when bills are run, and

5   when -- they run cycle every week and --

6        THE COURT:  Do you have any case that marks the

7   beginning of the statute of limitations from the sureties

8   perspective as opposed to the principles?  Because everything

9   that I found including, you know, some Federal Circuit case

10  law, in particular that talks about when interest begins to

11  accrue, seems to suggest that the breach occurs when the

12  principal breaches.

13       And when you make demand on the surety, where you

14  can recover from the surety may have something to do with

15  whether or not they get charged interest greater than the

16  face value of the bond, but it does not trigger the statute

17  of limitations that's already running.

18       MS. FARRELL:  Well, the statute of limitations

19  isn't already running on the breach of the -- the principles

20  breach doesn't cause the statute of limitations to run on a

21  surety because the surety itself has another 30 days to make

22  payment.  So it needs to breach on our demand.

23       THE COURT:  I mean, that's funny because if you're

24  correct, then there are loads of appellate court cases that I

25  read that are flat-wrong.  You know, starting with, you know,

1   United States v. Reul going all the way back to 1992, which

2   clearly -- because that was one of the things that the

3   Government raised.  The Government the surety multiple times

4   in cases, and it's been shot down.

5             MS. FARRELL:  There's no question that --

6             THE COURT:  A surety's obligation to pay arises

7   from the principle's default, but no interest can be -- go

8   greater than the face value of the bond until after demand

9   has been made on the surety.  And that principle about

10  interest goes at least as far back as 1915 in a Supreme Court

11  case.

12            MS. FARRELL:  And that makes sense, Your Honor,

13  because the principle shouldn't --

14            THE COURT:  And the surety steps in when the

15  principle breaches.  That's what it has a contractual

16  agreement to do.  Its obligation to pay is triggered by its

17  principle's failure to do its duty.

18            MS. FARRELL:  Its obligation to pay is triggered by

19  a breach of the principle, but its time -- the time for the

20  Government to commence an action against it is couched in

21  when we send a demand.

22            THE COURT:  Well, but that where -- what

23  contractual term says that?

24            MS. FARRELL:  In a sense --

25            THE COURT:  What contractual terms says that?

```
 1    Because in --

 2            MS. FARRELL:  The face of the bond says that, Your

 3    Honor.

 4            THE COURT:  Well, read me the language.

 5            MS. FARRELL:  One second.

 6            THE COURT:  Read me the language.  It can't just be

 7    your regulation.  It has to be --

 8            MS. FARRELL:  Understood, Your Honor.

 9            THE COURT:  -- contractual terminology.

10            MS. FARRELL:  Yes, Your Honor, in the bond itself

11    incorporated by reference to the customs regulation into this

12    bond.  So the two parties to the bond, the principle and the

13    surety, it's above the signature blocks, and it's in the

14    middle.  A principle and surety agree that they are bound to

15    the same extent as if they executed a separate bond covering

16    each set of conditions incorporated by reference to the

17    customs regulations into this bond.

18            So they have -- based on incorporating the

19    regulations into the bond, they're entitled to a demand.  And

20    indeed, the testimony from Aegis in this case was that they

21    would not pay anything until they received a demand from

22    customs.  So the industry itself understands based on the

23    incorporation by reference of the regulations, which they've

24    turned it into a contractual term in the face of the bond,

25    that they're expected to get a demand, and they're not paying
```

1   until they do.

2           THE COURT:  I agree that that was probably the

3   stupidest thing their witness could said for their case.

4   I've had a litany of cases recently in which you could

5   give -- as long as you explained it adequately without the

6   legal jargon to a 6th grader and asked them the question tell

7   me something you absolutely should not say if you want to

8   win, the party has nonetheless blurted out exactly what they

9   should not say.  And what their witness said definitely falls

10  into that category --

11          MS. FARRELL:  But what they're --

12          THE COURT:  -- in terms of what the heck were they

13  thinking.

14          MS. FARRELL:  Well, understood.

15          THE COURT:  But I'm looking at the --

16          MS. FARRELL:  For its truth.

17          THE COURT:  -- I'm looking -- I mean, you've shot

18  yourself in the foot here this morning by coming out -- this

19  afternoon by coming out and going in a completely different

20  direction than you briefed.  So we'll have to see where that

21  goes.

22          But what I'm looking at is I can't find a case.

23  They all tell me whatever's going on, whatever language

24  you've put in that when the principle breaches, the clock

25  starts ticking because that's when the security's on the hook

1  for it.

2  　　　　MS. FARRELL:  Those cases, Your Honor --

3  　　　　THE COURT:  The surety's on the hook for it.

4  　　　　MS. FARRELL:  The cases that make those statements

5  are cases that are not based on 1505(b), the latest iteration

6  that's applicable here.  They're based on, like, Cocoa Berkau

7  and other cases are based on other situations that --

8  　　　　THE COURT:  Well, actually, you're correct.  It's

9  not based on that language.  But the language at issue in

10  Cocoa Berkau had a separate pay as demanded.  It had two --

11  it arguably had two demand clauses if I'm going to read it as

12  you're reading it,  and yet the Federal Circuit said, nope,

13  once the -- once the principle breached -- once the

14  principle failed to redeliver the good to the warehouse,

15  surety's on the hook.  Clock starts ticking.  It had the pay

16  as demanded language in there, and it said, no, the actual

17  time the clock starts ticking is the time of the first

18  breach.

19  　　　　MS. FARRELL:  Because of the situation there which

20  is --

21  　　　　THE COURT:  Same in the Ferrari case.

22  　　　　MS. FARRELL:  Which was a delivery case.  But if we

23  look at U.S. Commodities Export, 972 F.2d 1266 , also 1992,

24  it's - the Federal Circuit says that in this case, however,

25  the parties have not agreed to condition on institution of a

1    suit.  Rather, customs has unilaterally adopted regulations

2    which delay the filing of actions.  The bond agreement does

3    not require customs to demand payment or to send notice for

4    suing Commodities or Old Republic.

5          In our case -- so this is a scenario that's not our

6    scenario, but they're saying this case the bond agreement

7    doesn't require demand from customs.  Our bond agreement does

8    require demand from customs because it incorporates by

9    reference customs regulations.  So the Commodities case is

10   actually telling us that if the face of the bond has

11   incorporated by reference --

12         THE COURT:  Do you think it makes a difference in

13   this case as to whether the demand requirements -- excuse me,

14   as to whether the clock starts ticking when you first made

15   demand on Linyi or when you first made demand in -- to the

16   surety?  Does it make a different in whether you can recover,

17   assuming all other things are in your favor?

18         MS. FARRELL:  You know, I think the demand in Linyi

19   was within 30 days.  I'm trying to think of the timing in

20   this case.  Give me one second, Your Honor.  I'm not sure how

21   close to six years the action was filed from when the notice

22   went out of 2015.

23         THE COURT:  Well, it --

24         MS. FARRELL:  I would have to -- I'd have to

25   calculate the math to see if it's correct.  They didn't

1   matter if it was Linyi.

2           THE COURT:  It's at least 2,191 days.  It's

3   actually going to turn on whether or not you include a

4   certain date in the calculations as to whether you made it or

5   not.  It was very close.

6           MS. FARRELL:  Right.  And Your Honor, with respect

7   to does it matter, I think independent of even the timing in

8   this case, I think it does matter because we can't bring a

9   lawsuit against the surety until we've made a demand against

10  that surety and they reached a demand.

11          THE COURT:  To your knowledge, has any lawsuit

12  against a surety ever been dismissed because of failure to

13  make demand?

14          MS. FARRELL:  Your Honor, I don't think so because

15  I don't think –

16          THE COURT:  This language appears to have been

17  there for years and years.  Has anyone ever filed a 12(b)(6)

18  motion and said, you know what, can't hear this case.  They

19  didn't make demand.

20          MS. FARRELL:  I'm not aware of that occurring, Your

21  Honor, because my understanding is that I don't think we

22  would -- you know, I don't think we would bring an action

23  without having made a demand if a demand was required.

24          THE COURT:  You told me a little bit.  Let's skip

25  the statute for a moment, and let's go to the affirmative

1  defenses that the defendant has invoked.  You've told me that

2  laches doesn't apply.  Impairment of suretyship may, but it

3  was a factual matter.  That's fair.

4        So when I look up impairment of suretyship, I find

5  a case that the Federal Circuit decided entitled <u>United</u>

6  <u>States v. Great American Insurance Company</u> 738 F.3d 1320.

7  Now, in that case which the bonds at issue must have really

8  been worth some money because the insurance company hired

9  Carter Phillips to defend them.  So that is not cheap.  And

10  so I'm assuming that they really had an issue there.

11        They waived impairment of suretyship, and they did

12  not find that impairment of suretyship was found there.  But

13  they also didn't say it can't run against the government.

14  That would've been an easy way to dispose of the claim.  They

15  could've said, oh, you can never get impairment of suretyship

16  against government.  They didn't.  They analyzed it on the

17  merits.  And they said some interesting things to me that

18  while it did not help the insurance company in the Great

19  American Insurance Company case, question I have before you

20  is, are we in a little bit different circumstance?

21        Because in Great American Insurance Company, the

22  insurance company was trying to argue that it did not receive

23  notice, just like similar what's going on here, and timely

24  notice, and that had it received notice, it could have done

25  several different things including intervene in the action to

1   argue that a lower duty rate should apply to a pending action

2   that was then ongoing before the department.

3            It speculated that it could've bought reinsurance

4   maybe to get some insurance itself for what was going on.

5   And the Court said, well, you know, you didn't actually do

6   any of these things that you listed Great American Insurance

7   Company.  But at a bare minimum, in order to trigger the

8   imparity of suretyship defense, you've got to come forward

9   with evidence that -- not just that you could have taken an

10  action theoretically to reduce your risks as a result of the

11  had you received timely notice or whatever it was, but that

12  you would have taken an action.

13           And in the Great American Insurance Company case,

14  the insurance company did not proffer any evidence that in

15  the past when it had found itself and anything approximating

16  a similar situation, it had taken any particular actions to

17  better protect itself.

