UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HONORABLE STEPHEN ALEXANDER VADEN, JUDGE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| | : | |
| Plaintiff, | : | Court No. 20-03628 |
| | : | |
| v. | : | |
| | : | |
| AEGIS SECURITY INSURANCE CO., | : | |
| | : | |
| Defendant. | : | |
| | : | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S SUPPLEMENTAL
BRIEF AND IN FURTHER SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

BRYAN M. BOYNTON
Principal Deputy Assistant Attorney General
Civil Division

PATRICIA M. McCARTHY
Director

JUSTIN R. MILLER
Attorney-In-Charge
International Trade Field Office

BEVERLY A. FARRELL
Senior Trial Attorney
Department of Justice, Civil Division
Commercial Litigation Branch
26 Federal Plaza, Room 346
New York, New York 10278
Tel.: (212) 264-0483 or 9230
Attorneys for Plaintiff

Of Counsel:
SUZANNA HARTZELL-BALLARD
Office of the Assistant Chief Counsel
U.S. Customs and Border Protection

Dated: August 10, 2023

# TABLE OF CONTENTS

BACKGROUND ........................................................................................................... 1

SUMMARY OF ARGUMENT ..................................................................................... 4

ARGUMENT ................................................................................................................ 6

I.  THE DOCTRINE OF IMPAIRMENT OF SURETYSHIP DOES NOT BAR THE
    GOVERNMENT'S CLAIM ................................................................................... 6

    A.  The Legal Standard ...................................................................................... 7

    B.  The Record Before The Court Is Sufficient For The Court To Decide The Issue Of
        Impairment of Suretyship Without Resort To A Trial ...................................... 9

        1.  CBP did not alter the parties' rights and obligations under the CB..................... 10

        2.  CBP did not modify the CB ............................................................................ 11

        3.  CBP did not deprive Aegis of recourse by impairing the importer's
            duty of performance ...................................................................................... 12

        4.  Even if the Court determines that CBP's demand for payment caused impairment
            of Aegis's suretyship, the Government should still recover 60 percent of the
            face amount of the bond and interest under 19 U.S.C. § 580 and
            28 U.S.C. § 1961 ......................................................................................... 14

II.  TO PERFECT ITS CLAIM AND COMMENCE THIS ACTION, THE GOVERNMENT
     WAS STATUTORILY AND CONTRACTUALLY REQUIRED TO MAKE A DEMAND
     ON AEGIS ............................................................................................................ 15

    A.  19 U.S.C. § 1505 Requires That A Demand Be Made ...................................... 16

    B.  The Contractual Terms Of The Bond Require That A Demand Be Made .............. 18

    C.  Aegis's Right To Protest Hinges On A Demand For Payment............................ 21

III. NO STATUTE PROVIDES A DEADLINE BY WHICH A DEMAND FOR PAYMENT
     MUST BE MADE BY CBP OR A STATUTE OF REPOSE BY WHICH A COLLECTION
     ACTION MUST BE COMMENCED ..................................................................... 22

CONCLUSION............................................................................................................ 26

# TABLE OF AUTHORITIES

<u>**Cases**</u>

*Air-Sea Brokers v. United States*,
  596 F.2d 1008 (C.C.P.A. 1979) ............................................................................. 25

*CALPERS v. ANZ Securities, Inc.*,
  582 U.S. 497 (2017) ............................................................................................ 24

*Chevron U.S.A. v. United States*,
  923 F.2d 830 (Fed. Cir. 1991) .............................................................................. 15

*Connecticut Nat'l Bank v. Germain*,
  503 U.S. 249 (1992) .............................................................................................. 7

*Gomez-Perez v. Potter*,
  553 U.S. 474 (2008) ............................................................................................ 25

*Nyhus v. Travel Management Corp.*,
  466 F.2d 440 (D.C. Cir. 1972) ....................................................................... 16, 23

*Stone v. INS*,
  514 U.S. 386 (1995) ............................................................................................ 17

*United States v. Am. Home Assurance Co.*,
  857 F.3d 1329 (Fed. Cir. 2017) ........................................................................... 16

*United States v. Ataka Am. Inc.*,
  826 F. Supp. 495 (Ct. Intl Trade 1993) .................................................................. 8

*United States Postal Service v. Gregory*,
  534 U.S. 1, (2001) .............................................................................................. 13

*United States v. Chemical Foundation, Inc.*,
  272 U.S. 1 (1926) ............................................................................................... 13

*United States v. Cocoa Berkau, Inc.*,
  990 F.2d 610 (Fed. Cir. 1993) ........................................................................ 20, 21

*United States v. Cocoa Berkau, Inc.*,
  789 F. Supp. 1160 (Ct. Int'l Trade 1992) .............................................................. 20

ii

*United States v. Commodities Export Co.*,
   972 F.2d 1266 (Fed. Cir. 1992) ........................................................... 15

*United States v. Fed Ins. Co.*,
   805 F.2d 1012 (Fed. Cir. 1986) ........................................................... 25

*United States v. Gordon*,
   No. 90 Civ., 1994 WL 514533 (S.D.N.Y. Sept. 21, 1994) ...................... 23

*United States v. Gottlieb*,
   948 F.2d 1128 (9th Cir. 1991) ........................................................... 23

*United States v. Great Am. Ins. Co. of New York*,
   738 F.3d 1320 (Fed. Cir. 2013) ........................................................... 7

*United States v. Ins. Co. of N. Am.*,
   83 F.3d 1507 (D.C. Cir. 1996) ........................................................... 16

*United States v. Reul*,
   959 F.2d 1572 (Fed. Cir. 1992) ........................................................... 16

*United States v. Rollinson*,
   866 F.2d 1463 (D.C. Cir. 1989) ........................................................... 23

*United States v. Tabor*,
   608 F. Supp. 658 (Ct. Intl Trade 1985)………………………………..25

*United States v. Vanornum*,
   912 F.2d 1023 (8th Cir. 1990) ........................................................... 23

## **Statutes**

Securities Act § 13,
   15 U.S.C. § 77m .............................................................................. 24

19 U.S.C. § 580 ....................................................................... 12, 14, 15

19 U.S.C. § 1504 ............................................................................... 22

19 U.S.C. § 1504(1)(E) ....................................................................... 22

19 U.S.C. § 1505 ......................................................................... 16, 17

19 U.S.C. § 1505(b) ............................................................................ 16, 17, 18, 22

19 U.S.C. § 1508 .................................................................................................... 22

19 U.S.C. § 1514(a) ............................................................................................... 21

19 U.S.C. § 1514(c)(3) ........................................................................................... 21

19 U.S.C. § 1675(a)(3)(B) ..................................................................................... 22

28 U.S.C. 1581(a) .................................................................................................. 22

28 U.S.C. §1582(2) ........................................................................................... 18, 22

28 U.S.C. § 1961 .............................................................................................. 14, 15

28 U.S.C. § 2415(a) ................................................................................... 10, 11, 20

28 U.S.C. 2637 ....................................................................................................... 22

