**NON-CONFIDENTIAL**

1   UNITED STATES COURT OF INTERNATIONAL TRADE

2

3   Case No. 20-cv-03628

4   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5   In the Matter of:

6   UNITED STATES OF AMERICA,

7                   Plaintiff,

8           vs.

9   AEGIS SECURITY INSURANCE COMPANY,

10                  Defendant.

11  - - - - - - - - - - - - - - - - - - - - - - - - - - - x

12

13                  U.S. Court of International Trade

14                  One Federal Plaza

15                  New York, NY 10278

16

17                  November 15, 2023

18                  2:31 PM

19

20

21

22

23  B E F O R E:

24  HON STEPHEN ALEXANDER VADEN

25  U.S. INTERNATIONAL TRADE JUDGE

```
 1   A P P E A R A N C E S :

 2

 3   UNITED STATES DEPARTMENT OF JUSTICE

 4        Attorney for Plaintiff

 5        International Trade Field Office

 6        26 Federal Plaza

 7        New York, NY 10278

 8

 9   BY:  BEVERLY A. FARRELL, ESQ.

10

11   U.S. CUSTOMS AND BORDER PROTECTION

12        Attorney for Plaintiff

13        6650 Telecom Drive

14        Indianapolis, IN 46278-1988

15

16   BY:  SUZANNA HARTZELL-BALLARD, ESQ.

17

18   SANDLER, TRAVIS & ROSENBERG, PA

19        Attorney for Defendant

20        414 Jackson Street

21        Suite 200

22        San Francisco, CA 94111

23

24   BY:  THOMAS R. FERGUSON, ESQ.

25
```

**NON-CONFIDENTIAL**

1    KING & SPAULDING, LLP

2         Attorney for Defendant

3         1700 Pennsylvania Avenue, NW>

4         Suite 200

5         Washington, DC 20006-4706

6

7    BY:  JEFFREY M. TELEP, ESQ.

8

9    ALSO PRESENT:

10

11        Gilbert Sandler, Amicus

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2              THE COURT OFFICER:  The United States Court of

3  International Trade is now in session.  The Honorable Stephen

4  Alexander Vaden presiding before court number 20-03628, the

5  United States v. Aegis Security Insurance Company.

6              Will the attorneys please state their names and

7  firms for the record, starting with Plaintiff's counsel?

8              MS. FARRELL:  Good afternoon, Your Honor.  Beverly

9  Farrell, United States Department of Justice for Plaintiff

10  United States.

11              MS. HARTZELL-BALLARD:   Suzanna Hartzell-Ballard

12  from U.S. Customs and Border Protection.

13              MR. TELEP:  Good afternoon, Your Honor.  For Aegis

14  Security Insurance Company, the Defendant, Jeff Telep of King

15  & Spaulding.

16              MR. FERGUSON:  T. Randolph Ferguson for the

17  Defendant, Aegis Security.

18              MR. SANDLER:  Gilbert Lee Sandler, Sandler, Travis

19  & Rosenberg, from the International Trade Surety Association

20  (indiscernible).

21              THE COURT:  Okay.  Thank you all for being here.

22  This case has gone on for such a length of time.  We've had

23  substitution of counsel and other fun things.  But this is

24  going to be the last go around; third time's the charm.  I

25  hope you all looked at the questions I submitted rather

1    carefully because I think they lay out some of the key moves

2    that will govern the decision in this case.

3            As you probably know, but I'll repeat again, if you

4    wish to have a transcript of today's proceedings, please let

5    us know within seven calendar days of today's date, and that

6    way, we can get you a transcript promptly made.  Although not

7    perhaps, given past experiences, promptly as they promise for

8    the rate they charge you.

9            But anyhow, we have pending motion.  It is in

10   substance the same motion that was filed and that we

11   discussed in the status conference some days ago, wishing to

12   add information to the record in this case.  That motion has

13   been filed by the Defendant, Aegis Security Insurance

14   Company.

15           Mr. Telep, what do you wish to say about that?

16           MR. TELEP:  Your Honor, we scaled back our request

17   considerably from what was in the original motion

18   (indiscernible) the original motion.  After we saw Your

19   Honor's questions and we realized there was going to be some

20   discussion today on what a reasonable period of time

21   (indiscernible), we identified Plaintiff's interrogatory

22   responses that constitute the normal cycle for a

23   (indiscernible), and also two or three other documents that

24   (indiscernible).

25           We think that the record is completed

1    (indiscernible) discussed (indiscernible) the last time and

2    is complete with respect to the parties' expectations

3    (indiscernible) were set out (indiscernible) for today.

4    (Indiscernible) decision (indiscernible) that this is

5    confirmatory information that we would need.  As to the

6    point, demands should be made within a reasonable time

7    (indiscernible) set to be admitted into the record.

8              THE COURT:  Okay.

9              Ms. Farrell, does the Government have any objection

10   to this scaled-down requestion for admission of certain

11   materials into the record?

12             MS. FARRELL:  No, Your Honor.  Our understanding

13   was that you want the Defendant to be able to make a full

14   argument today before the Court.  (Indiscernible).  We have

15   nothing.  If the Court believes that this information is

16   relevant after hearing it and wants to allow it in, obviously

17   the Government agrees if the Court decides to allow it in.

18   So we take no position and defer to the Court.

19             THE COURT:  Okay.

20             Well, of course, this case is at heart a case

21   involving both statutory and contractual interpretation.

22   Extrinsic evidence can't change what the statute says.  And

23   it's only rarely relevant to determine contract terms.  But

24   given the scaled-down nature and the lack of objection, I'm

25   going to grant the motion.  And there will be a minute order

```
 1    issued on the docket reflecting as such for the record for

 2    further proceedings in this action.

 3              So who's this --

 4              MR. TELEP:  Your Honor, yes, I have copies, if that

 5    makes it easier for the Court.

 6              THE COURT:  Sure.  If you'd pass them up to Jason

 7    there, he can distribute them to me.

 8              Speaking of other cases, Ms. Farrell, are you

 9    representing the Government in the action that is currently

10    pending before my colleague, Judge Restani?

11              MS. FARRELL:  Yes, Your Honor.  I am, Your Honor.

12              THE COURT:  Okay.  Could you update me on the

13    status of your proceeding before Judge Restani; in other

14    words, where you are procedurally in that case?

15              MS. FARRELL:  Yes, Your Honor.  Procedurally, we

16    recently had a motion to amend the scheduling order extended.

17    And so we're in the middle of discovery at the moment.

18              THE COURT:  Okay.  So you are still in the

19    preliminary stages of that litigation?

20              MS. FARRELL:  Yes.

21              THE COURT:  And if memory serves, the only case

22    pending on this topic involves Judge Eaton.  And Judge Eaton

23    has rendered a final decision, which the Government has filed

24    a protective motion to appeal?

25              MS. FARRELL:  Correct, Your Honor.
```

1        THE COURT:  Okay.  And you may have answered this

2   question previously, Ms. Farrell, or maybe it was the

3   Defendant insurance company that raised it, but the amount

4   involved in this case is, as things go, comparatively small.

5   But I was led to understand that the principle here governs

6   whole host of bonds from a whole bunch of Chinese importers

7   who similarly stiff the Government; is that correct?

8        MS. FARRELL:  Your Honor, I know of another Aegis

9   case (indiscernible), which is a larger amount of

10  (indiscernible) than this case.

11       THE COURT:  Well, to me it doesn't matter the

12  insurance company, I'm just talking about -- yeah.

13       MS. FARRELL:  My understanding, I don't know that

14  they've been referred yet or if they have, I know I haven't

15  seen them.  But my understanding is that there are some

16  follow-up cases that are still out there that would then be

17  referred to the Department of Justice.

18       THE COURT:  Around the same time frame and with the

19  same issues?

20       MS. FARRELL:  I'm not entirely sure it's the exact

21  same time frame but I think to go with that time frame pretty

22  much found its way up to most -- there were a ton of these

23  cases back in 2009, 2010, and through 2013 that all came in

24  early on.

25       THE COURT:  That makes sense.

1          MS. FARRELL:  But I don't want to say because I'm

2   not entirely sure.  But I do believe that there are more

3   involved.

4          THE COURT:  Okay.  Understood.  Well, I appreciate

5   that.

6          Well, with those questions answered, I want to jump

7   into the legal argument.  And to help everyone focus, I want

8   to start, as we always should, with the statute.  And I want

9   to lay out to you where I am with regard to the statute.  And

10  that is, I am currently leaning toward finding, and I'm of

11  the opinion, that it is impossible to read the amendment to

12  the statute that Congress enacted as doing anything other

13  than making a substantive change in the law.

14          The prior version of the statute that was in effect

15  was very explicit that duties were both determined to be due

16  upon liquidation and they shall be due 15 days after the date

17  of liquidation or reliquidation.  So the statute by its own

18  terms -- the prior version -- set when the duties are

19  determined and when the duties become due --two separate

20  dates -- and it set an explicit, easily discernible timeline

21  for both.

22          Congress, for reasons of its own choosing, chose to

23  modify that statute.  It appears to have kept the format in

24  separating the date on which duties are to be determined at a

25  separate time for when duties are to become due and payable

**NON-CONFIDENTIAL**

1    to Customs Service.  But it appears to have removed the

2    definitive date from which they become due.  In other words,

3    there's not more 15 days, or 30 days, or something like that

4    in the language of the statute.  Instead, the statute says

5    the duties, fees, and interest determined to be due on

6    liquidation or reliquidation are due 30 days after issuance

7    of a bill for such payment.  There is no language in the

8    statute about when said bill must be issued, only that when

9    the bill is issued, you have 30 days to pay it.

10           Most notably to me is, while amending that language

11   of the statute, they kept largely intact the language dealing

12   with refunds if someone had overpaid.  And that language,

13   unlike the language that now governs when monies are due to

14   Customs, expressly does link refunds and when they are due to

15   the date of liquidation.  It says, refunds of excess monies

16   deposited, together with interest thereon, shall be paid

17   within 30 days of liquidation or reliquidation.

18           So to summarize, I don't see how reading the plain

19   text of that statute and applying the normal cannons of

20   statutory construction one can come to any other conclusion

21   than if you overpay the amount of money, the Government has

22   30 days from the date of liquidation in order to give you

23   your money back, your overpayment back.  But if you owe the

24   Government money, you have 30 days after they issue you a

25   bill to pay that money.  And there is no hard time frame set

**NON-CONFIDENTIAL**

1  in the statute for when the Government has to give you that

2  bill.

3           Previously, the Government had a clear duty --

4  well, nothing was discussed about a bill; you just had to

5  give them a check or some other form of payment if you owed

6  them extra money 15 days after the date of liquidation or

7  reliquidation.  All you needed was the calendar and you could

8  solve that problem.  You didn't even need the bill, you just

9  needed the calendar.

10          And so I don't see any way to read that as changing

11  the game.  And whether or not Customs has followed that is

12  irrelevant to my mind.  Customs' actions cannot amend a

13  congressional enactment.  If Customs has been ignoring the

14  law for ten years or whatever it is and no one's called them

15  on it, well -- when I was general counsel of the cabinet

16  agency, I always told my attorneys -- and it was a very hard

17  lesson for them to learn, unfortunately -- we start with the

18  statute.  We don't start with what the agency has always

19  done.  We don't start with the regulation.  We don't start

20  with, well, you know somebody told me this.  We don't start

21  with that.  We start with the statute, and this is why;

22  because far too often when we don't look at the statute

23  first, we go off the rails.

24          So you're free to make any argument you want to

25  about the statute, but you're going to have a difficult row

1   to hoe telling me that the change from "you owe the money 15

2   days after the date of liquidation" to "you owe the money 30

3   days after they send you a bill" didn't enact a change -- and

4   that includes a change in the time when the money's due --

5   and it's not due automatically after liquidation.  And no

6   regulation has been pointed to me that says otherwise.  And I

7   don't know that there's particularly a gap to fill in that,

8   unless you've got a regulation where Customs attempts to tie

9   its hands in terms of when it must send you a bill.