18           Now, in this case, we have the fact that Aegis did

19  have reinsurance.  As a matter of fact, they through

20  discovery have put -- now put on the record before this court

21  that they had quite a cute little setup with regard to this

22  transaction.  They essentially agreed to lend their name and

23  their license for a fee to another company to write bonds.

24           And then in order to protect itself, they had

25  reinsurance so that should one of those bonds go bad, they

1  wouldn't be out any money, and they'd get to keep their fee

2  and be a profitable transaction from their books'

3  perspective.  And that was from the very beginning

4  uncontested.

5         Well, you know.  You were part of this action.  You

6  know what happened.  Nine years after this was deemed

7  liquidated, their reinsurer went belly up.  They lost their

8  reinsurance.  Now, you pointed out accurately that they

9  didn't exactly cover themselves in glory when they first

10 found out that Linyi may not be the world's most reputable

11 garlic exporter.  They cancelled the bond when they

12 realized -- the continuous bond.  They refused to renew it

13 when they came to learn that their broker had issued this

14 bond in derogation of the instruction the broker was given.

15        Aegis told them whatever you do, don't give one of

16 these continuous bonds to somebody who's going to be

17 importing something that is subject to anti-dumping and

18 countervailing duties.  We don't want any part of that.

19 Don't do it.  But whatever reason the broker did it.  They're

20 on the hook for it.

21        They contact Linyi.  They say we want some more

22 money.  We want some more collateral.  They get the same

23 thing you got many years before you stuck your head up.  No

24 response.  So they're clearly all noted that Linyi is less

25 than reputable.  Despite that, in the record it appears to

1  show they took no additional actions.  I don't have any

2  record that they went against the broker.  I don't have any

3  record that they did anything other than just sit.  Not

4  great.

5          But on the other hand, they had reinsurance.  And

6  although this particular transaction if their broker had

7  acted properly would have never happened and made my life

8  much easier, they had a reinsurance policy up until the

9  reinsurer went busted.  Now they don't have a reinsurance

10 policy.  They have a litigation settlement that provide that

11 some of their expenses will be covered by the parent company

12 of the defunct reinsurer.  But now they're going to be out

13 money, whereas if a more timely demand would've been made,

14 they wouldn't have been out a penny.

15          And the Federal Circuit says that when we're

16 looking at imparity of suretyship, the person asserting the

17 defense must show that the liability was attributable to,

18 quote, the incrementable risks associated with the change in

19 conditions as opposed to the original risks associated with

20 posting bond.  The Federal Circuit also says that the party

21 asserting the defense should show either its own conduct,

22 meaning the surety, or the ultimate outcome would have been

23 different had it received the required notice.

24          Now, I came up with that on my own in doing some

25 research.  When you talk about impairment of surety or when

1   Mr. Mancuso talked about impairment of surety in his

2   briefing, he wanted to tell me all about the first part of

3   what I said.  They knew that Linyi was disreputable, and

4   that's why they cancelled the continuous bond.  A pox on

5   their house, Mr. Mancuso said.

6          But he didn't want to talk about the reinsurance

7   part.  When your friends over there at Aegis talked about

8   impairment of surety, they wanted to tell me all about the

9   reinsurance part, but they didn't want to tell me about the,

10  you know, we knew back in 2000 and whatever that Linyi wasn't

11  a great company, and we probably shouldn't have issued a bond

12  to them.

13         Nobody talked about how you measure those two

14  things together, what the case law says about it.  Nobody

15  quoted the standard from the Federal Circuit.  And as this is

16  an issue of fact, no one opined on whether the facts in the

17  record are enough, win, lose, or draw, on impairment of

18  surety defense.  It is something that the court can decide on

19  summary judgment or whether this may take a trial if this is

20  going to be a potentially viable defense based on the record

21  as compiled after discovery.

22         So I want to hear what you have to say about the

23  imparity of suretyship defense.  And you can talk about

24  whether you think it's legally viable as a general matter

25  against the Government and why you think the Federal Circuit,

1    you know, may have overlooked that in the <u>Great American</u>

2    <u>Insurance</u> case.  Or if you want to talk to me about based on

3    your understanding of what facts are in the record why they

4    have not raised a reasonable question about why their own

5    conduct or the ultimate outcome would have been different had

6    they received demand sometime prior to nine years after the

7    liquidation.  Because their reinsurance was good up until

8    basically the last day of 2015.  So more than nine years

9    after the deemed liquidation.  Wouldn't have cost them a

10   dime.

11           MS. FARRELL:  Well, Your Honor, when Aegis set up

12   its customs bond where they fronted with Kingsway and Lincoln

13   General, and Avalon, they told Avalon we do not want any

14   anti-dumping entries associated with our bonds.

15           THE COURT:  That's correct.  Yeah.

16           MS. FARRELL:  So their continuous bonds run in

17   October.  So October 2002 to October 2003 they had a bond,

18   and then 2003 to 2004 the continuous bond continued.  The

19   problem for Aegis is that it didn't put its foot down about

20   that because that second when the -- the first renewal of the

21   continuous bond --

22           THE COURT:  Uh-huh.

23           MS. FARRELL:  -- was October 24, 2003.  They were

24   on notice with the public register that Linyi said we now

25   want to use bonds in lieu of cash deposits because we're

1    (indiscernible) shipping on garlic, which is subject to an

2    anti-dumping order.  So all they had to do was read public

3    information and not (indiscernible).  They would never had

4    needed to have reinsurance.  So they were remiss because they

5    (indiscernible) --

6              THE COURT:  Well, they can -- you can hardly -- you

7    can't fault them for the fact that they took extra -- that

8    they paid extra money in order to further assure themselves

9    that they wouldn't be out some unexpected sum of money.  We

10   shouldn't have a rule that discourages people from insuring

11   against loss.  That wouldn't make good sense anyway in any

12   form or fashion.  We want people to have insurance.

13             MS. FARRELL:  But if you've told the system your

14   reinsurer is under the understanding that you're not going to

15   issue continuous bonds for anti-dumping, then what you've

16   done is you've set the reinsurer up as well because you knew

17   as of July 2003, a good three months in advance of your

18   renewal of the continuous bond --

19             THE COURT:  Is the reinsurance contract in the

20   record?

21             MS. FARRELL:  Sorry, Your Honor?

22             THE COURT:  Is the reinsurance contract in the

23   record?

24             MS. FARRELL:  I see counsel for Aegis shaking his

25   head yes.

1          MS. FARRELL:  I think it may be.  I think it's part

2     of --

3          THE COURT:  Are you alleging that they have -- that

4     they somehow breached their reinsurance contract so that they

5     wouldn't be able to get any money back anyhow?  Because from

6     what they've told me, they're entitled to some sum of money

7     as a result of their settlement with Kingsway following the

8     going out of business of the reinsurer.

9          Now, it's hard for me to posit that a company would

10    agree to reimburse them partially for expenses over a

11    transaction that was not covered by the original reinsurance

12    contract.

13         MS. FARRELL:  Well, Your Honor, the original

14    reinsurance contract is not going to be limited just to this

15    particular set of events.  It's going to be -- it's going to

16    cover all of the bonds that were issued with Aegis as the

17    front for the surety position.  So all of those bonds were

18    going to be covered by that.

19         THE COURT:  Okay.

20         MS. FARRELL:  And so then they --

21         THE COURT:  So my question is that when I read

22    Great American Insurance Company, some of the things the

23    Federal Circuit there said suggested that their -- whatever

24    else comes of the statutory argument, and whether demand was

25    required, and whether you had to issue a bill, and what that

1   was and what have you, that they may be sitting in a little

2   bit different position than Great American Insurance Company

3   because the problem the Federal Circuit had with the Great

4   American Insurance Company appeared to be they -- in the

5   particular instance did not take any further action to cover

6   themselves, and there was no evidence in the record that they

7   had a history of doing that on finding out that there was a

8   problem with their principle in this case.

9        Here we have one of those things.  We have they

10   didn't take any particular extra action on finding that the

11   principle was less than trustworthy.  But unlike the Great

12   American Insurance Company, Aegis had the peace of mind of

13   knowing that before this whole thing began they had bought

14   themselves an insurance policy.

15        MS. FARRELL:  Well, just for the record, I'm not

16   sure.  I do know that Lincoln General went into receivership

17   in November of 2011.  So they would have been skating on thin

18   ice prior to that, and so Aegis should have been making sure

19   that its reinsurer was money good throughout that time

20   period.

21        THE COURT:  Well, but we -- again, that may be

22   true, but hindsight in this case is 20/20, and we know that

23   until the end of calendar year 2015, which is more than nine

24   year after the date of deemed liquidation in this case, had

25   the Government come to Aegis and said give us the $50,000,

1    Aegis could have gone to Lincoln General and said you're on

2    the hook for $50,000.  As of the end -- as of turning the

3    calendar page to 2016, they lost the right to do that.

4            MS. FARRELL:  Well, they didn't lose it in 2015.

5    They lost it at -- you know, for sure in November of 2011.

6            THE COURT:  No.  According to what they have in

7    their brief, the court issued a receivership order which said

8    as part of that that any and all claims that anybody in the

9    world may have against Lincoln General have to be in by

10   December of 2015 or forever hold your piece.  That's what's

11   in their submission.  That's nine years after October --

12           MS. FARRELL:  But by the same token --

13           THE COURT:  -- of 2006.

14           MS. FARRELL:  -- Aegis knew that bonds were being

15   issued associated with anti-dumping duties, and anti-dumping

16   duties --

17           THE COURT:  Well, that's why, but if -- they could

18   have done more, but if it was covered by their reinsurance

19   policy, that would seem to give a normal person a little bit

20   of peace of mind.  Well, that's all I have for you right now.

21   I want to hear from Aegis.  They've been sitting back there

22   very patiently.  But you do some thinking on impairment

23   surety, and don't worry.  There'll probably be a homework

24   assignment regarding impairment of surety at the end of these

25   proceedings.

1          MS. FARRELL:  Thank you, Your Honor.

2          THE COURT:  Now, I know we've got three attorneys

3    here for the insurance company.  Mr. Ferguson on the phone.

4    Mr. Telep, you're here, and you have your friend whose name

5    escapes me because I can't find my sheet with me here -- Mr.