28 U.S.C. § 2680(c) ............................................................................................... 24

North American Free Trade Agreement Implementation Act (NAFTA),
    PL 103–182, December 8, 1993, 107 Stat 2057……..………………….……………………17, 18

## Regulations

19 C.F.R. § 24.3a(a) .............................................................................................. 16

19 C.F.R. 113.27(b) ..............................................................................6, 10, 11-12

19 C.F.R. § 113.62(a)(1)(ii) ....................................................................... 18, 19, 21

19 C.F.R. § 141.1 ............................................................................................. 7, 8, 9

19 C.F.R. § 141.1(b)(1) ............................................................................................ 8

19 C.F.R. § 159.9(c)(2)(ii) ..................................................................................... 22

19 C.F.R. § 159.9(d) .............................................................................................. 23

## <u>Other Authorities</u>

American Law Institute. *Restatement of the Law Third Suretyship and Guaranty 3d*
  American Law Institute 1996. ...........................................................................................*passim*

*Fresh Garlic From the People's Republic of China*,
  68 Fed. Reg. 40,242 (Dep't Commerce July 7, 2003).......................................................3, 4, 11

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE:  HONORABLE STEPHEN ALEXANDER VADEN, JUDGE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| | : | |
| Plaintiff, | : | Court No.  20-03628 |
| | : | |
| v. | : | |
| | : | |
| AEGIS SECURITY INSURANCE CO., | : | |
| | : | |
| Defendant. | : | |
| | : | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S SUPPLEMENTAL BRIEF AND IN FURTHER SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

In accordance with the Court's April 24, 2023 Order requesting further briefing "addressing: (1) whether the record before the Court is sufficient to decide the issue of imparity of suretyship on summary judgment, the appropriate legal standard and remedy, and whether trial is necessary; (2) the applicability of the demand requirement and its linkage, if any, with the statutory interpretation argument; and (3) any other argument or case citations regarding the duty of the Government to make demand within a reasonable time," plaintiff, United States (the Government) respectfully submits this response in opposition to defendant's, Aegis Security Insurance Co. (Aegis), supplemental brief.

**BACKGROUND**

Through this action, the Government seeks to recover on a continuous customs bond issued by Aegis in the amount of $50,000.00 (the CB).  Docket Nos. 66 at ¶ 1, 71 at ¶ 1.  Aegis entered into a CB with Linyi Sanshan Import & Export Co. (Linyi) with an effective date of October 26, 2002.  *Id.* at ¶¶ 7.  The CB was terminated on October 25, 2004.  *Id.* at ¶¶ 10.  The CB secured the importation by Linyi of ten entries of fresh garlic into the United States made

between January 16 and February 11, 2004.[1]  The ten entries were subject to an antidumping

duty order with a duty rate of 376.67 percent *ad valorem*.  Docket Nos. 76-1 at ¶ 7, 83 at p. 46, ¶

7.  On November 4, 2006, the entries liquidated by operation of law (also known as deemed

liquidation) at the rate of duty, value, quantity, and amount of duty asserted by the importer at

the time of entry.  Docket Nos. 76-1 at ¶ 12, 83 at p. 47, ¶ 12.

However, as reflected in a July 14, 2014 message from the Department of Commerce

(Commerce), U.S. Customs and Border Protection (CBP) was unaware of the deemed liquidation

of the ten entries.  Docket Nos. 76-1 at ¶ 15, 83 at p. 47, ¶ 15.  The Commerce message notified

CBP that the suspension of liquidation of the ten entries lifted in May 2006 when Commerce

published a notice of partial rescission of the antidumping order in the Federal Register.  *Id*.

Thus, CBP had not issued bills for payment at that time.  Shortly after receiving the Commerce

message, CBP issued bills to Linyi on October 4, 2014 and October 31, 2014 for duties due on

each of the entries.  *Id*.  Linyi did not pay any of the bills.  Docket Nos. 76-1 at ¶ 19, 83 at p. 47,

¶ 19.

When Linyi did not make payment, CBP turned to Aegis, as surety on the bond, for

payment on January 7, 2015 through the Formal Demand on Surety for Payment of Delinquent

Amounts Due (the 612 Report).  Docket Nos. 76-1 at ¶ 20, 83 at p. 47, ¶ 20.  Although the 612

Report sought bill amounts exceeding that which was actually due based on the deemed

liquidation, the true amount due exceeded the $50,000 limit of liability on Aegis's CB.  Docket

Nos. 76-1 at ¶ 22 & 27, 83 at p. 47, ¶ 22 & p.48, ¶ 28.  Aegis has not made any payment in

accordance with its obligations under the CB.  Docket Nos. 76-1 at ¶ 7, 83 at p. 46, ¶ 7.

---

[1] These ten entries were also covered by single transaction bonds issued by a different surety
who has made payment under those bonds.

In this litigation, the undisputed facts show that Aegis's customs bond program was created by Kingsway Financial Services, Inc. (Kingsway).  Pl. Reply Br. dated Nov. 22, 2022 at 3.  Kingsway was the parent of two subsidiaries: Avalon Risk Management, Inc. (Avalon) and Lincoln General Insurance Company (LGIC).  *Id.*  An arrangement was reached where Aegis's name and forms would be used to issue customs bonds because LGIC supposedly could not do so.[2]  *Id.*  Also, as part of this arrangement, Avalon would serve as Aegis's general agent for the administration of its customs bond program,[3] and LGIC would indemnify Aegis for all losses attributable to the bonds issued under the bond program.  *Id.*

As part of this program, Aegis created a class of bonds it considered low risk in which it would permit customs house brokers to issue continuous bonds in Aegis's name but excluded covering entries subject to antidumping duties made by a foreign importer.  *Id.* at 5.  During May and June 2003, Linyi submitted a request to Commerce for a new shipper review regarding fresh garlic from the People's Republic of China (PRC), which is subject to an antidumping duty order.  68 Fed. Reg. 40,242 (Dep't Commerce July 7, 2003).  On July 7, 2003, Commerce published notice in the Federal Register that it would conduct a new shipper review and would instruct Customs "to allow, at the option of the importer, the posting of a bond or security in lieu

---

[2] The Court may take judicial notice of several collection actions filed in this Court against LGIC.  *See* Court Nos. 11-00296, 11-00352, 11-00367, 13-00084, 13-00085, 13-00086, 13-00087, 13-00088, 13-00089, 13-00090, 13-00091, and 13-00092.  In all of these actions, LGIC issued customs bonds to importers whose goods were subject to antidumping duty orders shortly before or during the effective period of the CB.