10          So that then brings us to the issue of whether

11  there is a demand requirement and the issue of the

12  reasonableness of the timing of the demand that was made.

13  And those are two separate issues.  As I understand from

14  reading your pleadings, including your supplemental

15  pleadings, I read the Government to be taking the position

16  that a demand is required.  I read the insurance company to

17  be taking the position that a demand is not required.

18          Do I have the parties' positions correct?

19          MR. TELEP:  Your Honor, I would qualify that

20  statement by simply saying that whatever complications

21  Customs imposed upon itself in a negative end doesn't have

22  anything to do with the statute of limitations running or the

23  cause of action accrued.

24          THE COURT:  Well, that's not the case.  The law

25  seems to me to be quite clear that if there is a demand

1  requirement, the statute of limitations runs from the time

2  that the demand is made.  That's found in treatises and

3  that's also found in just black-letter case law.  If there's

4  not a demand requirement, you're correct; when the money's

5  due, you got to pay it, and the clock starts ticking once it

6  becomes ascertainable.  But if there is a demand requirement,

7  then the clock doesn't start ticking on the statute of

8  limitations until demand is made.  Otherwise, what's the

9  point of a demand requirement?

10         Do you disagree with that; that if there's a demand

11  requirement, it's irrelevant to the statute of limitations?

12         MR. TELEP:  No, I don't disagree with that, Your

13  Honor.

14         THE COURT:  Okay.

15         So that brings us to the question of whether there

16  is a demand requirement in this case.  That is of course

17  governed by the language of the contract the parties entered

18  into, some of which is contained in the pieces of paper,

19  others of which are incorporated by reference to Customs

20  regulation.  And I believe it is that latter that contains

21  the language that will govern whether or not this should be

22  seen as a demand requirement.  And that's 19 CFR Section

23  113.62.  Do I have that correct?

24         MR. TELEP:  Where is it?

25         THE COURT:  That is the pay as demanded by CBP

1    language.  All additional duties, taxes, and charges

2    subsequently found due, legally fixed and imposed on any

3    entry secured by this bond.

4           So I would like to hear what the parties have to

5    say about whether they believe that pay, comma as demanded by

6    CBP comma, all the rest of it, is a demand requirement.  Now

7    one thing I will say before you begin is that in looking at

8    the clock, it does not appear to me in this instance to

9    matter whether it is that demand had to be made on Linyi, the

10   insured, or on Aegis because the Government filed this suit

11   at a time where even if Linyi, that is to say the earlier

12   party from which the Government demanded money, was the

13   governing one, the Government filed suit within six years of

14   the date they made demand on Linyi, which means they clearly

15   filed six years from the date that they made demand on Aegis.

16   That is my calculation of the dates.

17          But you tell me what you think, Ms. Farrell, with

18   that background?

19          MS. FARRELL:  Yes, Your Honor.  Just to follow up

20   on your earlier question.  One thing that, in preparing for

21   today's argument, that I've come to a conclusion about is

22   that the Government has an option to go after Linyi, the

23   importer, either as a personal, you owe me money, 1582.3, or

24   they could use the bond under --

25          THE COURT:  Um-hum.

1          MS. FARRELL:  -- 1582.2.

2          THE COURT:  And if you go after them personal,

3     there's no statute of limitations on them.  That is something

4     that cannot be extinguished.

5          MS. FARRELL:  And the Government does not, in

6     general, unless it's an accident, go after importers under

7     1582, okay, because 1505(b) uses language for a bill.  I

8     think you're correct; the Government has been imprecise in

9     language.  What the Government has done vis a vis Linyi is we

10    requested payment through a bill.  What the Government has

11    done vis a vis insured, Aegis, has sought a demand under the

12    bond.  And Your Honor, there is this grappling between that

13    statute and the, also, contract.

14         THE COURT:  Well, I would think that if you sent

15    someone a bill, that functions as a demand for payment.  We

16    generally don't send bills to people from whom we don't

17    expect money.

18         MS. FARRELL:  Agreed, Your Honor, except that it's

19    not a demand for payment under the bond.  It's a demand for

20    payment as a result of you having entered goods into the

21    United States and you owe us money, and we never extinguished

22    that obligation to pay.  And so I just wanted make sure --

23    because I think that the Government, sometimes we were a

24    little imprecise; we called it a demand, but really it's a

25    bill to the importer and then a demand on surety.  And it is

1    that until the bill goes out and 30 days after, we don't,

2    under the regulations -- and again, this is an interesting

3    point that Your Honor brought up about 1505(b), saying fill

4    in the gaps.  There's nothing in 1505(b) that says to whom

5    the bill goes.  Under Customs regulations, it appears that

6    they've filled that gap.  And then when we're talking about

7    1505(b) and sending a bill, we're talking about sending it to

8    the importer.  Because you wouldn't send a bill to a surety;

9    you would flood them with these bills --

10        THE COURT:  Yeah, the surety's only there for

11   backup.

12        MS. FARRELL:  They're only there for backup under

13   the obligations of their bond.  And that's consistent with

14   the regulations 24 --

15        THE COURT:  And that also, just as a matter of

16   intuitive sense, before we get to the contract language, is

17   why a demand just seems to be the natural thing that one

18   would expect if you ever expect a surety to pay the bill.

19        MS. FARRELL:  Exactly and indeed.  There's language

20   from during discovery in this case where a resident agrees

21   that they're (indiscernible).  The could comment, we're not

22   going to pay the bill until somebody sends us a demand.

23   And --

24        THE COURT:  I believe it was on cross, but she

25   answered, correct, to that question, yes.  You're not going

1  to pay something unless you get a bill.  And she responded,

2  correct, in the deposition.

3         MS. FARRELL:  Exactly.  So I mean -- and that makes

4  sense because a surety (indiscernible) sends the money in and

5  it's already been paid by the importer; that makes no sense.

6         THE COURT:  I want to hear the Government's

7  interpretation of a case that you cited in your supplemental

8  brief, which I found, while not directly controlling,

9  illuminating.  And that is the American Home Assurance

10  Company case, which is a federal circuit case written by

11  Chief Judge Moore.  And it comes from 2017, so it's a

12  relatively recent vintage compared to many of the things that

13  we have been discussing in this case.  And it involves, in

14  part, the question of when something become due.

15         MS. FARRELL:  Right.

16         THE COURT:  Because we have an insurance company

17  that is not wanting to pay interest, any type of interest.

18  There are lots of types of interest, unfortunately, for the

19  insurance company at issue in this matter.  But we were

20  looking at a particular type of interest that comes into play

21  if an insurance company, once called on for the money, does

22  not pay when due.  And that was called Section 580 interest.

23         MS. FARRELL:  Yes, Your Honor.

24         THE COURT:  And Chief Judge Moore, in looking at

25  this, she says -- and this is on page 1335 of volume 857 of

1   the Third Federal Reporter -- Chief Judge Moore says, the

2   plain language of Section 580 dictates that Section 580

3   interest is calculated "from the time when said bonds became

4   due".  This language is clear and unambiguous since "no

5   interest runs against a surety on the principle amount of a

6   bond unless requisite notice and demand for payment is first

7   made".  The time when the bonds became due can be no earlier

8   than the Government's first formal demand for payment.  And

9   it cites the Reul, R-E-U-L, case involving the Ferraris for

10  1992 of the federal circuit.

11          And then it goes on to cite the regulation that

12  also comes up in our case, that is to say, 19 CFR

13  113.62(a)(1)(ii), the pay-as-demanded language, immediately

14  right after that.  And so it notes that there can be with

15  regard to this regulation two separate points in time; number

16  1, the time when someone is required to pay money, and number

17  2, a separate time when we can actually calculate how much it

18  is that they owe.  And Chief Judge Moore ends that section of

19  the opinion by saying, the language 580 is clear, the Trade

20  Court did not err in holding that Section 580 interest runs

21  from the date of the Government's first formal demand for

22  payment.

23          Now, it definitely can be the case as well, we must

24  keep in mind that there can be a difference between when a

25  particular interest or other payment runs and whether that

1    demand is a legally required step to make the money due.  I

2    think the Cocoa Berkau case speaks to that point.

3          But how does the Government view the American Home

4    Assurance case and what it does or does not tell us about the

5    scheme that we're working out here as to whether or not pay-

6    as-demanded is a demand requirement?

7          MS. FARRELL:  Well, pay-as-demanded there with

8    respect to 580 interest is, the Government can't keep 580

9    interest against the surety until it brings an action against

10   the surety.  And so there needs to be a demand on the surety

11   to make a payment.  And then that surety has 30 days to make

12   a payment.  If they don't make a payment, then 580 interest,

13   which runs at six percent, reverts back to the date of the

14   demand --

15         THE COURT:  But interest is not at issue here, at

16   least in so far as we're not calculating any interest at this

17   point.  I'm talking about her statement about when the bonds

18   became due.  She said the bonds became due when the

19   Government first made formal demand on the surety, suggesting

20   that with the American Home Assurance bond that there was a

21   demand requirement.

22         MS. FARRELL:  Yes, Your Honor.  And the demand

23   requirement in the American Home Assurance bond is akin to

24   that at issue here.

25         THE COURT:  It's the same language, isn't it?

1          MS. FARRELL:  It's the same language.  It's the the

2   same structure of the bond.  I'm pretty sure they are almost

3   identical.  I don't -- this is a form that comes from the

4   Government, and so some people --

5          THE COURT:  You don't actually individually

6   negotiate these things with the insurance companies?

7          MS. FARRELL:  They're not individually negotiated.

8   But yes, there is built into all of the surety bonds that are

9   (indiscernible) surety bonds (indiscernible).  Don't ask me

10  about delivery or other types of bonds because that's not

11  this.

12         THE COURT:  Yeah.

13         MS. FARRELL:  But for purposes of supporting either

14  an entry under one, or an entry under antidumping, or under

15  (indiscernible), with respect to a continuous bond, it covers

16  both, both regular duties and then the antidumping

17  (indiscernible) duties.  And so I think what we see, if

18  nothing else, we seem to see everything converging that the

19  time the Government's right alignment vis a vis the surety,

20  is on demand.  That triggers the right to protest under 1514.

21  That triggers the right to get 580 interest.  I mean,

22  everything seems to congeal that way.

23         You also look at the regulation; it says, Customs

24  will reach out to bill to the importer.  If we don't get

25  paid, you'll get a 612 report.  And in fact --

**NON-CONFIDENTIAL**

1           THE COURT:  Who's the you?

2           MS. FARRELL:  Pardon?

3           THE COURT:  You is who?  What's the antecedent to

4   that pronoun?

5           MS. FARRELL:  The antecedent to that is, you, Mr.

6   or Mrs. Importer, do not --

7           THE COURT:  So Linyi will get the 612 report?

8           MS. FARRELL:  Linyi will have the bill.  They don't

9   pay.  And then we turn and make the demand to the surety.

10  And so many aspects of the case turn on a demand being made

11  of a surety.  It's in the contract.  I mean, it's in the

12  bond, (indiscernible) the bond.  So that's why we make that

13  demand.

14          THE COURT:  And do I read the statute that you

15  cited -- because you seem to me to be making an argument that

16  look, our interpretation of this contractual language is a

17  demand requirement jives most smoothly with the entire

18  statutory scheme.  Do I read you to be saying that the

19  protest that you mentioned that a surety can file under

20  1514(c)(3), it is, that protest is separate and independent

21  from any protest that the surety's insured could have filed,

22  correct?