6    Sandler.  So do you have this divided up a certain way, or

7    are you here to answer everything?  Just tell me at the front

8    end.

9          MR. TELEP:  Yes, Your Honor.  I'm going to be the

10   principal advocate for Aegis today.  Mr. Ferguson is on the

11   phone with me.  He's been co-counsel historically in the case

12   and is interested, but does not intend to speak unless called

13   upon by the Court.  Mr. Sandler also with Mr. Ferguson's

14   firm, Sandler, Travis, Rosenberg, is here in case the Court

15   inquires into elements of suretyship industry practice that

16   may be unfamiliar to me.  They are --

17         THE COURT:  Okay.

18         MR. TELEP:  -- certainly the experts.

19         THE COURT:  Well, so I was real surprised when we

20   started, Mr. Telep because I'm still not entirely sure where

21   the Government is on the bill part.  But why don't we pick up

22   first where we left off on impairment of suretyship?  The

23   reinsurance contract is part of the record.  I saw you

24   nodding when I asked your counterpart the question.  Is that

25   correct?

```
 1              MR. TELEP:  Yes.

 2              THE COURT:  Okay.  I assume you're going to tell me

 3   that that reinsurance contract covered the bond in this case.

 4              MR. TELEP:  It did.

 5              THE COURT:  Even though it was issued arguably in

 6   error?

 7              MR. TELEP:  Pardon me?  Even if it was issued?

 8              THE COURT:  In error.  They violated what you told

 9   them to do when they gave Linyi the bond.

10              MR. TELEP:  Yes, the reinsurance contract would

11   cover it.

12              THE COURT:  Okay.  Are you aware of the Great

13   American Insurance Company case that I've been referring?

14              MR. TELEP:  Yes, Your Honor.

15              THE COURT:  Okay.  Tell me what you think about

16   that and how that applies to your situation here, and whether

17   you think there's enough evidence on the record for the Court

18   to make a determination as a matter on summary judgment about

19   your impairment of suretyship defense, first of all.

20              MR. TELEP:  Sure.  Impairment of suretyship is not

21   barred as a matter of law when asserted against the

22   government.  It's a fact-dependent inquiry.

23              THE COURT:  Is there a case that you can just cite

24   right off the reel to the first part?

25              MR. TELEP:  I'm referring just to the case, the
```

1   fact that they found the suretyship impairment defense was

2   decided on the facts implies that the suretyship defense is

3   available against the Government.

4         We saw a lot of cases by contrast in connection

5   with laches where the courts have sort of taken up the

6   question of, does it apply, does it not apply and so forth.

7   There's exceptions, Janeiro (ph.) defense and so forth, but

8   that's not how the Great American case went off on the facts.

9   And from that I take it the defense is available against the

10   Government.

11         In terms of the facts, I think there are a couple

12   things.  You've obviously keyed into them, most of them,

13   certainly the ones that are favorable to us.  Specifically,

14   Aegis, Avalon, Kingsway, and LGIC put this entire program

15   together so that Aegis would bear zero risks.  The way they

16   did it was through the reinsurance program.  If they

17   reinsurance had been in effect and stayed in effect, and LGIC

18   had not gone insolvent, end of story.  Aegis would have

19   passed the amount through, would've been reimbursed, and we

20   wouldn't be here today.

21         That's not what happened.  What happened is that

22   LGIC went insolvent.  The period for submitting claims

23   expired in December of 2015, as Your Honor pointed out.  And

24   at that point or slightly before that, actually, Aegis had to

25   do something to protect its interests.  And what it did was

1  to go to its indemnification agreement which was triggered

2  upon LGIC's receiving a downgrade in its bond rating, and it

3  sued Kingsway.  So it took steps.  You're asking, what did

4  Aegis do?  It took steps.

5          THE COURT:  Who said?

6          MR. TELEP:  Kingsway.  And it got the best deal

7  that it could out of Kingsway in terms of a litigation

8  settlement, but it didn't cover --

9          THE COURT:  Now, do I understand it correctly from

10  what you submitted that under that indemnification agreement,

11  Kingsway is playing -- number one, paying Aegis' legal fees

12  in this action?

13          MR. TELEP:  60 percent of them.

14          THE COURT:  60 percent.  Okay, it's covered.  And

15  that if there is any judgment against Aegis that they will

16  pay 60 percent of that?

17          MR. TELEP:  Correct.  One modification to the 60

18  percent is there are other caps involved in the total amount

19  of money that Kingsway is going to place into that escrow.

20          THE COURT:  Yeah, however many claims there are --

21          MR. TELEP:  Right.

22          THE COURT:  -- with so many million dollars --

23          MR. TELEP:  Right.

24          THE COURT:  -- that after it reaches that, no more.

25          MR. TELEP:  Correct.

```
 1              THE COURT:  Doesn't matter.  There's no 60 -- so
 2    it's 60 percent up to a set cap?
 3              MR. TELEP:  Yes.
 4              THE COURT:  Does that include litigation expenses
 5    or no?
 6              MR. TELEP:  Yes.
 7              THE COURT:  All in?
 8              MR. TELEP:  Yep.
 9              THE COURT:  Okay.  That's very useful.  What do you
10    think your remedy is under an impairment of suretyship
11    defense?
12              MR. TELEP:  We think that the Government should be
13    foreclosed from bringing the suit.
14              THE COURT:  You think that's the case even though
15    you're still off the hook to some extent in terms of your
16    expenses?  You don't think the Government is entitled to at
17    least as much as you're off the hook for?
18              MR. TELEP:  No.  Our rights as a surety were
19    impaired, period.  The (indiscernible) should not be pursued
20    by the custom service for this action in addition to all the
21    other arguments about statute limitations, which I want to --
22              THE COURT:  I didn't see any lengthy discussion of
23    potential remedies in either party's brief on the imparity of
24    suretyship.  I know you were -- you asked for extension, but
25    you were still limited in terms of what you could argue.
```

1   It's an equitable defense, correct?

2          MR. TELEP:  Yes.

3          THE COURT:  Every chancellor's foot is different,

4   but taking you at your word and what the evidence seems to

5   show, that you set up a plan where you would lend your name

6   and your license to people who would get to use it, and then

7   you were going to get a fee out of it, and that's it.  And

8   you wouldn't be on the hook for the resulting losses.  Or as

9   you termed it, a no risk transaction that turned out to be

10  really risky as things developed.  If the Government got a

11  judgment for only 40 percent of what it was owed, keeping the

12  60 percent off the table under your agreement, how is that

13  not equitable?  Gives you the benefit of your bargain.

14         MR. TELEP:  Yeah.  Thinking about this from the --

15         THE COURT:  Punishes them for their delay.

16         MR. TELEP:  Aegis shouldn't be in this position.

17  It shouldn't be in this position.  It shouldn't be here in

18  court.  It shouldn't be incurring any of the costs associated

19  with this litigation.  It insured against that.  It went into

20  the market and procured commercial available insurance to

21  prevent all of this from happening.  The fact that any of it

22  is happening is inequitable.

23         THE COURT:  Well, I'm going to -- I'm just going to

24  flag for both parties.  At the end of this proceeding, I'm

25  going to ask for supplemental briefing on imparity of

 1   suretyship.  We're going to go -- we're going to talk.  We'll

 2   meat on that bone in the order that comes out.  But I want

 3   both of you to wrestle fully with what the standard is for

 4   imparity of suretyship in order to prove it, whether there

 5   are sufficient facts on this record so that it -- so that the

 6   determination can be made as a matter of law, or whether it

 7   would require a trial because of factual disputes, and what

 8   the remedy for imparity of suretyship in this case is.  And

 9   we'll draw a line under that discussion for right now.

10           Mr. Telep, I want to begin at the beginning with

11   you.  You raised a jurisdictional objection to begin things

12   with.  Do you have any case decided by either this court or

13   the Federal Circuit Court of Appeals post the 1984 amendments

14   to Section 1505, which finds that a proceeding under Section

15   1582 is tolled or cannot be otherwise be brought when there

16   is a pending section 1581(a) protest before the customs

17   service.

18           MR. TELEP:  I had some preliminary arguments

19   about -- or comments to make about the jurisdictional piece.

20           THE COURT:  Answer my question first.

21           MR. TELEP:  No.  The answer is no.

22           THE COURT:  Okay.  Let me ask you, what would be

23   the benefit to you of such a finding?  Let's assume --

24           MR. TELEP:  Okay.

25           THE COURT:  -- that you were correct that it was

```
 1   tolled or it defeated their ability to file a cause of
 2   action.  Wouldn't the necessary result of that be they could
 3   mail you a quick thing, and then they have a fresh statute of
 4   limitations that you couldn't argue against?
 5           MR. TELEP:  Your Honor, this is a technical
 6   argument.  We felt like we had a duty of candor to make it.
 7   We understand this argument it's percolating its way through
 8   this court or one of the judges in this court in other cases.
 9   But we think that the statute of limitations argument can and
10   should be decided first.  And the reason for that is
11   manifold.  First, the jurisdiction argument only affects the
12   Miami entries, not the Houston entries, so you're going to
13   have to get to the statute of limitations argument anyway.
14           THE COURT:  Okay.
15           MR. TELEP:  And you should save yourself the
16   trouble of dealing with the jurisdictional argument.  And
17   second, the jurisdictional argument only comes into play if
18   the court rules against us on the statute of limitations
19   piece and holds that an administrative demand by Customs is a
20   pre-cursor to sue.  And the reason for that is that all the
21   entries, including the Miami entries, were deemed liquidated
22   eight years before customs made its initial demand.  So
23   Customs could've sued during that time, but it didn't.  And
24   as you know, our position is that the statute of limitations
25   expired even before Aegis made --
```

1          THE COURT:  So what do you make of the statutory

2   scheme?  I spent some time talking with Ms. Farrell about

3   notice, and bills, and demands and was somewhat confused --

4          MR. TELEP:  Yeah.

5          THE COURT:  -- by the discussion that resulted was

6   different than what I expected based on the briefing the

7   Government to say.  But then again, I was somewhat surprised

8   that in the deposition testimony that was taken of one of

9   your deponents that the insurance company was very strident

10  that we're not paying a thing unless we get a bill, which it

11  seems to be given your position is not what you would've had

12  them say.  So I'm just confused all around.  So maybe --

13         MR. TELEP:  Yeah.

14         THE COURT:  -- why don't you tell me what you

15  think?