[3] The Court may take further judicial notice that LGIC admitted that it "executed an agreement, effective January 1, 2000, whereby LGIC conferred agency status and authority on Avalon, subject to Avalon's obligation to issue bonds that conformed to the formal requirements of the law."  Court No. 13-00088, Docket No. 23 at ¶ 3.

3

of a cash deposit for each entry of the subject merchandise both grown and exported by Linyi until the completion of the new shipper review[]." *Id.*

It was not until July 13, 2004, when Avalon conducted its renewal review of the CB[4] that it discovered Linyi's entries were subject to antidumping duties.  Pl. Response Br. dated Oct. 21, 2022 at 10.  Avalon attempted to communicate with Linyi to obtain an indemnity agreement and collateral to renew the CB, but Linyi did not respond.  *Id.*  Avalon did not monitor these entries, their liquidation dates, or whether Linyi paid the antidumping duties.  *Id.* at 10-11.  In accordance with its custom and practice, Avalon did not monitor entries secured by customs bonds until CBP issued a bill for payment.  *Id.* at 11.  And "under no circumstances would Avalon pay duties that were secured by a bond . . . until it receives a bill" from CBP.  *Id.*

In 2008, Aegis became uncomfortable with LGIC's financial solvency and cancelled the reinsurance agreement between them effective May 12, 2009.  *Id.* at 8.  It was not until 2020, due to LGIC's inability to indemnify Aegis for losses from the customs bond program, that Aegis sued Kingsway for indemnification.  *Id.*  Aegis and Kingsway reached an agreement in which Kingsway would indemnify Aegis for 60 percent of its future losses from the bond program, including attorney's fees.  *Id.*

<u>**SUMMARY OF ARGUMENT**</u>

By seeking to enforce its legal rights based on a legal theory different than those made in the past, the Government has not modified the continuous bond issued by Aegis.  The terms of

---

[4] The first term of the CB was for the period October 26, 2002 to October 25, 2003.  There is no evidence that Avalon conducted a renewal review of the CB prior to October 26, 2003, notwithstanding Linyi's public request for a new shipper review under the fresh garlic antidumping duty order, which was published in the Federal Register several months prior to the renewal.  The entries at issue were then made during this second bond period.

the bond are as they were when the bond was executed on October 23, 2002.  Therefore, the bulk of the provisions of the Restatement (Third) of Suretyship and Guaranty (1996) referenced by Aegis in its supplemental brief are simply inapplicable because they turn on the Government having changed the obligations of the principal to the detriment of surety.

Next, Aegis raises a claim for impairment of suretyship by blaming CBP for its own failings.  By entering into an arrangement with Kingsway and its subsidiaries LGIC and Avalon (the Kingsway entities) after making it known that Aegis's bonds were not to cover entries subject to antidumping duties, Aegis should have confirmed that the Kingsway entities were satisfying its requirements.  Aegis was placed on public notice—six months before the ten entries covered by its continuous bond with Linyi were made—that Linyi was seeking a new shipper review for fresh garlic, a commodity covered by an antidumping duty order.  Aegis could have protected itself by terminating the continuous bond.

Nor did Aegis conduct sufficient diligence to learn that LGIC, its reinsurer, was issuing bonds covering entries subject to antidumping duty orders during the period that Aegis's continuous bond was in force.  Had it done so in a timely fashion, it could have obtained a different reinsurer or exited from the arrangement with Kingsway.

Aegis argues that the Court should impose a deadline by which CBP may issue a demand for payment or find that the Government untimely commenced this action.  But Congress has not exercised its legislative prerogative to do either.

Finally, should the Court determine that some impairment of Aegis's suretyship occurred due to actions of the Government, the Court should nevertheless require Aegis to pay 60 percent of the face amount of the bond given its special arrangement for reimbursement from Kingsway.

<u>**ARGUMENT**</u>

**I.    THE DOCTRINE OF IMPAIRMENT OF SURETYSHIP DOES NOT BAR THE GOVERNMENT'S CLAIM**

Under the unique facts of this case, the doctrine of impairment of suretyship does not bar the Government's claim.  The seeds of any impairment suffered by Aegis were planted by Aegis when it chose to participate in an arrangement with Kingsway and its subsidiaries during the pertinent period in this action.  Specifically, Aegis failed to inform itself that Avalon was issuing customs bonds for LGIC that covered entries subject to antidumping duty orders—the very type of bonds that Aegis determined were too risky.  As a result, its first reinsurer, LGIC, was exposing itself to bonds that Aegis knew were beyond its risk threshold.

Next, in a notice dated July 7, 2003 and filed publicly in the Federal Register, Aegis's continuous bond principal Linyi obtained a new shipper review of the antidumping duty order on fresh garlic from the PRC.  This served as notice that Avalon had entered into a bond with a principal potentially exposing Aegis to antidumping duty risk, a risk Aegis had specifically sought to avoid.

Notwithstanding this red flag, nothing in the record before the Court indicates that Aegis investigated the Kingsway arrangement to confirm that its risk avoidance of antidumping duty exposure was being honored.  Nor did Aegis avail itself of the right to terminate its continuous bond with Linyi.  *See* 19 C.F.R. § 113.27(b) ("A surety may not disavow already incurred obligations but may, with or without the consent of the principal, terminate its agreement to accept future obligations on a bond.").  As of July 2003, the entries giving rise to this action had not occurred and would not occur for six months.  Had Aegis terminated the Linyi CB at that time, it would not have been exposed to the ten entries giving rise to this collection action.

## A.  The Legal Standard

When apportioning rights and responsibilities under a customs bond, the U.S. Court of

Appeals for the Federal Circuit will consider the Restatement (Third) of Suretyship and Guaranty

(1996).  *See United States v. Great Am. Ins. Co. of New York*, 738 F.3d 1320, 1332 (Fed. Cir.

2013).  In seeking to discharge its obligations based on a defense of impairment of suretyship, a

surety such as Aegis, which is in the business of entering into secondary obligations, bears the

burden of persuasion in establishing "the occurrence of the act constituting the impairment" and

that such an impairment exists.  Restatement § 49 (1), (2).

Section 37(1) of the Restatement provides:

> If the obligee acts to increase the secondary obligor's risk of loss by
> increasing its potential cost of performance or decreasing its
> potential ability to cause the principal obligor to bear the cost of
> performance, the secondary obligor is discharged as described in
> subsections (2) and (3), and the secondary obligor has a claim
> against the obligee as described in subsection (4).[5] An act that
> increases the secondary obligor's risk of loss by increasing its
> potential cost of performance or decreasing its potential ability to
> cause the principal obligor to bear the cost of performance is an
> impairment of suretyship status.