23          MS. FARRELL:  The importer?

24          THE COURT:  Yes.

25          MS. FARRELL:  The importer has to file within 180

1    days --

2            THE COURT:  Period.

3            MS. FARRELL:  -- of liquidation.

4            THE COURT:  But even if that 180-day period has

5    lapsed --

6            MS. FARRELL:  Right.

7            THE COURT:  -- the surety gets an opportunity,

8    independent and separate from its insured, once you make

9    demand on them, if they wish to file a protest about any

10   legal issue regarding Customs did, is that your understanding

11   and interpretation of that language?

12           MS. FARRELL:  That's exactly the Government's

13   understanding of that provision, because there could have

14   been an importer, like in this case, who disappears.  What if

15   Linyi had inappropriately calculated what was due and owing,

16   and we send a demand through the surety within maybe a year

17   later, we send a demand through surety.  The surety is

18   outside of the 180-day period of when the liquidation

19   occurred and the bill went out.  They have to have a right,

20   if there's an error, to protect themselves.  And that's what

21   that demand requirement is there for.  That's why it's

22   critical.

23           The demand is critical.  It's critical for a surety

24   to be able to defend themselves if the importer didn't the

25   defend themselves or if the importer only defended something

1   that had nothing to do with what --

2          THE COURT:  And so in other words -- just to use a

3   concrete example, but an example that's not this case -- if

4   an importer brings a good into the country and Customs makes

5   a determination about what duties are due and what tariff

6   schedule provisions apply, the 180 days passes, and the

7   actual importer neither protests nor gives you the money that

8   you're due, but they do have a bond.  And two years later,

9   after that date, you make demand on the surety, even though

10  we are at this point, multiples pass the 180 days, that

11  surety can come to you and say, we want to file a protest

12  about what you did, we think it's wrong.

13         MS. FARRELL:  Absolutely, Your Honor.  It happens

14  all the time.

15         THE COURT:  Okay.

16         The way the Government tells it, Mr. Telep and Mr.

17  Ferguson, though not having the demand requirement in this

18  case may be great help to you here, it sounds like, if

19  they're correct, it might not be a great help to the surety

20  industry overall if this demand requirement were found not to

21  be in existence here.  What do you have to say that?  Yeah,

22  and please feel free to go to the podium.

23         I guess a better way to put it from your

24  perspective might be, I don't think your claim necessarily

25  rises or falls solely based on whether there's a demand

1  requirement.  It seems to me that a demand requirement --

2  again, I have to do what the law says, whether it's helpful

3  to you or not.  But I assume that the insurance industry will

4  take legal positions that are in its own best interest in the

5  majority of cases.  It seems to me that the demand

6  requirement does a lot of good for the surety industry;

7  doesn't it?  So why wouldn't we want to read this language as

8  a demand requirement?

9          MR. TELEP:  Well, as I mentioned earlier, Your

10  Honor, there's a lot of cases that cover whether a demand

11  needs to made, doesn't need to be made, all the rest.  Cocoa

12  Berkau, for example, involved a case where there was a demand

13  made for (indiscernible) payment.  And the statute of

14  limitations ran from that period of time.

15          THE COURT:  Um-hum.

16          MR. TELEP:  (Indiscernible) Export involved nothing

17  having to do with demand at all.  And the contract was agreed

18  upon, and inspection by the Customs Service of the warehouse.

19  There was not a demand involved.  And yet, they paid damages

20  ultimately and presumably paid.

21          In the cases that I've referred to as the

22  counterclaim cases, there was no demand made at all on the --

23          THE COURT:  Isn't the general rule -- now, of

24  course, the fun stuff about contract law is that you can

25  always contract around general rules.  It's literally make-

1   your-own adventure.  But isn't the general, black-letter rule

2   in contract cases that, even in contracts where -- if I just

3   wanted a contract, and you agree to perform a service to me,

4   and I will pay you on demand $1500 for whatever service you

5   did, courts will not interpret that as an actual demand

6   requirement if it's between you and me.

7         But if there's a guarantor -- if there's a surety

8   third party to the contract -- there's an exception.  And

9   they will interpret that as a demand requirement -- as a

10   black-letter rule with regard to the surety.  Is that not

11   correct?

12         MR. TELEP:  I'm not sure if I'd agree with the

13   first part of the sentence.  If there is a condition

14   precedent --

15         THE COURT:  Well, I'll read you Corbin on contracts

16   where it says just that, if you'd like.  They have an entire

17   section dealing with that.  In the older version, when

18   Professor Corbin was actually still alive, it was his third

19   volume, section 643.  And he talks about promises to render

20   performance on demand.  And Professor Corbin explains that it

21   is held, when a negotiable instrument is made payable on

22   demand with nothing more to indicate that an actual demand is

23   intended, the money is payable at once, and that an action

24   can be maintained without first making a demand.  But reading

25   on in Professor Corbin's treatise, that exceptionable

1   doctrine is applicable only to the promise of a debtor to pay

2   his own debt.  It is not applicable -- in other words, the

3   exception -- any exception to demand is not applicable

4   against a surety who promises to pay the debt of another on

5   demand.  In other words, that's a real demand requirement --

6   where there's a surety.

7           MR. TELEP:  Right.  My disagreement with Corbin was

8   that parties in certain -- principal -- principal obligor and

9   obligee are capable of entering into contracts where they

10  make demand a condition precedent to paying.  In other words,

11  you don't have to pay me until I make a demand.  And when I

12  make a demand, you have to pay me.  So (indiscernible) --

13          THE COURT:  That's right.

14          MR. TELEP:  -- I understood.

15          THE COURT:  So do you believe this is a demand

16  requirement here?

17          MR. TELEP:  Against a surety?

18          THE COURT:  Against your client, yes.

19          MR. TELEP:  Against my client?  Is there a demand

20  requirement?  I mean, I think there is a demand requirement.

21          THE COURT:  You think there's -- okay.  Well,

22  there's agreement on that.  That's helpful.  All right.  So

23  there is a demand requirement.

24          And I don't hear you to object that whatever it was

25  they sent you wasn't a demand for payment, correct?

1          MR. TELEP:  It's an incorrect demand for payment.

2   But it was a demand for payment.

3          THE COURT:  Yeah, I'm not saying that you agree

4   that you owe the money.  I'm just saying that it was a formal

5   demand.  And then your response is, it's an untimely demand.

6          Okay.  Well, let's get to the reasonableness of

7   timely demand.

8          MR. TELEP:  Yes.

9          THE COURT:  So it's pretty clear that there's not

10   an express contractual term in this regulation or in the

11   language that the parties have agreed to, as it were, that

12   sets any type of strict timeline on when demand has to be

13   made.  There is case law, and there is notations in

14   treatises -- one of which I've provided to you in the

15   proposed questions; it was question 3 -- that suggest that

16   there is an implied reasonability standard whenever

17   unilateral action is required on the part of a party.

18          In other words, if a party is required to take a

19   particular action, and there is no time limit in the contract

20   itself for the party to take that action, then it is implied

21   that that action is to be taken in a reasonable amount of

22   time.  Do you agree with that summary?

23          MR. TELEP:  I agree with it and would add that not

24   only does Williston on contracts say that, but the United

25   States v. Gordon, 78 F.3d 781 and 786, makes that point

**NON-CONFIDENTIAL**

1    clear.  It also says that the requirement that the Government

2    bring suit against a guarantor is within a reasonable time

3    after the borrower's default.  It had nothing to do with

4    equitable defenses of latches or estoppel; rather, it is an

5    implied condition to a contract.

6            THE COURT:  So let me ask you some questions

7    that -- since we're both reading the same thing, which is

8    good.  Let me ask you some questions that derive from that.

9            Gordon -- and there were cases from the Ninth

10   Circuit that also involved similar precepts; Dos Cabezas

11   Corporation, Gottlieb, Garan -- I'm not promising I'm

12   pronouncing any of those correctly -- but those are three

13   Ninth Circuit cases that discuss in the concept -- in these

14   cases, they're all loans the Government made to someone --

15   whether demand against a guarantor was made in a timely

16   fashion.  From the 8th Circuit, we have the Vanornum case.

17   And you mentioned the Gordon case of the Second Circuit.

18           One thing I note from those five cases that we just

19   mentioned here is that in each case there's discussion of a

20   reasonability standard, but there's not enforcement of it.

21   In other words, in each case the Government was -- in four of

22   the five, the Government was found by the appellate court not

23   to have acted in an unreasonable amount of time.  In one of

24   the cases, the appellate court remanded to the district court

25   for a factual inquiry for the district court to do in the

**NON-CONFIDENTIAL**

1    first instance as to whether the Government had acted in a

2    reasonable amount of time.

3            Now, in looking at the different periods of time

4    covered, most of them seem to me to be, if I had to do a

5    reasonable analysis, quite reasonable.  I mean, we're talking

6    less than two years; 14 months from the default to demand.

7            Gordon is an interesting one, because in Gordon the

8    Government waited four years before making demand.  And then

9    the Government waited nearly the full six years after making

10   demand to file suit.  So in other words, the total time

11   period that elapsed from date when money became due to date

12   Government filed suit was a decade; ten years.  That's quite

13   a lengthy period of time.

14           But the Second Circuit, at least, didn't have any

15   problem finding that the four-year demand -- wait to make

16   demand was reasonable.  And then of course, because that was

17   reasonable, that was the starting of the six-year statute of

18   limitations, and they just made it within the six-year

19   statute of limitations.  So they thought that was fine.

20           So I'm curious as to what you think -- what

21   evidence there is out there, in any of these cases, since --

22   if you've got a case where a federal court applying federal

23   law has found -- or, for that matter, a state court in a

24   analogous circumstance has found unreasonably delayed demand,

25   I'd love to see it, because I currently don't have one before

1   me.  But tell me what you can about what reasonable means.

2           MR. TELEP:  All right.  Well, let me start with

3   closing.  In our motion to add a couple of documents for the

4   record, we quoted from Campbells -- I actually had the quote

5   wrong.  This is actually Campbell v. Whoriskey, 48 Northeast

6   1070 Massachusetts (1898).  And then Williston adopts that,

7   or at least he talks about it -- it's arguable whether he

8   adopts it or not -- and basically says three things:  one,

9   demand has to be made within a reasonable time.  He doesn't

10  aggregate periods of time.  He doesn't say that you get to

11  take the reasonable period of time and then a period of time

12  for statute of limitations, and if all of that's reasonable,

13  that's fine.  He says, demand has to be made within a

14  reasonable time.  So I think the error in looking at Gordon,

15  the way we've described it, Your Honor, is to aggregate the

16  two periods of time.  And instead, you're focused at the

17  period of time needed to make a demand.

18          Second thing Williston says is that you can look

19  and evaluate reasonableness one of two ways.  I'll take the

20  second first.  At the outside, the period of time in the

21  statute of limitations -- which, in this case, is six

22  years -- defines the period for making a reasonable demand.

23          THE COURT:  So why?

24          MR. TELEP:  Why?  It's just -- why?  Because the

25  policy reasons articulated in Gordon --

1          THE COURT:  Well, let me quibble with Gordon for a

2    moment.  You notice that when I -- you may have asked

3    yourself why did I read the 1960 version of Corbin, when

4    Professor Corbin was still alive?  Well, because that's what

5    Gordon cited to.

6          But Corbin, despite his death, his name lives on,

7    and his treatise on contracts lives on.  And while they

8    have -- unfortunately for people who are doing research,

9    particularly my clerks -- reorganized Corbin.  We were able

10   to find the modern version of 3A, section 643 from when

11   Corbin was alive.

12         And if you look at it, that provision cited by the

13   Second Circuit has been excised.  The current version of

14   Corbin no longer states that the statute of limitations time

15   period sets a almost de facto period of reasonableness in

16   which to make a demand.  And I was curious as to why that had

17   been excised.