16         MR. TELEP:  All right.  Let's start with the

17  statutes, 1505(b).  1505(b) is a collection statute.  The

18  statute says -- directs customs to collect duties with

19  interest or refund duties with interest is determined upon

20  liquidation.

21         THE COURT:  Uh-huh.

22         MR. TELEP:  So liquidation, not demand establishes

23  the surety's liability.  And that's all fixed under 1514 and

24  1504.

25         THE COURT:  But you would agree with me that the

1   prior version of the statute before it was amended in 1983,

2   '84, said that duties determined to be due -- oh, excuse me.

3   The statute after it was amended in '83, '84.  Let me correct

4   that -- after it was amended in '83, '84.  Said duties

5   determined to be due upon liquidation or reliquidation shall

6   be due 15 days after the date of that liquidation or

7   reliquidation.

8           MR. TELEP:  Yes.  That was the '84 version --

9           THE COURT:  Yeah.

10          MR. TELEP:  -- of the statute.

11          THE COURT:  It made it somewhat academic in that it

12  tied it to the date of reliquidation, gave them a short 15-

13  day period breather after which it was due.  So essentially,

14  for all purposes, liquidation was the date that everybody

15  looked to, and the clock clearly started running.  But they

16  changed that in '93.  It's unclear to me why they changed

17  that, but they changed that, and they took out the hard date

18  of 15 days after liquidation, and they replaced it with 30

19  days after issuance of the bill for such payment.

20          So my question is, how does that come into play in

21  deemed liquidation situation such as yours?  I mean, if this

22  were 1985 and we were sitting here, I'd say, well, that's

23  real easy.  I look at the date that it's deemed liquidated,

24  October 2006.  I go 15 days after that.  Clock starts

25  running.  This would be a simple case.  You guys wouldn't be

1    here, I don't imagine, if it --

2              MR. TELEP:  Yeah.

3              THE COURT:  -- were still there.  But they changed

4    the statute.  So what am I to make of it?

5              MR. TELEP:  Well, first of all, start with the

6    reasons for the change.  And the reasons for the change were

7    to deal with or to make -- put refunds and demands on equal

8    footing.  So in the 1984 version that was at issue in Judge

9    Restani's Ataka decision, the 15 day after demand didn't say

10   anything about refunds, or interest, or how you deal with all

11   of that.  The key element or change to the 1983 amendment is

12   to add a provision saying refunds are due 30 days after

13   liquidation.

14             And then if you look at the legislative history,

15   which I can give the Court the quote.  I don't believe we

16   cited this in our brief.  Legislative history says the

17   amendments will also provide equity in the collection and the

18   refund of duties and taxes together with interest by treating

19   collecting collections and refunds equally.

20             So the point of that statue, the reason why

21   Congress changed the statute in 1993 was to say you got 30

22   days from the date of liquidation to issue a refund and 30

23   days, you know, as it says to pay a bill.  Now, what it

24   doesn't do, what it doesn't do is give customs unfettered

25   discretion to extend out in perpetuity demand and then make

 1   that administrative demand a precursor to some kind of filing

 2   of suit.

 3          And if you look at the way that the customs

 4   actually processes its statements and it bills, all of that

 5   makes sense.  The way customs makes -- handles this is it

 6   hits liquidation, and then because of that refund provision,

 7   it has to issue a statement within 30 days to figure out

 8   whether there's a refund.  Is there a refund or not?

 9          THE COURT:  Well, let me stop you there for a

10   moment because your point about refunds is well-taken.  The

11   post 93 amended version says refunds of excess monies

12   deposited together with interest thereon shall be paid within

13   30 days of liquidation or reliquidation.  But the same

14   Congress struck the provision that said duties, fees, and

15   interests determined to be due on liquidation or

16   reliquidation shall be due 15 days later and replaced it with

17   duties, fees, and interests determined to be due on

18   liquidation and reliquidation are due 30 days after issuance

19   of the bill for such payment.

20          Now, given that this is literally the same

21   subsection of the same statute, Congress clearly knew how to

22   tie a date to liquidation when it wanted to.  It had that in

23   the '83, '84 version.  It has that for refunds in the post-

24   1993 version.  But for whatever reason, in 1993 -- and I'm at

25   a loss to understand practically why, but it's clearly not

1  unconstitutional, so it doesn't matter why -- they struck

2  that nice 15-day language and tied it to issuance of a bill.

3          MR. TELEP:  Yeah.  Well, again, the stated reason

4  that Congress made all of these amendments was to put

5  collection and refunds on an equal footing.  And what that

6  means is that the period of a -- a very short period of time

7  exist during which time an importer can get a refund, or an

8  importer has to pay.  But it doesn't again mean that demand

9  is a prerequisite -- an administrative demand is a

10 prerequisite to suit.  In fact --

11         THE COURT:  Well, let me ask you this.  Doesn't the

12 Government have potentially two ways to win absent the

13 success of your impairment of suretyship defense?  Way number

14 1 is if I agree with them on the demand point.  Way number 2

15 is if the implication of the post-1993 amended statute is

16 that the cause of action does not begin to accrue until the

17 bill itself.

18         MR. TELEP:  Okay.  No.  In order for the Government

19 to win, they would have to win the language of the bond.

20 They'd have to win the language of the statute.  They'd have

21 to overcome all of the reliance interests generated from the

22 Encino case.  You know, they would have to win those two

23 arguments first.  And then you're into the world of whether

24 or not the collection --

25         THE COURT:  Help me with why the language of the

1    bond is not separate from the language of the statute with

2    regard to the accrual of the cause of action in this

3    instance.

4              MR. TELEP:  The language of the bond -- the

5    language of the bod basically says pay.  That's what the bond

6    says.  Starts out with pay duties that are fixed as a

7    consequence of the deemed -- or the liquidation.  And then

8    there's one phrase, pay as demanded by customs.  But as we

9    learned from the Cocoa Berkau case, Commodities Export, and

10   others, and the Nyhus case, that language, pay as demanded or

11   demand, has to be in incredibly concrete terms in order to

12   interpose –

13             THE COURT:  Well, in Cocoa Berkau it said redeliver

14   on demand, and they determined that that was a demand

15   requirement sufficient enough.  Just a verb before on demand.

16             MR. TELEP:  The Cocoa --

17             THE COURT:  I assume that it's not just the fact

18   that, you know, it's the difference between redeliver and

19   pay.

20             MR. TELEP:  Yeah.  We get back to maybe first

21   principles here.  The Government can file a lawsuit to

22   collect upon breach by the principle, and that can take place

23   the day after the principle's opportunity to pay expires.

24             THE COURT:  Okay.

25             MR. TELEP:  So --

```
 1              THE COURT:  The Government says that's when they
 2    send the bill.
 3              MR. TELEP:  Yeah.  Well --
 4              THE COURT:  And they tell me to read 1505 for that
 5    purpose.
 6              MR. TELEP:  Yeah.
 7              THE COURT:  Previously, they would tell me that
 8    it's 15 days after liquidation.  See the 1983, '84 versions.
 9              MR. TELEP:  Yeah.  The Cocoa Berkau case basically
10    says that there's two demands, as you point out, in Cocoa
11    Berkau.  One is for payment of liquidated damages.
12              THE COURT:  Uh-huh.
13              MR. TELEP:  Or delivery.  And the other one is for
14    payment of liquidated damages.  Only the second applied to
15    the surety.  The first one created an obligation on the part
16    of the importer that didn't exist before customs made the
17    demand here.  The obligation on the part of the import exist
18    as of liquidation or 30 days thereafter.
19              So that demand you don't need in this case.  That
20    demand is extant already right now.  It's the second demand
21    at Cocoa Berkau that is analogous to our case because in that
22    scenario under very, very similar language about customs, you
23    know, paying on demand or paying as demanded by customs, the
24    Court says it's not a precursor to sue.  That's the direct
25    analogy that the Court should draw and why the demand
```

1   language --

2          THE COURT:  Well, but wasn't that issue of whether

3   that was a separate demand moot because they determined that

4   the breach actually occurred on the failure to delivery, and

5   that's when the surety became liable to pay the money.

6          MR. TELEP:  Yes, they did.  Same here, though,

7   because the importer became liable to pay money as of the

8   date of the deemed liquidation or 30 days after depending on

9   how you --

10         THE COURT:  Well, see, you and I may be in

11  agreement on which breach matters.

12         MR. TELEP:  Right.

13         THE COURT:  That is the issue of your principal --

14         MR. TELEP:  Right, correct.

15         THE COURT:  -- Linyi as opposed to you.  So but my

16  question still goes back to, they would point me to 1505 and

17  say that if, you know, Linyi had brought its garlic in in

18  1985, 15 days after the date of that deemed liquidation

19  money's due.

20         MR. TELEP:  Nothing in the statute allows --

21         THE COURT:  Then they look at -- then they tell me

22  look at the '93 version, the post '93 amendment version.  So

23  after we -- 30 days after we send the bill with nothing about

24  when they have to send the bill.

25         MR. TELEP:  Liquidation and the bill are the same

1    thing.  Notice and the liquidation of the bill are all the

2    same thing, Your Honor.

3            THE COURT:  Well, but how could I find that as a

4    matter of statutory interpretation when the very next

5    sentence which you emphasize uses the word "liquidation".  It

6    says refunds of excess monies deposited together with

7    interest thereon shall be paid within 30 days of liquidation

8    or reliquidation.  It doesn't say within 30 days of us

9    sending you a statement telling you we owe you the money for

10   an invoice.

11           MR. TELEP:  Well, that's because in the refund

12   context -- in the refund context, Customs is holding the

13   money and they -- they're going to run their calculation.

14   Liquidation takes place.  They understand that they owe the

15   importer money, and they pay the importer money.  That's why

16   it's very easy to -- for Congress to say, here, liquidation.