Section 37(2) of the Restatement provides that a fundamental alteration of risks imposed

on the secondary obligor, *i.e.*, surety, could arise if the obligee released the principal obligor, i.e.,

principal, from a duty other than the payment of money (section 39(c)(iii)) or agreed to a

modification of the duties of the principal that amounts to a substituted contract or imposes risks

on the surety fundamentally different from those imposed before a modification (section

---

[5] Section 37(4) involves impairing the surety's suretyship status after it performs a portion of its
obligation or before it performs if the surety then performs without knowledge of such
impairment.  Because Aegis has not made any payment, it has not performed, and this section of
the restatement is inapplicable.

41(b)(i)).  In such a scenario, a surety "is discharged from any unperformed portion of the secondary obligation as more fully set forth in those sections."

Similarly, section 37(3) provides for a discharge of the surety's duties if the obligee: impairs the surety's recourse by releasing the principal from a duty to pay money (section 39(c)(ii)), grants the principal an extension of time for performance of its duties (section 40(b)), agrees to a modification of the principal's duties other than a release or extension (section 41(b)(ii)), impairs the value of an interest in collateral securing the principal's obligation (section 42), fails to institute an action before the expiration of the statute of limitations governing the underlying obligation of the principal (section 43), or any other act or omission that impairs the principal's duty of performance, the principal's duty to reimburse, or the surety's right of restitution or subrogation (section 44).

Section 43 of the Restatement provides for a discharge of the surety if the obligee (*i.e.*, the Government) fails to bring an action against a surety until after the Government's cause of action is barred by the running of the statute of limitations against the principal for the underlying obligation.  Because "[t]he liability for duties, both regular and additional, attaching on importation, constitutes a personal debt due from the importer to the United States which can be discharged only by payment in full of all duties legally accruing, unless relieved by law or regulation," 19 C.F.R. § 141.1 (b)(1), section 43 is inapplicable here.[6]  *See* Restatement § 43, cmt. b ("If, however, the obligee institutes action against the secondary obligor before the expiration of the statute of limitations as to the principal obligor, there is no unfairness to the

---

[6] No statute of limitations is applicable to the Government's claim to recover customs duties from an importer.  *United States v. Ataka Am., Inc*., 826 F. Supp. 495, 497-98 (Ct. Int'l Trade 1993).

secondary obligor or the principal obligor, even if the obligee never institutes action against the principal obligor.").

Section 44 of the Restatement provides "[i]f otherwise than described in §§ 39- 43 the obligee impairs the principal obligor's duty of performance (§ 21), the principal obligor's duty to reimburse (§§ 22- 25), or the secondary obligor's right of restitution (§ 26) or subrogation (§§ 27- 31), the secondary obligor is discharged from its duties pursuant to the secondary obligation to the extent that such impairment would otherwise cause the secondary obligor a loss." By their terms, sections 39-43 speak in terms of actions relating to the principal. *See* above. So too sections 21, 22-25 concern actions relating to the principal. Finally, the right of restitution or subrogation referenced in sections 26, 27-31 concerns restitution from the principal or being subrogated to the rights of the obligee, here, the Government.[7]

### B. The Record Before The Court Is Sufficient For The Court To Decide The Issue Of Impairment of Suretyship Without Resort To A Trial

The undisputed factual record developed and presented by the parties in connection with their summary judgment briefing is sufficient to render a decision. *See* Docket Nos. 76-1 and 83;

---

[7] Restatement § 28, cmt. a explains:

> When a secondary obligor is subrogated to the rights of the obligee with respect to the underlying obligation, the result is essentially the same as if the obligee had assigned those rights to the secondary obligor. Indeed, subrogation is often referred to as equitable assignment or an assignment by operation of law. An obligee would be economically indifferent to a choice between receiving full performance of the obligation owed to it and assigning its claim in exchange for consideration equivalent to full performance. Thus, by giving the secondary obligor the equivalent of an assignment of the obligee's rights, the law, while leaving the rights of the obligee unharmed, effectuates the goal of causing the principal obligor to bear the cost of performance.

9

77 at 55-72 and 82-1.  Accordingly, the Government, like Aegis, respectfully submits that trial is not necessary.  *See* Def. Supp. Br. at 1.

    1.  <u>CBP did not alter the parties' rights and obligations under the CB</u>

    Aegis states that its status as a surety has been impaired by CBP's "policy" change, in other words, the Government's legal argument made in this litigation has allegedly altered the terms of the bond.  Def. Supp. Br. at 1, 6.  Specifically, Aegis contends that CBP fundamentally altered the parties' rights and obligations under the CB when it made the legal argument that the applicable six-year statute of limitations to collect duties from a surety runs not from the date of liquidation but from the date of demand.  *Id.*  A legal argument is not a policy position, it is a legal position.

    Under the various sections of the Restatement discussed above, none provide that a legal argument constitutes the type of act sufficient to discharge a surety from its contractual obligations under a bond based on a theory of impairment of suretyship.  *See supra*.  Indeed, other than referencing prior case law that Aegis believes expresses the view that the statute of limitations for a collection action begins to run from the date of liquidation, Aegis points to no section of the Restatement supporting its position.  Nor can Aegis argue that this Court must perpetuate a legal error.

    As we have shown in our amended summary briefing, the cause of action referenced in 28 U.S.C. § 2415(a) accrues not at the time of liquidation but when the bond is breached after a demand for payment required by the terms of the bond is made.  Therefore, the commencement of this action was timely.  Accordingly, to the extent any prior interpretation of section 2415(a) holds that the Government's cause of action accrues at liquidation, such interpretation should be rejected.

10

2.   <u>CBP did not modify the CB</u>

Citing Restatement § 41(b)(i), Aegis contends that CBP modified the CB thereby

imposing material risks on Aegis different than those imposed by the CB at the time of

execution.  Aegis is incorrect.  First, section 41 is predicated on the following condition: "[i]f the

principal obligor and the obligee agree to a modification other than an extension of time or a

complete or partial release, of the principal obligor's duties pursuant to the underlying obligation

. . . ."  Aegis has not alleged and there is no factual support for the proposition that the principal

(Linyi) and CBP agreed to modify the CB.  And for the reasons discussed above in section I.B.1.,

CBP did not modify the bond.  Rather, the Government is simply showing the proper application

of the law involving the accrual of its right of action under section 2415(a).

Moreover, Aegis's reinsurance argument fails because any increase in risk under the CB

was due entirely to the acts of entities with whom it chose to enter into an arrangement to issue

customs bonds, and its own failure to conduct sufficient due diligence as to those entities.  First,

Aegis's arrangement with the Kingsway entities was that the Aegis bonds would not cover the

risk of entries subject to antidumping duties.  Def. Ex. 3 at 59:14–61:2, 80:1–24; Def. Ex. 8 at

39:5–41:16.  Yet, Aegis and the Kingsway entities were on notice no later than July 7, 2003 that

Avalon had issued a bond in Aegis's name to Linyi, a principal who was seeking a new shipper

review of the antidumping duty order on fresh garlic from the PRC.  68 Fed. Reg. 40,242 (Dep't

Commerce July 7, 2003).