18         But when I read what Professor Corbin himself, when

19   he was alive in 1960, had to say about it, I can see why they

20   took it out.  Because Professor Corbin -- again, this is

21   selected quotation by the Second Circuit.  The Second Circuit

22   quoted him correctly, but they did not quote him completely.

23   He said that -- he does say indeed, that in the absence of

24   special circumstances, the statutory period of limitation is

25   often taken to be the reasonable time.

1          But then, Professor Corbin himself -- this is in

2   1960 -- went on to say, but if the demand is made within this

3   reasonable time, it is generally held, and should be, that

4   the statutory period for barring action begins to run from

5   the date of the demand.  There seems to be the slightest --

6   there seems to be slight reason for measuring a reasonable

7   time for demand by the period of limitation for bringing

8   suit.

9          So in other words, in 1960 Professor Corbin said,

10  there seems to be a rule that courts look to the statutory

11  period of demand as a gauge of reasonableness, but I,

12  Professor Corbin, don't really see much reason for using that

13  as a gauge.  In the 2023 version of the people who are now

14  editors of Corbin on contracts, they just say it has to be

15  made within a reasonable time, period, and they don't suggest

16  a metric for determining what reasonable is.

17         MR. TELEP:  Okay.  I did not have access to Corbin.

18  I did have access to the Northeastern Reporter, and this was

19  Campbell v. Whoriskey, the Supreme Court of Massachusetts'

20  1898 decision from which all of this stems, as far as I can

21  tell:  Where there's nothing to indicate an expectation that

22  the demand is to be made quickly or there is to be a delay in

23  making it, we are of the opinion that the time  when to bring

24  such an action after the cause of action accrues should

25  ordinarily be treated as the time in which the demand must be

1  made.

2          And the reason why?  Such a rule seems fairly to

3  apply the principles of analogy to the statute of limitations

4  to the contract of the parties, and it is in accordance with

5  the weight of authority in this commonwealth and elsewhere.

6  That theory was picked up by Williston in this excerpt that I

7  included in my motion.  It's also set forth in Gordon.

8          And from one other case for good measure, take a

9  look at Northern District of California's decision in Curry,

10 where the court basically decided that a demand made more

11 than six years, it was subject to the same statute of

12 limitations here.  The Small Business Administration made a

13 loan to the borrower.  The borrower wasn't able to pay.  The

14 SBA and the borrower went back and forth about what an

15 appropriate resolution would be.  The last offer in was from

16 borrower.  The SBA ignored for more than six years the

17 statute of limitations under 4415(a), and the Court -- the

18 Northern District of California district court judge said,

19 too late, so sorry, you're out of luck.

20          THE COURT:  And that was based on failure to make

21 timely demand?

22          MR. TELEP:  It ultimately was discussed in the

23 context of, you blew the statute of limitations.  But I think

24 what the court was saying in that case was, you not only have

25 to make a demand within the six-year statute of limitations

1    period, but you have (indiscernible) of the six-year statute

2    of limitations, too.  But then --

3              THE COURT:  Well, that's not the law.

4              MR. TELEP:  In the Curry case, Northern District of

5    California case, it cited all of these decisions that we're

6    talking about, and Nyhus in particular, that it can't wait an

7    unreasonable period of time to make a demand.

8              THE COURT:  Was that case appealed to the Ninth

9    Circuit?

10             MR. TELEP:  Not that I'm aware of, no.

11             THE COURT:  Okay.  Well, I don't find anything that

12   suggests that if -- that's from an appellate court level that

13   suggests that if someone has been reasonable in making the

14   demand, that's when the clock stops ticking.

15             MR. TELEP:  Well, then let's --

16             THE COURT:  Starts ticking.

17             MR. TELEP:  -- let's talk about what is reasonable

18   in making a demand.  In this case, there is nothing

19   reasonable about the delay that took place.  The federal

20   register that was announcing the lifting of suspension of

21   litigation took place more than eight years -- in fact,

22   deemed liquidation took place more than eight years.  Customs

23   in the Commerce Department of the United States -- the named

24   party in this case -- did nothing for eight years.  If you

25   look at what the Customs Service was telling the trade all

1    along, this means that -- and this is point two from

2    Williston -- six years marks the outer bound.

3            The other boundary is, what's the expectation of

4    the parties?  If you're going to apply a reasonableness

5    provision into the suretyship contract, the reasonableness

6    provision starts, first, with the expectation of the parties.

7    What are the expectations of the parties here?

8            Well, I'll start with the expectation of my client,

9    James Zuhlke.  He executed a declaration in this case that is

10   unrebutted.  And he said, for 40 years the surety industry

11   has relied upon a system whereby liquidation starts the

12   period of time running for the collection of duties.  We base

13   our entire business on it.  We base our industry on it.

14   There is no way that Aegis or any one of these surety

15   companies would enter a contract where the grace period of

16   reasonableness can outstrip the statute of limitations

17   (indiscernible).  In the Government's view, that's -- 100

18   years from now they could to wait to make their demands.  Is

19   that reasonable?  Of course not.

20           So let's look at the expectations of the parties.

21   Our client articulated its expectation in the declaration of

22   James Zuhlke.  What has Customs said about it?  Well, Customs

23   has done a number of things.  It said that the AHAC decision,

24   first, well, liquidation is what starts the statute of

25   limitations, right?  (Indiscernible) --

1          THE COURT:  Customs doesn't have the ability to

2     modify the statute.

3          MR. TELEP:  We're not talking about modifying the

4     statute.  We're talking about the reasonable expectations of

5     the parties to a contract.  I take the points on 1505(b).

6     I'm not here to argue 1505(b), and if Customs can modify the

7     statute, or anything else.  I'm here to talk about the

8     contract.

9          THE COURT:  Well, let me throw some other things in

10    that I saw other courts discuss, because if -- as I said, the

11    statute says "bill", and that, in my term, is what we're

12    looking at.  But I'm curious to know a couple of things.

13         Number 1, any of the materials that are currently

14    part of the record; do you have in there any information, any

15    official document from Customs that describes, we send a bill

16    out within X days of liquidation?  Or -- answer that first.

17         MR. TELEP:  Start with Customs headquarter ruling

18    that we talked about, where it says that the cause of action

19    begins 31 days after liquidation.  In other words, the

20    obvious inference for that is, we're going to generate a

21    bill.  The other documents that are in the record now are

22    Customs' interrogatory responses from the Presstek case.

23    What do they say?  They say that we send out -- that we

24    liquidated on Friday, we sent out a bill on Monday, and that

25    if the importer doesn't pay, 30 to 60 days later, we send out

**NON-CONFIDENTIAL**

1   a bill to the surety.  There's another document in there that

2   says, we send out bills immediately upon liquidation.  The

3   Customs Service is telling itself internally, when it issues

4   a demand.  It has told the trade in the form of the

5   headquarters ruling.  And that position, as I indicated in

6   our supplemental brief, was heard loudly and clearly by the

7   insurance company.  Because James Zuhlke testified under oath

8   in the form of a declaration, unrebutted, this was our

9   expectation.

10         So if you adhere to the idea that reasonableness

11  starts, at least, with the expectation of the parties, which

12  is what Williston said -- and we'll talk about Williston --

13  that's what should govern this case.  What's reasonable is

14  what Customs ordinarily does.  Interestingly, I believe that

15  if you asked Ms. Farrell, she would say, that's exactly what

16  we did in this case after we figured out that the entries

17  were being liquidated.  It wasn't how they handled this

18  case -- if you want more of it, it's in the record -- what

19  they did -- what happened in this case.

20         They should have known, based on the Federal

21  Register notice announcing the suspension of liquidation,

22  that the entries were being liquidated, and here's your

23  golden ticket.  Commerce failed to send in the liquidation

24  instructions.  When Commerce sent the liquidation

25  instructions, what did Customs do?  Generated a bill and sent

1    it to the importer.  When the importer didn't pay, sent it to

2    the surety.

3            That's exactly how they do it.  Because they have

4    an expectation in the industry -- in the trade -- that the

5    surety companies rely on for when they're going to get their

6    bill.

7            THE COURT:  So, you represent a surety company.

8    Obviously, the surety company, because of the nature of its

9    business, is frequently interacting with the Customs

10   Department on items for which Customs says it owes money.

11           In looking at some of these cases, I took interest

12   in some parties who had much less than eight years that they

13   were arguing was unreasonable for the Government to wait to

14   make demand.  For example, in the Dos Cabezas case out of the

15   Ninth Circuit, 995 F.2d 1486; in that case, there was a 15-

16   month delay between the acceleration of the loan, which was

17   taken by the Court to be the point at which it was clear the

18   money was due, until demand was made on the guarantor in that

19   case.  And the guarantor came to the Ninth Circuit and said,

20   you waited 15 months, that's just horrible.  We shouldn't

21   have to pay this thing.

22           And the Ninth Circuit took a look at some factual

23   factors and said, look, when I look at these loans which were

24   accelerated and which are the subject of your guarantee, Mr.

25   Guarantor, these loans vary in duration from 1 year to 40

1    years.  And it makes sense that the Government ought to have

2    some amount of time to work out a non-litigation settlement

3    with the parties; in other words, give them some time to go

4    to the guarantor and see if they can get money off of them in

5    an amount that might satisfy the Government and keep

6    everybody out of court.  And so, Mr. Guarantor, we think 15

7    months' delay is entirely reasonable because, I mean, the way

8    the world works, sadly, it takes time to work this stuff out.

9            So I'm wondering -- the Ninth Circuit looked at

10   factors and noted that the Government shouldn't be allowed to

11   frustrate the running of the statute of limitations, but that

12   giving the Government a reasonable amount of time to see if

13   it could work out an agreement with the parties to keep

14   everyone out of court wasn't unreasonable.  Are there any

15   factors like that that you think come into play here with

16   regard to what determines reasonableness in this concept?

17   Presumably, the surety company doesn't want everything to be

18   litigated.  I assume you work some things out with the

19   Government.

20           MR. TELEP:  We do work some things out with the

21   Government, but we're talking eight years.  We're talking a

22   period of time from the liquidation of these entries until

23   the surety industry first heard about any of it.  And after

24   that it was, well, we're sending a bill to the Lindyi.  If

25   they don't pay, here's your bill.  Here's your 6 to 12

1    months.

2            And then actually, the Government, interestingly

3    enough, after sending its demands -- so now we're in the

4    statute of limitations period, if you accept the idea that

5    the statute of limitations runs from the period of demand --

6    they went after ███████ , another surety company who issued a

7    single transaction on this.

8            And because of those delays -- if ███████ paid

9    that right away and if Customs had made its demand right

10   away, we wouldn't be here.  It's 100 percent of the liability

11   that Aegis is suffering from right now in being asked to pay

12   is in the form of interest.

13           THE COURT:  Well, I'm glad you mentioned that.  Do

14   you believe that under the reasonableness standard you have

15   to prove any type of prejudice in order to prevail?

16           MR. TELEP:  I don't know if you do or not.  But I

17   will say that we're suffering prejudice simply by being asked

18   to pay (indiscernible).

19           THE COURT:  Do you have a date certain, from your

20   calculations of how interest would have run on this, as to

21   when your client, Aegis, first became liable for the first

22   dollar of money to the U.S. Government due to the passage of

23   time and the racking up of interest?

24           MR. TELEP:  I don't have a date certain, but what I

25   can say is that --

1          THE COURT:  If I asked you to provide me a date

2   certain of when that happened, could you do it?

3          MR. TELEP:  Yeah.

4          THE COURT:  I would appreciate your doing that.

5          MR. TELEP:  I can do that.  If I can answer that

6   question, then --

7          THE COURT:  Sure.

8          MR. TELEP:  -- in -- narratively in some other

9   fashion -- the total amount due on all of these bonds, I

10  think, was ████████ from the moment demand was made upon

11  Linyi.  ██████████ had insured Linyi to the tune of about

12  ███████.  So if ██████████ paid right away, then we would not

13  be here.  But I can give you --

14         THE COURT:  So from what you're saying, even at a

15  relatively modest rate of interest, because their bond was

16  basically totally taken up by the principal, it would have

17  immediately run over into you very quickly.