17   In the previous paragraph, again, they're referring to duties

18   that are due upon liquidation.  And there's a reference in

19   here to a bill that Customs has.  Look, they have a -- you

20   know, Ms. --

21           THE COURT:  Farrell.

22           MR. TELEP:  -- Farrell is correct in the sense that

23   customs does like to issue bills.  They have internal

24   procedures for issuing bills and so forth.  All of that is

25   their internal machinery, but it doesn't mean that the cause

1    of action by the Government accrues --

2              THE COURT:  Well, I'm not looking at their

3    regulations.

4              MR. TELEP:  Right.

5              THE COURT:  I assume that if there's a magical

6    regulation out there which defines bill or tells me that a

7    bill on liquidation is the same, one of you very experienced

8    advocates would have found it.  That's why I'm solely looking

9    at the statute.  The legislative history which you have

10   recited is interesting, but it certainly can't override the

11   plain language of the statute, particularly when the

12   statute's language seems rather plain.

13             And I can't help but be struck by the fact that in

14   1505 they struck the language they used to have which

15   expressly linked it to liquidation, replaced it with language

16   for whatever reason that linked it to the issuance of a bill

17   for payment, and then added a new section separate for

18   refunds which did link to liquidation.

19             I mean, it appears to me that if I were to find

20   that the bill and liquidation were the same thing, I would

21   need some sort of statutory reference for that, a definition

22   defining one as the same or the other.  Otherwise, you're

23   asking me to assume Congress didn't know the effects of the

24   words it chose to pass.

25             MR. TELEP:  Well, if I can, Your Honor, interpose

1    additional statutory context.  You're obviously looking at

2    one statutory provision and comparing it to another.  The

3    other statutory provision that I think is relevant to this

4    question has to do with the ability of the Government to

5    collect interest on overpayments.  And that provision,

6    1505(d), says interest accrues from the date the liquidation

7    takes place, not from the date the bill goes out.

8            THE COURT:  I agree that that is of interest, and

9    that does worry me.  But with regard to your claim, that's

10   not so much of an issue.  Your liability is limited by the

11   face value of the bond.  In other words, you're not taking on

12   any additional risks than that for which you bargained.

13           And the only way according to cases going at least

14   as far back as 1915, that you can get tagged with interest in

15   addition to the face value of the bond is after demand on the

16   Government for you -- after demand by the Government on you

17   to pay off on the bond, you say no.  Then you become liable

18   for certain interest payments, but not before demand. But

19   you're protected by the face value of the bond.  Now, who

20   isn't protected is your principal.

21           MR. TELEP:  Uh-huh.

22           THE COURT:  And that is worrisome.  Now, in this

23   case, the principal appears to have gone vamoose.  Judgment

24   proof.  They're in China.  They're gone.  But there is case

25   law out there which says that it is a sovereign right of the

1   government to collect these duties and that the cause of

2   action against the principle, the importer, is not

3   contractual but statutory and is not subject to any statute

4   of limitation, which would have the perverse effect of

5   allowing the government in such a case where a principle

6   didn't pay and wasn't judgment proof to seek in this case

7   interest all the way back to October of 2006, the day of

8   liquidation, essentially compensating the government for its

9   own gross incompetence.

10          MR. TELEP:  Yes, Your Honor.  And I would add to

11  that that not all bonds are limited to $50,000.  There are

12  single transaction bonds of various amounts.

13          THE COURT:  Well, that's true, but again, the bonds

14  have a dollar limit.  You voluntarily took on risks to that

15  dollar amount.  The circumstances that may lead you to have

16  to pay that amount could perhaps be subscribing, but the

17  limit of your liability is not a surprise.

18          MR. TELEP:  That may be true, Your Honor.  But when

19  the Court issues its decision on this point, it's going to be

20  speaking to the trade generally and not -- you certainly

21  would be citing the facts of this case, but this is an

22  important point for importers as you pointed out, and

23  sureties with much higher bond amounts than we have at issue

24  here.

25          THE COURT:  Well, and that is why it troubles me

1    greatly the implications of this case.  This is a very hard

2    case.  It troubles me greatly that there have been several

3    opportunities where the argument currently being propounded

4    before the Court could have been propounded previously and

5    was not.  And here we have an instance, which according to

6    record, involves a whole lot of bonds that are floating out

7    there that the Government through gross incompetence failed

8    to collect on, and now they've come up with this.

9            The problem that I have with that, as much as I

10   despise that, particularly given that it is one week from Tax

11   Day, and you see how the government treats your motion.  They

12   don't care.  They stick a gun in your face and say give us

13   all this tax money, and then they flush it down the toilet.

14   This is why people hate the federal government.

15           So I'm with you on that page.  I have no sympathy

16   for them whatsoever.  But I am stuck with the language of the

17   statute.  And the language of the statute in applying the

18   canons of statutory construction, they've got an argument.

19           MR. TELEP:  Yeah.  Okay.  To go through it, 1505(b)

20   should be read in light of its legislative history and the

21   purpose for it.  There's not a statement in here saying that

22   duties or the bill that customs wants to issue or believes is

23   a predicate to any collection action.  We believe it isn't.

24   We think that they could file suit the day the importer

25   breaches, but -- that's our first point.

1          Second point, the bill here cannot be extended in

2    perpetuity.  And there case law that we cited in our brief I

3    think (indiscernible) --

4          THE COURT:  Well, but that case law, I took a look

5    at that much more closely this time than the first time

6    around, and that case law when it talks about unilaterally

7    tolling the statute of limitations is linked to the fact that

8    in those cases the language at issue here was not in the bond

9    contract.

10         And what the Federal Circuit said is, guess what

11   custom service?  You can't just pass magical regulations and

12   toll the statute of limitations.  It's got to be in the

13   contract mutually agreed between the parties, and if it's

14   not, tough tamales.  We don't care about your regulations.

15   Here they say -- and you don't disagree -- the language is in

16   your contract.

17         MR. TELEP:  Okay.  The language in the contract,

18   think about it this way.  We're a lot -- we have heard from

19   the Government during the first argument, and again today,

20   and in the briefs that this is a case about the contract.

21   You asked Mr. Mancuso, what's -- so the contract controls?

22   Yes, the contract controls.

23         So in that contract which the Government

24   characterizes as being freely negotiated between the parties,

25   it incorporates the language from 113, which is the language

1    that you and Ms. Farrell talk about a few minutes ago as

2    basically saying pay as demanded.  Customs could've written

3    that regulation any way that it wanted to.  If it wanted to

4    say that an administrative demand is a precursor to payment

5    or precursor to liability, it  could've said exactly that.

6    You don't owe us any money until we send you a demand.

7           They didn't say that.  They said pas as demanded,

8    which as Your Honor pointed out during the first hearing has

9    been the language in the contract for 30 years, and we've

10   never seen a court say that language means there's an

11   antecedent administrative demand for --

12          THE COURT:  So let's assume I agree with you on

13   that point.  It's not a demand requirement.  Doesn't that

14   lead me back to 1505?

15          MR. TELEP:  Again, 1505 has to be read in the

16   context of  1505(b).  Read in the context of 1505 (b) about

17   the reason for the change.  I understand your point about the

18   language is language.  You know, obviously can't get around

19   that.

20          The second point is that the 1505(d) delinquency

21   interest provision makes clear that you -- the way I put it

22   in the brief was if the interest accrues, so too does the

23   cause of action.  How can an importer be on the hook for

24   interest for years, and years, and years -- 100 years under

25   the Government's theory -- and never have the ability to do

1    deal with it because they never got -- you know, the deemed

2    liquidation took place.

3            And then the third point I'd make -- and this is in

4    our brief as well -- is that I'm not even sure that 1505(b)

5    is susceptible to operation in the context of deemed

6    liquidation.  If you look at the Cherry Hill's Textile case,

7    Federal Circuit decision in Cherry Hill's Textile, it was

8    point blank clear that deemed liquidation is a statute of

9    repose, and when that date expires, all bets are off.

10   Everybody walks away.  And that's what happened here.  It's

11   1505(d).  Again, 1505(d) -- 1504(d), pardon me -- which is

12   the deemed liquidation statute, doesn't have the trappings of

13   bills or anything else.  In fact, if you're looking to impose

14   duties under 1504(d), the deemed liquidation statute, Customs

15   doesn't even have to send a notice to the importer about any

16   of that.  So how in the world do we reconcile the concept of

17   duties, fees, and so forth that are being due upon

18   liquidation of the bill when no bill has to be sent by

19   Customs to the importer or to the surety?

20           THE COURT:  Well, the only issue that I have with

21   that is, again, the cases previously where the statute of

22   limitations questions have come up appear to have looked to

23   1505 for when things are due.  And if I look at 1505 in its

24   current format, I note that it does begin in 1505(b) with,

25   the Customs Service shall collect any increased or additional

1   duties and fees due, together with interest thereon, or

2   refund any excess monies deposited, together with interest

3   thereon, as determined on a liquidation or reliquidation.  So

4   it tells me that Customs has a duty to collect increased

5   duties and fees and to refund any excess monies deposited,

6   together with interest thereon, as determined on liquidation.

7          Then the next sentence tells me that where money is

8   owed, it's due as determined on liquidation or reliquidation

9   three days after issuance of a bill.  And then, it tells me

10  what the second part of that first sentence says next,

11  refunds of excess monies deposited, together with interest

12  thereon, shall be paid within 30 days of liquidation.

13         Now, the only way that you can get by that is if

14  you believe, somehow, the duties that are described in

15  1505(b) do not include duties that are determined under 1504

16  and deemed liquidation.  But it seems to me that if that were

17  the operation of the statute, someone before me would have

18  found that.  This deemed liquidation scheme isn't new.  It

19  was put in many decades ago in order to get them to do their

20  job and punish them if they don't.  But nobody has come up

21  with -- this case is full of things that nobody has thought

22  up in 40 years.

23         MR. TELEP:  Yeah.  Well, to be fair to everybody in

24  the courtroom, the reason for that is, in all likelihood,

25  this new shipper review provision that popped up for a period

1    of time.  I mean, if we were not in a new shipper review

2    context right now, again, we'd have no case because Customs

3    would have accepted the money that the importer put on

4    deposit, they would have parted company deemed liquidation is

5    a statute of repose.  It comes up --

6              THE COURT:  Are you aware of any regulation that

7    they issued governing the new shipper program?