Notwithstanding this red flag, Aegis has proffered no evidence that it investigated the

Kingsway arrangement to confirm that its risk avoidance of antidumping duty exposure was

being honored.  Nor did Aegis avail itself of the right to terminate its continuous bond with

Linyi.  *See* 19 C.F.R. § 113.27(b) ("A surety may not disavow already incurred obligations but

may, with or without the consent of the principal, terminate its agreement to accept future obligations on a bond.").  As of July 2003, the entries giving rise to this action had not occurred and would not occur for six months.  Had Aegis terminated the Linyi CB at that time, it would not have been exposed to the liability of the ten entries giving rise to this collection action.

Further, given that one of Kingsway's subsidiaries was exposing Aegis to an expressly unwanted risk, Aegis should have conducted some due diligence to confirm that the other was not similarly exposing it to unwanted risk.  Had Aegis investigated LGIC at that time, it would have discovered that LGIC was issuing bonds covering entries subject to antidumping duty orders.  In other words, Aegis's reinsurer was exposing itself to the very risk that Aegis sought to avoid.

3.  CBP did not deprive Aegis of recourse by impairing the importer's duty of performance

Aegis argues that "Customs impaired Linyi's duty of performance by withholding its bill for eight years following liquidation."  Def. Supp. Br. at 11.  Aegis seems to suggest that CBP intentionally withheld the demand for payment.  *See id*. at 11, 28 ("It would make no sense to interpret the collection statute to allow Customs to run up the surety's interest obligation by withholding the bill.").[8]  This suggestion should be rejected.[9]

---

[8] But under Aegis's theory that a demand is not necessary for the Government to bring a collection action, then the Government would be able to collect interest pursuant to section 580 (6 percent and the possibility of additional equitable interest if 6 percent is less than the current rate) running from the date of liquidation by always commencing an action against the surety.  In addition to being contrary to the statute and terms of the bond contract, such a theory calling for ambush litigation is illogical and contrary to the orderly conduct of trade.

[9] As discussed in Section III, Congress has not seen fit to enact legislation to set a deadline for CBP to issue bills or a statute of repose by which the Government must initiation a collection action.  If Congress had intended for a deadline, it would have expressly provided for one.

The factual record before the Court establishes that CBP was not aware of the deemed liquidation of the subject entries. One cannot withhold acting on something about which one is unaware.[10] Through a July 14, 2014 message from Commerce, CBP learned that the suspension of liquidation of the ten entries lifted in May 2006 when Commerce published a notice of partial rescission of the antidumping order in the Federal Register and thus those entries had liquidated by operation of law. After receiving the Commerce message, CBP issued bills to Linyi on October 4, 2014 and October 31, 2014 for duties due on each of the entries.

Moreover, Aegis and its agent Avalon were on public notice in the summer of 2003 through Linyi's request for a new shipper review that Linyi intended to be involved in the importation of entries subject to an antidumping duty order. This was contrary to Aegis's non-antidumping duty customs bonds agreement with the Kingsway entities. Therefore, the CB should have been terminated at that time, months before the ten entries at issue were entered.

Further, in July 2004, when Avalon conducted a renewal review of the CB, it discovered that Linyi's entries were subject to antidumping duties. Def. Ex. 18 at 105:11–114:8. In response, Avalon demanded financial statements, a signed indemnity agreement, and 100 percent collateral from Linyi to renew the continuous entry bond. *Id*. Avalon received no response from Linyi, and the continuous entry bond was not renewed. *Id*. Avalon found this lack of response "concerning" because it may indicate that the importer is "hiding something" or "out of business" and flagged Linyi as a "problem importer." *Id*. at 113:1–115:21.

---

[10] Also, the Supreme Court has long recognized that "a presumption of regularity attaches to the actions of Government agencies." *United States Postal Service v. Gregory*, 534 U.S. 1, 10, (2001) (citing *United States v. Chemical Foundation*, Inc. 272 U.S. 1, 14-15 (1926)). Here, once CBP was aware of the deemed liquidation, it acted in accordance with its responsibilities.

The ten entries liquidated by operation of law on November 4, 2006, more than two years after Aegis and its agent Avalon became aware that Linyi was problematic and non-responsive to Avalon's requests.[11]  Even if CBP had sent demands for payment in December 2006 after the deemed liquidation, based on Aegis's own evidence, Linyi would not have responded to the demand.  Of course, CBP was entitled to simply seek payment from Aegis who by the contractual terms of the CB had agreed to be jointly and severally liable with Linyi.  Aegis has put forward no evidence showing that Linyi would suddenly become responsive to a request for reimbursement, had Aegis made payment to CBP.

Finally, Aegis contends that it "would not have incurred any liability under the Subject Bond but for Customs' policy change."  Def. Supp. Br. at 12.  For the reasons discussed, CBP has not made a policy change but instead advances legal analysis showing the proper interpretation of the law.  But, of course, Aegis incurred liability when it issued the CB.  The only question is whether it has a defense to that liability.  For the reasons articulated in this brief and in our amended summary judgment briefing pending before the Court, this action was timely filed, and Aegis has no sufficient defense to avoid payment.

4.  Even if the Court determines that CBP's demand for payment caused impairment of Aegis's suretyship, the Government should still recover 60 percent of the face amount of the bond and interest under 19 U.S.C. § 580 and 28 U.S.C. § 1961

Aegis contends that CBP's demand for payment made on January 7, 2015, well after the November 4, 2006 deemed liquidation of the entries covered by the CB, impaired its ability to recover any bond losses from the importer or through its right to reinsurance by LGIC.  *See* Def.

---

[11] Aegis contends that "[w]ithout receiving a bill for eight years, Linyi was unable to determine the amount it owed Customs."  Def. Supp. Br. at 11-12.  Aegis is wrong.  When the ten entries liquidated by operation of law, Linyi knew exactly what it owed Customs: the amounts it claimed on its Form 7501 entry summaries.

14

Supp. Br. at 6-13.  For the reasons discussed above, the Court should reject Aegis's contention that the advancement of legal analysis showing the proper interpretation of the law constitutes an impairment of suretyship.  By entering into a customs bond, Aegis is bound by the laws and regulations governing such bonds as interpreted by the Court.  Further, the evidence developed in this action does not support a finding that the timing of CBP's demand for payment impaired Aegis's ability to obtain reimbursement from LGIC.

However, should this Court determine that Aegis has established impairment of suretyship, it should not fully discharge Aegis's obligations under the CB.  As Aegis admits, it is entitled to recover 60 percent of its losses here arising from a settlement with Kingsway.  Def. Supp Br. at 8-9.  Therefore, the Court should only discharge Aegis for, at most, 40 percent of the face amount of the bond.  Further, based on Aegis's own actions independent of its bond liability, the Court should award the statutory interest provided for by 19 U.S.C. § 580 because the Government brought suit to recover duties covered by a bond, and interest under 28 U.S.C. § 1961 ("[i]nterest shall be allowed on any money judgment in a civil case").