18         MR. TELEP:  Right.  I can give you an exact date.

19  I don't know exactly --

20         THE COURT:  Do you have any idea of what the total

21  amount of money was owed with interest on the date they made

22  demand on you?

23         MR. TELEP:  I want to say ████████ -- well, no.

24  ██████████, I believe, was the amount that it was -- when they

25  made demand on us, I believe it was ████████.  It's in the

1    record.  It's in their plea, actually.  I believe there's a

2    declaration from Bruce Ingram with the Customs Service

3    counting that amount up.  And my recollection is that it was

4    in the neighborhood of ████.

5            THE COURT:  So the total amount owed was 50,000,

6    and it had become ████?

7            MR. TELEP:  Due to interest.

8            THE COURT:  And so ████ of that was interest?

9            MR. TELEP:  Well, it was all interest.  They just

10   (indiscernible) --

11           THE COURT:  It was all interest?

12           MR. TELEP:  -- interest.  The (indiscernible) was

13   responsible for the interest as if it were principal.

14           THE COURT:  Okay.  Well, I would be curious if you

15   could tell me the date at which you became liable for the

16   first dollar.  But I hear you saying is that, Judge Vaden,

17   whatever reasonableness is, it can never be eight years

18   later.

19           MR. TELEP:  Yeah.  That's exactly right.  It

20   can't -- there's no excuse for it.  I mean, what I was

21   looking at is -- in preparing for this argument, I was

22   thinking, Customs at some level can't be faulted for this.

23   Customs, not the United States.  Customs.  They didn't pick

24   up the Federal Register notice.  They didn't understand the

25   implications of it.  Commerce never sent us the instructions.

1    That's how we normally get notice in all the rest.

2              But this is the pleading. The United States is the

3    plaintiff.  We've got Aegis Security Insurance Company as the

4    defendant.  I know who is not responsible for the delay.

5    This company -- the defendant -- it's us.

6              And if they're not responsible for the delay, at

7    what point does it become unreasonable to delay further?  You

8    have statements from Customs to the trade, statements from

9    Customs to the Court, statements from Customs to itself, that

10   it basically makes demand immediately upon liquidation.  You

11   have Customs' actions in this case making demand

12   (indiscernible) immediately upon understanding the

13   liquidation instruction from the Commerce Department that

14   demand has to be made immediately.

15             All of that is evidence showing when demand is

16   supposed to be made.  It is reasonable for them -- and it is

17   the expectation understood by the surety industry -- that

18   that's the reasonable period of time.  If you want to ignore

19   all of that, you can still look at the six-year statute of

20   limitations period.  And I understand there's Corbin on

21   contracts that, in a later iteration, (indiscernible) that.

22   And you've got Williston on contracts.  You have the source

23   documents from the Supreme Court decisions at the state court

24   level we said had been adopted into federal common law that

25   articulate this rule.  You have Gordon, which says why you

1   have this rule and why you tie it to the statute of

2   limitations.  You just can't let stale claims go on forever.

3            THE COURT:  Well, let me try to summarize what

4   you're saying, because I want to hear what Ms. Farrell has to

5   say to all of this.  But if I were to summarize the arguments

6   you're making before me today, I would summarize it as

7   follows.

8            This is a contract claim.  The Government is no

9   different from any other contracting party, and so normal

10  rules of contract apply.  You see the limit of reasonableness

11  in taking a particular action -- a time limit for taking a

12  particular action -- as applying when there is no particular

13  time specified in the contract itself.  And you believe,

14  whatever standard is applied, whether it be six years,

15  whether it be looking at prudential factors or what have you,

16  the eight years that it took to make demand in this instance

17  is categorically unreasonable.  And you don't believe

18  prejudice should factor into it, but if it does, prejudice is

19  shown by the fact that you're here at all because it's all

20  interest that piled up because of the delay in making demand.

21           MR. TELEP:  There you go.

22           THE COURT:  All right.

23           Ms. Farrell, the floor is yours.

24           MS. FARRELL:  Thank you, Your Honor.

25           So following up on this concept of reasonableness,

**NON-CONFIDENTIAL**

1   the timing that Customs used to make demand on the surety was

2   reasonable vis a vis the bill that was sent to the importer

3   and wasn't paid.  Customs received a notice from Commerce in

4   July of 2014.  By October of 2014, bills under 1505(b had

5   gone out to Linyi.  Linyi did not pay.  By February of 2015,

6   a 612 report had gone out to Aegis for all of Linyi's ten

7   entries.

8          That is a period -- information from Commerce,

9   July -- end of July.  September, October; two months.  No

10  payment by the end of November.  December, January.  Bill in

11  February.  Two and a half months.  We're done.  We've brought

12  the action within five years of demand on the surety.  So if

13  we've been using the U.S. v. Gordon argument, we're timely.

14         THE COURT:  So you don't think you'd consider the

15  gap in time, which was approaching eight years, between when

16  deemed liquidation happened and when the first bill was sent

17  and when subsequent demand was made on Aegis for payment?

18  You don't think that counts in the calculation?

19         MS. FARRELL:  Not --

20         THE COURT:  Of reasonableness.

21  MS. FARRELL:  Not for the reasonableness vis-a-vis the

22  surety.  We're reasonable vis-a-vis the surety.  And we're

23  reasonable vis-a-vis the importer as well, because the

24  situation that we had -- the notice of rescission as to Linyi

25  and deciding their new shipper bond -- Customs was uncertain

1   when in fact that became an issue in the AHAC case that Your

2   Honor is discussing, from --

3          THE COURT:  2017?

4          MS. FARRELL:  2017.  There are so many AHAC cases;

5   it could be 2016.  One of these two AHAC cases had a

6   rescission -- let me think of which one it is.  It may be the

7   Judge Gordon case that went on, and it would have been a

8   different panel than Judge Moore (ph.).

9          But in any event, the issue was, did

10  rescission -- no, let me think.  I take it back.  I was

11  involved in a case.  I'm trying to pull something out of the

12  back of my brain.

13         THE COURT:  The Judge Moore one was an opinion of a

14  Judge Gordon decision, if that helps at all.

15         MS. FARRELL:  Okay.  Yeah, the Judge Gordon case,

16  that was a different case.  It was the Judge Eaton case,

17  AHAC, where there was a rescission, and we were found to be

18  untimely.  It's actually the one that's on appeal now.  So

19  that issue of -- there was an earlier AHAC case that Judge

20  Eaton did not permit us to seek a -- supplement the case to

21  file a brief saying the argument that was made in this most

22  recent Judge Eaton AHAC case, and the argument that's made

23  here, that it is the demand that triggers the statute of

24  limitations.

25         In that earlier AHAC case, the issue came up.  We

**NON-CONFIDENTIAL**

1  believed we were timely because there had been a rescission.

2  But there hadn't been instructions to seek payment because we

3  didn't know what rate was going to be applied, because our

4  understanding was, when that rescission was lifted, those

5  entities were going to go into the country-wide rate.  There

6  was a country-wide rate that was still being determined.

7  　　　　THE COURT:  Well, in this case that's not an issue,

8  because this was a deemed liquidation.  So everyone knew the

9  amount that was due; it was the amount that was claimed to be

10 due.

11 　　　　MS. FARRELL:  Right.  Understood, Your Honor.  But

12 in the sense of a deemed liquidation, that is because

13 six -- that's because within the time period after Commerce

14 tells you what rate to apply.  The deemed liquidation agrees

15 to the rate that the importer used, because you missed your

16 time to apply whatever rate Commerce said to apply.

17 　　　　So we have a situation where Customs was unaware

18 that it was supposed to move forward on the Linyi entries --

19 　　　　THE COURT:  Well, what I'm asking -- you're

20 seeking -- your argument is seeking to bifurcate, basically,

21 the counting of time.

22 　　　　MS. FARRELL:  Yes.

23 　　　　THE COURT:  There's the Commerce department and

24 what they did, and the error is on them because they waited.

25 I don't think there's any dispute as to that.  And then as

1    even Mr. Telep said, once Customs was alerted that it needed

2    to do something, it acted with reasonable speed, after an

3    unreasonable delay by Commerce in letting it know it should

4    do something.

5           But to come back to the case title; the title of

6    this case isn't Custom Service versus Aegis Security

7    Insurance Company.  It's not Commerce Department versus Aegis

8    Security Insurance Company.  It is the United States versus

9    Aegis Security Insurance Company, and we have one single

10   federal government.  We have one executive branch.  And

11   although some people dispute the unitary executive theory and

12   the role of the President in controlling the entire executive

13   branch, the one thing I do know -- and that is not

14   disputed -- is that both the Customs Service and Commerce are

15   part of that executive branch.

16          And so I don't see how, when it's all the United

17   States, why we can slough off one part of what the United

18   States did and not consider that at all.  And then but what

19   the other part of the United States did was great, and so

20   that's the only thing we can consider.  What principle is

21   there out for bifurcating the timeline in that way?

22          MS. FARRELL:  I think that the bifurcation of the

23   timeline is 1505(b)'s issuance of a bill, and there's nothing

24   in that -- with that respect that puts -- I mean, Congress

25   has drafted -- as Your Honor recognized, there used to be a

1   drop dead deadline; they took it away.  They triggered it off

2   of a bill.  Does Customs attempt to get bills out as quickly

3   as possible?  Yes, they do, when they're aware of the fact

4   they should

5          THE COURT:  Well, your friend over there made a

6   point, and it refers back to your predecessor, Mr. Mancuso,

7   when he was Government counsel.  And in an early interaction

8   with the Court, I had a fun exchange with Mr. Mancuso asking

9   him how long the Government could wait to send a bill under

10  its theory.

11         And we started out with five years, and there was

12  no problem with that.  And we got up to like 20 years and 50

13  years, and Mr. Mancuso, to his credit in my view, could not

14  say, no, that they couldn't do it.  But he also didn't want

15  to say yes, because just in terms of practicality, putting

16  the law aside for a moment, it seems a little bit crazy to

17  say, we can wait 50 years to send you a bill, and that's

18  okay.

19         Do you believe that that is correct; that the

20  Customs Service could wait 50 years?  And if for some reason

21  some -- there was actually someone at USDA who worked for the

22  federal government for 50 years.  I got to sign their

23  certificate when I was there.  If someone retires after 50

24  years of government service at the Commerce Department, and

25  as the cleaning crew is cleaning out their desk, whoa, here's

1   something from 50 years ago that they should have sent to our

2   friends at Customs.  And they send that to Customs, and

3   Customs sends a bill the very next day, is that compliant

4   with the law?

5          MS. FARRELL:  On behalf of Customs, yes, it is,

6   because Customs is not waiting.  Customs is actually acting

7   promptly in response to something that it learns about.

8          THE COURT:  Okay.  Do you disagree with the premise

9   that seems to be stated by multiple federal courts that the

10  purpose of the statute of limitation and the entire exercise

11  around it is to, in the words of the Supreme Court in the

12  Crown Coat Front case, equalize the litigative opportunities

13  between the Government and private parties; do you agree with

14  that statement?

15         MS. FARRELL:  Supreme Court said it, so I agree

16  with it.

17         THE COURT:  Okay.  And just for the record, so I

18  can be clear, the Federal Circuit also said it in the

19  Commodities Exchange Corporation case, in footnote 3, which,

20  even more interestingly, was cited by the Second Circuit in

21  court.