8              MR. TELEP:  The regulation just tracked the

9    language of the new shipper program and said you can, at

10   Commerce's direction -- or Commerce directed Customs to allow

11   the importer to secure antidumping duty liability through a

12   bond at the importer's request.  That's basically what the

13   statute that was operative --

14             THE COURT:  So nothing that clarifies this?

15             MR. TELEP:  No.

16             THE COURT:  I assume you're also not aware of any

17   guidance issued by the Agency that might shed light on this?

18             MR. TELEP:  No.  And one final point if I can while

19   we're trying to parse the statute is you have to think about

20   how all of this plays out in the long run.  I hear Your Honor

21   on the second sentence in Section 1505(b).  Again, 1505(d)

22   doesn't square with that language.  1504(d) doesn't square

23   with that language.  But if the Court were to say that the

24   bill is an administrative prerequisite to suit, Customs can

25   hold open this for liability for a century.  That's what Mr.

1    Mancuso said.  Mr. Mancuso actually said so long as nobody is

2    prejudiced.  They withdrew that position in their latest

3    brief.

4              THE COURT:  I noted that.

5              MR. TELEP:  So there's no bounds on it.  To quote

6    the late Judge Poe -- Chief Judge Poe -- that cannot be the

7    law.  It simply cannot be the law that Customs can take the

8    entire machinery of deemed liquidation, which was designed to

9    put limits on the importer's and the surety's liability --

10   four years, I think, was the maximum of all the different

11   types of deemed liquidation that there are -- four years was

12   the max.  You take four years and you turn it into 100 years.

13   That can't be the law.  It just cannot be the law.  Law has

14   got to make sense, and this law doesn't the way that they've

15   interpreted this.

16             THE COURT:  All right.  Anything else you wish to

17   say?  Or the other two?

18             MR. TELEP:  No.  I'm happy to rest on that, Your

19   Honor.

20             THE COURT:  Okay.  Thank you, sir.

21             Ms. Farrell, I have a question for you.  The date

22   of deemed liquidation is not in dispute in this matter,

23   correct?

24             MS. FARRELL:  Correct, Your Honor.

25             THE COURT:  And you would agree with me that the

1   Government could have sent out a bill anytime starting with

2   the date of deemed liquidation?

3           MS. FARRELL:  Not to the surety, but --

4           THE COURT:  To the principal.

5           MS. FARRELL:  -- to the principal.  After the

6   deemed liquidation.

7           THE COURT:  Because the money was owed.  The sum

8   was certain.  There was nothing else to be done.

9           MS. FARRELL:  There was a fixed amount and it

10  hadn't been paid as a deposit, so yes.

11          THE COURT:  The 30 days from demand is something of

12  a grace period, correct?

13          MS. FARRELL:  That's correct, Your Honor.

14          THE COURT:  Pay this within 30 days and you don't

15  owe us any interest, kind of like my credit card bill?

16          MS. FARRELL:  Exactly like your credit card.

17          THE COURT:  I owe the money, really, at the time

18  that I charge it, but there's a grace period there and I can

19  just pay the normal amount due if I pay it within the 30 days

20  after they -- I get the statement or what have you.  That's a

21  grace period to keep me from having to pay interest and

22  that's to encourage me to pay the bill in a timely fashion.

23          Why doesn't the right accrue at the time you have

24  the right to send the bill?

25          MS. FARRELL:  Because based on the statute, we have

1    to make a demand.  So although the amount is fixed, there's

2    one more step for Customs.  They have to send the bill out.

3    They have to make a demand for that payment.  Both to the

4    importer as well as the surety.  And Your Honor, I --

5              THE COURT:  Let's go back to my credit card

6    example.  Let's put the demand requirement aside.  Pretend

7    there's no demand requirement.  I know you assert there is.

8    I'm not forgetting that.

9              MS. FARRELL:  Okay.

10             THE COURT:  But for the purposes of my

11   hypothetical --

12             MS. FARRELL:  Understood.

13             THE COURT:  -- forget the demand requirement.  I

14   go -- I take my credit card.  I go over here to the Oculus.

15   I buy my girlfriend something nice at Stuart Weitzman.

16   American Express forgets to send me a bill.  I forget to pay.

17   American Express wakes up and realizes, you know what, Vaden

18   didn't pay his American Express bill.  They sue me.  Nothing

19   wrong with that, is there?

20             MS. FARRELL:  No, I don't think so.  I mean, I

21   don't know the terms of your American Express, whether they

22   actually have to send you a bill for you to pay it.  But --

23             THE COURT:  Let's assume they don't.

24             MS. FARRELL:  -- assume they didn't --

25             THE COURT:  There's no demand requirement.  I owe

1    them money.  I know I spent the money.  What have you.

2            MS. FARRELL:  If there was no demand requirement

3    and you knew you spent the money and you knew, generally,

4    your bill shows up around the end of the month and you didn't

5    pay it, then --

6            THE COURT:  It wouldn't be nice, but they could do

7    it?

8            MS. FARRELL:  They could do it.

9            THE COURT:  Okay.

10           MS. FARRELL:  Because they don't have a demand --

11   that I'm aware of, they don't have a demand requirement on

12   you.

13           THE COURT:  Because the money that I owe is clear.

14   It's whatever I bought there at the oculus -- what the price

15   of that is.  And my owing it is clear.

16           MS. FARRELL:  Right.

17           THE COURT:  Why isn't that the case we have here on

18   liquidation?  As of the date of that deemed liquidation, they

19   owed you whatever the amount of money was.  It was clear.

20   Assume there's no demand requirement.  You could have sent a

21   bill anytime, but you didn't.  Why hasn't the cause of action

22   accrued?

23           MS. FARRELL:  Well -- and again, this makes -- with

24   the assumption that no demand was required --

25           THE COURT:  That's part of the hypothetical.

1          MS. FARRELL:  -- then you could say pay me now.

2     Don't need to make -- just bring a lawsuit.  With the

3     exception that in addition to the demand, knowing that you

4     have to make a payment also triggers something else.  It

5     triggers the opportunity to protest the amount.

6          Now, on a deemed liquidation, if there had been a

7     change in position, if there had been an error, they were

8     told to bring it in under this amount because they thought

9     that that was the duty rate.  And then they find out, no, no,

10    there was an error.  They're going to -- under Koyo and some

11    other cases, they're going to have an opportunity to come

12    back and say, well, we put that in there because that's what

13    we thought was right, but then when you sent us the bill we

14    realized, no, no.  We want an opportunity to protest the

15    amount we accidentally put into the entry papers.  They have

16    180 days to do that after a demand.  So that's critical --

17         THE COURT:  Well, but you're arguing in your brief

18    that 1581(a) and 1582 are two separate causes of action and

19    they're not linked?

20         MS. FARRELL:  Absolutely, Your Honor.

21         THE COURT:  So why does it matter that they want to

22    file a protest if you're the Plaintiff and it's your cause of

23    action and you're under 1582, not 81?

24         MS. FARRELL:  Because generally, the system that

25    Congress has set up -- it's funny, we were joking before the

1    argument began it feels very funny as the Government to sit

2    on this side of the room because we're never Plaintiff.  We

3    should never be Plaintiff in a collection action, either.  It

4    should be always a 1581(a) that a surety pays and then comes

5    back and says, nope.  Everything you did is wrong, this is

6    wrong, that's wrong, whatever.

7            And in fact, Your Honor, we talk about the demand.

8    Something that I wanted to raise, and I unfortunately didn't

9    say it earlier, but in 1505 -- excuse me, 1514(c)(3) --

10           THE COURT:  Um-hum.

11           MS. FARRELL:  -- and we drop down to a protest of a

12   decision, order, or finding described in subsection (a) shall

13   be filed with the Customs Service within 180 days after but

14   not before the date of liquidation or reliquidation.  This is

15   the protest.

16           THE COURT:  Um-hum.

17           MS. FARRELL:  If we drop down to below (B), it says

18   a protest by a surety which has an unsatisfied legal claim

19   under its bond may be filed within 180 days from the date of

20   mailing of notice of demand for payment against its bond.

21           So the surety's right to protect itself through the

22   1581(a) protest scheme is triggered by the demand.  This is

23   consistent with 1505(b), that a demand has to go out.  Why?

24   Because it may even be the importer.  The importer -- there

25   could be a change in the law.  There could be something that

1   has occurred that effects what they thought they were putting

2   correctly on the face of the entry and they have 180 days to

3   try to fix it once they get the bill.

4          Same as the surety.  They wouldn't be able to

5   protest if they don't get a demand.  Their demand is

6   triggered by -- excuse me -- their protest right is

7   contingent upon a demand.  So it makes sense that in face of

8   a bond, they would adopt Customs' regulation requiring a

9   demand.  Why?  Because I want to be able to protect myself

10  under 1514, not have it be final and conclusive only.

11         What if the importer screwed up and used the wrong

12  rate and because we're in this era of a bond standing in lieu

13  of money on file, there's no deposited money.  If the numbers

14  in the entry paperwork were too high, we know that the surety

15  would have an opportunity after that demand within 180 days

16  to come back and say, okay, I know my bond is here but you

17  know what, folks?  Guess what?  This number is wrong.  It

18  should be lower.  I'm protesting the amount.

19         They would have the right -- other than if it were

20  collusion for an importer who blew their own deadline -- a

21  surety would have the right to bring all of those kinds of

22  defenses to the face of the bill.  That -- oh, well, it

23  shouldn't be that the interest rate was rung wrong or that

24  the rate of duty that was in it -- or this was -- there was

25  an exclusion for these particular goods to that antidumping

1   order or 301 order.

2            THE COURT:  But again, you're arguing here in your

3   brief that whether or not a surety has filed a protest that

4   has been redressable under 1581(a) before this Court is

5   immaterial to the accrual of your cause of action under 1582.