## II.   TO PERFECT ITS CLAIM AND COMMENCE THIS ACTION, THE GOVERNMENT WAS STATUTORILY AND CONTRACTUALLY REQUIRED TO MAKE A DEMAND ON AEGIS

"'Under federal law governing statutes of limitations, a cause of action accrues when all events necessary to state a claim have occurred.'"  *United States v. Commodities Export Co.*, 972 F.2d 1266, 1270 (Fed. Cir. 1992) (quoting *Chevron U.S.A. v. United States*, 923 F.2d 830, 834 (Fed. Cir. 1991)).  All events necessary for a claim against a surety on a customs bond will not have occurred at the time of a liquidation or a deemed liquidation.  Although liquidation or a deemed liquidation signifies the final computation of the duties and sets the amount due, CBP is still required both by the terms of the bond and by statute to make a demand for payment.

15

Federal Circuit precedent reflects that sureties are generally "obligated to pay the United States" only after receiving a demand for payment because "only from then can the United States lay claim to a loan to the surety." *United States v. Reul*, 959 F.2d 1572, 1581 (Fed. Cir. 1992); *United States v. Am. Home Assurance Co.*, 857 F.3d 1329, 1335–1336 (Fed. Cir. 2017) ("[T]he time when the bonds became due can be no earlier than the government's first formal demand for payment.").

And other courts of appeals have held that similar language in surety bonds makes "demand . . . a prerequisite to liability and therefore to the running of the statute of limitations." *See*, *e.g.*, *United States v. Ins. Co. of N. Am.*, 83 F.3d 1507, 1510 (D.C. Cir. 1996) ("Whether a demand was required to trigger the statute of limitations depends on the terms of the bond.  If it 'envisions an actual demand, the statute of limitations is set in motion only by such demand.'") (quoting *Nyhus v. Travel Management Corp.*, 466 F.2d 440, 453 (D.C. Cir. 1972)).

**A.  19 U.S.C. § 1505 Requires That A Demand Be Made**

Aegis argues that the statute of limitations should be governed by when the entry deemed liquidates. Def. Supp. Br. at 6.  Yet, this is contrary to the express statutory language Congress enacted in section 1505, which specifies that duties do not become due until 30 days after a bill is issued.  19 U.S.C. § 1505(b).  Consistent with the statute, the regulations state that, "bills for supplemental duties, taxes and fees (increased or additional duties, taxes, and fees assessed upon liquidation or reliquidation)," are due and payable within 30 days of the date of issuance of the bill.  19 C.F.R. § 24.3a(a) (incorporating the 30-day time frame of 19 C.F.R. § 24.3(e)).  Aegis's argument contravenes the directives of these provisions.

Aegis appears to acknowledge that a former version of section 1505 provided that duties determined to be due upon liquidation or reliquidation were due "15 days after . . . liquidation or

16

reliquidation," and that in 1993, Congress amended the language of section 1505 to specify that duties are due 30 days after issuance of the bill.  *See* 19 U.S.C. § 1505(b) (1990); North American Free Trade Agreement Implementation Act, Pub. L. No. 103-182, § 642, 107 Stat. 2205 (1993).  Yet, Aegis suggests that the statutory change in the language of 1505 as to when duties become due should be largely ignored because of legislative history indicates that Congress desired to provide equity in the collection and refund of duties and interest.  Def. Supp. Br. at 18.  This position ignores principles of statutory construction, which provide that changes to statutory language should be presumed to have real and substantial effect.  *See Stone v. INS*, 514 U.S. 386, 397 (1995) ("When Congress acts to amend a statute, we presume it intends its amendment to have real and substantial effect.").

Further, principles of statutory construction provide that the plain and unambiguous language of a statute controls and that the inquiry as to the meaning of the statute should go no further than the unambiguous statutory language.  *See Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992) ("In interpreting a statute, a court should always turn first to one, cardinal canon before all others.  We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there.  When the words of a statute are unambiguous, then, this first canon is also the last: judicial inquiry is complete.").

Aegis argues that all elements of the Government's cause of action are present at liquidation, even though Congress has expressly stated in section 1505 that duties are not due until 30 days after issuance of a bill.  Aegis's argument is inconsistent the language of section 1505 after it was amended in 1993.  Under Aegis's position, in circumstances such as those here where there is a delay between liquidation and the issuance of the bill, the Government would be

17

required to file suit to recover upon a Customs bond before those duties have even become due as per the statute—which is an untenable interpretation of the law.

Aegis appears to suggest that the statutory change in the language of 1505(b) should be ignored since CBP did not change its policies or practices when it came to collection, liquidation, and billing in response to certain statutory amendments. Def. Supp. Br. at 15. This position must fail because the language of a statute must take precedence of an agency's internal practices. Moreover, CBP did not need to update its practices because CBP's practice of liquidating entries and issuing bills to principals and, if necessary, sureties, for amounts owed as determined at liquidation or reliquidation remained the same before and after enactment of Section 642 of the NAFTA Implementation Act. Pub. L. No. 103-182, 107 Stat. 2057, 2205 (Dec. 8, 1993).

In the context of deemed liquidations, CBP can only begin the billing process once it successfully identifies that the deemed liquidation occurred. The amended language of section 1505 shows that Congress intentionally altered the due date for amounts owed as determined on a liquidation or reliquidation and made that due date contingent upon issuance of a bill. As a result, this statutory change affected the procedural requirements and timeframe for CBP to commence legal action against a customs surety to collect under a customs bond pursuant to 28 U.S.C. § 1582(2). CBP must issue a bill to the surety before the duties become due from the surety and this bill must go unpaid before all elements of the Government's cause of action will be present.

## B.  The Contractual Terms Of The Bond Require That A Demand Be Made

A condition of the bond issued by Aegis is that the principal and surety agree to pay "as demanded by CBP." Pl. Ex. 1 (incorporating 19 C.F.R. § 113.62(a)(1)(ii)); Docket Nos. 66 at ¶ 8,

18

71 at ¶ 8.  Indeed, Section II of the bond provides that "[t]his bond includes the following

agreements."  Pl. Ex. 1.  Below that heading, the parties selected "Activity Code 1," which includes

"Customs Regulations in which conditions codified." *Id.* The regulations for Activity Code 1 are set

forth in 19 C.F.R. § 113.62, which provides in part as follows:

> (1)     If merchandise is imported and released from CBP custody
> or withdrawn from a CBP bonded warehouse into the commerce of,
> or for consumption in, the United States, or under § 181.53 of this
> chapter is withdrawn from a duty-deferral program for exportation
> to Canada or Mexico or for entry into a duty-deferral program in
> Canada or Mexico, the *obligors (principal and surety, jointly and
> severally) agree to*:
>
> *             *             *             *
>
> (ii) *Pay, as demanded by CBP, all additional duties, taxes, and charges
> subsequently found due*, legally fixed, and imposed on any entry
> secured by this bond.