22         MS. FARRELL:  Yes, Your Honor.

23         THE COURT:  So the Secon Circuit did a bunch of

24  digging around in Federal Circuit case law.  So my question

25  is this.  Let's reverse the positions.  Let's say someone is

**NON-CONFIDENTIAL**

1   suing the Government over a contract, and so this same

2   statute of limitations applies, because it applies to either

3   side.

4            And that party, if they thought the Government was

5   supposed to pay it money, required them to make demand on the

6   Government for payment.  What if they waited eight years or,

7   in your example, 50 years, to make demand upon the

8   Government?  Are you telling me the Government wouldn't come

9   into court and assert the defense, look, you waited too darn

10  long, that ship sailed, we're not paying it?

11           MS. FARRELL:  I'm sure the Government would likely

12  come in and make that defense, if it were appropriate.  But

13  we're also --

14           THE COURT:  And probably they wouldn't be friendly

15  to an argument from the company, well, we're a huge

16  corporation, and this was our construction subsidiary.  But

17  our accounting division is contained in another subsidiary,

18  so it stayed in somebody's desk, and the instructions didn't

19  make it over to the other subsidiary, so really what that --

20  accounting subsidiary got the thing.  They acted the very

21  next day, so they acted reasonably.  They probably wouldn't

22  be friendly to that argument, would they?

23           MS. FARRELL:  I don't think they would.  But Your

24  Honor, they also aren't a sovereign seeking to recover

25  revenue for the public fisc either.  And so I find it

**NON-CONFIDENTIAL**

1  interesting that Congress, in rewriting 1505(b), took away

2  the drop dead deadline, because I think they

3  understood -- because you're looking to recover revenue for

4  the public fisc.  So we're in --

5           THE COURT:  Well, that's true.  But what --

6           MS. FARRELL:  -- a little bit of a different

7  position.

8           THE COURT:  Can I bifurcate that a little bit to

9  your point you made earlier?  I want to get your response to

10  this.  So going back to that point, the person who in the

11  first instance owes the money is Linyi.  And as you and I

12  discussed at the beginning of this argument, Linyi will be on

13  the hook for that in perpetuity.

14           If ever Linyi or -- I don't know, perhaps somebody

15  in privity with Linyi, but definitely Linyi -- if they ever

16  stick their head up again and have however much money it is

17  that they owe you, you can grab them at any time.

18           The question here is about Aegis.  And the only

19  reason why Aegis owes you anything is not because they

20  imported something.  It's not because you are taxing them in

21  your capacity as sovereign.  It is because you entered into,

22  voluntarily, a contractual relationship with Aegis.  And in

23  that case, you're not acting as a sovereign; you're acting as

24  a contracting party.

25           So I'm curious as to how you think, vis a vis

1   Aegis, the fact that you were acting vis a vis Linyi as a

2   sovereign in a taxing capacity matters.

3          MS. FARRELL:  Well, because we're still acting as a

4   sovereign in a tax capacity matter -- manner, excuse me, vis

5   a vis the surety, who has now stepped into -- once we make

6   the demand on them, they have to now fulfill the promise to

7   satisfy what Linyi would have owed us.  So they --

8          THE COURT:  But that has to be founded in contract,

9   because otherwise we wouldn't be talking about the particular

10  statutory provision at issue.  Because the statute of

11  limitations provision here does not apply to you seeking

12  money as a sovereign; it only applies if your cause of action

13  is founded on a contract.

14         MS. FARRELL:  Right.  And our cause of action is

15  founded on a contract, which requires a demand made on a

16  surety.  And under 201415(a) we have to do that within six

17  years, and we did.  Now the question goes back; is the time

18  period between the bill that went out to Linyi and the time

19  of deemed liquidation -- that is, the time period from 2006

20  to 2014 -- what does the -- there's no contract for that.

21  What does the statute say to that?

22         It says in 1505(b), when you send the bill, they

23  have to pay you, so that's the problem.  Because this is not

24  a demand on Linyi under the bond.  This is a request for

25  payment of Linyi, but it's a demand under a contract vis a

1    vis the surety.  So we're living in two worlds, and Your

2    Honor caught it, I think, in the beginning.

3             And I know one thing.  Reading your questions

4    clarified an awful lot for me, because it made certain to me

5    that 1505(b) is about a bill, and it's a bill to an importer.

6    It's not a bill to a surety.  Surety gets a demand, gets a

7    612 after the bill to the importer hasn't been paid.  So the

8    real question is, what does the statute say about when we

9    should send a bill?  It says nothing.  In fact, it says less

10   than nothing.

11            THE COURT:  Well, but let me --

12            MS. FARRELL:  It used to say we had to send a bill.

13            THE COURT:  Let me go back to the distinction that

14   you made at the very beginning.  You wanted to be very exact

15   in your terminology.  And if I heard you correctly, you said

16   a bill is only something that is sent to the importer,

17   correct?  Linyi, in this case.

18            MS. FARRELL:  Yes, Your Honor.

19            THE COURT:  So if we're talking about what was sent

20   to Aegis, it wasn't a bill; it was a demand.

21            MS. FARRELL:  Yes.

22            THE COURT:  It was a request to pay up.

23            MS. FARRELL:  Yes.

24            THE COURT:  And so that's not governed by the

25   statute; that's governed by the contract.  And so why

NON-CONFIDENTIAL

1    wouldn't we look to contract law to determine when it was you

2    should send them a demand?

3              MS. FARRELL:  Well, the demand is -- it's kind of

4    intrical.  Although it's contract law, it is also informed by

5    Customs regulations.  And it's understood in the industry

6    that we seek payment -- under 1505(b), we send a bill to the

7    importer.  In the ordinary course usually nothing happens.

8    They pay, and everybody's happy.

9              This is not the ordinary course; something else

10   happened.  So now we go into a different realm.  We go into a

11   contractual realm, which requires us to make a demand.  That

12   is the condition precedent for our ability to be on the wrong

13   side of a caption.  We should never be on the wrong side of a

14   caption.

15             Why we have to be a plaintiff against a surety is

16   beyond me.  Pay your bill, and then bring a protest.  And

17   then if you don't like Customs' outcome, come to the CIT, and

18   they will make sure you get the right result.  I mean, it's

19   simple.  But we're living a world where we had to make a

20   demand.

21             Our predicate to our action was to make a demand on

22   Aegis.  We could not make a demand on Aegis until we had an

23   importer who didn't pay first.  We do our bill; that's what

24   our regulation says.  We send a bill out to the importer.  If

25   the importer doesn't pay, we make a demand on the surety.

1            THE COURT:  Let me see if I can summarize your

2    argument, and you tell me if I've got any of it wrong.  I

3    hear you saying -- and we'll start at the beginning.  I hear

4    you saying that things are due 30 days after we send a bill

5    to the importer.

6            MS. FARRELL:  Yes.

7            THE COURT:  Our relationship with any surety is

8    governed by contract.  The contract language at issue here is

9    incorporated by reference from a regulation.  That regulation

10   is a demand requirement.  So we are required to make demand

11   on the surety.

12           We made demand on the surety as soon as we got a

13   much delayed notice from the Commerce Department that we

14   should do so.  And Judge Vaden, the only time that matters in

15   terms of determining whether or not we made demand within a

16   reasonable time period -- and I don't hear you arguing that

17   the reasonable time period requirement doesn't apply.  You're

18   instead saying that the only time period that the Court

19   should look at is the time period from when customs received

20   the request or the notice that it should be issuing a demand

21   for payment, and how long it took it to then send the demand

22   out; do I have that correct?

23           MS. FARRELL:  Very close, Your Honor.  But it is

24   that the demand on the surety is not made until we know 30

25   days after we send a bill to the importer.  At that moment in

1    time, based on our regulation 24.3(a), we then turn to the

2    surety.  And the industry understands that.  We bill the

3    importer first.  We make a demand on the surety.  If the --

4            THE COURT:  It's kind of like a credit card; you

5    get a 30-day grace period.  And if you do so, you don't owe

6    any interest, and you've paid your bill in full, and the

7    Government is very happy.

8            MS. FARRELL:  Exactly right, Your Honor.  But

9    because they have that statutorily mandated requirement of a

10   bill and a right for 30 days to pay, we don't turn to the

11   surety until we know we haven't been paid, that there's been

12   an obligation not fulfilled.

13           We then turn to the contract, which incorporates by

14   reference Regulation 113.62, and therefore the other

15   regulations that are associated with that.  But that all

16   pulls it in together.  That's when we make our demand on the

17   surety.  Our regulations say that these are the steps that

18   Customs takes.  They send a bill out to the importer, then

19   they go to the surety.

20           THE COURT:  So just to clarify, the Government does

21   not dispute that the implied reasonableness contractual term

22   applies to it.  Its dispute is what the time period we're

23   looking at to determine whether it is reasonable.

24           MS. FARRELL:  Right.  And that contract -- our

25   action is an action against a surety based in contract.  Our

**NON-CONFIDENTIAL**

1   action, if Linyi hadn't disappeared, would have been an

2   action in personal obligation under 1582.3.

3          MS. FARRELL:  Which they can't dodge.

4          MS. FARRELL:  Which they can't dodge.

5          THE COURT:  And never will be able to.

6          MS. FARRELL:  They may never be able to.  But we

7   have a contract claim vis a vis Aegis.  We are timely to them

8   because our demand on them went out in February as part of

9   the 612, and we brought the action -- that's February of

10  2015.  We brought the action in 2020.  That's five years.

11         THE COURT:  May I ask you a factual question about

12  the regulation at issue here that contains the pay-as-

13  demanded terminology?  I may have asked this question before.

14  I apologize if I have in an earlier proceeding.  But has this

15  language, pay as demanded by CBP, has it remained constant

16  for a long period of time?  Or if I went back ten years

17  prior, would it be a little different?

18         MS. FARRELL:  Don't quote me on it, but my

19  understanding is, it's always pay as demanded, because why

20  wouldn't it be?  I mean, that's what surety is supposed to

21  do.  Once we've made a demand of you, we've made you aware of

22  the fact we didn't get paid by your principal.  Hello, Mr.

23  Surety, your principal didn't pay us, now it's your turn.

24  We're making our formal demand as required by your contract,

25  and we would like you to pay.  And Aegis could have paid

1   then, right on that demand.

2          There's a complaint about interest.  Well,

3   everybody knows -- and this came up in the Great American

4   case.  This comes up in the CDSOA cases, which the domestic

5   producers were upset that some money went to interest. and

6   they said, no, that money should go to us.  The way it works

7   is, it's just like your mortgage.  It's just like your credit

8   card.  Fees and interest are paid first, and then we bite

9   into principal.

10          So when ███████ paid -- and it took them a little

11   while, but they paid.  When ███████ paid, they knocked out

12   interest, and then they bit into principal.  Principal is

13   what was left.  The principal that was left was greater than

14   the face of the bond.  If the first time you received that --

15          THE COURT:  So you're actually disagreeing then

16   with Mr. Telep.  You're telling me that what Aegis is on the

17   hook for in this lawsuit is not interest, it is principal?

18          MS. FARRELL:  I don't think -- let me confirm -- I

19   need to follow up with a spreadsheet.  But my understanding

20   on this is that what was left over from this time period was

21   interest on the amount that was outstanding, and that the

22   single transaction bonds from ███████ finished up all the

23   interest and then bit into principal, and that what remains

24   is principal.  Because all the interest would have been eaten

25   up first when ███████ paid.  So whatever interest was

1   outstanding at the time ████ paid, that went to interest

2   first.  That's the rule.

3           THE COURT:  I will give a brief opportunity, after

4   we have oral argument today, for everybody to go back to

5   their accounts.  And I intend to allow you, Mr. Ferguson, to

6   tell me the answer to the question that I gave you.  In other

7   words, when was the first date on which you became due, and

8   whether you believe what you believe is purely interest or

9   not.