6            MS. FARRELL:  It's immaterial to our accrual of our

7   action under 1582.  That is correct.  But our action hinges

8   on the fact that we sent a demand, and the necessity of

9   sending the demand affects the surety's right to be able to

10  protest.  So even though they have a right to protest, if we

11  don't send a demand, they don't know.  They can't protest.

12  It's contingent.  So it's consistent --

13           THE COURT:  But one could posit a circumstance in

14  which your failure to send a demand may mean that they're

15  protected with their 1581 remedies if you ever do try to come

16  back at them, but the clock is running on your 1582 action.

17           MS. FARRELL:  Right.

18           THE COURT:  And so what I'm trying to understand is

19  the credit card company can sue me if I don't pay the money

20  as soon as it's due --

21           MS. FARRELL:  Right.

22           THE COURT:  -- absent a contractual term otherwise.

23  This money was due in October of 2006.  You could have sent a

24  bill anytime you wanted to, starting in October of 2006.

25           MS. FARRELL:  Well, we --

1          THE COURT:  So why aren't you, like American

2    Express, your cause of action has accrued?

3          MS. FARRELL:  Because our cause of action based on

4    the regulations in the face of a bond require a demand, as

5    well as 1505(b) requiring a demand for payment, as well as --

6          THE COURT:  So what you're saying is that the

7    insurance company has unwittingly given you an unrestrained

8    period of time in which you can make demand?

9          MS. FARRELL:  Your Honor, I don't think it's the

10   insurance company that's given it to us.  I think the fact

11   that Congress has (indiscernible) a statute of repose for

12   when the bill has to be sent out vis-à-vis -- Your Honor was

13   talking about it earlier.  There's nothing in these

14   provisions -- there's nothing in any of these provisions that

15   says -- that ties the bill the must go out within X numbers

16   of days, years.  That six-year statute of limitations could

17   have easily -- Congress could have easily built into the

18   statute -- 1505(b) -- that says, oh, and by the way, you must

19   send the bill out within six years minus 180 days if you want

20   to bring an action.  Congress didn't do that.  I mean,

21   Congress didn't do it.  It's not here.

22          THE COURT:  May I ask a question about the bill in

23   this case?

24          MS. FARRELL:  Yes, Your Honor.

25          THE COURT:  It's undisputed that the bill is wrong?

```
1              MS. FARRELL:  Correct.

2              THE COURT:  Why haven't you ever sent a corrected

3    bill?

4              MS. FARRELL:  Because --

5              THE COURT:  I actually went back and looked at your

6    amended complaint because I was curious -- I mean, the bill

7    has been wrong since it was sent.  I was curious with all the

8    amendments that have taken place in this case whether you had

9    changed how you characterized the bill, and the operative

10   complaint currently before the Court just says you sent a

11   bill, it's attached as exhibit whatever, and elides over the

12   fact that the bill is completely wrong.

13             MS. FARRELL:  Well, and it's interesting, Your

14   Honor, because the 612 report -- when it goes out -- the 612

15   report conveys what's owed by the importer when it goes to

16   the surety.  So in fact, if you are a continues bond surety

17   with a $50,000 limit on your bond, and that they've entered

18   numerous entries, frequently -- technically, if it's going to

19   the surety, it should be the face of your bond is 50,000

20   payoff because we're going to -- underneath we're going to

21   show you that your importer -- your principal on your bond --

22   has all of these.  But what they get is the whole list and

23   not anything limiting it to 50,000.

24             What that means is then the surety comes back.

25   This is why the demand is so necessary.  The surety has an
```

1   opportunity to come back and be heard by Customs and they can

2   say, well, wait a second here.  This is wrong.  We're willing

3   to pay, but let's get the number right.

4           Say, for example --

5           THE COURT:  Yeah.  But couldn't they raise that in

6   defense to a 1582 action, too?  I mean, that's essentially

7   what's gone on here.  You have filed a complaint with a bill

8   that's wrong, and you have obviated the need for them to

9   raise as a defense if the only thing, it's definitely not

10  this amount, it's some other amount because you have conceded

11  error.  But surely you're not claiming that absent a protest,

12  they couldn't raise a defense in that regard in a 1582?

13          MS. FARRELL:  Well, absent a protest?  Yeah.  Yes.

14  Absolutely because it became final and conclusive on them

15  when they got the bill because they had an opportunity to

16  protest that bill.

17          THE COURT:  Well, in this case, it was a deemed

18  liquidation and your bill was wrong.

19          MS. FARRELL:  Right.  But the thing is, is that you

20  have an opportunity to protest the amount if the amount if

21  beyond what the face of your bond is or any other reason.

22  But yeah, when we get a bill as a surety, you have an

23  opportunity to protest it.  That's the reason that the

24  demand -- one of the other reasons the demand is being made.

25  It, number one, is to put you on notice that you owe us

1  money, and number two, it's to afford you your rights under

2  1514 that you can claim a protest.

3       THE COURT:  Is it your belief that had you not

4  conceded error of the bill that they couldn't contest the

5  amount here?

6       MS. FARRELL:  Your Honor, I think that from the

7  perspective from the DOJ --

8       THE COURT:  That they couldn't say, look, this is

9  deemed liquidated.  They don't have any right to send us a

10  bill for this.  The amount was set in October of 2006.

11       MS. FARRELL:  There is -- if it's deemed liquidated

12  at that amount, then yeah.  I think it doubled, though.  I

13  think that the bill actually ended up doubled --

14       THE COURT:  I think that's why.  At least doubled.

15       MS. FARRELL:  -- of the face amount of the bond --

16  of the entry paperwork because there wasn't a form from the

17  importer stating that they hadn't been reimbursed, because of

18  antidumping duties.  So it causes a doubling if you don't get

19  that form from the importer.

20       So say, for example, I'm a surety who believes, oh

21  yes, there's a deemed liquidation.  Oh, boy.  The importer

22  went away.  Yes, I understand I'm going to have to pay.  But

23  just FYI, and the bond is big enough to be larger than the

24  amount in the bill.  They're going to come back and they're

25  going to protest and they're going to say, there's a lot of

1   wonky stuff in here.  Let's sit down and figure out what we

2   really owe because we don't think we owe this full amount,

3   and in fact, we think we owe less than the face of our bond.

4          So I mean, that happens.  It didn't happen in this

5   scenario because of the -- just the vagaries of the facts

6   here.  But that is -- when you read the statute together --

7   when you read 1505(b), it seems to me that putting in that

8   language about a bill makes it awful consistent with 1514,

9   giving you notice that you have -- once you get that bill,

10  the clock is ticking.  You have 180 days to file a protest if

11  you're unhappy with the number that you're looking at in the

12  bill.  So I think all taken together --

13         THE COURT:  You're telling me that other than the

14  part -- in other words, your basic argument is other than the

15  part, that there's not a limit on how long the Government can

16  take to send a bill.  It all seems to work together as a

17  coherent whole reading the statutes?

18         MS. FARRELL:  Well, and even the time not --

19  reading the statute, the absence -- as Your Honor knows --

20  the absence of evidence is also evidence.  The absence of a

21  repose on when the bill has to be.  And they say, we have to

22  send the bill.  They don't say when.  They just say, you have

23  to make a demand.

24         THE COURT:  Well, the real question is -- there are

25  several questions here.  One of the primary questions is, is

1    this indeed the proper way to read the statute, and then the

2    question for Congress will be, if it is the proper way to

3    read the statute, is did they intend it to be that way and

4    would they like to change it if that ends up being the proper

5    interpretation.

6            MS. FARRELL:  Well, I would make one note, Your

7    Honor, factually, that when the bill went out to the importer

8    and it wasn't paid, shortly thereafter, the bill -- the

9    demand, was made of the surety.  So this wasn't a scenario

10   where a bill went out upon deemed liquidation or liquidation.

11           THE COURT:  Well, no.  I agree.  You were

12   reasonably prompt in terms of the difference between when you

13   billed Linyi and when you billed Aegis.

14           MS. FARRELL:  Yes.

15           THE COURT:  You weren't prompt at all in terms of

16   when you sent the first bill.

17           MS. FARRELL:  But unfortunately, due to -- I don't

18   want to say that anyone did anything necessarily on purpose

19   wrong, but computer systems, whatever -- something fell

20   through because it was one of these deemed liquidations and

21   this unique beast of a bond in lieu of deposits.  So it was

22   this perfect storm of facts that generated this.  But when

23   Customs realized, with the instruction from Commerce, that

24   oh, FYI, if you have an antidumping case with Linyi and it's

25   garlic, let's go.  This is the amount you need to liquidate.

1   They got that in 2014, so all of this was occurring -- now,

2   granted, there was the decision notice, right, that occurred

3   so much earlier.

4           THE COURT:  Yeah.  But then even after all of that,

5   you still waited nearly another six years before filing suit.

6           MS. FARRELL:  Well --

7           THE COURT:  It's not like you made demand on Linyi

8   in 2014, you made demand on Aegis in early 2015, and then you

9   filed suit in 2020.  I mean, nothing about this case screams

10  alacrity.

11          MS. FARRELL:  Well, I mean, I'm not sure --

12  sometimes, what happens is that Customs is busy working on

13  trying to resolve the case.

14          THE COURT:  And think about this with regard to

15  where we're about to go, because I'm about to give you your

16  homework assignment and send you home.  Had you filed suit

17  before the end of 2015, they may not have an impairment of

18  surety shift defense.  So your waiting nearly six years after

19  you sent the bill to Linyi has had consequences.

20          MS. FARRELL:  Well -- well, we didn't --

21          THE COURT:  I mean, by the time --

22          MS. FARRELL:  -- well, the suit --

23          THE COURT:  -- you sent the bill to Linyi, it was

24  already eight years past the liquidation date.  And now,

25  rather than, okay, we screwed up.  Let's move this thing

 1   along.  Okay.  They're not going to pay.  Sue them.  Six more

 2   years.  Six more years.

 3           MS. FARRELL:  Well, Your Honor, my understanding is

 4   that during that time period --

 5           THE COURT:  I mean, I'm not perfect.  I'm human.

 6   But when I catch a mistake, I get my tail into gear.

 7           MS. FARRELL:  Well, I think that what happened,

 8   Your Honor, is that Customs was going against the STB bonds

 9   that were on all of --

10           THE COURT:  I mean, we all make choices.  But when

11   we make choices, there are consequences and sometimes there's

12   accountability.