19 C.F.R. § 113.62(a)(1)(ii) (emphasis added).

The bond, therefore, incorporates 19 C.F.R. § 113.62 as part of its contractual terms.  *See*

Docket No. 82-2 (Pl. Ex. 1) ("Principal and surety agree that they are bound to the same extent as if

they executed a separate bond *covering each set of conditions incorporated by reference to the

Customs Regulations into this bond*.") (Emphasis added); Docket Nos. 66 at ¶ 8, 71 at ¶ 8.  Thus,

the terms of the bond at issue were not breached by Aegis until CBP made a demand for payment

from Aegis and Aegis failed to pay the duties within the time required by law.

Thus, Aegis agreed to "[p]ay, as demanded by CBP, all additional duties, taxes, and

charges subsequently found due, legally fixed, and imposed on any entry secured by this bond."

Docket No. 82-2 (Pl. Ex. 1).

This bond language is significant.  In the context of an action to collect upon a customs

bond, "the date of accrual occurs at the time of the breach of the bond" and to determine when a

bond has been breached, we must look to the "language of the bond stipulating the relevant obligations of the bond principal and its surety." *United States v. Cocoa Berkau, Inc.*, 990 F.2d 610, 613–14 (Fed. Cir. 1993) (citations omitted).

In *Cocoa Berkau*, the principal and surety executed an "Immediate Delivery and Consumption Entry Bond" to secure the importation of chocolate. *United States v. Cocoa Berkau, Inc.*, 789 F. Supp. 1160, 1161 (Ct. Int'l Trade 1992). The terms of the bond stated:

> principal shall redeliver or cause to be redelivered to [Customs], on demand . . . any and all merchandise found not to comply with law and regulations governing its admission into the commerce of the United States . . . or in default of redelivery after a proper demand . . . the principal [or surety] shall pay to [Customs] such amounts as liquidated damages as may be demanded by [Customs.].

*Cocoa Berkau*, 990 F.2d at 611 (alterations in original) (emphasis added).

On February 11, 1985, CBP issued a notice to the principal demanding redelivery within 30 days. *Id.* The principal failed to redeliver and on June 26, 1985, CBP demanded payment for liquidated damages from the principal within 60 days. *Id.* at 611–12. The principal did not pay. *Id.* at 612. On November 20, 1990, CBP then sought payment of the liquidated damages from the surety and, upon default of the surety, commenced suit on August 22, 1991. *Id.*

The surety moved to dismiss the action as untimely under 28 U.S.C. § 2415(a), arguing that the Government's right of action accrued no later than March 13, 1985, when the principal breached the bond (*i.e.*, 30 days after the redelivery demand). *Id.* Alternatively, the Government countered that its right of action accrued on December 30, 1990, when the surety defaulted on its obligations to pay liquidated damages. *Id.*

In its decision, the Federal Circuit held that a claim accrues when all events fixing liability have occurred and for "a claim arising under a bond . . . the date of accrual occurs at the time of the

breach of the bond." *Id.* at 613.  Because the bond in *Cocoa Berkau* "placed an obligation on the bond principal to redeliver the imported merchandise upon a proper demand" for redelivery by Customs, the Court found that, "[t]he bond was breached, and . . . the government's right of action accrued, when the principal failed to redeliver upon proper demand." *Id.*

Thus, binding authority counsels that the bond terms determine at what point a cause of action to enforce the bond accrues — just like any other contract.  Here, the terms incorporated into the continuous bond at issue provide that Aegis agreed to "[p]ay, as demanded by CBP*,* all additional duties, taxes, and charges subsequently found due, legally fixed, and imposed on any entry secured by this bond."  Pl. SJ Ex. 1 (incorporating 19 C.F.R. § 113.62(a)(ii)).  "Liquidation" or "deemed liquidation" do not appear with in the bond language.  *Id.*  Therefore, Aegis breached the terms of the continuous entry bond when it refused to pay the demand for the outstanding debt within 30 days of the issuance of the demand.

### C.  Aegis's Right To Protest Hinges On A Demand For Payment

The demand for payment directed to a surety is not merely ministerial.  Rather, it presents significant legal consequences because it triggers the protest period for a surety.  If the surety does not protest, then finality under section 1514 attaches to the liquidation.  19 U.S.C. § 1514(a).

By statute, to avoid finality of a liquidation, a party must timely protest the liquidation within 180 days after the date of liquidation or reliquidation.  19 U.S.C. § 1514(c)(3).  However,

> [a] protest by a surety which has an unsatisfied legal claim under its bond may be filed within 180 days from the date of mailing of notice of demand for payment against its bond. If another party has not filed a timely protest, the surety's protest shall certify that it is not being filed collusively to extend another authorized person's time to protest as specified in this subsection.

*Id.*

Thus, a surety's statutory right to protest is triggered by when a demand for payment is made, which in turn impacts the attachment of finality under 19 U.S.C. § 1514.  Contrary to Aegis's arguments that CBP's issuance of the bill to the surety is a "ministerial" "administrative vehicle to manager interest collection," Def. Supp. Br. at 23, 25, there are statutorily prescribed legal consequences tied to CBP's issuance of the bill to the surety.[12]

## III.  NO STATUTE PROVIDES A DEADLINE BY WHICH A DEMAND FOR PAYMENT MUST BE MADE BY CBP OR A STATUTE OF REPOSE BY WHICH A COLLECTION ACTION MUST BE COMMENCED

Aegis's argument provides no statute requiring a deadline by which CBP must issue a bill, even though it claims Congress has engaged in repeated efforts "to limit the surety's exposure caused by CBP's administrative delays."  Def. Supp. Br. at 27-30.  Instead, Aegis cites case law and argues by analogy that the deemed liquidation provision of 19 U.S.C. § 1504, liquidation after antidumping duty administrative review of 19 U.S.C. § 1675(a)(3)(B), 5-year record-keeping requirements of 19 U.S.C. § 1508, interest accrual of 19 U.S.C. § 1505(b), and notice of liquidation regulations of 19 C.F.R. § 159.9(c)(2)(ii) contain language that requires acts to be done within a certain or reasonable time.[13]  *Id.*  Yet, contrary to these examples, Congress

---

[12] Aegis suggests that Government counsel's observation that Customs always sends a bill as a precursor to suit (*i.e.,* a section 1582 suit) is inconsistent with counterclaims "seeking to collect duties."  Def. Supp. Br. at 23-24.  Aegis apparently misunderstands that in the four actions where the Government asserted a counterclaim as part of its answer in a 28 U.S.C. § 1581(a) action there were no unpaid liquidated duties to be "collected."  Indeed, for jurisdiction to attach to a section 1581(a) action, "all liquidated duties, charges, or exactions" must have been paid at the time the action is commenced.  28 U.S.C. § 2637.