10          And then I'll allow the Government to respond to

11   that however they wish.  That seems to me to be something

12   that is subject to definite factual knowledge, in terms of

13   how much is owed and what amount that is owed actually

14   constitutes.

15          MS. FARRELL:  And I will confer with Customs, their

16   finance, their revenue department, because I know they'll be

17   able to tell me that, as well.

18          THE COURT:  Excellent.  I know we have here today

19   Mr. Sandler, and you are here representing the International

20   Trade and Surety Association, which filed an amicus brief a

21   good while ago in this matter.  I wanted to give you the

22   opportunity, if you wish, to address any particular topic

23   about what it may have -- influence on the surety industry,

24   or what have you.

25          MR. SANDLER:  Your Honor, I don't have anything to

1    add at this time.  Mr. Telep has made a very good case to the

2    position of our members in the Surety Association.  Mr.

3    Zulkey (ph.) of the department being one of those individuals

4    who's an active member of our association.  Clearly, his

5    statements about the expectations of the sureties, how we

6    work regularly with CBP to make sure that these bills are

7    issued timely, that the six-year statute of limitations is

8    one that governs the actions of the Government in issuing

9    bills and making demands on sureties and resolving issues,

10   whether it's protest or what have you, before we wind up

11   having to go to court.  That's been our expectation in

12   working in the industry, and working under the surety

13   contracts, and working with Customs and Border protection in

14   this process, the Customs Service and Bureau of Customs as

15   well.

16            THE COURT:  Okay.  Thank you.  Mr. Telep, do you

17   wish to say anything about the impairment about suretyship

18   affirmative defense that you have cited?  I had a couple of

19   questions that I put out about that.  The one I'm most

20   interested in is the question about timing and whether you

21   disagree with my premise there, that based on what I have,

22   Customs sent you a sent you a demand in January of 2015.

23            According to the order from the state court there

24   in Pennsylvania, any and all claims that were owed by Lincoln

25   General, your reinsurer, should have been submitted to

1   Lincoln General no later than July 6th, 2016, which was more

2   than a year and a half after Aegis received its demand from

3   the Customs Service for payment.  So I'm curious as to A,

4   whether you disagree with that timeline, and B, regardless of

5   the answer to that question, how you think it affects your

6   impairment of suretyship affirmative defense?

7             MR. TELEP:  Your Honor, I don't disagree with the

8   timeline.  I would ask for two minutes to rebut what Ms.

9   Farrell had to say on --

10            THE COURT:  After you answer my question, yes.

11            MR. TELEP:  After I answer your question.  So it

12  doesn't affect the impairment of suretyship defense, and

13  here's why.  LGIC was in trouble long before the Pennsylvania

14  court held that it was insolvent.

15            Fortunately, Aegis had the foresight not only to

16  reinsure its risk with LGIC, but also to obtain an

17  indemnification agreement from Kingsway.  Recall from the

18  undisputed record testimony that Aegis wanted this

19  transaction to be completely risk free, and it insured itself

20  in two ways:  LGIC and its reinsurance, and the Kingsway

21  indemnification agreement.

22            The Kingsway indemnification agreement basically

23  says that Kingsway shall indemnify Aegis, directly or

24  indirectly, for the actions of Lincoln of Avalon, including,

25  without limitation, Lincoln's obligations as a reinsurer

1    under the agreement.

2         LGIC was downgraded below B plus by AM Best, and

3    caused Aegis to terminate the LGIC reinsurance treaty on

4    February 12th, 2009, which it was authorized in a title to

5    do.  And it then looked to Kingsway to pay for its bills, in

6    addition to LGIC.  LGIC, by the way, remained on risk for

7    that period of time.

8         THE COURT:  Because the action covered during the

9    time period that you had a contract with them for

10   reinsurance?

11        MR. TELEP:  Exactly.  And if you look at, I believe

12   it's exhibit --

13        THE COURT:  So let me ask you a question.

14        MR. TELEP:  Yeah.  It's -- yes.

15        THE COURT:  I know you didn't do it, but if in

16   January 2015 or sometime before the 6th of July 2016, Aegis

17   had laid Customs bill before Lincoln General Insurance

18   Company, would that have meant that Lincoln General Insurance

19   Company would have been on the hook for the amount of money?

20        MR. TELEP:  Yes, it would have.

21        THE COURT:  Okay.  Why didn't you do that, just as

22   a matter of course?

23        MR. TELEP:  Because the statute of limitations

24   expired.  And as much as Ms. Farrell would have everyone

25   believe that they're supposed to pay whenever the Government

1    says they're supposed to pay and then fight it out

2    afterwards, that's not Aegis' position.  The statute of

3    limitations expired.

4               THE COURT:  Can I ask you a question just as a

5    matter of -- you're an insurance company that has bought

6    insurance from another insurance company.  Is it your general

7    understanding of how insurance companies work that when

8    someone says, you owe me money, and that risk is a risk that

9    you have insured, if you believe that they are wrong, and you

10   do not actually owe them money, that is an excuse for not

11   notifying your insurance carrier?

12              MR. TELEP:  I don't think that Aegis thought it was

13   wrong.  At a demand, this is untimely under everything that

14   they knew about the industry at the time.  The court cases

15   that came out of this Court, what Customs was telling them

16   and the trade, and all the rest.  They looked at -- and I

17   would also add --

18              THE COURT:  Is there anything in the contract that

19   you had with Lincoln General Insurance Company that would

20   have allowed you to delay notifying the insurance company

21   that there is a possibility that you may owe money to someone

22   for which Lincoln General Insurance Company had a reinsurance

23   obligation because you thought the claim was not a sure fire

24   winner?

25              MR. TELEP:  I'm not aware of that, Your Honor.  I'd

 1  have to go back and look at the reinsurance contract.

 2          THE COURT:  Okay.  Now, you wanted a couple of

 3  minutes --

 4          MR. TELEP:  Yeah.

 5          THE COURT:  -- to rebut what Ms. Farrell said.

 6          MR. TELEP:  Well, the first thing I wanted to do,

 7  you asked earlier, Your Honor, about additional authorities.

 8  So we have Williston, 7929, accrual on demand time for making

 9  a demand.  Our view is that the federal common law -- you

10  asked that question earlier, I can certainly provide cites

11  for that proposition.

12          THE COURT:  And just so I can check.

13          Ms. Farrell, you also agree that federal common law

14  applies to govern the resolution of this action, correct?

15          MS. FARRELL:  Yes, Your Honor.  The federal bonds

16  do, yes.

17          THE COURT:  Okay.  Thank you.

18          MR. TELEP:  United States v. Gordon -- we talked

19  about that already -- 79 F.3d 781.  Desiderio v. D'Ambrosio,

20  190 N.J. Sup. 424 at 429, 430 (1983).

21          THE COURT:  And you believe that case shows?

22          MR. TELEP:  It says, "Reasonable period

23  presumptively compared, covered by statutory period is an

24  easily ascertainable and lucid standard". That's the money

25  quote from Desiderio.

1          THE COURT:  And could you give that cite one more

2   time?

3          MR. TELEP:  It is 190 N.J. Sup. 424 at 429-30,

4   (1983).  That's in addition to the --

5          THE COURT:  Is that the New Jersey Supreme Court or

6   the intermediate appellate court?

7          MR. TELEP:  Well, I don't practice in New Jersey,

8   Your Honor.  I am not sure.

9          THE COURT:  Okay.

10         MR. TELEP:  And that's in addition to the Whoriskey

11  case that I cited earlier on the record, in case you want to

12  keep them all in one place.

13         THE COURT:  And is that the Northern District of

14  California case that you referred to?

15         MR. TELEP:  No.  And the Northern District of

16  California case is Curry.  I have the quote -- or the cite on

17  that if you'd like that one.

18         THE COURT:  Please.

19         MR. TELEP:  That was actually cited in one of our

20  briefs, I believe.  It's 679 F.Supp. 966 at 970, Northern

21  District of California (1987).

22         THE COURT:  And that other case was the 1898 case

23  that you were mentioning?

24         MR. TELEP:  That was -- bear with me a moment.

25  Campbell v. Whoriskey, W-H-O-R-I-S-K-E-Y, 48 Northeastern

**NON-CONFIDENTIAL**

1 │ 1070, Massachusetts Supreme Court, I understand, (1898).

2 │ Again, quoted in Williston, at Williston 7929.

3 │      All right.  I just want to be very clear about the

4 │ representations of the Government with respect to the period

5 │ of time that they believe they have to issue a demand.  Mr.

6 │ Mancuso said 100 years, so long as there's not prejudice.  In

7 │ a supplemental submission by the Government after Mr.

8 │ Mancuso's statement, they said, well, prejudice seems to lead

9 │ into latches or some other equitable defense, and we don't

10 │ believe this apply to the Government, so 100 years.  And I

11 │ can provide the quote for you on that if you like.  So what

12 │ you're looking at is a position from the Government; they've

13 │ got 100 years.  Prejudice, no prejudice, doesn't matter; they

14 │ believe they have 100 years.

15 │      The second point I'd make in rebuttal is this whole

16 │ idea that the Government is acting in a sovereign capacity is

17 │ completely irrelevant.  Your Honor picked up on a couple of

18 │ the points.  That may be true with respect to the importer;

19 │ it's not true with respect to the surety.

20 │      The other point that I'd like to make about

21 │ sovereign acts is, if they're talking about sovereign

22 │ immunity -- in other words, you can't apply a provision on

23 │ the contract that says we have to act within a reasonable

24 │ time because somehow we're sovereign immune.  There was a

25 │ hint of that in the reply brief on the last round of

1   briefing.  I just want to point out that sovereign immunity,

2   it defends the king from being sued.  The king can be sued

3   only -- the sovereign can be sued when the sovereign says it

4   can be sued; not before, not after, and not in any other way.

5   Government's acting as a plaintiff here.  They're not being

6   sued.  Sovereign immunity doesn't apply.

7          And a third point I'd make on that is that this is

8   a matter of the Government acting in its position -- well,

9   you already made the point; I'm not going to repeat that.

10  Then I guess the question -- and I want to make one point

11  about international trading.  I'm not quite sure I understood

12  this correctly when the dialogue was taking place.

13          But as much as the Government would like to say,

14  gee, we really did act promptly at the time we got notice

15  from the Commerce department.  We didn't know.  It's the

16  liquidation instruction that really counts, so we acted

17  reasonably.  We sent out the bills right away.  We didn't

18  know.  Certainly, that was in the Government's briefing in

19  the supplemental round.

20          Look no further than the Federal Circuit's decision

21  in International Trading 1 and International Trading 2;

22  they're cited extensively in our brief.  They stand for the

23  proposition that the Commerce Department's notice to the

24  Custom Service doesn't do the job.  What counts is the

25  Federal Register notice.

1           And in that case, it counted for purposes of

2  putting everybody, the world, including Customs, on notice

3  that the entries had been liquidated, and it's starting to

4  deem liquidation clock running.  No difference here.  It

5  doesn't matter that the Commerce Department didn't send

6  Customs a notice of liquidation, such that Customs could

7  react to it.

8           THE COURT:  It was published in the Federal

9  Register?

10          MR. TELEP:  The Federal Register noticed counts.

11 It counted in International Trading, and it counts here.

12          And in the last point I'd like to make, Your Honor,

13 is perhaps leaving the Court with the question.  The question

14 is, what's reasonable?  Everybody agrees you have this

15 implied provision in the contract that says that the

16 Government has to act within the reasonable time.  I pointed

17 out unrebutted evidence in the record about what everybody

18 thought a reasonable period of time was.  I pointed to

19 Williston that says the parties' expectation is a legitimate

20 basis for making a reasonableness determination.  We pointed

21 to cases a moment ago that say that the outer bound of

22 reasonableness is the statute of limitations period.