13           MS. FARRELL:  But --

14           THE COURT:  So --

15           MS. FARRELL:  But Your Honor, just for the Court's

16   edification, Customs was going over the single transaction

17   bond surety to get paid because that should have been

18   sufficiently enough.  When it was realized that it wasn't,

19   then they turned to the continuous bond.

20           THE COURT:  And that's another one of their points.

21   Because of the large delay here that rung up the interest

22   cost, which we have learned that Customs calculates your

23   payments the same way some credit card companies do.  They

24   knock it against the interest first rather than the

25   principal.  So I'll remember that next time I hear someone

1    from the Government jump up and down about how rapacious

2    payday lenders and credit card companies are.  You change

3    first before you complain about somebody else.

4            MS. FARRELL:  Well, Your Honor, and of course that

5    regulation has been longstanding and everyone in the

6    community understands that that's how it works, that --

7            THE COURT:  Well, I know.  It's always different

8    when the shoe is on the other foot.  I get it.

9            MS. FARRELL:  Understood.  Understood.

10            THE COURT:  But I mean, that's one of their things.

11            MS. FARRELL:  But again, and I appreciate Your

12    Honor -- in an optimal, perfect world, but once they

13    determine that there were still monies outstanding, they then

14    sought -- the demand was already out there.  So this wasn't a

15    surprise to Aegis that they may owe money.  I mean, they

16    could have stepped into the negotiations and asked to go

17    first and leave it on someone else to go second, but --

18            THE COURT:  Well, I'm going to stop it there and

19    I'm going to give a homework assignment that will be noted in

20    an order.  But I'm going to give Aegis five minutes to say

21    whatever it is they want to say about your argument regarding

22    Section 1514 or anything else that you have said at any

23    tenure here.

24            So Mr. Telep, if you'd like to approach --

25            MS. FARRELL:  Thank you, Your Honor.

1          THE COURT:  -- if you have anything you wish to

2    say, you've got five minutes.

3          MR. TELEP:  I won't need that long, Your Honor.  I

4    think Ms. Farrell just made our case that, again, 1504(d),

5    deemed liquidation duties, are not governed by the statutory

6    provision.  If a protest by a surety, which is an unsatisfied

7    legal claim under its bond, may be filed within 180 days from

8    the date of mailing of notice of demand for payment of its

9    bond.  There's no notice in a deemed liquidation context.

10   That's in that statute in 19 U.S.C. Section 1504.

11         The only other points I'd make is that we agree

12   with Your Honor's understanding and recitation of events.

13   Eight years.  Eight years from the date that the entries were

14   deemed liquidated did they send any kind of notice.  Then

15   they waited -- not six years -- five years, 364 days.

16         The last point I'd make is that Hartford paid CBP

17   under the single transaction bonds on November 17th, 2017.

18   So zero activity and no reason for any delay for three years

19   following Hartford's payment of the principal -- which was

20   the full payment of the principal -- leaving only interest to

21   accrue for another three years.

22         That's all I have, Your Honor.

23         THE COURT:  All right.  Thank you.

24         So I have a few questions.  I know you've done a

25   lot of writing here, but there's still more to do.  And I

1    want to make certain that you have adequate time to consider

2    these questions because I want you to turn in your best work.

3    Because this is not an easy case and there's a lot to

4    consider here.

5            So first, I'm going to want you to submit letter

6    briefs on a couple of topics.  I'm going to give you those

7    topics.  Then I'm going to ask for your input as to how many

8    pages, double spaced, you think you may need.  I have

9    something in mind, but we'll see if we're in the same

10   ballpark.  And I'm also going to ask you for guidance on how

11   long you want to submit.

12           As I have said a couple of times, I want you to

13   tell me about impairment of suretyship.  I want you to look

14   at the record that has been made for discovery, apply the

15   governing standard, and tell me whether, based on the record

16   that is before the Court, there is enough to decide the issue

17   on summary judgment.  If so, what that decision should be and

18   what an appropriate remedy for impairment of suretyship

19   should be.

20           Should it be, if there is to be a remedy, complete

21   disallowance of the claim, or only partial disallowance of

22   the claim based on the discussion we've had here today?  Tell

23   me what the case law says, anything else you want to bring to

24   bear on it.  If you think that it's going to require trial,

25   tell me what issues of fact that would govern the application

1    of the defense are left to be determined.  That's issue

2    number one.

3            Issue number two, I would like for a little more

4    briefing on the application of the demand requirement and

5    what difference it makes here as opposed to the statutory

6    argument.  As I have intimated, I can potentially see those

7    being separate.  You may view them as one in the same.  I

8    don't know.  I'd like to hear a little bit more about the

9    demand requirement and why you think this requires demand or

10   doesn't require demand, and if so, on whom.

11           Third, I'll call this a catch-all.  If you can

12   think of any other reason -- I know you, in your briefing,

13   Mr. Telep and Mr. Jefferson, you talked about -- well, demand

14   needs to be made at a reasonable time.  I took a look at some

15   of those cases.  I didn't come away particularly jolted by

16   any one of them.  But I'm giving you an opportunity to

17   further develop the -- there's some additional reason why the

18   failure to make a demand of eight years, whether it be your

19   reasonableness argument or some other argument, vitiates

20   their ability to collect.

21           So those are the three topics I'd like to hear a

22   little more about.  Impairment of suretyship, first and

23   foremost, a little more on demand, and then what I termed a

24   catch-all.  If you wish to further develop the argument that

25   you have made, Mr. Telep, governing demand has to be made

 1   within a reasonable time, I looked at some of those cases

 2   that you cited.  They appear to be bailment cases rather than

 3   suretyship cases, so I didn't remain convinced.  A bailor and

 4   a bailee are in a little bit different circumstance than an

 5   insurance company and its principal -- a surety and its

 6   principal.  But I want to see if you've got anything else out

 7   there.

 8            So those are the three topics that I'm looking at.

 9   Mr. Telep, how many pages do you think you need?

10            MR. TELEP:  Your Honor, I think if we had 40 pages

11   on something like this, but you mentioned that you had some

12   ideas in mind.  We're obviously interested in hearing those.

13            THE COURT:  Okay.  If this was The Price is Right,

14   you'd be a loser.

15            Ms. Farrell?

16            MS. FARRELL:  Your Honor, on The Price is Right is

17   the little man still going up the mountain?  Are we looking

18   at 30 pages?

19            THE COURT:  Well, the Price is Right rule is, of

20   course, if you go over, you lose.  But 30 pages sounds a

21   little more reasonable than 40 pages.  I was hoping for

22   something around 20 or 25.  But I want to give you all your

23   best effort, so I'll be generous today and say 30 pages.

24            The burden of proof lies with the Government.  On

25   the other hand, the impairment of suretyship is an

1   affirmative defense on which the burden of proof lies on the

2   Defendant.  Since that's the main issue that I think could

3   benefit from further briefing, I'm going to give Mr. Telep

4   the first brief.

5          Mr. Telep, how many days would you like?

6          MR. TELEP:  60, Your Honor.  Unless you, again --

7          THE COURT:  That's fine.

8          MR. TELEP:  All right.

9          THE COURT:  60 days from today's date.  So that

10  would be approximately June 24th.  Is that a weekday, Jason

11  (ph.)?

12         CLERK:  No.  It's a Saturday.

13         MS. FARRELL:  It's a Saturday.

14         THE COURT:  Oh, okay.

15         CLERK:  (Indiscernible).

16         THE COURT:  So it'll actually be the 26th of June

17  because that's a Monday.  Okay.

18         Ms. Farrell, how many days would you like to

19  respond to Mr. Telep's brief?

20         MS. FARRELL:  Your Honor, is 45 days acceptable to

21  the Court?

22         THE COURT:  More than acceptable.  45 days for the

23  Government's response.

24         I leave the option to you, Mr. Telep.  Do you want

25  to reply or do you want to stand on your brief?

1          MR. TELEP:  Your Honor, can we reserve that right

2   for the time and the schedule for a reply, and if we like

3   what we see at the end of reviewing the Government's brief,

4   waive the reply?

5          THE COURT:  That's fair.  How many days do you

6   want?

7          MR. TELEP:  20.

8          THE COURT:  So done.

9          MR. TELEP:  All right.

10         THE COURT:  All right.  I don't like that I'm

11  giving you additional writing.  I know you've written an

12  awful lot and this is the second go around, but I take this

13  case very seriously.  It's a difficult case.  It's probably

14  the most difficult case that I have seen regarding its

15  statutory implications.  And I also take it very seriously

16  that though this is a $50,000 case, there are lots of other

17  bonds that are in play and the rule here is going to govern

18  them, and the rule here is undoubtedly going to be determined

19  by the Federal circuit.  So I would like to do my best work

20  for them and ensure that you have provided the best briefing

21  that you can.

22         So we will enter an order later this afternoon

23  laying out the topics and the timelines as we've agreed here

24  today.  We'll await what you have to say.  And then after

25  that, as I said, in the catch-all you can comment on anything

1    you want, including my credit card theory or anything else

2    that comes to your mind, and then we'll make a decision.

3    Unless it turns out we have to have a trial.  And if that's

4    the case, God save us all.

5            Anyhow, anything else?

6            MR. TELEP:  Not from Aegis, Your Honor.

7            MS. FARRELL:  No, Your Honor.  But we thank the

8    Court for giving the parties an opportunity to provide

9    additional information.

10           THE COURT:  Okay.  And just as a reminder, seven

11   days from today's date, if you want a transcript, let us

12   know.  And with that, just a few minutes before 5 o'clock, we

13   stand in adjournment.

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T I O N

2

3    I, JoAnna Sargent, certify that the foregoing transcript is a

4    true and accurate record of the proceedings.

5

6

7

8    _____

9    JoAnna Sargent

10

11   eScribers

12   7227 North 16th Street, Suite #207

13   Phoenix, AZ 85020

14

15   Date:  May 3, 2023

16

17

18

19

20

21

22

23

24

25