[13] Aegis misapprehends a point made by the Government at oral argument that "notice [of liquidation] and the bill for all intents and purposes are the same thing" to suggest this supports its position that a bill must be issued promptly after the final calculation of antidumping duties. Def. Supp. Br. at 27.  In making this statement, the Government was simply observing that, because section 1504(1)(E) does not require notice of liquidation to be given for an entry that deemed liquidated, for a surety, the bill can operate to provide notice that a liquidation occurred.

22

has not enacted any statute requiring CBP to issue a bill within a certain period or a reasonable period.

Aegis's recitation of certain cases provides it no assistance.  For example, *Nyhus v. Travel Management Corp.*, 466 F.2d 440 (D.C. Cir. 1972), is an action between private parties. *United States v. Gottlieb*, 948 F.2d 1128 (9th Cir. 1991); *United States v. Vanornum*, 912 F.2d 1023 (8th Cir. 1990); and *United States v. Rollinson*, 866 F.2d 1463 (D.C. Cir. 1989) concern the repayment of a loan to the Small Business Administration.  Similarly, *United States v. Gordon*, No. 90 Civ., 1994 WL 514533 (S.D.N.Y. Sept. 21, 1994) concerns the repayment of a loan.[14] None of these cases implicate the Government acting in its sovereign capacity when collecting duties on imports.

Notwithstanding Aegis's belief that Congress has repeatedly attempted to limit a surety's exposure, Congress has not enacted a statute of repose requiring the Government to collect duties from a customs bond surety within a certain number of years from the date of liquidation or reliquidation.  Indeed, Congress engaged in just such lawmaking when it promulgated Section 13

---

Although notice of deemed liquidation is not required, CBP issued a regulation in December 2016 in which it will endeavor to provide the entry filer or its agent and the surety with a courtesy notice of liquidation.  *See* 19 C.F.R. § 159.9(d).  Of course, sureties may also become aware of a deemed liquidation by monitoring Federal Register notices or through communication with the importer.  Although issuance of a bill can, as a practical matter, bring awareness to a surety that a liquidation has occurred, issuance of a bill and notice of liquidation are legally distinct concepts.

[14] We note that *Gottlieb*, 948 F.2d at 1129, *Vanornum*, 912 F.2d at 1026-1027, and *Gordon*, 1994 WL 514533, *4 addressed section 2415(a) and concluded that the statute of limitations accrues when the demand for payment is made.  Similarly, in *Nyhus*, 466 F.2d at 453, the court found that "[w]here a demand is necessary to perfect a cause of action, the statute of limitations does not commence to run until the demand is made."

of the Securities Act.[15]  In *CALPERS v. ANZ Securities, Inc.*, 582 U.S. 497, 504, 505 (2017), the Supreme Court observed that "[s]tatutes of limitations are designed to encourage plaintiffs to pursue diligent prosecution of known claims" whereas "statutes of repose are enacted to give more explicit and certain protection to defendants."  (Internal citations omitted.).  Statutes of repose "effect a legislative judgment that a defendant should be free from liability after the legislatively determined period of time."  *Id.* at 505 (citations omitted).

As shown by the Securities Act, Congress knows how to draft a statute to set an end date to the enforcement of a liability.  However, it has specifically not done so here, thereby affording the Government with a broad ability to collect duties and taxes when it is acting in its sovereign capacity.  Moreover, this is consistent with the Federal Tort Claims Act, which waives the Government's sovereign immunity for certain suits for money damages but carves out claims "arising in respect of the assessment or collection of any tax or customs duty."  28 U.S.C. § 2680(c).

---

[15] 15 U.S.C. § 77m provides:

> No action shall be maintained to enforce any liability created under section 77k or 77l(a)(2) of this title unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence, or, if the action is to enforce a liability created under section 77l(a)(1) of this title, unless brought within one year after the violation upon which it is based. **In no event shall any such action be brought to enforce a liability created under section 77k or 77l(a)(1) of this title more than three years after the security was bona fide offered to the public, or under section 77l(a)(2) of this title more than three years after the sale.**

(Emphasis added.)

24

Indeed, cases discussing equitable estoppel in the context of the Government further support our position in that they reject equitable estoppel, even if applicable, when the Government is operating to collect duties and taxes.  *See United States v. Fed Ins. Co.*, 805 F.2d 1012 (Fed. Cir. 1986) ("no equitable estoppel can arise against the government in connection with an obligation to pay taxes . . . Thus, the Court of International Trade erred, as a matter of law, in holding that the government was equitably estopped from collecting from the importer and its surety the duties owed to the public fisc."); *Air-Sea Brokers v. United States*, 596 F.2d 1008 (C.C.P.A. 1979) ("equitable estoppel, even if available in cases involving the Government in its proprietary capacity, is not available against the Government in cases involving the collection or refund of duties on imports"); *United States v. Tabor*, 608 F. Supp. 658, 666 (Ct. Int'l Trade 1985) ("laches will not provide an adequate defense when the United States, acting in its sovereign capacity, sues on a statutory cause of action").

"A waiver of the federal government's sovereign immunity must be unequivocally expressed in statutory text and will be strictly construed, in terms of its scope, in favor of the sovereign." *Gomez-Perez v. Potter*, 553 U.S. 474, 491 (2008).  Thus, without a clear legislative sign from Congress, there is no indication that the Government has expressly agreed to waive its right to collect duties due and owing if it does not issue a demand by a date certain.

## <u>CONCLUSION</u>

For the foregoing reasons and the reasons providing in our summary judgment briefing, we respectfully request that the Court issue an order (i) denying defendant's motion for summary judgment as amended, (ii) granting our motion for summary judgment as amended, (iii) granting judgment to the Government in the amount of $50,000.00, the contractual limit of the bond, (iv) granting the Government interest pursuant to 19 U.S.C. § 580 and 28 U.S.C. § 1961 to be calculated by the Government and provided to defendant in a schedule setting forth these interest amounts that would be due for payment at certain future dates.

Respectfully submitted,

BRYAN M. BOYNTON
Principal Deputy Assistant Attorney General
Civil Division

PATRICIA M. McCARTHY
Director

By:     /s/ Justin R. Miller
JUSTIN R. MILLER
Attorney-In-Charge
International Trade Field Office

/s/ Beverly A. Farrell
BEVERLY A. FARRELL
Senior Trial Attorney
Department of Justice, Civil Division
Commercial Litigation Branch
26 Federal Plaza, Room 346
New York, New York 10278
Tel.: (212) 264-0483 or 9230
Attorneys for Plaintiff

Of Counsel:
SUZANNA HARTZELL-BALLARD
Office of the Assistant Chief Counsel
U.S. Customs and Border Protection

Dated: August 10, 2023

26