23          If those aren't reasonable, then you have to ask,

24 what is?  We are now in a position where it's been a decade,

25 more than a decade that it took for the Customs Service to

1    make demand on this industry.  Do you honestly believe that

2    there's any way the surety industry would have signed up for

3    liability that extends out 14 years?  They don't.  Zulkey

4    said that they don't.  I mean, Mr. Sandler was deferential a

5    moment ago by not, kind of, making this point.  But what is

6    this going to do to the surety industry?

7            And I raise that because Gordon talked about the

8    policy implications of doing this.  Gordon at 78 Fed.3d 787

9    said finally, the policy underlying statutes of limitations,

10   generally, that there may be, at some fairly, definitely

11   ascertainable period, an end to litigation.  This supports a

12   time requirement.  Courts should not have to resolve stale

13   claims premised on events that occurred a decade ago.  And

14   we're more than a decade ago.  We're 1.4 decades ago that

15   we're dealing with this issue.

16           If there is a reasonable requirement -- everybody

17   agrees to that.  We've given the Court two bases for finding

18   that this demand was unreasonable.  And if it's not this,

19   then what is it?  And if the Court doesn't articulate what

20   that reasonableness standard is, then I don't know how an

21   importer's going to get a surety bond going forward.  It just

22   can't be 100 years.

23           I'm going to quote the great Judge Pogue, the late,

24   great Judge Pogue.  And he would say oftentimes that just

25   can't be the law.  And that just can't be the law here,

**NON-CONFIDENTIAL**

 1   either, Your Honor.

 2           THE COURT:  Okay.

 3           MR. TELEP:  That's all I have.

 4           THE COURT:  Thank you, Mr. Telep.

 5           Ms. Farrell, one point I want to clarify with you

 6   quickly.  When we were having our dialogue on what's

 7   reasonable and what's not, I took the Government's position

 8   to be prejudice doesn't matter to the Government here because

 9   it just doesn't come into play.

10           MS. FARRELL:  Well, with respect to the surety, I

11   think when we're talking about prejudice, latches doesn't

12   apply to the sovereign.  So the prejudice that ties up with

13   latches is out.  The one thing that does exist that Your

14   Honor asked about, which was Restatement suretyship.  It's a

15   possibility that there could be prejudice.

16           THE COURT:  Well, that's with impairment they need

17   to show some type of prejudice.  That comes in the name of

18   it, impairment of suretyship.

19           MS. FARRELL:  Impairment of the suretyship,

20   exactly.

21           THE COURT:  Here, I'm referring to -- going back --

22   I want to be clear here -- to the demand timeliness

23   requirement.  Do you believe there is any type of prejudice

24   element that they must show with regard to any claim that

25   demand was not made in a timely fashion?

1          MS. FARRELL:  Your Honor, I think that they would

2    need to show some prejudice.  And the reason I say that is we

3    were timely vis a vis the surety.  If we adopted, as the

4    surety is suggesting -- look at U.S. v. Gordon.  Oh, the

5    statute of limitations period; we brought the action within

6    the statute of limitations period of the demand.

7          The question now rolls backwards.  Now the question

8    is about the importer.  And the fact that Congress used to

9    have a drop-dead deadline and then said, no, just send a

10   bill, and got rid of a drop-dead deadline; they knew how to

11   write a drop-dead deadline when they wanted to, and they

12   didn't.

13         See, that would have given certainty -- this is the

14   certainty that the surety industry would have, because you

15   would know, oh, you know what?  They have to pay.  It becomes

16   due and owing; no bill necessary, 15 days, 20 days, 180 days,

17   whatever congress wanted to do.  But they didn't do that.

18   Congress said, no, you must send a bill, and that's what the

19   surety signed up for.

20         And sureties sign up for long periods of time when

21   they're dealing with ADD and CBD, because it takes sometimes

22   an awfully long time for Customs -- excuse me, for Commerce

23   to wrangle through that.  It goes up to the CIT; they remand

24   it.  No, we disagree with that rate.  We disagree with that

25   rate.  It could be ten years, so this is not a shock.

1          No, what really is the bigger problem here is that

2    you got Aegis admitting, hi, we hand out our bond.  Our

3    name's on it.  Go ahead, Lincoln General, Avalon, and

4    Kingsway, do whatever you want with that, because we're out.

5    We have no risk here.  We have no risk.  No risk?  They could

6    have been on notice to know that their reinsurer was issuing

7    the kinds of bonds they didn't want, which were ADD bonds.

8          They were very clear they didn't want ADD risk.

9    Hey, you want to talk about the Federal Register notice?

10   Linyi put a Federal Register notice out and said, hi, we're

11   going to start importing garlic, subject to antidumping, in

12   the middle of your continuous bond period.  Hey, kill the

13   bond, because you only issued the continuous bond supposedly

14   because you didn't want any risk, particularly risk with ADD.

15         So not only can periods of time run very long when

16   ADD's involved, but one ought not to turn a blind eye, put on

17   blinders and let someone else take your bond with your

18   signature.  This is your bond, and throw it into the world,

19   and they can do whatever they want, which they did.  Avalon

20   did do whatever it wanted.

21         It issued bonds that were associated with

22   antidumping, even though Aegis says that they didn't want

23   that to happen.  You can turn a blind eye and then come and

24   expect, oh, you got paid your premium, but the Government's

25   not going to get paid.  Even though the Government is timely

1    vis a vis your contract, and there's no period of time; in

2    fact, it's been removed by Congress under 1505(b) with

3    respect to the importer.

4           And you know that the regulations and what you as

5    an industry expect are Customs will send a bill to the

6    importer first, and then you will make a demand on the surety

7    if the importer doesn't pay.

8           THE COURT:  In your understanding of the scheme

9    that must be gone through in order to properly decide this

10   case, is it necessary for the Court to opine on the meaning

11   of the statute at all, since Linyi is not a party to this

12   case?  Or should we just go direct to the contract and start

13   there?

14          MS. FARRELL:  I think you go directly to the

15   contract, which says pay on demand.  If you don't pay on

16   demand within six years, we can sue you.  You didn't pay on

17   demand within six years; we sued you.

18          THE COURT:  Okay.  Anything else you wish to add?

19          MR. TELEP:  Ver briefly, Your Honor.  Lincoln

20   General Insurance Company was not the entity that issued the

21   bonds; Avalon had the authority.  Lincoln General is kind of

22   aside the point for that one.

23          The second thing I would say is just operationally.

24   Typically, when ADD duties are sought by an importer during

25   the period where bonding was permitted for new shippers, they

NON-CONFIDENTIAL

1   had to get a single transaction bond; basically, the ▉

2   bonds.  Usually, the importer comes back to the entity who

3   issued -- or the surety who issued the continuous importation

4   bond, said, hey, I need more security.  I'm about to enter

5   goods that are coming in under the auspices of an antidumping

6   duty order.

7           Linyi didn't do that; they went to ▉

8   instead.  And if they'd come to us, Aegis would have

9   understood and would have known, hey, these are antidumping

10  duties, and you're not going to renew your bond.

11          So I think all of that, quite frankly, is a little

12  bit of hand waiving.  Because our impairment of suretyship

13  defense is really predicated on the actions of the

14  Government, not our actions.  This is not a question of

15  whether or not Aegis took the measure to protect its interest

16  that the Government would have liked it to versus getting an

17  indemnification agreement with Kingsway and with LGIC.

18  That's all, Your Honor.

19          THE COURT:  Okay.  Thank you all very much.  I

20  think it's been a very useful argument.  I appreciate the

21  clarifications that the parties made.  And I really think

22  that you have -- though it has taken a winding road of

23  discovery and oral argument for us to get where we are, I

24  honestly think that this case is the better for the seasoning

25  that took place in between when the case was filed and where

**NON-CONFIDENTIAL**

1   we are now, where I'm fully prepared to issue a decision

2   adjudicating this matter and sending you somewhere other than

3   me.

4          I would like, however, an answer to the factual

5   question that I posed, which is, how much money is owed?  And

6   what does that amount allegedly owed represent in terms of

7   principal versus interest?  And with regard to Aegis in

8   particular, what was the first date at which Aegis became

9   liable for the first dollar on its bond?  And what did that

10  first dollar represent, interest or principal?

11         So I'll turn first to you Mr. Telep.  How long do

12  you think you could -- and I think that's just a brief letter

13  you write to me and put on the record.  How long do you think

14  it will take for you to get with your accountants and come up

15  with that answer?

16         MR. TELEP:  My co-counsel, Mr. Ferguson's not here,

17  but if we could have, I'd say, 14 days.  I just want to get

18  the transcript and make sure I got all this right.  But 14

19  days will do.

20         THE COURT:  Okay.  That's the 29th of November,

21  which is a -- wait a minute.

22         MR. TELEP:  Wednesday, Judge.

23         THE COURT:  It's a Wednesday.  Sorry.  That's a

24  Wednesday.

25         So Ms. Farrell, I know you said you could get with

**NON-CONFIDENTIAL**

1   Customs, and they could come up with theirs.  I also want you

2   have the opportunity to respond to the math that's going to

3   be done by Aegis Insurance Company.  How long would you want

4   after the 29th of November to file a little brief response

5   letter with your own calculation and explanation?

6          MS. FARRELL:  Your Honor, I think seven days is

7   fair from there.

8          THE COURT:  That's perfect.  So they'll give

9   themselves time to eat turkey on Thanksgiving.

10          MS. FARRELL:  Actually, I ask one indulgence.  Is

11   that Wednesday -- what day is -- what number is that?

12          THE COURT:  So they're going to be doing the 29th

13   of November, which is the week after Thanksgiving.

14          MS. FARRELL:  Right.  And then there's 30.

15          THE COURT:  And so you would be due seven days

16   later.  It would end up being December the 6th.

17          MS. FARRELL:  I'm going to be in the middle of oral

18   arguments at the CASC Monday -- well, Tuesday.  Wednesday,

19   I'm preparing for next argument on Wednesday.

20          THE COURT:  Do you want another seven days?

21          MS. FARRELL:  That probably makes sense.

22          THE COURT:  So the 13th of December?

23          MS. FARRELL:  I think that -- yeah, that makes

24   sense.

25          THE COURT:  Wednesday the 13th.  Okay.  That's

1  fair.

2          MS. FARRELL:  I'm sorry.  I thought I could do it

3  faster, but I forgot.

4          THE COURT:  And again, I'm not asking for any dupe

5  argumentation.  I do see this as just a factual question of

6  how much is currently owed.  What does the amount that is

7  currently owed represent in terms of principal versus

8  interest?  And then at what time did Aegis owe the first

9  dollar -- become liable for the first dollar on its own bond,

10  as opposed to the ██████ bond?  And what did that first

11  dollar represent, principal or interest?  Those are the two

12  questions that I have.

13          What is the status of the amount owed today?  And

14  what was the status of it on the first day that Aegis

15  allegedly became liable on its bond, when the first dollar

16  crossed over to its ledger, as it were?  Does that make

17  sense?

18          MR. TELEP:  Yes, Your Honor.

19          MS. FARRELL:  Yes, Your Honor.

20          THE COURT:  Okay.  Well, I don't have anything else

21  for you all.  I anxiously await your computations, since

22  you're much better at math than I am.  And then the next

23  thing you will hear from me will be an opinion deciding this

24  matter.  So thank you guys very much.  And we stand

25  adjourned.

1          CLERK:  Court is adjourned.

2      (Whereupon these proceedings were concluded at 4:16 PM)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T I O N

2

3    I, Nicole Ferguson, certify that the foregoing transcript is

4    a true and accurate record of the proceedings.

5

6

7

8    _____

9    Nicole Ferguson

10

11   eScribers

12   7227 North 16th Street, Suite #207

13   Phoenix, AZ 85020

14

15   Date:  November 26, 2023

16

17

18

19

20

21

22

23

24

25